# Ex. 1

JEFFREY E. TSAI (SBN 226081)
*jeff.tsai@us.dlapiper.com*
COLIN MCGRATH (SBN 286882)
*colin.mcgrath@us.dlapiper.com*
DLA PIPER LLP (US)
2000 Avenue of the Stars, Suite 400 North Tower
Los Angeles, California 90067-4735
Tel: 310.595.3000 | Fax: 310.595.3300

SAM H. BODLE (SBN 338507)
*sam.bodle@us.dlapiper.com*
DLA PIPER LLP (US)
555 Mission Street, Suite 2400
San Francisco, California 94105-2933
Tel: 415.836.2500 | Fax: 415.836.2501
*Attorneys for Plaintiff*
*M&N LUXURY AV, LLC*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

M&N LUXURY AV, LLC, a California limited liability company,

Plaintiff,

v.

BANG & OLUFSEN AMERICA INC. a Delaware Corporation; BANG & OLUFSEN A/S, a Danish Company; B&O PLAY A/S, a Danish Company; BANG & OLUFSEN OPERATIONS A/S, a Danish Company; and DOES 1-25,

Defendants.

BANG & OLUFSEN AMERICA INC. a Delaware Corporation; BANG & OLUFSEN A/S, a Danish Company; B&O PLAY A/S, a Danish Company; BANG & OLUFSEN OPERATIONS A/S, a Danish Company,

Counterclaim-Plaintiffs,

v.

M&N LUXURY AV, LLC, a California limited liability company,

Counterclaim-Defendant.

Case No. 2:24-cv-02230-DSF-KES

**PLAINTIFF'S EXPERT WITNESS DISCLOSURE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(A)(2)**

Judge: Hon. Dale S. Fischer
Trial Date: November 17, 2026

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(A) and (B) and the Scheduling Order (ECF No. 131), Plaintiff M&N Luxury AV, LLC ("Plaintiff") hereby discloses the identify of expert witnesses who may be used at trial to present evidence pursuant to Federal Rules of Evidence 702, 703, or 705. Plaintiff reserves the right under Federal Rule of Civil Procedure 26(e) to supplement or amend this disclosure.

**DISCLOSURE OF EXPERT WITNESS**

1. Howard B. Grobstein
   Grobstein Teeple LLP
   6300 Canoga Avenue, Suite 1500W
   Woodland Hills, CA 91367

Mr. Grobstein is expected to provide testimony regarding the amount and computation of Plaintiff's economic damages in connection with its claims against Defendants Bang & Olufsen America, Inc., Bang & Olufsen A/S, a Danish Company, B&O Play A/S, a Danish Company, and Bang & Olufsen Operations A/S (collectively, "Defendants") in the above-captioned case. Additionally, Plaintiff also expects Mr. Grobstein to provide expert testimony rebutting the testimony of Defendants' designated expert(s) (if any).

Attached as **Exhibit A** is a true and correct copy of Mr. Grobstein's expert report, including a complete statement of all opinions Mr. Grobstein will express and the basis and reasons for them; the facts or data considered by Mr. Grobstein in forming his opinions; any exhibits that will be used to summarize or support his opinions; and Mr. Grobstein's qualifications, including a list of all publications authored in the previous ten years and a list of all other cases in which, during the previous four years, Mr. Grobstein testified as an expert at trial or by deposition. Mr. Grobstein is being compensated at a rate of $780.00 per hour for his study and testimony in this case.

Mr. Grobstein reserves the right to supplement his report and/or provide a rebuttal report based on additional information that has not yet been made available, including documents, exhibits, figures, and data that may be presented in Defendants' expert report. Mr. Grobstein may also testify to additional opinions in rebuttal to Defendants' expert's(s') opinions.

Plaintiff reserves the right to present testimony concerning any matter set forth herein,

within Mr. Grobstein's report, and in any supplemental report produced in this matter. In addition to Mr. Grobstein, Plaintiff reserves the right to call all expert witnesses designated, disclosed, or called by Defendants, and any rebuttal expert upon proper notice to all parties.

Dated: May 1, 2026

Respectfully submitted,

DLA PIPER LLP (US)

By: /s/ *Jeffrey Tsai*
JEFFREY TSAI
COLIN MCGRATH
SAM BODLE

*Attorneys for Plaintiff*
*M&N LUXURY AV, LLC*

# EXHIBIT A

Confidential - Attorneys' Eyes Only

# Expert Report of Howard B. Grobstein, CPA|CFF, CFE

In Re: M&N LUXURY AV, LLC.,
a California limited liability company, Plaintiff

v.

BANG & OLUFSEN AMERICA INC., a Delaware corporation; BANG & OLUFSEN A/S, a Danish company; B&O PLAY A/S, a Danish company; BANG & OLUFSEN OPERATIONS A/S, a Danish company, Defendants

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CASE NO.: 2:24-cv-02230-DSF-KES

Howard B Grobstein

Expert Report of Howard B. Grobstein, CPA|CFF, CFE
May 1, 2026

**EXHIBITS**

**EXHIBIT 1:** Licensed Dealer Agreement

**EXHIBIT 2:** Addendum to the Licensed Dealer Agreement

**EXHIBIT 3:** Bang & Olufsen Licensed Dealer Agreement (Retail US)

**EXHIBIT 4:** Schedule 27 to B&O Framework Agreement Special Terms

**EXHIBIT 5:** Master Retailer Agreement

**EXHIBIT 6:** Framework Agreement

**EXHIBIT 7**: Calculation of Damage

**EXHBIIT 8:** Curriculum Vitae of Howard B. Grobstein

## I. ENGAGEMENT DESCRIPTION

I, Howard B. Grobstein, through my accounting firm Grobstein Teeple LLP (herein collectively referred to as "GT", "We", "Our"), was retained by DLA Piper LLP ("DLA") on behalf of its client M&N Luxury AV, LLC ("Client" and/or "M&N") to provide an expert opinion regarding damage in connection with its claims against Bank & Olufsen America, Inc.'s and its affiliates' (herein collectively referred to as "B&O" or "Defendants") in the proceedings commenced under M&N Luxury AV, LLC v. Bang & Olufsen America Inc. et al, Case No. 2:24-cv-02230-DSF-KES. M&N and B&O are herein collectively referred to as the "Parties".

## II. LIMITING CONDITIONS

GT prepared this report and related exhibits solely for the purposes of the engagement described above and, thus, this report should not be relied upon for any other purpose. We have not performed an audit, review, or examination, as defined by the American Institute of Certified Public Accountants, of any of the information relied upon in this report. This report may not be used for any other purpose without the express written consent of Howard B. Grobstein or an authorized designee of Grobstein Teeple LLP. Should additional information be presented, we retain the right to amend this report and exhibits.

## III. KEY DEFINED TERMS

A. Complaint – Plaintiff's Second Amended Federal Complaint filed March 18, 2025.
B. Answer – B&O's Answer to Plaintiff's Second Amended Complaint, Affirmative Defenses, and Amended Counterclaims filed May 30, 2025.
C. M&N or Plaintiff - M&N Luxury AV LLC.
D. B&O or Defendants - Bang & Olufsen America Inc., Bang & Olufsen A/S, B&O Play A/S, and Bang & Olufsen Operations A/S.
E. Agreement – Licensed Dealer Agreement dated January 26, 2017 by and between Bang & Olufsen America, Inc. and M&N Luxury AV LLC.
F. Addendum – Addendum to Licensed Dealer Agreement dated April 5, 2017 by and between Bang & Olufsen America, Inc. and M&N Luxury AV LLC.
G. Retailer Agreement – Master Retailer Agreement dated November 14, 2017 by and between Bang & Olufsen America, Inc. and M&N Luxury AV LLC .
H. Framework Agreement – Bang & Olufsen Framework Agreement dated February 28, 2020 between Bang & Olufsen America Inc., Bang & Olufsen A/S, B&O Play A/S, Bang & Olufsen Operations A/S, and M&N Luxury AV LLC, including any and all schedules, and as validly amended from time to time.
I. Pasadena Store – 650 E. Colorado Blvd., Pasadena, CA 91101.
J. Costa Mesa Store – 3323-B, Hyland Avenue, Costa Mesa, CA 92626.
K. La Jolla Store –7851 Girard Avenue, La Jolla, CA 92037.
L. West Hollywood Store –106 N. Robertson Blvd., West Hollywood, CA 90048, original location was 479 N. Rodeo Drive, Beverly Hills, CA 90210.
M. San Francisco Store – 25 Division Street, San Francisco, CA 94103.

## IV. SUMMARY OF FINDINGS

Based upon the documents received and reviewed by GT, and the analyses performed by GT and contained herein, GT determined the following:

B&O's actions resulted in M&N incurring economic damage in the amount of $13,167,000 comprised of:

| | Damage Category | Amount |
|---|---|---|
| 1. | Lost Profits Plus Interest, 1/1/23 - 12/31/24 | $3,790,000 |
| 2. | Lost Business Value, 12/31/24 | $7,972,000 |
| 3. | Lost Store Expansion Opportunity | $1,405,000 |
| | **Total Economic Damage** | **$13,167,000** |

## V. CASE BACKGROUND

Based on the Second Amended Complaint filed by M&N Luxury, LLC ("M&N" or "Plaintiff"), M&N was founded on January 17, 2017, for the purpose of selling products produced by Bang & Olufsen America Inc. and its affiliates ("B&O" or "Defendants"). On or about January 26, 2017, M&N and B&O entered into the Licensed Dealer Agreement ("Agreement"). Attached hereto as **Exhibit 1** is the Agreement. Soon thereafter on or about April 5, 2017, M&N and B&O entered into the Addendum to the Licensed Dealer Agreement ("Addendum"). Attached hereto as **Exhibit 2** is the Addendum. Under the terms of the Agreement, M&N was authorized to sell B&O's products ("Products") at the store located at 650 E. Colorado Blvd., Pasadena, CA 91101 ("Pasadena Store"). The Addendum was executed to make M&N the exclusive dealer for the sale of Products in Los Angeles, Orange and San Diego Counties ("Territory") and set forth the terms of this engagement.

The Addendum granted M&N,

> "…the sole and exclusive right to open Bang & Olufsen Retail Stores and/or Shop-in-Shop Stores anywhere in the Territory; provided, however, that in no event shall [M&N] have the right to license any other Person to sell the Products; provided, further, that the Bang & Olufsen Retail Store located at Mir Audio, Los Angeles California that is owned and operated by an independently owned Bang & Olufsen dealer shall be permitted to continue to operate until the earlier to occur of the date that the respective licensed dealer agreement expires or is otherwise terminated."

The Addendum included a list containing dates and the sequence by which M&N would open other B&O stores. It also authorized M&N to open other B&O stores within the Territory. Further, the Addendum also stated that B&O shall not open or permit any person to open a B&O store within the Territory without M&N's consent.

On or about June 1, 2017, M&N and B&O entered into a Bang & Olufsen Licensed Dealer Agreement (Retail US) ("LDA") under which M&N opened the Costa Mesa Store. Attached hereto as **Exhibit 3** is the LDA. By November 2022, M&N had opened five stores; West Hollywood, Pasadena, Costa Mesa, La Jolla, and San Francisco.

On or about November 14, 2017, M&N and B&O entered into a Master Retailer Agreement ("MRA") which superseded the Addendum. Attached hereto as **Exhibit 5** is the MRA. On or about March 3, 2020, the Parties entered into a Framework Agreement ("FA") which superseded the MRA and LDA. Attached

hereto as **Exhibit 6** is the FA. The FA set forth a series of stringent and burdensome requirements for M&N's continued operation of B&O's retail stores. In addition to the stringent requirements, the FA also replaced M&N's exclusive territories of Los Angeles, Orange, and San Diego Counties with a right of first offer. M&N alleges the agreements were presented on a "take it or leave it" basis. All agreements presented by B&O to M&N were drafted by B&O. M&N was not allowed to provide input or negotiate terms.

In or about August 2022, M&N and B&O agreed that M&N would open two additional stores in Northern California in the near future. The addition of two stores in Northern California would have provided M&N with a customer base covering the State of California. Attached hereto as **Exhibit 4** is Schedule 27 to B&O Framework Agreement Special Terms.

In or about February 2023, B&O asked that M&N purchase over $151,000 of B&O products that were not needed by M&N.

In or about November 2023, M&N raised concerns to B&O related to custom technology integrators being allowed to sell B&O products in M&N's Territory. These concerns were not received favorably by B&O. Thereafter, M&N asked to be bought out by B&O or for B&O to cooperate in selling M&N's stores to third parties.

Shortly thereafter, on February 14, 2024, B&O served M&N with a purported notice of termination. Then on May 8, 2024, B&O served a second purported notice of termination upon M&N.

M&N commenced this action by filing its complaint in this case on March 5, 2024, the First Amended Complaint on October 10, 2024, and the Second Amended Complaint on March 18, 2025 (herein collectively referred to as the "Complaint").

## VI. OVERALL APPROACH

GT was provided with financial reports for each of the store locations. GT was also provided with relevant agreements and communications between the Parties. GT used the historical financial information, relevant agreements, communications, and industry research, along with insight from M&N's management to prepare the economic damage calculations contained herein.

## VII. STATEMENT OF FINDINGS

### A. GT Calculated Three Categories of Damage

#### 1. Category No. 1: Lost Profits Plus Interest from January 1, 2023 Through December 31, 2024[1]

<u>Theory</u>

The first step in computing economic damage suffered by M&N involves calculating lost profits resulting from B&O's conduct for the period M&N remained operational (January 1, 2023 – December 31, 2024). Lost profits are expressed by the following formula:[2]

*LP* = *BFP* – *AP*, where:

- *LP* = lost profits.
- *BFP* = "but-for" operating profit (or profits in the absence of B&O's harmful actions).
- *AP* = actual operating profit (or profit taking into consideration the harmful actions of B&O).

To calculate *BFP*, GT first developed an estimate of M&N's operating profit in the "but-for" condition (that is, assuming B&O's harmful actions had not occurred) based on an analysis of M&N's historical performance and economic trends in the industry, discussions with M&N's management regarding likely sales growth for each of M&N's store locations absent the actions of B&O.

*AP* is taken from the actual profits (losses) of M&N for the period in question.

The subtraction of *AP* from *BFP* over the damage period yields lost profits.

Simple interest is then added to the computation of lost profits to arrive at total economic damage suffered by M&N for the period in question.

<u>Calculation</u>

**Lost profits plus interest: 1/1/23 – 12/31/24: $3,790,000 (see Schedule B and supporting schedules):**

GT computed LP as the difference between BFP (i.e., operating profit assuming B&O's actionable conduct did not occur) and AP. This calculation is summarized in *Schedule B.*

[1] M&N's sales and profits declined during 2023 relative to 2022. M&N management attributed this to B&O allowing custom technology integrators to compete against M&N in its territories. Thus, loss of profits are measured for both of the years 2023 and 2024.

[2] See Thomsen, William W. "Valuation in Lost Profits Damages Matters," in Shannon Pratt's Lawyer's Business Valuation Handbook 3rd ed., ed. Shannon P. Pratt and Alina V. Niculita (Chicago: ABA Book Publishing, 2024), chapter 32.

***BFP calculation (Exhibit B-1):***

BFP is computed by adjusting store revenues and gross profits to reflect levels that would have been realized had B&O's harmful acts not occurred. These adjustments are based on assumptions provided by M&N's management regarding B&O's established expectations for store performance, as well as industry knowledge, and historical financial performance of M&N's stores.

Additionally, BFP expenses were reduced by eliminating legal costs associated with the subject litigation. Please see *Exhibit B-1* for detailed calculations.

***AP calculation (Exhibit B-2):***

AP is based on M&N's historical financial performance. See *Schedule B-2* for this information.

***LP calculation (Exhibit B):***

As shown in *Schedule B*, subtracting AP from BFP yields a total LP amount of $3,462,017. Simple interest at an assumed rate of 10% is added to yield total lost profits, plus interest, of $3,790,110, rounded to $3,790,000. See *Schedule B* for this calculation.

**2. Category No. 2: Loss of Business Value as of Date of Valuation**

<u>Theory</u>

To account for economic damage suffered by M&N subsequent to the date of valuation, GT computed lost business value.[3] This loss is expressed by the following formula: [4]

*LBV* = *BFV* – *AV*, where:

- *LBV* = lost business value.
- *BFV* = "but-for" business fair market value (i.e., M&N's value in the absence of B&O's harmful actions).
- *AV* = actual fair market value (i.e., M&N's value taking into consideration the harmful actions of B&O – in this case, zero).

Fair Market Value is the key element in calculating LBV.

***Definition of Fair Market Value:***

IRS Revenue Ruling 59-60 defines Fair Market Value as:

> *"The price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not*

[3] For the purpose of this report, business value is defined as the fair market value of a 100% equity interest in M&N as of the date of valuation.

[4] See Thomsen, William W. "Valuation in Lost Profits Damages Matters," in Shannon Pratt's Lawyer's Business Valuation Handbook 3rd ed., ed. Shannon P. Pratt and Alina V. Niculita (Chicago: ABA Book Publishing, 2024), chapter 32.

*under any compulsion to sell, both parties having reasonable knowledge of relevant facts."*

The valuation analysis discussed above took into consideration Revenue Ruling 59-60 which provides that the following factors should be considered in valuing a closely-held or a scarcely-traded publicly held company:

a) The nature of the business and the history of the enterprise from its inception.
b) The economic outlook in general and the condition and outlook of the specific industry in particular.
c) The book value of the stock and the financial condition of the business.
d) The earning capacity of the business.
e) The business' dividend-paying capacity.
f) Whether or not the enterprise has goodwill or other intangible value.
g) Sales of the stock and the size of the block of stock to be valued.
h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

Each of the above factors were considered where relevant. In the subject analysis, as the objective was to determine economic damage, discounts for lack of control or lack of marketability are not applicable.

***Approaches to Value:***

Three broad approaches may be utilized to determine the value of any asset:

a) Market Approach.
b) Income Approach.
c) Asset Approach.

More than one approach can be used to develop multiple perspectives that add insight and corroboration as to the value conclusion. The weighting given to different approaches is context specific. The weighting for this valuation is detailed below.

***a) Market Approach***

The Market Approach relies on information in and about the marketplace by analyzing the price at which investors are willing to pay for companies with similar risk and growth prospects to that of the subject company. There are two general methods of valuing a company using the Market Approach:

(i) the Guideline Public Company Method.
(ii) the Guideline Transactions Method.

These valuation methods are discussed below.

**(i)** **Guideline Public Company Method.** The Guideline Public Company Method looks to the public market for evidence of the prices investors are willing to pay for non-controlling investments in similarly situated "guideline" publicly-traded companies. The five general steps performed in this method are:

- Research and selection of publicly-traded companies considered similar to the subject company.
- Analysis of the characteristics of the publicly-traded companies, which may include growth, profitability, leverage, stability, operations, etc.
- Calculation of the publicly-traded companies' pricing multiples based upon trading prices and financial fundamentals (e.g., Market Value of Invested Capital/Sales; Market Value of Invested Capital / Earnings, etc.).
- Selection of appropriate market-derived pricing multiples to be applied to the subject company.
- Calculation of value for the subject company based upon the selected market-derived pricing multiples.

**(ii)** **Guideline Transactions Method.** The Guideline Transactions Method looks to the public market for evidence of the prices investors are willing to pay for the acquisition of a controlling interest in similarly situated acquired companies. The five general steps performed in this method are:

- Research and selection of public and private acquisitions where the acquired company is similar to the subject company.
- Analysis of the characteristics of the acquired company (which may include growth, profitability, leverage, stability, operations, etc.), if the information is available for public review, compared to the subject company.
- Calculation of the acquired company's pricing multiples based upon trading prices and financial fundamentals.
- Selection of appropriate market-derived pricing multiples to be applied to the subject company.
- Calculation of value for the subject company based upon the selected market derived pricing multiples.

***b. Income Approach***

The Income Approach estimates business value by projecting the subject company's future income or cash flow based on company, industry, market, and wider economic factors, and discounting those amounts using a market-derived rate of return that reflects the company's risk profile. Though numerous valuation methods fall under the Income Approach, the two methods commonly used are:

(i) the Capitalization of Cash Flow Method.
(ii) the Discounted Cash Flow Method.

These valuation methods are discussed below.

**(i)** **Capitalization of Cash Flow Method.** Under the Capitalization of Cash Flow Method, the current economic income is projected to grow at a constant rate and is then discounted to

present value using a market derived rate of return specific to the subject company. The three general steps performed in this method include calculation of the subject company's:

- Current sustainable cash flow.
- Required rate of return based on historical market derived data.
- Perpetual long-term growth rate.

The subject company's value is then calculated using the variables listed above.

**(ii)** **Discounted Cash Flow Method.** Rather than calculating a single period capitalization rate as does the Capitalization of Cash Flow, the Discounted Cash Flow Method provides added flexibility by requiring the forecast of annual economic income for a period (usually five years) and then calculates a single period capitalization rate from which the terminal value is derived. All monies are discounted to the net present value using a market derived required rate of return for the subject company. The four general steps performed in this method include:

- Projecting annual economic earnings for a discrete period.
- Calculating a terminal value based on a single period capitalization rate (as discussed above) or multiple of earnings at the end of the discrete projection period.
- Calculating the present value of the projected annual economic earnings and the terminal value.
- Calculating value by adding the present value of projected annual economic earnings to the present value of the terminal value.

***c. Asset Approach***

The Asset Approach relies on the analysis of the balance sheet to determine value for the subject company. The most common application of this approach is the Adjusted Balance Sheet Method, described below.

**Adjusted Balance Sheet Method.** Under the Asset Accumulation or Adjusted Balance Sheet Method, all of the subject company's individual assets and liabilities are analyzed and valued separately. Specifically, this method involves separate identification and individual analysis, as of the date of valuation, of the following elements of the subject company:

- Financial asset account categories (e.g., cash, accounts receivable, inventory, etc.).
- Tangible personal property (e.g., machinery and equipment, furniture, and fixtures, etc.).
- Real estate.
- Intangible real property (e.g., leasehold interests, development rights, etc.).
- Intangible personal property (e.g., patents, trademarks, copyrights, etc.).
- Liability account categories.
- Contingent liabilities (e.g., pending disputes, litigation, and environmental concerns, etc.).
- Special obligations (e.g., unfunded pensions, earned vacations, etc.).

The value of the subject company is determined by subtracting the market value of liabilities from the market value of assets, which includes tangible and intangible assets.[5]

All of the valuation methods referenced above were considered in determining the fair market value of M&N. The valuation methods that were ultimately considered appropriate to utilize were the Discounted Cash Flow and Guideline Transactions methods. The Capitalization of Cash Flow method was not utilized, as the projected growth rate of M&N varies by year. The Guideline Public Company method was not used due to lack of public companies sufficiently similar to M&N in terms of the nature of their operations, size, geography, and diversification. The Adjusted Balance Sheet method was not considered relevant in valuing M&N in the "but for" scenario as it does not consider the going concern value of M&N. It was, however, used to determine the actual value of M&N when computing loss of business value.

Calculation

**Lost Business Value, 12/31/24: $7,972,000 (See Exhibit C and supporting schedules):**

As discussed above, GT computed lost business value to account for economic damage suffered by M&N subsequent to the date of valuation. This loss is expressed by the following formula:

*LBV* = *BFV* – *AV*, where:

- *LBV* = lost business value.
- *BFV* = "but-for" business fair market value (i.e., M&N's value in the absence of B&O's harmful actions).
- *AV* = actual fair market value (i.e., M&N's value taking into consideration the harmful actions of B&O – in this case, zero).

***Value of M&N (BFV Scenario) - DCF Method (Exhibit C-2):***

*Exhibit C-2* computes the fair market value of M&N in the BFV condition as of December 31, 2024 (the last date of the period M&N remained operational). Using the Discounted Cash Flow Method of the Income Approach, the calculation is based on historical financial performance and B&O's established expectations for store performance. Projected cash flow on an after-tax basis is discounted to present value using a risk-adjusted discount rate computed in *Exhibit C-3*.

As shown in *Exhibit C-2*, the indicated fair market value of M&N utilizing this method equals $8,458,085 as of December 31, 2024. *Exhibit C-2* provides detailed assumptions and computations supporting this calculation.

***Valuation of M&N (BFV Scenario) – Market Approach (Exhibit C-4):***

*Exhibit C-4* presents the calculation of the fair market value of M&N utilizing the Guideline Transactions Method and is based on adjusted EBITDA for the year ended December 31, 2024, as calculated in *Exhibit B-1,* and multiples derived from data presented in *Exhibit C-5*.

[5] See American Society of Appraisers *ASA Business Valuation Standards*, BVS-III Asset-Based Approach to Business Valuation, II.A.

As shown in *Exhibit C-4*, the aggregate equity value of M&N under this method is computed as $8,000,000 as of December 31, 2024.

***Concluded Value of M&N (BFV Scenario) (Exhibit C-1):***

*Exhibit C-1* presents the conclusion of the BFV based on the above calculations. The Discounted Cash Flow method is given greater weight, as it considers assumptions specific to M&N as outlined in *Exhibit C-1.* The Guideline Transactions method is considered less relevant given the relatively limited comparability of the identified transactions.

As shown in *Exhibit C-1*, the fair market value of M&N in the BFV condition equals $8,270,000 as of December 31, 2024. See *Schedule C* for detailed assumptions and calculations supporting this value.

***Value of M&N (AV Scenario) (Exhibit C-6):***

*Exhibit C-6* computes the AV of M&N as of December 31, 2024, under the Asset Approach. This is computed by adjusting M&N's balance sheet to estimated realizable fair market values (for example, adjusting inventory to the amount actually realizable by M&N). As shown on *Exhibit C-6*, this value equaled $297,776 as of December 31, 2024.

***LBV (Exhibit C):***

*Exhibit C* computes the LBV as the difference between the BFV and AV values. As shown in *Exhibit C*, this amount equals $7,972,000.

**3. Category No. 3: Valuation of Lost Business Opportunity**

<u>Theory</u>

M&N was also damaged by the loss of business opportunity to open two additional stores as agreed by B&O. The value of this lost business opportunity for M&N was determined using the discounted cash flow approach and based on historical financial information provided by M&N's management.

<u>Calculation</u>

**Lost Store Expansion Opportunity: $1,405,000 (See Exhibit D and supporting schedules):**

***Value of Lost Store Expansion Opportunities as of December 31, 2023 (Exhibit D-1):***

*Exhibit D-1* values the lost opportunity of opening two additional stores in Northern California using the Discounted Cash Flow Method. Projected cash flow on an after-tax basis is discounted to present value using a risk-adjusted discount rate computed in *Exhibit D-1*. The analysis assumes the Northern California stores would have opened by 2025.

As shown in *Exhibit C-2*, the value of this opportunity utilizing this method equals $1,277,598 as of December 31, 2023. See this exhibit for detailed assumptions and computations supporting this calculation.

***Value of Lost Store Opportunity as of December 31, 2024 (Exhibit D):***

*Exhibit D* values M&N's lost store expansion opportunity as of December 31, 2024, by adding prejudgment interest at 10% to the number computed in *Exhibit D-1*. As shown on *Exhibit D*, the value of the lost store expansion opportunity as of December 31, 2024, is computed at $1,405,000.

Attached hereto as **Exhibit 7** are the damage calculations.

**B. Summary Of Damage (Exhibit 7, Exhibit A)**

*Exhibit A* summarizes the economic damage suffered by M&N as of December 31, 2024. As shown in the Schedule, this damage total $13,167,000. Damage consists of the three elements summarized below:

| | |
|---|---|
| 1. Lost Profits Plus Interest, 1/1/23 - 12/31/24 | $3,790,000 |
| 2. Lost Business Value, 12/31/24 | $7,972,000 |
| 3. Lost Store Expansion Opportunity | $1,405,000 |
| **Total Economic Damage** | **$13,167,000** |

## VIII. PROFESSIONAL QUALIFICATIONS

Howard B. Grobstein, CPA/CFF, CFE

Howard Grobstein is a partner with Grobstein Teeple LLP, a consulting and accounting firm located in Woodland Hills, California. Mr. Grobstein is a certified public accountant licensed in the State of California, and a certified fraud examiner certified by the Association of Certified Fraud Examiners. Mr. Grobstein is a member of the panel of Trustees in the Central District of California. He has been involved in small and large forensic examination and fraud related cases, working on behalf of governmental agencies, corporations, individuals, receivers, special masters, bankruptcy trustees, and law firms. He has testified at depositions, arbitrations and at trials both in federal and state court.

Mr. Grobstein co-authored a chapter in the *Fraud Casebook: Lessons from the Bad Side of Business* and authored a chapter in the book *Reviving the Financially Distressed Business.*

Attached as **Exhibit 8** is the *curriculum vitae* of Howard B. Grobstein.

## IX. DATA OR INFORMATION RELIED UPON

In preparation of this expert report, we relied upon the following data or information:

(a) Plaintiff's Second Amended Federal Complaint filed March 18, 2025
(b) B&O's Answer to Plaintiff's Second Amended Complaint, Affirmative Defenses, and Amended Counterclaims filed May 30, 2025
(c) Agreement – Licensed Dealer Agreement dated January 26, 2017 by and between Bang & Olufsen America, Inc. and M&N Luxury AV LLC

(d) Addendum – Addendum to Licensed Dealer Agreement dated April 5, 2017 by and between Bang & Olufsen America, Inc. and M&N Luxury AV LLC
(e) Retailer Agreement – Master Retailer Agreement dated November 14, 2017 by and between Bang & Olufsen America, Inc. and M&N Luxury AV LLC
(f) Framework Agreement – Bang & Olufsen Framework Agreement dated February 28, 2020 between Bang & Olufsen America Inc., Bang & Olufsen A/S, B&O Play A/S, Bang & Olufsen Operations A/S, and M&N Luxury AV LLC
(g) MNAV 2018 P&L by Store for Feb2026 Reporting
(h) MNAV 2019 P&L by Store for Feb2026 Reporting
(i) MNAV 2020 P&L by Store for Feb2026 Reporting
(j) MNAV 2021 P&L by Store for Feb2026 Reporting
(k) MNAV 2022 P&L by Store for Feb2026 Reporting
(l) MNAV 2023 P&L by Store for Feb2026 Reporting
(m) BOSoCal_MarketingHistory_WEB2_LowRes.pdf

## X. TESTIMONY EXPERIENCE

See **Exhibit 8**.

## XI. COMPENSATION

Grobstein Teeple LLP is being compensated for fees and costs based on its normal hourly rates. Mr. Grobstein's hourly fee for providing deposition or trial testimony is $780. His hourly fee for consulting also is $780. Mr. Grobstein does not have a set daily fee for providing deposition or trial testimony or consulting.

# SEE SUPPORTING MATERIALS ZIP FOR MATERIALS USED TO PREPARE REPORT

*Confidential - Attorneys' Eyes Only*

# EXHIBIT 1

# BANG & OLUFSEN LICENSED DEALER AGREEMENT (RETAIL US)

BANG & OLUFSEN

**CONTENTS**


| | | Page |
|---|---|---|
| 1 | DEFINITIONS AND INTERPRETATION | 4 |
| 2 | PURPOSE AND BACKGROUND | 7 |
| 3 | APPOINTMENT | 8 |
| 4 | DEALER'S PURCHASE AND RESALE OF THE PRODUCTS | 8 |
| 5 | MINIMUM AGGREGATE PURCHASE OBLIGATION | 9 |
| 6 | STORES | 9 |
| 7 | CUSTOMER SERVICE AND GUARANTEE | 10 |
| 8 | DEALER'S PERSONNEL | 11 |
| 9 | TRAINING | 11 |
| 10 | MARKETING AND PROMOTION | 11 |
| 11 | POS SYSTEM AND SUBMISSION OF SHOP DATA | 12 |
| 12 | ASSISTANCE AND SERVICES PROVIDED TO THE DEALER | 12 |
| 13 | CUSTOMER SATISFACTION | 12 |
| 14 | INTELLECTUAL PROPERTY RIGHTS | 12 |
| 15 | TERM AND TERMINATION | 13 |
| 16 | CONDITIONS FOLLOWING TERMINATION | 15 |
| 17 | CONFIDENTIALITY OBLIGATION | 16 |
| 18 | OTHER PROVISIONS | 17 |
| 19 | GOVERNING LAW AND DISPUTES | 21 |

**SCHEDULES (AVAILABLE ELECTRONICALLY)**

| | |
|---|---|
| Schedule 3.1: | Stores |
| Schedule 4.1: | Displayed Products |
| Schedule 4.3: | Bang & Olufsen retail ordering system (ROS) |
| Schedule 4.5(a): | E-commerce guideline (Bang & Olufsen Products) |
| Schedule 4.5(c): | Corporate Visual Identity Manual |
| Schedule 4.6.1: | Commercial Terms |
| Schedule 6.1: | Shop Concept |
| Schedule 6.2(a): | Bang & Olufsen Store Elements |
| Schedule 7.1: | Operation Manual |
| Schedule 7.2: | Bang & Olufsen Guarantee |
| Schedule 11.1: | Shop data requirements |

Confidential - Attorneys' Eyes Only

This

BANG & OLUFSEN LICENSED DEALER AGREEMENT

was concluded on January 26, 2017, between

Bang & Olufsen America, Inc.
~~4751 Lake Cook Road~~ 200 Tri State International Suite 525
~~Deerfield, Illinois 60015~~ Lincolnshire IL 60069 DJ
("BOA")

and

M&N Luxury AV LLC
*[Dealer Legal name/entity]*

5741 Norwich Ave
VAN Nuys, CA
91411
*[Dealer Address, which will be used for all future correspondence with Dealer]*
(the "Dealer")

(individually the "Party" and collectively the "Parties")

**1 DEFINITIONS AND INTERPRETATION**

1.1 In the Agreement, the following words and expressions have the meanings stated below, unless the context requires otherwise.

| | |
|---|---|
| Agreement | this agreement with schedules. |
| Bang & Olufsen | Bang & Olufsen a/s, CVR no. 41257911, Peter Bangs Vej 15, DK-7600 Struer, Denmark. |
| Bang & Olufsen Store Elements | the mandatory store elements required to sell Bang & Olufsen Products as set out in clause 6.2(a). |
| Bang & Olufsen Products | the range of audio and video products sold under the Bang & Olufsen brand from time to time. |

| | |
|---|---|
| B&O PLAY | B&O PLAY a/s, CVR no. 33859643, Gl. Lundtoftevej 1B, DK-2800 Kgs Lyngby, Denmark. |
| B&O PLAY Products | the range of audio and video products sold under the B&O PLAY brand from time to time. |
| B1 Stores | stand-alone retail stores dedicated to the sale of the Products which are equipped, fitted up and furnished in accordance with Bang & Olufsen's Shop Concept. |
| Commercial Terms | the commercial terms set out in clause 4.6.1. |
| Effective Date | February 1, 2017 |
| Financial Year | a period of time commencing June 1 and ending May 31. |
| Force Majeure | any event that either Party has not reasonably been able to predict, control, avoid or remedy, including – depending on the circumstances – defects or breakdowns of telecommunications networks or lines, server or computer breakdowns (e.g. due to virus or hacker attacks), disruptions of electricity supply, public authority prohibition or enforcement notices, strikes and lockouts, acts of terrorism, wars, civil wars, riots, natural disasters, nuclear accidents, epidemics, pandemic diseases, fires, floods, storms, sabotage, criminal damage and similar events. |
| Goodwill | all goodwill, reputation, value and commercial advantage in connection with the Intellectual Property Rights and the Products. |
| Intellectual Property Rights | any intellectual property rights, including patents, utility models, trademarks, designs, copyrights or rights in databases owned or licensed by Bang & Olufsen in all countries as well as any applications or renewals concerning such rights. |
| Marketing Plan | the marketing plan for each Financial Year as set out in clause 10.1. |
| Network | the network of Bang & Olufsen Dealers (retailers) authorized to resell the Bang & Olufsen Products in B1 Stores and/or Shop-in-shops in the Territory, as well as B&O PRO authorized resellers (permitted to sell to permitted users). |

| | |
|---|---|
| Operation Manual | Bang & Olufsen's manual for customer service requirements in force from time to time as set out in clause 7.1. |
| POS System | the point of sale system set out in clause 11. |
| POS Material | posters, brochures, catalogues and other marketing material used from time to time in connection with the resale of the Products. |
| Products | Bang & Olufsen Products and Third Party Products. If Dealer becomes an authorized B&O PLAY reseller, B&O PLAY products will be included in Products. |
| Schedule | a schedule to the Agreement |
| Shop Concept | Bang & Olufsen's manual in force from time to time which describes how the Stores must be equipped, fitted up and furnished as set out in clause 6.1. |
| Shop-in-shops | clearly defined spaces dedicated to the sale of the Products in retail stores which are equipped, fitted up and furnished in accordance with Bang & Olufsen's Shop Concept. |
| Stores | B1 Stores and/or Shop-in-shops listed in Schedule I1(a)(i)3.1. |
| Territory | United States and Canada. |
| Third Party Products | the range of third party products which Bang & Olufsen from time to time has specified to be sold in connection with the sale of Bang & Olufsen Products and which are sourced by the Dealer from either BOA or from third party suppliers designated or approved by Bang & Olufsen. |
| Trademarks | the trademarks, logos, names, product designations, designs etc. owned or licensed by Bang & Olufsen. |

1.2 The Agreement is the result of the Parties' negotiations, and it cannot be interpreted against a Party as a consequence of such Party having drafted one or more of the provisions of the Agreement.

1.3 Expressions, such as "including" and similar expressions, mean "including, but not limited to".

1.4 Nouns in the singular include the plural and vice versa. Nouns in the definite form include the indefinite form and vice versa.

1.5 The headings of the Agreement are for guidance only and have no separate legal effect on the understanding or interpretation of the provisions of the Agreement.

1.6 The Agreement contains the entire agreement between the Parties concerning the Dealer's sale of the Products and supersedes all previous agreements between the Parties on the subject-matter of the Agreement.

1.7 In case of any discrepancy between the Agreement (without Schedules) and the Schedules, the Agreement (without Schedules) will take precedence.

## 2 PURPOSE AND BACKGROUND

2.1 The Bang & Olufsen group manufactures a highly distinctive and exclusive range of televisions, music systems, loudspeakers, telephones, and multimedia products under the Bang & Olufsen brand (the Bang & Olufsen Products) and the B&O PLAY brand (the B&O PLAY Products).

2.2 The Bang & Olufsen Products are sold through a network of authorized Dealers and B&O PRO partners (the Network). As a member of this exclusive Network, the authorized Dealers and their stores become part of the Bang & Olufsen universe including not only the Bang & Olufsen Products but also the professional support functions which are offered to the Bang & Olufsen Dealers. In exchange the Dealer must deliver high quality customer services and experiences that support Bang & Olufsen's brand values towards quality, innovation and design. Within the Network Bang & Olufsen currently distinguishes between B1 Stores and Shop-in-shops, and also B&O PRO's, who are allowed to sell Bang & Olufsen Products to permitted users (subject to individual contracts). Bang & Olufsen may from time to time modify, create new or close existing retail categories which may affect the Dealer's rights and obligations according to the Agreement.

2.3 The B&O PLAY Products are sold (i) through the Network, (ii) through authorized distributors and/or resellers outside the Network. Authorized resellers of B&O PLAY Products are resellers who have been authorized to resell B&O PLAY Products by B&O PLAY and/or BOA which form a separate contract outside this Agreement. Should Dealer wish to sell B&O PLAY Products (both in store and/or online), Dealer will undertake to sign up and agree to the separate terms and conditions to become an authorized reseller of B&O PLAY products, as requested by B&O PLAY and/or BOA [as set forth here: [http://www.beoplay.com/authorised_reseller_us_ld] or another website] communicated to Dealer from time to time).

2.4 BOA wishes to appoint the Dealer as an authorized Bang & Olufsen Dealer and the Dealer wishes to be appointed as an authorized Bang & Olufsen Dealer on the terms and conditions in this Agreement.

## 3 APPOINTMENT

3.1 BOA grants the Dealer a non-exclusive right to distribute the Bang & Olufsen Products and use the Trademarks at the addresses and in connection with the operation of the B1 Stores and/or Shop-in-shops listed in Schedule 3.1 (the Stores).

3.2 The Dealer must only use the Trademarks in connection with the operation of the Stores and must operate the Stores in accordance with the provisions of this Agreement and the Schedules hereto.

## 4 DEALER'S PURCHASE AND RESALE OF THE PRODUCTS

4.1 The Dealer is required to display such assortment of Products in its Stores as listed in Schedule 4.1. In B1 Stores, no other products than the Products must be sold or displayed. In Shop-in-shops, no other products than the Products must be displayed in the space dedicated to the sale of the Products.

4.2 The Dealer must purchase its entire requirement for Bang & Olufsen Products solely from BOA or suppliers designated or approved by Bang & Olufsen or from other authorized Bang & Olufsen Dealers within the Network.

4.3 The Dealer must order and purchase the Products through the Bang & Olufsen retail ordering system as described in Schedule 4.3.

4.4 The Dealer must run the Stores as retail stores and must not without prior written approval in each individual case sell any Bang & Olufsen Products to wholesalers. The Dealer is not entitled to sell Bang & Olufsen Products to other Dealers than authorized Bang & Olufsen Dealers within the Network. Nor is the Dealer entitled to sell any Bang & Olufsen Products, whether directly or indirectly, outside the Territory.

4.5 Dealer must comply with Bang & Olufsen's Corporate Visual Identity Manual attached as Schedule 4.5(c) with regard to electronic usage (e.g. home pages).

4.6 Prices and delivery terms

4.6.1 The commercial terms including prices, interests, discounts, bonuses, delivery terms, minimum purchase obligations etc. (the Commercial Terms) for the Dealer's purchase of the Products from BOA are determined by (i) general commercial terms applied by BOA from time to time and (ii) the Dealer's individual performance according to a number of performance criteria. BOA will communicate to the Dealer the Commercial Terms applicable for the Financial Year, or such shorter period until the end of the first Financial Year from the Effective Date. The Commercial Terms are set out in Schedule 4.6.1.

4.6.2 Upon the request of BOA, the Dealer must prepare and present to BOA an initial five (5) year business plan for the operation of the Stores in accordance with the specifications set out in Schedule 4.6.2.

4.6.3 The Dealer waives the right to allocate payment for the repayment on a specific debt. Thus, upon receipt of payments from the Dealer, BOA may in its discretion refer the payment including interest or any other charge to any outstanding debt item owed by the Dealer. In the absence of any mandatory legislation or notification to the contrary from BOA payments are deemed to reduce the oldest debt first.

## 5 MINIMUM AGGREGATE PURCHASE OBLIGATION

5.1 During the term of this Agreement the Dealer must in aggregate or within each category of Products as determined by BOA purchase Products from BOA for an agreed minimum aggregate purchase amount. Minimum purchase amounts are measured within periods of six (6) months of the Financial Year. The minimum aggregate purchase amounts are included in the Commercial Terms.

5.2 In the event that the Dealer does not fulfil the aggregate minimum purchase amounts for two (2) consecutive six (6) months' periods the Dealer is considered in material breach of the Agreement (see clause 15.3).

## 6 STORES

6.1 The Dealer must build B1 Store fronts and equip, fit up and furnish the Stores in accordance with Bang & Olufsen's Corporate Visual Identity Manual (Schedule 4.5(c)) and the Shop Concept (Schedule 6.1) as changed and updated from time to time.

6.2 The Stores must be equipped and fitted up with Bang & Olufsen Store Elements as described in Schedule 6.2(a). Bang & Olufsen Store Elements must be purchased by the Dealer from BOA or third party suppliers designated or approved by Bang & Olufsen.

6.3 The Dealer is not entitled to commence the operation of any Store until the Store has been equipped, fitted up and furnished in accordance with Bang & Olufsen's specifications and the Store in writing has been approved ready for operation by BOA.

6.4 The Dealer must follow and implement all campaigns regarding window display, interior or exterior shop decoration, and special product promotions etc. which from time to time are initiated by BOA. When new Bang & Olufsen Products are launched the Dealer is required to purchase the amount of such new Bang & Olufsen Products considered adequate by BOA for that purpose. Products from the existing product range that are included in campaigns and window displays must be purchased by the Dealer unless the Dealer has agreed with BOA not to acquire such Products. Furthermore, the Dealer is required to purchase Bang & Olufsen Store Elements and/or any other elements required by BOA in connection with new window displays.

6.5 The Dealer may not without the express, written permission of BOA change the internal appearance of the Stores, nor the external appearance of any B1 Stores. The Dealer must maintain the Stores and carry out all such repairs and improvements as required and deemed necessary by BOA in order to maintain a visual identity of high quality. BOA may

Confidential - Attorneys' Eyes Only

from time to time instruct the Dealer to make changes of the internal and/or external appearance of the Stores in order to comply with changes in Bang & Olufsen's Shop Concept.

6.6 Store leases

6.6.1 Upon written request from BOA the Dealer must use all reasonable efforts to ensure that BOA obtains:

(a) a right to substitute and takeover all rights and obligations of the Dealer in respect of a lease of the Stores in the event that the Dealer breaches the lease agreement or terminates the lease agreement pursuant to which it occupied the Stores and to ensure that BOA in this event receives copies of all notices from the landlord including without limitation notice of termination whether statutory or otherwise in a reasonable time to decide whether it will exercise the right to substitute the Dealer on reasonable conditions; and

(b) a right to substitute and takeover all rights and obligations of the Dealer in respect of a lease of the Stores in the event that the Agreement is terminated due to the Dealers breach of this Agreement; and

(c) a right to acquire the lease of the Stores on similar conditions as the lease are offered to any third party in the event that the Dealer has a right to assign its rights under the lease agreement to a third party. The price to be paid by BOA is limited to the amount corresponding to the market value for the right to assignment as set out in clause 6.6.2.

6.6.2 In the event that BOA exercises its right to take over a lease according to clauses 6.6.1 (a) or (b), the Dealer may request that BOA pays to the Dealer the market value, if any, of the right of assignment of the lease. The market value shall be determined as the average of the market value determined by two (2) independent real estate appraisers with local knowledge of whom one (1) shall be appointed by the Dealer and one (1) shall be appointed by BOA. The Parties shall pay the costs to the appraiser appointed by them. Absent any manifest error the market value calculated as the average of the two valuations shall be final and binding on the Parties and not subject to review by arbitration or court proceeding. BOA shall be entitled to set-off money owed by the Dealer to BOA against payment for the lease.

6.6.3 The Dealer must submit a copy of the lease agreement for the Stores and any amendments thereto to BOA.

## 7 CUSTOMERSERVICE AND GUARANTEE

7.1 The Dealer must comply with Bang & Olufsen's manual for customer service requirements with regard to guidance on and demonstration of the Products, delivery and installation of the Products, and repairs of the Products as outlined in Schedule 7.1. Installation and repairs must be performed either by an authorized Bang & Olufsen service center within the Dealer's organization or by an external authorized Bang & Olufsen service center.

Confidential - Attorneys' Eyes Only

7.2 The Dealer must simultaneously with the completion of the sale of Bang & Olufsen Products provide customers with an original Bang & Olufsen warranty and comply with the responsibilities as described in Schedule 7.2.

## 8 DEALER'S PERSONNEL

8.1 The operation of the Store requires that the Dealer's personnel have the qualifications and skills required in order to provide the customers with high quality service and guidance and in-depth technical knowledge of the Products. The Dealer is obliged to employ a sufficient number of suitably qualified personnel to ensure the proper fulfilment of its obligations under this Agreement.

## 9 TRAINING

9.1 Mandatory training is required for owners, shop managers and other personnel involved in the operation of the Stores.

9.2 Training is conducted electronically and/or physically at the locations designated by BOA. The Dealer pays all wage costs, travelling and other expenses for individuals participating in such training. BOA will pay for accommodation (choice of accommodation is at BOA's discretion).

9.3 The Dealer must ensure that its personnel at any time have completed the required training.

## 10 MARKETING AND PROMOTION

10.1 For each Financial Year, BOA may at its sole discretion decide to set out the promotion and marketing activities, Product releases and campaigns planned for the various parts of the Territory (the Marketing Plan), however such plan is not mandatory and the Dealer does not have a legal claim to obtain such Marketing Plan. Where a Marketing Plan is provided by BOA, it will be included as Schedule 10.1, which will apply for that Financial Year.

10.2 The Dealer may in addition to the marketing activities included in the Marketing Plan make additional local marketing and promotional activities provided that the Dealer submits samples of all advertising and promotional plans and materials to BOA for its prior approval, if such plans and materials have not been prepared or previously approved by BOA.

10.3 Each Financial Year the Dealer pays a mandatory marketing fee to BOA for its access to and benefits of use of POS Material, participation in joint marketing and promotion activities etc. The marketing fee will be communicated to the Dealer as part of the Commercial Terms (see clause 4.6.1).

## 11 POS SYSTEM AND SUBMISSION OF SHOP DATA

11.1 For the purpose of among other things providing fast and efficient gathering of data of sales and status of inventory, creating customer behavior statistics, optimizing support functions, reducing costs in the distribution chain and in general increasing customer satisfaction, the Dealer must provide BOA – if so required by BOA - with Profit & Loss accounts and install and use a point of sales system (the POS System) that is capable of retaining and analyzing the shop data described in Schedule 11.1 as amended from time to time. The POS System must be approved by BOA and must be accessible with an interface by BOA and Bang & Olufsen and must be compatible with Bang & Olufsen's finance system. BOA shall keep all received records from Dealer (including customer information) confidential and shall not sell or share said information with third parties outside the Network, and the use of said information shall solely be for the purposes of operating Bang & Olufsen' business.

11.2 Until an approved POS System is in place for all Stores, the Dealer must supply BOA with such information which BOA deems relevant from time to time.

## 12 ASSISTANCE AND SERVICES PROVIDED TO THE DEALER

12.1 The Bang & Olufsen group continuously strives to develop the Network in close cooperation with the Bang & Olufsen subsidiaries (national sales organizations) and the Dealers. BOA provides the Dealer with any reasonable assistance and services prior to and after the opening of the Stores to help the Dealer optimize its sales processes. Furthermore, BOA will to the extent possible accommodate other reasonable requests from the Dealer for additional assistance.

## 13 CUSTOMER SATISFACTION

13.1 In order to ensure that the Products and the Stores meet or surpass customers' expectations the Dealer must according to instructions from BOA either collect data to the Bang & Olufsen customer satisfaction index (CSI) or allow BOA to collect such date directly from the customers. Further, BOA is entitled at any time to inspect and examine the Stores to make sure that the Dealer complies with its obligation under this Agreement.

## 14 INTELLECTUAL PROPERTY RIGHTS

14.1 Bang & Olufsen retains all Intellectual Property Rights in and to the Bang & Olufsen Products and the Trademarks.

14.2 Except for the Dealer's rights under this Agreement, no right, title or interest in or to the Bang & Olufsen Products is granted or otherwise transferred by this Agreement. The Dealer must respect the rights of Bang & Olufsen in accordance with all applicable laws and the provisions of this Agreement.

14.3 The Dealer may use the Trademarks on its letterhead, envelopes, order sheets, cars or any other stationery items in connection with this Agreement provided that the Dealer comply with Bang & Olufsen's Corporate Visual Identity Manual (Schedule 4.5). Any use of the Trademarks in connection with any signs, decoration or advertising must also be in accordance with Bang & Olufsen's Corporate Visual Identity Manual.

14.4 The Dealer may refer to itself as an authorized Bang & Olufsen Dealer but may not use the Trademarks or names or trademarks confusingly similar to the Trademarks in or as part of the Dealer's company name or secondary name.

14.5 The Dealer must inform BOA as soon as possible of any known infringement of Bang & Olufsen's Intellectual Property Rights or of any claim or allegation by a third party that its intellectual property has been infringed by the exercise of any of the rights granted by BOA to the Dealer under this Agreement.

14.6 The Dealer must itself refrain from registering any Intellectual Property Rights attached in and to the Bang & Olufsen Products, the Trademarks and/or any part or derivative hereof. In the event that any such rights have already been registered before the execution of this Agreement, the Dealer must ensure that any such rights are assigned to Bang & Olufsen without compensation.

14.7 CRM database

14.7.1 The Dealer must take adequate steps to register all customers in the Bang & Olufsen CRM database in accordance with the guidelines provided for in the Operation Manual and as part thereof obtain and file for documentation purposes acceptances from the customers of their entry into the CRM database.

14.7.2 In order to ensure that the customers' communication with Bang & Olufsen is operated in a professional manner and to avoid, for example, that customers receive multiple copies of identical marketing material, BOA may in the interest of the customers instruct that general marketing campaigns from Bang & Olufsen or from BOA (as opposed to marketing campaigns initiated by the Dealer) are distributed to the customers from a Dealer designated by BOA. Such designation is subject to BOA's sole discretion, but may amongst other things include evaluation of accumulated sales to customer over a certain period of time.

14.7.3 All rights to data in the CRM database belong to Bang & Olufsen. The Dealer must only use the CRM database for the purpose of this Agreement and may not sell, license or otherwise dispose of such data without the prior written approval of Bang & Olufsen in each individual case.

## 15 TERM AND TERMINATION

15.1 The Agreement enters into force on the Effective Date and remains in force until terminated by either Party in accordance with the terms set out below. Notwithstanding the aforesaid, neither Party shall be allowed to unilaterally terminate the Agreement for convenience for the initial five (5) years, commencing on the Effective Date.

15.2 Upon expiration of the initial five (5) year's period, BOA shall be entitled to terminate the Agreement in full or in part with six (6) months' written notice. For the avoidance of doubt, this means that BOA regardless of the numbers of Stores covered by the Agreement (see Schedule 3.1) is entitled to terminate the Agreement with effect for one or more Stores or one or more Products without effect for the remaining Stores or Products. The Dealer is not entitled to partial termination of the Agreement.

15.3 Notwithstanding clauses 15.1 and 15.2, either Party may with immediate effect terminate this Agreement due to a material breach by the other Party if the breach has not been remedied within thirty (30) calendar days of receiving written notice of such breach and of what is required to be done by the breaching Party to remedy the breach. Material breach includes, among other things, the following:

(a) Dealer's failure to display the Products in accordance with Schedule 4.1.

(b) Dealer's failure to buy Bang & Olufsen Products solely from BOA or suppliers designated or approved by Bang & Olufsen or other authorized Bang & Olufsen Dealers within the Network (see clause 4.2).

(c) Dealer's sale of Bang & Olufsen Products to wholesalers without prior written approval (see clause 4.4).

(d) Dealer's sale of Bang & Olufsen Products to other Dealers than authorized Bang & Olufsen Dealers within the Network (see clause 4.4).

(e) Dealer's sale of Bang & Olufsen products outside the Territory (see clause 4.4).

(f) Dealer's failure to comply with Bang & Olufsen's E-commerce guidelines (Schedule 4.5(a)) and Corporate Visual Identity Manual (Schedule 4.5(c)).

(g) Dealer's failure to comply with its payment obligations in due time according to Schedule 4.6.1.

(h) Dealer's failure to fulfil aggregate minimum purchase amounts for two (2) consecutive six months' periods (see clause 5.2).

(i) Dealer's failure to comply with the Store requirements concerning the internal or external appearance of the Stores as set out in the Bang & Olufsen Shop Concept (see clauses 6.1 to 6.3).

(j) Dealer's failure to accommodate with instructions from BOA regarding internal or external appearance of the Stores (see clauses 6.4 to 6.5).

(k) Dealer's failure to comply with the Store lease obligations (see clause 6.6).

(l) Dealer's failure to comply with Bang & Olufsen's customer service requirements (see clause 7).

(m) Dealer's breach of its marketing and promotion obligations (see clause 10).

(n) Dealer's breach of the rules on the use of the Intellectual Property Rights (see clause 14).

(o) Dealer's failure to comply with the training requirements (see clause 9).

(p) Dealer's breach of the confidentiality obligation including without limitation the duty to observe secrecy regarding new Product releases (see clause 17.1).

15.4 BOA may terminate this Agreement, effective immediately upon receipt by the Dealer of a termination notice from BOA to the Dealer, which termination notice BOA will be entitled to serve, upon the occurrence of any one or more of the following events of termination:

- the Dealer no longer holds a license that the Dealer must hold to operate the Store;
- the Dealer becomes bankrupt or insolvent or under administration or commences any voluntary or involuntary creditor arrangement;
- the Dealer is convicted of a felony or a misdemeanor involving fraud or moral turpitude;
- the Dealer is fraudulent or grossly negligent in connection with the operation of the Stores;
- the Dealer agrees to an immediate termination of this Agreement.

15.5 Unless expressly provided for by mandatory provisions of the law applicable, termination of this Agreement by BOA will not entitle the Dealer to any payment or compensation or a payment towards Goodwill (see clause 16.2).

## 16 CONDITIONS FOLLOWING TERMINATION

16.1 Immediately upon the termination of this Agreement:

(a) the Dealer will pay any and all amounts owing to BOA and its related entities pursuant to this Agreement and all the rights under this Agreement granted to the Dealer will automatically cease;

(b) the Dealer will discontinue any use of the Intellectual Property Rights;

(c) the Dealer will discontinue any use of the Trademarks or reference to the Trademarks on the exterior or interior of the Stores (i.e. remove all signs, fixtures, and equipment); and

(d) the Dealer will refrain from doing business under any name or in any manner that might give the impression that the Dealer is or was a Dealer of BOA or any of its related entities or otherwise affiliated or associated with Bang & Olufsen.

16.2 The Dealer acknowledges and agrees that the value of a luxury retail store like a Bang & Olufsen retail business predominantly lies within the Products and the Bang & Olufsen brand and therefore the Dealer acknowledges and agrees that:

(a) the Goodwill and any increase in value of the Goodwill vests absolutely in Bang & Olufsen and that the Dealer is not entitled to any payment or other compensation whatsoever from Bang & Olufsen and its related entities for any increase in value of the Goodwill that occurred during the term of this Agreement unless otherwise provided for by mandatory provisions of the law applicable;

(b) With respect to any other inventory related to the operation of the Stores, BOA has the right but not the obligation, within thirty (30) days after termination, to purchase from the Dealer said goods at the market value but never more than the lowest of either its purchase price or book value according to the Dealer's accounts. Unless otherwise provided for by mandatory provisions of applicable law, if BOA shall repurchase Dealer's Products (which are included in Schedule 4.1), products must be in factory sealed packaging. The repurchase price would be limited to Dealer's cost net of any discounts or bonuses. BOA arranges for transportation, insurance and any related costs associated with transport of the inventory to a location designated by BOA; and

(c) the Dealer must return to BOA any hard copies of manuals and any other materials provided by BOA (marketing, activity, advertising and promotional material) in its possession or control.

16.3 BOA acknowledges and agrees that clause 16.2(a) does not limit the Dealer from selling the business it operates under this Agreement in connection with the operation of that business and retaining the proceeds of such a sale, provided that BOA has previously approved the sale and the buyer in writing.

16.4 All obligations of the Parties which expressly or by their nature survive the termination of this Agreement will continue in full force and effect notwithstanding the termination of this Agreement.

## 17 CONFIDENTIALITY OBLIGATION

17.1 The Dealer undertakes to keep strictly confidential all confidential information about Bang & Olufsen and its related entities, its suppliers, customers, Bang & Olufsen Products, releases of new Bang & Olufsen Products, and the structure and development of the Network. Any and all information of such nature is deemed business or operating secrets of Bang & Olufsen and its related entities. The Dealer may use the information provided by BOA solely for the purpose of the operation of the Stores.

17.2 The Dealer undertakes not to disclose to third parties any confidential and business information pursuant to clause 17.1 which the Dealer has received prior to or after the signing of this Agreement. The Dealer must take any reasonable precautions to prevent third parties from getting access to the business or operating secrets of Bang & Olufsen and its

related entities. This includes the obligation to impose appropriate confidentiality undertakings on the Dealer's present and future employees in written form.

17.3 The Dealer may give access to manuals and other material provided by BOA to its employees for use within its business. However, the Dealer must take all reasonable precautions preventing the employees from copying, printing or removing any documents or electronic information from the Stores and from handing over copies of such documents or information to any third party.

17.4 If the Dealer breaches clause 17, the Dealer will be obligated to pay a fee to BOA of USD twenty-five thousands ($ 25,000) for each breach. Receipt of such fee will not preclude BOA or Bang & Olufsen from seeking actual damages for their losses, but fee paid will be deducted from the claim for actual damages. Payment of a fee and/or actual damages will not release, in full or in part, the Dealer from its obligations under the Agreement. Further to the remedies provided for in clause 17.4, BOA and Bang & Olufsen will be entitled to apply any other remedy, e.g. by seeking an injunction in accordance with applicable legislation.

17.5 This confidentiality obligation survives the termination of this Agreement and remains in force as long as any of the information pursuant to clause 17.1 is of confidential nature, i.e. not in the public domain.

**18 OTHER PROVISIONS**

18.1 Assignability

18.1.1 The Dealer may not assign or in any other way transfer its rights or obligations under this Agreement without the prior written consent of BOA which consent will not be unreasonably withheld provided inter alia that any new Dealer completes mandatory training prior to the commencement of the distribution.

18.1.2 BOA may assign its rights and obligations under this Agreement fully or in part to any company within the group of which BOA belongs or to a person or company appointed by Bang & Olufsen as Bang & Olufsen's Master Dealer (MDA) in the Territory and the Dealer will execute all necessary documents in a form Bang & Olufsen and its related entities considers reasonably necessary to effect such an assignment. Furthermore, Bang & Olufsen is entitled to assign the Agreement in connection with a possible assignment of all or the majority of Bang & Olufsen's assets and liabilities.

18.2 Force Majeure

18.2.1 Neither of the Parties to this Agreement is responsible to the other Party for any delay in performance or non-performance due to Force Majeure, but the affected Party must promptly upon the occurrence of any such causes inform the other Party in writing, stating that such cause has delayed or prevented its performance hereunder and thereafter such Party must take all action within its power to comply with the terms of this Agreement as

fully and promptly as possible; provided, however, that the provisions of this clause 18.2.1 shall not apply to any payment obligations under this Agreement.

18.2.2 Each Party is entitled to terminate the Agreement by thirty (30) days' written notice to the other Party if performance of the Agreement continues to be impossible on account of any circumstances due to Force Majeure for a period of more than ninety (90) days.

18.3 Insurance

18.3.1 The Dealer is obliged to take out and maintain general liability insurance covering all of the Dealer's activities including service and installation and including public and employer's liability insurance. In addition, the Dealer is obliged to take out all other relevant insurances as may be requested at any time by BOA in connection with the operation of the Stores. Such insurance(s) shall name BOA and Bang & Olufsen a/s as additional insureds. Copies of all insurance policies must upon request be made available to BOA together with receipts for payment of premium.

18.4 Dealer's Status

18.4.1 The Dealer must always refer to his status as an independent Dealer operating in the Dealer's own name and for his own account. At no time must the Dealer refer to himself as Bang & Olufsen or any of its related entities, hold himself out as a subsidiary, business division, agent or employee of Bang & Olufsen or any of its related entities. The Dealer must only use the Trademarks in accordance with the terms and conditions of this Agreement. This Agreement does not in any way create the relationship of principal and agent between Dealer and BOA or Bang & Olufsen, and in no circumstances shall Dealer, its agents or employees be considered the agents of BOA or Bang & Olufsen. Nothing contained in this Agreement creates a franchise and the Dealer is not a franchisee. Dealer agrees to take such further affirmative action as BOA may require in this regard, including, without limitation, (i) exhibiting a notice of Dealer's licensee status (in form prescribed by BOA) in a conspicuous place in the Store, (ii) making any and all "assumed name" or similar filings required or permitted to be made under applicable state and local laws to disclose the true identity of Dealer, and (iii) placing the phrase "an authorized independent Dealer of Bang & Olufsen® products" in a conspicuous location on all advertising, promotional materials, letterhead, business cards, forms and other printed material, in accordance with clause 14.3.

18.5 Dealer's legal structure (legal entity)

18.5.1 The Dealer represents and warrants to BOA that as of the Effective Date, the record and beneficial ownership of Dealer is as follows:

(a) In case Dealer is a partnership or Limited Liability Company, by the following persons in the following percentages:

David Junk 100%
______________________________

(b) In case Dealer is a corporation, 100% or the issued and outstanding shares of voting stock (regardless of class) of Dealer is owned by the following persons in the following percentages:

____________________________________________

____________________________________________

18.6 Waiver

18.6.1 The failure of any Party at any time to enforce any of the provisions of this Agreement or to exercise any right under this Agreement shall in no way affect that Party's rights after any failure or constitute a waiver of that right.

18.7 Notices

18.7.1 Any notice to be given under the Agreement must be in writing and delivered by hand, sent by letter with a delivery note, or sent by registered and ordinary mail, by fax or by email to the addresses of the Parties set out in the Agreement.

18.8 Compliance with law

18.8.1 The Dealer must conduct its business in a lawful manner and must faithfully comply with all applicable laws or regulations for the conduct of its business.

18.9 Severability

18.9.1 Where any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the laws of any jurisdiction then such provisions will deemed to be severed from the Agreement and, if possible, replaced with a lawful provision which, as closely as possible, gives effect to the intention of the Parties under this Agreement. The other provisions of the Agreement will remain effective.

18.10 Miscellaneous Provisions

18.10.1 The Dealer will duly execute and perform all such acts, deeds, matters and things (including the execution of documents) as may be reasonably required by BOA to enable BOA to obtain the full benefit and advantage of this Agreement and the transactions contemplated by this Agreement.

18.10.2 Where this Agreement refers to rights belonging to Bang & Olufsen, BOA is without limitation entitled to enforce such rights against the Dealer on behalf of Bang & Olufsen being a company which is a member of the Bang & Olufsen group.

18.10.3 The terms and conditions of this Agreement may be amended or varied only in writing signed by the Parties.

18.11 Payments.

18.11.1 All payments (other than for Products) which the Dealer is obligated to make to BOA during the first six (6) months of operation of the Business or prior thereto shall be deferred and shall not be due and payable until the first day immediately following such six (6) month period. Any payments made contrary to the preceding sentence shall be deemed to have been made to BOA after the first six (6) months of operation of the Business or refunded to Dealer during that six (6) month period at its request and then shall be deferred and shall not be due and payable until the first day immediately following such six (6) month period.

18.11.2 The provisions of clause 18.11.1 shall not apply to the Dealer's purchases of Products from BOA, which shall be purchased and paid for in accordance with the Commercial Terms, nor shall it apply if this Agreement renews or extends a prior Agreement between BOA and the Dealer.

18.11.3 BOA has not charged and will not charge any fee, direct or indirect, for entering into this Agreement or the right to sell the Products. No such fee or charge is or will be included in any prices or payments for Products or other items sold or services rendered by BOA to the Dealer. The Dealer shall be precluded from contending that any such fee or charge was included in any price or payment for Products or other items sold or services rendered by BOA to the Dealer unless the Dealer contends in writing to BOA within sixty (60) days after the Products or other items were sold or services were provided by BOA that the prices or payments for Products or other items sold or services included any such fee or charge.

18.12 Schedules

18.12.1 All Schedules to this Agreement can be found via Bang & Olufsen retail ordering system ROS. All such Schedules, as in effect from time to time, are incorporated herein by this reference as though fully set forth herein.

18.12.2 The Dealer is required to read, understand and follow each and every term, condition, requirement and standard applicable set forth in the Schedules. Please carefully review these materials. THE DEALER'S EXECUTION AND RETURN OF A COUNTERPART OF THIS AGREEMENT CONSTITUTES THE DEALER'S ACKNOWLEDGMENT THAT IT HAS READ ALL OF THE SCHEDULES, as set forth on ROS as of 9:00 a.m. Central time (U.S.) on the date immediately preceding the Effective Date. Any proposed addition or change to the Schedules is hereby rejected and the Dealer agrees any such proposed additions or changes cannot and will not be a part of this Agreement.

18.12.3 The Schedules shall remain in full force and effect unless and until modified by a writing signed by the Parties, or until changed in accordance with the following procedure: BOA may propose changes to any Schedule by providing the Dealer with thirty (30) days' prior notice of the proposed change(s), which notice may be given by posting such proposed change(s) to ROS (the Dealer agrees to monitor ROS for such notices), and such proposed change(s) will become effective as and when provided in the notice unless BOA receives the Dealer's written objection to the proposed change(s). If the Dealer so object, the proposed change(s) will not become part of this Agreement, BOA may terminate this Agreement upon sixty (60) days' written notice; provided, however, that if the Dealer rescinds

all such objections during such sixty (60) day period, then this Agreement, including all proposed changes to any Schedule, shall remain in effect.

**19 GOVERNING LAW AND DISPUTES**

19.1 This Agreement is governed by and will be interpreted in accordance with the laws of the State of Illinois without reference to choice of law principles.

19.2 **The Parties agree that any controversies arising under or related to this Agreement shall be presented before any state court located in the county in which BOA's principal place of business is located or any federal court located in the district in which BOA's principal place of business is located, and the Parties hereby submits themselves to the exclusive jurisdiction of said courts. Each of the Parties waives any objection to jurisdiction and venue as provided in the immediately preceding sentence of any action related to or arising from this Agreement, and further agrees not to assert any defense based on jurisdiction or venue.**

19.3 **The Dealer and BOA waive trial by jury for any action related to or arising from this Agreement.**

19.4 The Dealer shall pay BOA all reasonable attorneys' fees and costs BOA incurs in any action to enforce this Agreement or that is related to it, or otherwise arises from the relationship between the Parties.

19.5 The Dealer shall indemnify, defend and save BOA, Bang & Olufsen and their respective successors and assigns, and their officers, stockholders, agents and employees, harmless from and against all claims, demands, costs, and expenses (including reasonable attorneys' fees and disbursements) of whatever nature, arising out of or related to this Agreement.

19.6 Absent any legislation or case law to the contrary, BOA is not prevented from bringing monetary claims against the Dealer before the ordinary courts at Bang & Olufsen's, BOA's or the Dealer's venue or from resorting to immediate legal steps such as injunctions.

19.7 **The Dealer waives all claims against BOA, any of its officers or employees, and any of its parents, subsidiaries or affiliates, for any lost profits, consequential, special, contingent or incidental damages and for punitive, exemplary or other enhanced damages, for any matters related to or arising from this Agreement.**

This Agreement has been executed in two (2) original copies, each Party receiving 1 copy.

Place: Pasadena CA
Date: 26 January 2017

**For Bang & Olufsen America, Inc.:**

J. Siboni
Signature

JACOB SIBONI
Printed Name

Director
Printed Title

Place: Pasadena CA
Date: 26 January 2017

For M&N Luxury AV, LLC
[Dealer Legal name/entity]

[signature]
Signature

DAVID JUNK
Printed Name

CEO
Printed Title

# EXHIBIT 2

## ADDENDUM TO LICENSED DEALER AGREEMENT

This ADDENDUM TO LICENSED DEALER AGREEMENT (this "**Addendum**") is dated and effective as of April 5, 2017 (the "**Effective Date**") by and between BANG & OLUFSEN AMERICA, INC., a Delaware corporation ("**BOA**") and M&N Luxury AV, a California Limited Liability Corporation ("**Dealer**" and together with BOA, the "**Parties**"). Capitalized terms used in this Addendum and not otherwise defined herein have the meanings specified the **Appendix**.

**Preliminary Statement**

Pursuant to certain Licensed Dealer Agreement dated January 26, 2017 by and between BOA and Dealer, Dealer is authorized to sell the Products at the Store located at 169 West Green Street Pasadena CA. Dealer would like to be the exclusive dealer for the sale of the Products in Los Angeles, Orange and San Diego Counties in the State of California (the "**Territory**"). BOA is willing to authorize Dealer to be the exclusive dealer for the sale of the Products in the Territory, subject to the terms and conditions of this Addendum.

NOW THEREFORE, in consideration of the covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

1. **Appointment as Master Retailer**.

(a) Subject to the terms, conditions and limitations contained in this Addendum, BOA grants Dealer the sole and exclusive right to open Bang & Olufsen Retail Stores and/or Shop-in-Shop Stores anywhere in the Territory; provided, however, that in no event shall Dealer have the right to license any other Person to sell the Products; provided, further, that the Bang & Olufsen Retail Store located at Mir Audio, Los Angeles California that is owned and operated by an independently owned Bang & Olufsen dealer shall be permitted to continue to operate until the earlier to occur of the date that the respective licensed dealer agreement expires or is otherwise terminated.

(b) Subject to Paragraph 2, Dealer shall open the Bang & Olufsen Retail Stores, on the dates and in the sequence set forth on **Schedule 1(b)** (the "**Store Opening Plan**"). In addition, Dealer may open other Bang & Olufsen Retail Stores and/or Shop-in-Shop Stores anywhere in the Territory provided that the Dealer complies with the requirements for opening a Store set forth in Paragraph 2.

(c) Except as otherwise provided in this Paragraph 1, BOA shall not (i) open or permit any Person other than Dealer to open any Bang & Olufsen Retail Store or Shop-in-Shop Store within the Territory without Dealer's consent. Notwithstanding the provisions of the immediately preceding sentence, BOA and any parent, subsidiary or affiliate thereof shall have the right to (i) sell Products directly to its personnel and associates, governmental bodies or public institutions or diplomats, or commercial or industrial end-users or suppliers thereto (including "project sales" such as, but not limited to, sales for use in hotels and sales to builders and developers in connection with single-family and multi-family residential developments, including resort communities) for the purpose of their business (provided, however, that said suppliers do not resell the Products to

either wholesalers, retailers or other resellers or to private end-users, except to the extent the Products are incorporated into a finished product delivered by a supplier); (ii) engage in Internet sales (whether on a website hosted by BOA or any other Person); (iii) permit other licensed Bang & Olufsen dealers located outside of the Territory to market and sell certain Products on the Internet to End Users located in the Territory; (iv) operate forms of distribution other than Bang & Olufsen Retail Stores and Shop-in-Shop Stores (such as, but not limited to, the sale of Products to B&O Pro Partners); and (v) sell Products directly to End Users at Shop-in-Shop Stores, kiosks or any similar retail venue located within retail stores operated by a national or regional department store or "Big Box" store chain.

2. **Procedure for Opening Stores.**

(a) At least two (2) months prior to the estimated date that Dealer intends to open any Store, Dealer shall deliver written notice of Dealer's intention to open an Store (each, an "**Store Opening Notice**"). Each Store Opening Notice shall identify the precise location (by street address) at which Dealer intends to open such Store and shall be accompanied by a business plan for such Store that (i) shall be in reasonable detail; (ii) shall conform to the criteria for Bang & Olufsen Retail Store business plans, then generally in use with respect to the opening of Bang & Olufsen Retail Stores; (iii) includes a projection showing that such Store will be profitable within 36 months after the date such Store opens and (iv) contains a reasonable plan pursuant to which Dealer may obtain profitability within said 36-month period (each, a "**Store Business Plan**").

(b) Within twenty (20) days after receipt a Store Opening Notice and the related Store Business Plan, BOA shall notify Dealer in writing of BOA's approval or disapproval of the proposed location of the Store identified in the Store Opening Notice and the related Store Business Plan. Provided the related Store Business Plan conforms to the requirements in clauses (i) through (iv) of Paragraph 2(a), BOA's approval of a Store Business Plan shall not be unreasonably withheld; provided, further, that if BOA disapproves of a Store Business Plan, the Parties shall thereafter, in good faith, use commercially reasonable efforts to resolve all of BOA's objections and agree upon a mutually satisfactory Store Business Plan within twenty (20) days after the date BOA notifies Dealer of its disapproval. If the Parties are unable to agree upon a Store Business Plan within said 20-day period, the Store Business Plan shall be deemed to be disapproved by BOA. Dealer acknowledges that (i) any approval or disapproval of a Store location and/or a Store Business Plan shall be final and binding on Dealer and BOA and (ii) no approval as to a Store location (except as otherwise expressly provided in this Paragraph 2(b) with respect to any Initial Store) and/or a Store Business Plan shall be deemed effective or binding on BOA unless made in writing.

(c) After the Store location identified in a Store Opening Notice and the related Store Business Plan are approved, BOA and Dealer shall thereafter execute and deliver an LDA for such Store within five (5) business days after the date Dealer receives written notice of BOA's approval.

3. **Plans and Construction of Stores.** BOA shall provide Dealer with a suggested design plan for each Store that is the subject of an LDA between BOA and Dealer. BOA does not and shall not warrant, and shall not be liable for, the sufficiency of any such design plan or the compliance of any such design plan with all applicable laws, ordinances, codes, rules and regulation, and court orders. Dealer shall be solely responsible for engaging an architect and an engineer licensed in

the Territory to provide all necessary architectural and engineering drawing, designs, plans and specifications at Dealer's sole cost and expense. Dealer shall also be solely responsible for obtaining all necessary governmental and quasi-governmental permits and approvals necessary to commence and complete construction of each Store at Dealer's sole cost and expense.

4. **B&O Pro Partners**. If BOA identifies a Person who is a potential B&O Pro-Partner anywhere in the Territory (each, a "**Candidate**"), then BOA shall have the right to enter into an agreement with the Candidate pursuant to BOA's right to operate different forms of distribution under clause (iv) of the second sentence of Paragraph 1(c).

5. **Minimum Annual Purchase Goals**. As a condition to being the exclusive Dealer in the Territory, Dealer shall have actual net purchases of Products ("**Minimum Annual Purchase Goals**") from BOA as follows:

| Time Period | Minimum Annual Purchase Goal |
|---|---|
| The period commencing on the date the Bang & Olufsen Pasadena Store opens ("March 30, 2017") and ending on the last day of the month in which the first anniversary of the Store Opening Date occurs (the "**First Year**") | $797,000 |
| The twelve (12) month period commencing on the day immediately following the end of the First Year (the "**Second Year**") | $1,900,000 |
| The twelve (12) month period commencing on the day immediately following the end of the Second Year (the "**Third Year**") | $3,000,000 |

Minimum Annual Purchase Goals for each succeeding twelve (12) month period after the Third Year shall be established within a reasonable period of time prior to the commencement of each such twelve (12) month period by mutual written agreement of BOA and Dealer.

6. **Term and Termination**.

(a) This Agreement is entered into for an initial term of five (5) years starting from the date hereof. Upon expiration of the initial term, this Agreement shall be renewed for one (1) successive additional term of five (5) years, unless either party provides written notice to the other party, at least six (6) months before the expiration of the initial term, that it does not intend to renew this Agreement.

(b) Without prejudice to any remedy either Party may have for breach or non-performance of this Addendum, BOA shall have the right to terminate this Addendum effective immediately upon the occurrence of any of the following events:

(i) If Dealer is in default of any of its obligations under any LDA (including the Bang & Olufsen Pasadena LDA) after the expiration of all applicable grace or cure period;

(ii) If Dealer is in default of any of its obligations under this Addendum;

(iii) If Dealer is dissolved or liquidated, or a receiver is appointed for Dealer; or

(iv) If (A) Dealer files a petition in bankruptcy, or (B) an involuntary petition in bankruptcy is filed against Dealer and such petition is not dismissed within forty five (45) days thereafter, or (C) any assignment or composition of Dealer for the benefit of creditors occurs, or (D) a written warrant of attachment or any similar process is issued by any court against all or any substantial portion of Dealer's property or assets, and the writ, warrant of attachment, or similar process is not released or bonded within fifteen (15) days of the entry or levy.

(c) Upon any terminations of this Addendum, all of Dealer's rights and all of BOA's obligations (including the rights and obligations under Paragraph 1) shall immediately terminate and be of no further force or effect.

7. **Representations and Warranties**.

(a) Dealer represents and warrants to BOA as follows:

(i) Dealer was duly organized and is validly existing under the laws of the jurisdiction in which it was organized, is duly authorized to transact business under the laws of each state in which the character of the properties owned or leased by it or the nature of its activities makes such qualification necessary. Dealer has full right, power and authority to execute, deliver and perform under this Agreement and to consummate the transactions described herein, and all required action and approvals therefor have been duly taken and obtained.

(ii) This Addendum and each other document executed or to be executed by Dealer pursuant hereto are, or will when executed, constitute the valid and legally binding obligations of Dealer, enforceable against it in accordance with its terms.

(iii) The execution and delivery of this Addendum by Dealer does not, and the consummation of the transactions contemplated hereby will not, violate or constitute an occurrence of default under any provision of, or conflict with, or result in acceleration of any obligation under, or give rise to a right by any party to terminate its obligations under, any indenture, lease, mortgage,

agreement, order, or other material arrangement to which Dealer is a party or by which Dealer or any of its assets is bound or affected, or require a filing or registration with, or the consent or approval of, any third party, court or governmental agency or authority, the consequences of which could reasonably be expected to have, either in any case or in the aggregate, a materially adverse effect on Dealer's ability to perform its obligations hereunder.

(iv) There is no action, suit, proceeding or investigation pending or, to the actual knowledge of Dealer, threatened against Dealer regarding the transactions contemplated in this Addendum.

(v) To the best of Dealer's knowledge, it has no claims, rights of offset, demands, liabilities, causes of action, suits or damages against BOA as of the effective date hereof.

(b) BOA represents and warrants to Dealer as follows:

(i) BOA was duly organized and is validly existing under the laws of the jurisdiction in which it was organized, is duly authorized to transact business under the laws of each state in which the character of the properties owned or leased by it or the nature of its activities makes such qualification necessary. BOA has full right, power and authority to execute, deliver and perform under this Agreement and to consummate the transactions described herein, and all required action and approvals therefor have been duly taken and obtained.

(ii) This Addendum and each other document executed or to be executed by BOA pursuant hereto are, or will when executed, constitute the valid and legally binding obligations of BOA, enforceable against it in accordance with its terms.

(iii) The execution and delivery of this Addendum by BOA does not, and the consummation of the transactions contemplated hereby will not, violate or constitute an occurrence of default under any provision of, or conflict with, or result in acceleration of any obligation under, or give rise to a right by any party to terminate its obligations under, any indenture, lease, mortgage, agreement, order, or other material arrangement to which BOA is a party or by which BOA or any of its assets is bound or affected, or require a filing or registration with, or the consent or approval of, any third party, court or governmental agency or authority, the consequences of which could reasonably be expected to have, either in any case or in the aggregate, a materially adverse effect on BOA's ability to perform its obligations hereunder.

(iv) There is no action, suit, proceeding or investigation pending or, to the actual knowledge of BOA, threatened against BOA regarding the transactions contemplated in this Addendum.

8. **Nature of Relationship**. This Addendum does not in any way create the relationship of principal and agent between Dealer and BOA, and in no circumstances shall Dealer, its agents or employees be considered the agents of BOA. Dealer shall not act or attempt to act or represent itself directly or by implication as agent of BOA, or in any manner assume or create or attempt to assume or create any obligation or make any contract, agreement, representation or warranty on behalf or in the name of BOA, except such Product warranties as may be previously authorized in writing by BOA. No fiduciary relationship, special relationship, partnership, joint venture, agency, or employment is intended or created by this Addendum.

9. **Confidentiality**. From and after the Effective Date, Dealer shall, except as required by law, keep confidential the existence and terms of this Agreement (collectively, the "**Confidential Information**"). Dealer may only disclose the Confidential Information to its key employees, attorneys, analysts, and accountants (any of said parties, a "**Representative**") so long as each such Representative (other than any attorney) is under a confidentiality agreement comparable to this Paragraph 10 or agrees in writing to be bound by the terms of this Paragraph 10 in the same manner that Dealer is bound. To the extent that any Confidential Information may include material subject to attorney/client privilege, work product privilege, or any other applicable privilege concerning pending or threatened legal proceedings or government investigations, the sharing of such material is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under any of such privileges. BOA shall be entitled to equitable relief by way of injunction or otherwise, in addition to any other rights and remedies otherwise available if Dealer or any of its Representatives breach or threaten to breach any of the provisions of this Paragraph 10.

10. **Miscellaneous**.

(a) Any notice, request, consent, approval or demand given or made under this Addendum shall be in writing and shall be given in the following manner: (i) by personal delivery of such notice; or (ii) by mailing of such notice by certified mail, return receipt requested; or (iii) by sending facsimile transmission of such notice with confirmed transmission; or (iv) by sending e-mail transmission of such notice; provided notice is also delivered by one of the other methods specified in this Paragraph 11(a); or (v) by commercial overnight delivery of such notice. All notices shall be delivered to the addresses set forth in the Bang & Olufsen Pasadena LDA. Notice served by certified mail shall be effective on the fifth (5th) Business Day after the date of mailing. Notice served by facsimile transmission shall be effective as of date and time of facsimile transmission, provided that the notice transmitted shall be sent on a Business Day during business hours (9:00 a.m. to 5:00 p.m. Central time). In the event facsimile notice is transmitted on a non-Business Day or during non-business hours, the effective date and time of notice is the first business hour of the next Business Day after transmission. Notice served by e-mail transmission shall be effective as of date and time of e-mail transmission, provided that the notice transmitted shall be sent on a Business Day during business hours and provided notice is also delivered by one of the other methods specified in this Paragraph 11(a), unless such further Notice requirement is waived by e-mail. In the event e-mail notice is transmitted on a non-Business Day or during non-

business hours, the effective date and time of notice is the first business hour of the next Business Day after transmission. Notice served by commercial overnight delivery shall be effective on the next Business Day following deposit with the overnight delivery company. For purposes hereof, the first "business hour" of a Business Day shall be 9:00 a.m. Central time.

(b) Whenever it is provided in this Addendum that a Party "may" perform an act or do anything, it shall be construed that such Party "may, but shall not be obligated to," so perform or so do. The following words and phrases shall be construed as follows: (a) "at any time" shall be construed as "at any time or from time to time;" (b) "any" shall be construed as "any and all;" (c) "include" and "including" shall be construed as "including but not limited to;" and (d) "will" and "shall" shall each be construed as mandatory. Except as otherwise specifically indicated, all references to paragraph numbers and letters shall refer to the paragraphs of this Agreement. The words "hereby," "hereof," "hereto," "herein" and "hereunder" and any similar terms shall refer to this Addendum as a whole and not to any particular paragraph. The word "hereafter" shall mean after the Effective Date and the word "heretofore" shall mean before the Effective Date. Words of the masculine, feminine or neuter gender shall mean and include the corresponding words of other genders, and words implying the singular number shall mean and include the plural number and vice versa. The paragraph headings are inserted in this Addendum for convenience only and are not intended to, and shall not be construed to limit, enlarge or affect the scope or intent of this Addendum or the meaning of any provision hereof. All references to any agreement or instrument (including this Addendum) shall be to such agreement or instrument as in effect from time to time, including any amendments, replacements, restatements, modifications and/or supplements thereto.

(c) Notwithstanding any laws of the Territory to the contrary, this Addendum, the rights and remedies of the Parties hereunder, all waivers and agreements herein contained and all claims, disputes and controversies related hereto, shall be governed by and construed in accordance with the laws of the State of Illinois without reference to the principles of conflict of laws.

(d) In the event that any provision of this Addendum shall be held to be unenforceable or invalid, the remaining provisions of this Addendum shall nonetheless continue to be valid and enforceable as though the unenforceable or invalid provisions were not a part hereof.

(e) This Addendum shall be construed without regard to any presumption or other rule requiring construction against the Party causing this Addendum to be drafted.

(f) Dealer may not assign its interest in this Addendum without the express written consent of BOA, which consent may be withheld in its sole discretion. Any purported assignment of Dealer's interest herein, whether voluntarily or by operation of any applicable laws or otherwise, shall be ineffective as to BOA. No consent to an assignment of this Addendum shall release the assignee of the obligation to obtain consent to a subsequent assignment if such consent is otherwise required under the terms of this Paragraph 11(f).

(g) This Addendum may be amended or modified only by a written instrument executed by BOA and Dealer.

(h) This Addendum shall be binding upon, and inure to the benefit of the Parties and their respective successors and assigns.

(i) This Addendum is for the sole benefit of the Parties and no other Person shall be entitled to rely upon or receive any benefit from this Addendum or any provision hereof.

(j) No consent or waiver by a Party (either express or implied) to or of a breach of any representation, warranty or covenant contained herein shall be construed as a consent or waiver to or of any other or subsequent breach of the same or any other representation, warranty or covenant.

(k) DEALER AND BOA EACH HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF ILLINOIS, UNITED STATES OF AMERICA, WAIVES TRIAL BY JURY AND FURTHER WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED HEREUNDER, AND FURTHER AGREES NOT TO ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE. BOA AND DEALER FURTHER ACKNOWLEDGE AND AGREE THAT ANY ACTION RELATED TO OR ARISING FROM THIS AGREEMENT OR ANY MATTERS HEREIN DESCRIBED MUST BE BROUGHT IN A STATE OR FEDERAL COURT LOCATED WITHIN COOK COUNTY, ILLINOIS, UNITED STATES OF AMERICA.

(l) IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY OPERATING LOSSES, LOST PROFITS, PUNITIVE DAMAGES, CONSEQUENTIAL DAMAGES OR ANY OTHER INCIDENTAL DAMAGES OR LOSSES DUE TO A BREACH OF THIS ADDENDUM.

(m) Dealer shall pay BOA all reasonable attorneys' fees and costs it incurs in any action to enforce this Addendum or that is related to it, or otherwise arising from the relationship between the Parties.

(n) This Agreement supersedes all prior agreements and understandings between the Parties relating to the subject matter hereof.

(o) Time is of the essence in this Addendum.

(p) All Schedules attached to this Agreement are incorporated herein by this reference.

(q) This Addendum may be executed in two or more counterparts, each of which will be deemed an original, but all of which together constitute one and the same document. To facilitate execution of this Addendum, the Parties may execute and exchange counterparts of the signature pages to this Addendum by facsimile or other electronic form of communication (such as .pdf files).

[SIGNATURE PAGE FOLLOWS]

**Appendix**

"**Bang & Olufsen Retail Store**" means, as of any date, a retail store selling a full range of the Products related accessories, and such other products as are generally permitted to be sold as of such date pursuant to an LDA.

"**B&O Pro Partner**" means any Person who is in the business of providing consumer electronics consulting, design, integration, installation and/or related services to end users of consumer electronics products and/or contractors, builders and developers who include consumer electronics products as part of a commercial or residential real estate product that is offered for sale or lease.

"**Business Day**" means any day other than a Saturday, Sunday or legal holiday of the United States Government.

"**End User**" means any Person initially purchasing any Product, with no intention of reselling the purchased Product, either as a result of (i) a personal visit to a Store located in the Territory; or (ii) any other contact through one of any other Permitted Means.

"**LDA**" means, as of any date, the standard form of Licensed Dealer Agreement generally used by BOA as of such date.

"**Permitted Means**" means any means of marketing or selling Products, or offering Products for sale, in the Territory that is authorized by BOA in writing from time to time.

"**Person**" means any natural person, corporation, partnership, association, limited liability company, joint-stock company, trust, unincorporated association, joint venture, Governmental Authority or any similar entity.

"**Products**" has the meaning specified in the Pasadena LDA.

"**Shop-in-Shop Store**" means, as of any date, a retail store that is located within a larger retail location but has a separate store identity within such larger retail location that includes the interior and exterior appearance of a Bang & Olufsen Retail Store.

IN WITNESS WHEREOF, the Parties have caused this Addendum to be entered into as of the Effective Date.

BOA: Lincolnshire, IL 4-5-2017

Bang & Olufsen America, Inc.

By: J. Siboni
Jacob Siboni, Authorized Person

DEALER:

M&N Luxury AV, LLC

By: D.M
Name: DAVID JUNK
Title: CEO

**Schedule 1(b)**

**STORE OPENING PLAN**

By March 30, 2017, Dealer shall complete the acquisition of the Bang & Olufsen Store at 169 West Green Street in Pasadena California

By December 31, 2017, Dealer shall operate no less than 2 Bang & Olufsen B1 Shops within the Territory

By December 31, 2018, Dealer shall operate no less than 4 Bang & Olufsen B1 Shops within the Territory

After the opening of the 4th shop in the territory, Bang & Olufsen and Dealer will open discussions on the acquisition of the Bang & Olufsen Shop at 479 N Rodeo Drive Los Angeles California.

*Confidential – Attorneys' Eyes Only*

# EXHIBIT 3

Confidential - Attorneys' Eyes Only

# BANG & OLUFSEN LICENSED DEALER AGREEMENT (RETAIL US)

**CONTENTS**


| | | Page |
|---|---|---|
| 1 | DEFINITIONS AND INTERPRETATION | 4 |
| 2 | PURPOSE AND BACKGROUND | 7 |
| 3 | APPOINTMENT | 8 |
| 4 | DEALER'S PURCHASE AND RESALE OF THE PRODUCTS | 8 |
| 5 | MINIMUM AGGREGATE PURCHASE OBLIGATION | 9 |
| 6 | STORES | 9 |
| 7 | CUSTOMER SERVICE AND GUARANTEE | 11 |
| 8 | DEALER'S PERSONNEL | 11 |
| 9 | TRAINING | 11 |
| 10 | MARKETING AND PROMOTION | 11 |
| 11 | POS SYSTEM AND SUBMISSION OF SHOP DATA | 12 |
| 12 | ASSISTANCE AND SERVICES PROVIDED TO THE DEALER | 12 |
| 13 | CUSTOMER SATISFACTION | 12 |
| 14 | INTELLECTUAL PROPERTY RIGHTS | 12 |
| 15 | TERM AND TERMINATION | 14 |
| 16 | CONDITIONS FOLLOWING TERMINATION | 15 |
| 17 | CONFIDENTIALITY OBLIGATION | 16 |
| 18 | OTHER PROVISIONS | 17 |
| 19 | GOVERNING LAW AND DISPUTES | 21 |

## SCHEDULES (AVAILABLE ELECTRONICALLY)

| | |
|---|---|
| Schedule 3.1: | Stores |
| Schedule 4.1: | Displayed Products |
| Schedule 4.3: | Bang & Olufsen retail ordering system (ROS) |
| Schedule 4.5(a): | E-commerce guideline (Bang & Olufsen Products) |
| Schedule 4.5(c): | Corporate Visual Identity Manual |
| Schedule 4.6.1: | Commercial Terms |
| Schedule 6.1: | Shop Concept |
| Schedule 6.2(a): | Bang & Olufsen Store Elements |
| Schedule 7.1: | Operation Manual |
| Schedule 7.2: | Bang & Olufsen Guarantee |
| Schedule 10.1 | Marketing Plan |
| Schedule 11.1: | Shop data requirements |

This

BANG & OLUFSEN LICENSED DEALER AGREEMENT

was concluded on June 1, 2017, between

Bang & Olufsen America, Inc.
200 Tri State International Drive
Suite 525
Lincolnshire, Illinois 60069
("BOA")

and

M&N Luxury AV, LLC
*[Dealer Legal name/entity]*

5741 Norwich Ave
Van Nuys, CA 91411

*[Dealer Address, which will be used for all future correspondence with Dealer]*
(the "Dealer")

(individually the "Party" and collectively the "Parties")

## 1 DEFINITIONS AND INTERPRETATION

1.1 In the Agreement, the following words and expressions have the meanings stated below, unless the context requires otherwise.

| | |
|---|---|
| Agreement | this agreement with schedules. |
| Bang & Olufsen | Bang & Olufsen a/s, CVR no. 41257911, Peter Bangs Vej 15, DK-7600 Struer, Denmark. |
| Bang & Olufsen Store Elements | the mandatory store elements required to sell Bang & Olufsen Products as set out in clause 6.2(a). |

| | |
|---|---|
| Bang & Olufsen Products | the range of audio and video products sold under the Bang & Olufsen brand from time to time. |
| B&O PLAY | B&O PLAY a/s, CVR no. 33859643, Gl. Lundtoftevej 1B, DK-2800 Kgs Lyngby, Denmark. |
| B&O PLAY Products | the range of audio and video products sold under the B&O PLAY brand from time to time. |
| B1 Stores | stand-alone retail stores dedicated to the sale of the Products which are equipped, fitted up and furnished in accordance with Bang & Olufsen's Shop Concept. |
| Commercial Terms | the commercial terms set out in clause 4.6.1. |
| Effective Date | July 31, 2017 |
| Financial Year | a period of time commencing June 1 and ending May 31. |
| Force Majeure | any event that either Party has not reasonably been able to predict, control, avoid or remedy, including – depending on the circumstances – defects or break-downs of telecommunications networks or lines, server or computer breakdowns (e.g. due to virus or hacker attacks), disruptions of electricity supply, public authority prohibition or enforcement notices, strikes and lockouts, acts of terrorism, wars, civil wars, riots, natural disasters, nuclear accidents, ep-idemics, pandemic diseases, fires, floods, storms, sabotage, criminal damage and similar events. |
| Goodwill | all goodwill, reputation, value and commercial ad-vantage in connection with the Intellectual Property Rights and the Products. |
| Intellectual Property Rights | any intellectual property rights, including patents, utility models, trademarks, designs, copyrights or rights in databases owned or licensed by Bang & Olufsen in all countries as well as any applications or renewals concerning such rights. |
| Marketing Plan | the marketing plan for each Financial Year as set out in clause 10.1. |

| | |
|---|---|
| Network | the network of Bang & Olufsen Dealers (retailers) authorized to resell the Bang & Olufsen Products in B1 Stores and/or Shop-in-shops in the Territory, as well as B&O PRO authorized resellers (permitted to sell to permitted users). |
| Operation Manual | Bang & Olufsen's manual for customer service requirements in force from time to time as set out in clause 7.1. |
| POS System | the point of sale system set out in clause 11. |
| POS Material | posters, brochures, catalogues and other marketing material used from time to time in connection with the resale of the Products. |
| Products | Bang & Olufsen Products and Third Party Products. If Dealer becomes an authorized B&O PLAY reseller, B&O PLAY products will be included in Products. |
| Schedule | a schedule to the Agreement |
| Shop Concept | Bang & Olufsen's manual in force from time to time which describes how the Stores must be equipped, fitted up and furnished as set out in clause 6.1. |
| Shop-in-shops | clearly defined spaces dedicated to the sale of the Products in retail stores which are equipped, fitted up and furnished in accordance with Bang & Olufsen's Shop Concept. |
| Stores | B1 Stores and/or Shop-in-shops listed in Schedule I1(a)(i)3.1. |
| Territory | United States and Canada. |
| Third Party Products | the range of third party products which Bang & Olufsen from time to time has specified to be sold in connection with the sale of Bang & Olufsen Products and which are sourced by the Dealer from either BOA or from third party suppliers designated or approved by Bang & Olufsen. |
| Trademarks | the trademarks, logos, names, product designations, designs etc. owned or licensed by Bang & Olufsen. |

1.2 The Agreement is the result of the Parties' negotiations, and it cannot be interpreted against a Party as a consequence of such Party having drafted one or more of the provisions of the Agreement.

1.3 Expressions, such as "including" and similar expressions, mean "including, but not limited to".

1.4 Nouns in the singular include the plural and vice versa. Nouns in the definite form include the indefinite form and vice versa.

1.5 The headings of the Agreement are for guidance only and have no separate legal effect on the understanding or interpretation of the provisions of the Agreement.

1.6 The Agreement contains the entire agreement between the Parties concerning the Dealer's sale of the Products and supersedes all previous agreements between the Parties on the subject-matter of the Agreement.

1.7 In case of any discrepancy between the Agreement (without Schedules) and the Schedules, the Agreement (without Schedules) will take precedence.

## 2 PURPOSE AND BACKGROUND

2.1 The Bang & Olufsen group manufactures a highly distinctive and exclusive range of televisions, music systems, loudspeakers, telephones, and multimedia products under the Bang & Olufsen brand (the Bang & Olufsen Products) and the B&O PLAY brand (the B&O PLAY Products).

2.2 The Bang & Olufsen Products are sold through a network of authorized Dealers and B&O PRO partners (the Network). As a member of this exclusive Network, the authorized Dealers and their stores become part of the Bang & Olufsen universe including not only the Bang & Olufsen Products but also the professional support functions which are offered to the Bang & Olufsen Dealers. In exchange the Dealer must deliver high quality customer services and experiences that support Bang & Olufsen's brand values towards quality, innovation and design. Within the Network Bang & Olufsen currently distinguishes between B1 Stores and Shop-in-shops, and also B&O PRO's, who are allowed to sell Bang & Olufsen Products to permitted users (subject to individual contracts). Bang & Olufsen may from time to time modify, create new or close existing retail categories which may affect the Dealer's rights and obligations according to the Agreement.

2.3 The B&O PLAY Products are sold (i) through the Network, (ii) through authorized distributors and/or resellers outside the Network. Authorized resellers of B&O PLAY Products are resellers who have been authorized to resell B&O PLAY Products by B&O PLAY and/or BOA which form a separate contract outside this Agreement. Should Dealer wish to sell B&O PLAY Products (both in store and/or online), Dealer will undertake to sign up and agree to the separate terms and conditions to become an authorized reseller of B&O PLAY products, as requested by B&O PLAY

and/or BOA [as set forth here: [http://www.beoplay.com/authorised reseller us ld] or another website] communicated to Dealer from time to time).

2.4 BOA wishes to appoint the Dealer as an authorized Bang & Olufsen Dealer and the Dealer wishes to be appointed as an authorized Bang & Olufsen Dealer on the terms and conditions in this Agreement.

## 3 APPOINTMENT

3.1 BOA grants the Dealer a non-exclusive right to distribute the Bang & Olufsen Products and use the Trademarks at the addresses and in connection with the operation of the B1 Stores and/or Shop-in-shops listed in Schedule 3.1 (the Stores).

3.2 The Dealer must only use the Trademarks in connection with the operation of the Stores and must operate the Stores in accordance with the provisions of this Agreement and the Schedules hereto.

## 4 DEALER'S PURCHASE AND RESALE OF THE PRODUCTS

4.1 The Dealer is required to display such assortment of Products in its Stores as listed in Schedule 4.1. In B1 Stores, no other products than the Products must be sold or displayed. In Shop-in-shops, no other products than the Products must be displayed in the space dedicated to the sale of the Products.

4.2 The Dealer must purchase its entire requirement for Bang & Olufsen Products solely from BOA or suppliers designated or approved by Bang & Olufsen or from other authorized Bang & Olufsen Dealers within the Network.

4.3 The Dealer must order and purchase the Products through the Bang & Olufsen retail ordering system as described in Schedule 4.3.

4.4 The Dealer must run the Stores as retail stores and must not without prior written approval in each individual case sell any Bang & Olufsen Products to wholesalers. The Dealer is not entitled to sell Bang & Olufsen Products to other Dealers than authorized Bang & Olufsen Dealers within the Network. Nor is the Dealer entitled to sell any Bang & Olufsen Products, whether directly or indirectly, outside the Territory.

4.5 Dealer must comply with Bang & Olufsen's Corporate Visual Identity Manual attached as Schedule 4.5(c) with regard to electronic usage (e.g. home pages).

4.6 Prices and delivery terms

4.6.1 The commercial terms including prices, interests, discounts, bonuses, delivery terms, minimum purchase obligations etc. (the Commercial Terms) for the Dealer's purchase of the Products from BOA are determined by (i) general commercial terms applied by BOA from time to time and (ii)

the Dealer's individual performance according to a number of performance criteria. BOA will communicate to the Dealer the Commercial Terms applicable for the Financial Year, or such shorter period until the end of the first Financial Year from the Effective Date. The Commercial Terms are set out in Schedule 4.6.1.

4.6.2 Upon the request of BOA, the Dealer must prepare and present to BOA an initial five (5) year business plan for the operation of the Stores in accordance with the specifications set out in Schedule 4.6.2.

4.6.3 The Dealer waives the right to allocate payment for the repayment on a specific debt. Thus, upon receipt of payments from the Dealer, BOA may in its discretion refer the payment including interest or any other charge to any outstanding debt item owed by the Dealer. In the absence of any mandatory legislation or notification to the contrary from BOA payments are deemed to reduce the oldest debt first.

## 5 MINIMUM AGGREGATE PURCHASE OBLIGATION

5.1 During the term of this Agreement the Dealer must in aggregate or within each category of Products as determined by BOA purchase Products from BOA for an agreed minimum aggregate purchase amount. Minimum purchase amounts are measured within periods of six (6) months of the Financial Year. The minimum aggregate purchase amounts are included in the Commercial Terms.

5.2 In the event that the Dealer does not fulfil the aggregate minimum purchase amounts for two (2) consecutive six (6) months' periods the Dealer is considered in material breach of the Agreement (see clause 15.3).

## 6 STORES

6.1 The Dealer must build B1 Store fronts and equip, fit up and furnish the Stores in accordance with Bang & Olufsen's Corporate Visual Identity Manual (Schedule 4.5(c)) and the Shop Concept (Schedule 6.1) as changed and updated from time to time.

6.2 The Stores must be equipped and fitted up with Bang & Olufsen Store Elements as described in Schedule 6.2(a). Bang & Olufsen Store Elements must be purchased by the Dealer from BOA or third party suppliers designated or approved by Bang & Olufsen.

6.3 The Dealer is not entitled to commence the operation of any Store until the Store has been equipped, fitted up and furnished in accordance with Bang & Olufsen's specifications and the Store in writing has been approved ready for operation by BOA.

6.4 The Dealer must follow and implement all campaigns regarding window display, interior or exterior shop decoration, and special product promotions etc. which from time to time are initiated by BOA. When new Bang & Olufsen Products are launched the Dealer is required to purchase

the amount of such new Bang & Olufsen Products considered adequate by BOA for that purpose. Products from the existing product range that are included in campaigns and window displays must be purchased by the Dealer unless the Dealer has agreed with BOA not to acquire such Products. Furthermore, the Dealer is required to purchase Bang & Olufsen Store Elements and/or any other elements required by BOA in connection with new window displays.

6.5 The Dealer may not without the express, written permission of BOA change the internal appearance of the Stores, nor the external appearance of any B1 Stores. The Dealer must maintain the Stores and carry out all such repairs and improvements as required and deemed necessary by BOA in order to maintain a visual identity of high quality. BOA may from time to time instruct the Dealer to make changes of the internal and/or external appearance of the Stores in order to comply with changes in Bang & Olufsen's Shop Concept.

6.6 Store leases

6.6.1 Upon written request from BOA the Dealer must use all reasonable efforts to ensure that BOA obtains:

(a) a right to substitute and takeover all rights and obligations of the Dealer in respect of a lease of the Stores in the event that the Dealer breaches the lease agreement or terminates the lease agreement pursuant to which it occupied the Stores and to ensure that BOA in this event receives copies of all notices from the landlord including without limitation notice of termination whether statutory or otherwise in a reasonable time to decide whether it will exercise the right to substitute the Dealer on reasonable conditions; and

(b) a right to substitute and takeover all rights and obligations of the Dealer in respect of a lease of the Stores in the event that the Agreement is terminated due to the Dealers breach of this Agreement; and

(c) a right to acquire the lease of the Stores on similar conditions as the lease are offered to any third party in the event that the Dealer has a right to assign its rights under the lease agreement to a third party. The price to be paid by BOA is limited to the amount corresponding to the market value for the right to assignment as set out in clause 6.6.2.

6.6.2 In the event that BOA exercises its right to take over a lease according to clauses 6.6.1 (a) or (b), the Dealer may request that BOA pays to the Dealer the market value, if any, of the right of assignment of the lease. The market value shall be determined as the average of the market value determined by two (2) independent real estate appraisers with local knowledge of whom one (1) shall be appointed by the Dealer and one (1) shall be appointed by BOA. The Parties shall pay the costs to the appraiser appointed by them. Absent any manifest error the market value calculated as the average of the two valuations shall be final and binding on the Parties and not subject to review by arbitration or court proceeding. BOA shall be entitled to set-off money owed by the Dealer to BOA against payment for the lease.

6.6.3 The Dealer must submit a copy of the lease agreement for the Stores and any amendments thereto to BOA.

## 7 CUSTOMERSERVICE AND GUARANTEE

7.1 The Dealer must comply with Bang & Olufsen's manual for customer service requirements with regard to guidance on and demonstration of the Products, delivery and installation of the Products, and repairs of the Products as outlined in Schedule 7.1. Installation and repairs must be performed either by an authorized Bang & Olufsen service center within the Dealer's organization or by an external authorized Bang & Olufsen service center.

7.2 The Dealer must simultaneously with the completion of the sale of Bang & Olufsen Products provide customers with an original Bang & Olufsen warranty and comply with the responsibilities as described in Schedule 7.2.

## 8 DEALER'S PERSONNEL

8.1 The operation of the Store requires that the Dealer's personnel have the qualifications and skills required in order to provide the customers with high quality service and guidance and in-depth technical knowledge of the Products. The Dealer is obliged to employ a sufficient number of suitably qualified personnel to ensure the proper fulfilment of its obligations under this Agreement.

## 9 TRAINING

9.1 Mandatory training is required for owners, shop managers and other personnel involved in the operation of the Stores.

9.2 Training is conducted electronically and/or physically at the locations designated by BOA. The Dealer pays all wage costs, travelling and other expenses for individuals participating in such training. BOA will pay for accommodation (choice of accommodation is at BOA's discretion).

9.3 The Dealer must ensure that its personnel at any time have completed the required training.

## 10 MARKETING AND PROMOTION

10.1 For each Financial Year, BOA may at its sole discretion decide to set out the promotion and marketing activities, Product releases and campaigns planned for the various parts of the Territory (the Marketing Plan), however such plan is not mandatory and the Dealer does not have a legal claim to obtain such Marketing Plan. Where a Marketing Plan is provided by BOA, it will be included as Schedule 10.1, which will apply for that Financial Year.

10.2 The Dealer may in addition to the marketing activities included in the Marketing Plan make additional local marketing and promotional activities provided that the Dealer submits samples of all advertising and promotional plans and materials to BOA for its prior approval, if such plans and materials have not been prepared or previously approved by BOA.

10.3 Each Financial Year the Dealer pays a mandatory marketing fee to BOA for its access to and benefits of use of POS Material, participation in joint marketing and promotion activities etc. The marketing fee will be communicated to the Dealer as part of the Commercial Terms (see clause 4.6.1).

## 11 POS SYSTEM AND SUBMISSION OF SHOP DATA

11.1 For the purpose of among other things providing fast and efficient gathering of data of sales and status of inventory, creating customer behavior statistics, optimizing support functions, reducing costs in the distribution chain and in general increasing customer satisfaction, the Dealer must provide BOA – if so required by BOA - with Profit & Loss accounts and install and use a point of sales system (the POS System) that is capable of retaining and analyzing the shop data described in Schedule 11.1 as amended from time to time. The POS System must be approved by BOA and must be accessible with an interface by BOA and Bang & Olufsen and must be compatible with Bang & Olufsen's finance system. BOA shall keep all received records from Dealer (including customer information) confidential and shall not sell or share said information with third parties outside the Network, and the use of said information shall solely be for the purposes of operating Bang & Olufsen' business.

11.2 Until an approved POS System is in place for all Stores, the Dealer must supply BOA with such information which BOA deems relevant from time to time.

## 12 ASSISTANCE AND SERVICES PROVIDED TO THE DEALER

12.1 The Bang & Olufsen group continuously strives to develop the Network in close cooperation with the Bang & Olufsen subsidiaries (national sales organizations) and the Dealers. BOA provides the Dealer with any reasonable assistance and services prior to and after the opening of the Stores to help the Dealer optimize its sales processes. Furthermore, BOA will to the extent possible accommodate other reasonable requests from the Dealer for additional assistance.

## 13 CUSTOMER SATISFACTION

13.1 In order to ensure that the Products and the Stores meet or surpass customers' expectations the Dealer must according to instructions from BOA either collect data to the Bang & Olufsen customer satisfaction index (CSI) or allow BOA to collect such date directly from the customers. Further, BOA is entitled at any time to inspect and examine the Stores to make sure that the Dealer complies with its obligation under this Agreement.

## 14 INTELLECTUAL PROPERTY RIGHTS

14.1 Bang & Olufsen retains all Intellectual Property Rights in and to the Bang & Olufsen Products and the Trademarks.

14.2 Except for the Dealer's rights under this Agreement, no right, title or interest in or to the Bang & Olufsen Products is granted or otherwise transferred by this Agreement. The Dealer must respect the rights of Bang & Olufsen in accordance with all applicable laws and the provisions of this Agreement.

14.3 The Dealer may use the Trademarks on its letterhead, envelopes, order sheets, cars or any other stationery items in connection with this Agreement provided that the Dealer comply with Bang & Olufsen's Corporate Visual Identity Manual (Schedule 4.5). Any use of the Trademarks in connection with any signs, decoration or advertising must also be in accordance with Bang & Olufsen's Corporate Visual Identity Manual.

14.4 The Dealer may refer to itself as an authorized Bang & Olufsen Dealer but may not use the Trademarks or names or trademarks confusingly similar to the Trademarks in or as part of the Dealer's company name or secondary name.

14.5 The Dealer must inform BOA as soon as possible of any known infringement of Bang & Olufsen's Intellectual Property Rights or of any claim or allegation by a third party that its intellectual property has been infringed by the exercise of any of the rights granted by BOA to the Dealer under this Agreement.

14.6 The Dealer must itself refrain from registering any Intellectual Property Rights attached in and to the Bang & Olufsen Products, the Trademarks and/or any part or derivative hereof. In the event that any such rights have already been registered before the execution of this Agreement, the Dealer must ensure that any such rights are assigned to Bang & Olufsen without compensation.

14.7 CRM database

14.7.1 The Dealer must take adequate steps to register all customers in the Bang & Olufsen CRM database in accordance with the guidelines provided for in the Operation Manual and as part thereof obtain and file for documentation purposes acceptances from the customers of their entry into the CRM database.

14.7.2 In order to ensure that the customers' communication with Bang & Olufsen is operated in a professional manner and to avoid, for example, that customers receive multiple copies of identical marketing material, BOA may in the interest of the customers instruct that general marketing campaigns from Bang & Olufsen or from BOA (as opposed to marketing campaigns initiated by the Dealer) are distributed to the customers from a Dealer designated by BOA. Such designation is subject to BOA's sole discretion, but may amongst other things include evaluation of accumulated sales to customer over a certain period of time.

14.7.3 All rights to data in the CRM database belong to Bang & Olufsen. The Dealer must only use the CRM database for the purpose of this Agreement and may not sell, license or otherwise dispose of such data without the prior written approval of Bang & Olufsen in each individual case.

## 15 TERM AND TERMINATION

15.1 The Agreement enters into force on the Effective Date and remains in force until terminated by either Party in accordance with the terms set out below. Notwithstanding the aforesaid, neither Party shall be allowed to unilaterally terminate the Agreement for convenience for the initial five (5) years, commencing on the Effective Date.

15.2 Upon expiration of the initial five (5) year's period, BOA shall be entitled to terminate the Agreement in full or in part with six (6) months' written notice. For the avoidance of doubt, this means that BOA regardless of the numbers of Stores covered by the Agreement (see Schedule 3.1) is entitled to terminate the Agreement with effect for one or more Stores or one or more Products without effect for the remaining Stores or Products. The Dealer is not entitled to partial termination of the Agreement.

15.3 Notwithstanding clauses 15.1 and 15.2, either Party may with immediate effect terminate this Agreement due to a material breach by the other Party if the breach has not been remedied within thirty (30) calendar days of receiving written notice of such breach and of what is required to be done by the breaching Party to remedy the breach. Material breach includes, among other things, the following:

(a) Dealer's failure to display the Products in accordance with Schedule 4.1.

(b) Dealer's failure to buy Bang & Olufsen Products solely from BOA or suppliers designated or approved by Bang & Olufsen or other authorized Bang & Olufsen Dealers within the Network (see clause 4.2).

(c) Dealer's sale of Bang & Olufsen Products to wholesalers without prior written approval (see clause 4.4).

(d) Dealer's sale of Bang & Olufsen Products to other Dealers than authorized Bang & Olufsen Dealers within the Network (see clause 4.4).

(e) Dealer's sale of Bang & Olufsen products outside the Territory (see clause 4.4).

(f) Dealer's failure to comply with Bang & Olufsen's E-commerce guidelines (Schedule 4.5(a)) and Corporate Visual Identity Manual (Schedule 4.5(c)).

(g) Dealer's failure to comply with its payment obligations in due time according to Schedule 4.6.1.

(h) Dealer's failure to fulfil aggregate minimum purchase amounts for two (2) consecutive six months' periods (see clause 5.2).

(i) Dealer's failure to comply with the Store requirements concerning the internal or external appearance of the Stores as set out in the Bang & Olufsen Shop Concept (see clauses 6.1 to 6.3).

(j) Dealer's failure to accommodate with instructions from BOA regarding internal or external appearance of the Stores (see clauses 6.4 to 6.5).

(k) Dealer's failure to comply with the Store lease obligations (see clause 6.6).

(l) Dealer's failure to comply with Bang & Olufsen's customer service requirements (see clause 7).

(m) Dealer's breach of its marketing and promotion obligations (see clause 10).

(n) Dealer's breach of the rules on the use of the Intellectual Property Rights (see clause 14).

(o) Dealer's failure to comply with the training requirements (see clause 9).

(p) Dealer's breach of the confidentiality obligation including without limitation the duty to observe secrecy regarding new Product releases (see clause 17.1).

15.4 BOA may terminate this Agreement, effective immediately upon receipt by the Dealer of a termination notice from BOA to the Dealer, which termination notice BOA will be entitled to serve, upon the occurrence of any one or more of the following events of termination:

- the Dealer no longer holds a license that the Dealer must hold to operate the Store;
- the Dealer becomes bankrupt or insolvent or under administration or commences any voluntary or involuntary creditor arrangement;
- the Dealer is convicted of a felony or a misdemeanor involving fraud or moral turpitude;
- the Dealer is fraudulent or grossly negligent in connection with the operation of the Stores;
- the Dealer agrees to an immediate termination of this Agreement.

15.5 Unless expressly provided for by mandatory provisions of the law applicable, termination of this Agreement by BOA will not entitle the Dealer to any payment or compensation or a payment towards Goodwill (see clause 16.2).

## 16 CONDITIONS FOLLOWING TERMINATION

16.1 Immediately upon the termination of this Agreement:

(a) the Dealer will pay any and all amounts owing to BOA and its related entities pursuant to this Agreement and all the rights under this Agreement granted to the Dealer will automatically cease;

(b) the Dealer will discontinue any use of the Intellectual Property Rights;

(c) the Dealer will discontinue any use of the Trademarks or reference to the Trademarks on the exterior or interior of the Stores (i.e. remove all signs, fixtures, and equipment); and

(d) the Dealer will refrain from doing business under any name or in any manner that might give the impression that the Dealer is or was a Dealer of BOA or any of its related entities or otherwise affiliated or associated with Bang & Olufsen.

16.2 The Dealer acknowledges and agrees that the value of a luxury retail store like a Bang & Olufsen retail business predominantly lies within the Products and the Bang & Olufsen brand and therefore the Dealer acknowledges and agrees that:

(a) the Goodwill and any increase in value of the Goodwill vests absolutely in Bang & Olufsen and that the Dealer is not entitled to any payment or other compensation whatsoever from Bang & Olufsen and its related entities for any increase in value of the Goodwill that occurred during the term of this Agreement unless otherwise provided for by mandatory provisions of the law applicable;

(b) With respect to any other inventory related to the operation of the Stores, BOA has the right but not the obligation, within thirty (30) days after termination, to purchase from the Dealer said goods at the market value but never more than the lowest of either its purchase price or book value according to the Dealer's accounts. Unless otherwise provided for by mandatory provisions of applicable law, if BOA shall repurchase Dealer's Products (which are included in Schedule 4.1), products must be in factory sealed packaging. The repurchase price would be limited to Dealer's cost net of any discounts or bonuses. BOA arranges for transportation, insurance and any related costs associated with transport of the inventory to a location designated by BOA; and

(c) the Dealer must return to BOA any hard copies of manuals and any other materials provided by BOA (marketing, activity, advertising and promotional material) in its possession or control.

16.3 BOA acknowledges and agrees that clause 16.2(a) does not limit the Dealer from selling the business it operates under this Agreement in connection with the operation of that business and retaining the proceeds of such a sale, provided that BOA has previously approved the sale and the buyer in writing.

16.4 All obligations of the Parties which expressly or by their nature survive the termination of this Agreement will continue in full force and effect notwithstanding the termination of this Agreement.

## 17 CONFIDENTIALITY OBLIGATION

17.1 The Dealer undertakes to keep strictly confidential all confidential information about Bang & Olufsen and its related entities, its suppliers, customers, Bang & Olufsen Products, releases of new Bang & Olufsen Products, and the structure and development of the Network. Any and all

information of such nature is deemed business or operating secrets of Bang & Olufsen and its related entities. The Dealer may use the information provided by BOA solely for the purpose of the operation of the Stores.

17.2 The Dealer undertakes not to disclose to third parties any confidential and business information pursuant to clause 17.1 which the Dealer has received prior to or after the signing of this Agreement. The Dealer must take any reasonable precautions to prevent third parties from getting access to the business or operating secrets of Bang & Olufsen and its related entities. This includes the obligation to impose appropriate confidentiality undertakings on the Dealer's present and future employees in written form.

17.3 The Dealer may give access to manuals and other material provided by BOA to its employees for use within its business. However, the Dealer must take all reasonable precautions preventing the employees from copying, printing or removing any documents or electronic information from the Stores and from handing over copies of such documents or information to any third party.

17.4 If the Dealer breaches clause 17, the Dealer will be obligated to pay a fee to BOA of USD twenty-five thousands ($ 25,000) for each breach. Receipt of such fee will not preclude BOA or Bang & Olufsen from seeking actual damages for their losses, but fee paid will be deducted from the claim for actual damages. Payment of a fee and/or actual damages will not release, in full or in part, the Dealer from its obligations under the Agreement. Further to the remedies provided for in clause 17.4, BOA and Bang & Olufsen will be entitled to apply any other remedy, e.g. by seeking an injunction in accordance with applicable legislation.

17.5 This confidentiality obligation survives the termination of this Agreement and remains in force as long as any of the information pursuant to clause 17.1 is of confidential nature, i.e. not in the public domain.

## 18 OTHER PROVISIONS

18.1 Assignability

18.1.1 The Dealer may not assign or in any other way transfer its rights or obligations under this Agreement without the prior written consent of BOA which consent will not be unreasonably withheld provided inter alia that any new Dealer completes mandatory training prior to the commencement of the distribution.

18.1.2 BOA may assign its rights and obligations under this Agreement fully or in part to any company within the group of which BOA belongs or to a person or company appointed by Bang & Olufsen as Bang & Olufsen's Master Dealer (MDA) in the Territory and the Dealer will execute all necessary documents in a form Bang & Olufsen and its related entities considers reasonably necessary to effect such an assignment. Furthermore, Bang & Olufsen is entitled to assign the Agreement in connection with a possible assignment of all or the majority of Bang & Olufsen's assets and liabilities.

18.2 Force Majeure

18.2.1 Neither of the Parties to this Agreement is responsible to the other Party for any delay in performance or non-performance due to Force Majeure, but the affected Party must promptly upon the occurrence of any such causes inform the other Party in writing, stating that such cause has delayed or prevented its performance hereunder and thereafter such Party must take all action within its power to comply with the terms of this Agreement as fully and promptly as possible; provided, however, that the provisions of this clause 18.2.1 shall not apply to any payment obligations under this Agreement.

18.2.2 Each Party is entitled to terminate the Agreement by thirty (30) days' written notice to the other Party if performance of the Agreement continues to be impossible on account of any circumstances due to Force Majeure for a period of more than ninety (90) days.

18.3 Insurance

18.3.1 The Dealer is obliged to take out and maintain general liability insurance covering all of the Dealer's activities including service and installation and including public and employer's liability insurance. In addition, the Dealer is obliged to take out all other relevant insurances as may be requested at any time by BOA in connection with the operation of the Stores. Such insurance(s) shall name BOA and Bang & Olufsen a/s as additional insureds. Copies of all insurance policies must upon request be made available to BOA together with receipts for payment of premium.

18.4 Dealer's Status

18.4.1 The Dealer must always refer to his status as an independent Dealer operating in the Dealer's own name and for his own account. At no time must the Dealer refer to himself as Bang & Olufsen or any of its related entities, hold himself out as a subsidiary, business division, agent or employee of Bang & Olufsen or any of its related entities. The Dealer must only use the Trademarks in accordance with the terms and conditions of this Agreement. This Agreement does not in any way create the relationship of principal and agent between Dealer and BOA or Bang & Olufsen, and in no circumstances shall Dealer, its agents or employees be considered the agents of BOA or Bang & Olufsen. Nothing contained in this Agreement creates a franchise and the Dealer is not a franchisee. Dealer agrees to take such further affirmative action as BOA may require in this regard, including, without limitation, (i) exhibiting a notice of Dealer's licensee status (in form prescribed by BOA) in a conspicuous place in the Store, (ii) making any and all "assumed name" or similar filings required or permitted to be made under applicable state and local laws to disclose the true identity of Dealer, and (iii) placing the phrase "an authorized independent Dealer of Bang & Olufsen® products" in a conspicuous location on all advertising, promotional materials, letterhead, business cards, forms and other printed material, in accordance with clause 14.3.

18.5 Dealer's legal structure (legal entity)

18.5.1 The Dealer represents and warrants to BOA that as of the Effective Date, the record and beneficial ownership of Dealer is as follows:

(a) In case Dealer is a partnership or Limited Liability Company, by the following persons in the following percentages:

David Junk 100%

________________________________________

(b) In case Dealer is a corporation, 100% or the issued and outstanding shares of voting stock (regardless of class) of Dealer is owned by the following persons in the following percentages:

________________________________________

________________________________________

18.6 Waiver

18.6.1 The failure of any Party at any time to enforce any of the provisions of this Agreement or to exercise any right under this Agreement shall in no way affect that Party's rights after any failure or constitute a waiver of that right.

18.7 Notices

18.7.1 Any notice to be given under the Agreement must be in writing and delivered by hand, sent by letter with a delivery note, or sent by registered and ordinary mail, by fax or by email to the addresses of the Parties set out in the Agreement.

18.8 Compliance with law

18.8.1 The Dealer must conduct its business in a lawful manner and must faithfully comply with all applicable laws or regulations for the conduct of its business.

18.9 Severability

18.9.1 Where any provision of this Agreement is or becomes illegal, invalid or unenforceable in any respect under the laws of any jurisdiction then such provisions will deemed to be severed from the Agreement and, if possible, replaced with a lawful provision which, as closely as possible, gives effect to the intention of the Parties under this Agreement. The other provisions of the Agreement will remain effective.

18.10 Miscellaneous Provisions

18.10.1 The Dealer will duly execute and perform all such acts, deeds, matters and things (including the execution of documents) as may be reasonably required by BOA to enable BOA to obtain the full benefit and advantage of this Agreement and the transactions contemplated by this Agreement.

18.10.2 Where this Agreement refers to rights belonging to Bang & Olufsen, BOA is without limitation entitled to enforce such rights against the Dealer on behalf of Bang & Olufsen being a company which is a member of the Bang & Olufsen group.

18.10.3 The terms and conditions of this Agreement may be amended or varied only in writing signed by the Parties.

18.11 Payments.

18.11.1 All payments (other than for Products) which the Dealer is obligated to make to BOA during the first six (6) months of operation of the Business or prior thereto shall be deferred and shall not be due and payable until the first day immediately following such six (6) month period. Any payments made contrary to the preceding sentence shall be deemed to have been made to BOA after the first six (6) months of operation of the Business or refunded to Dealer during that six (6) month period at its request and then shall be deferred and shall not be due and payable until the first day immediately following such six (6) month period.

18.11.2 The provisions of clause 18.11.1 shall not apply to the Dealer's purchases of Products from BOA, which shall be purchased and paid for in accordance with the Commercial Terms, nor shall it apply if this Agreement renews or extends a prior Agreement between BOA and the Dealer.

18.11.3 BOA has not charged and will not charge any fee, direct or indirect, for entering into this Agreement or the right to sell the Products. No such fee or charge is or will be included in any prices or payments for Products or other items sold or services rendered by BOA to the Dealer. The Dealer shall be precluded from contending that any such fee or charge was included in any price or payment for Products or other items sold or services rendered by BOA to the Dealer unless the Dealer contends in writing to BOA within sixty (60) days after the Products or other items were sold or services were provided by BOA that the prices or payments for Products or other items sold or services included any such fee or charge.

18.12 Schedules

18.12.1 All Schedules to this Agreement can be found via Bang & Olufsen retail ordering system ROS. All such Schedules, as in effect from time to time, are incorporated herein by this reference as though fully set forth herein.

18.12.2 The Dealer is required to read, understand and follow each and every term, condition, requirement and standard applicable set forth in the Schedules. Please carefully review these materials. THE DEALER'S EXECUTION AND RETURN OF A COUNTERPART OF THIS AGREEMENT CONSTITUTES THE DEALER'S ACKNOWLEDGMENT THAT IT HAS READ ALL OF THE SCHEDULES, as set forth on ROS as of 9:00 a.m. Central time (U.S.) on the date immediately preceding the Effective Date. Any proposed addition or change to the Schedules is hereby rejected and the Dealer agrees any such proposed additions or changes cannot and will not be a part of this Agreement.

18.12.3 The Schedules shall remain in full force and effect unless and until modified by a writing signed by the Parties, or until changed in accordance with the following procedure: BOA may propose changes to any Schedule by providing the Dealer with thirty (30) days' prior notice of the proposed change(s), which notice may be given by posting such proposed change(s) to ROS (the Dealer agrees to monitor ROS for such notices), and such proposed change(s) will become effective as and when provided in the notice unless BOA receives the Dealer's written objection to the proposed change(s). If the Dealer so object, the proposed change(s) will not become part of this Agreement, BOA may terminate this Agreement upon sixty (60) days' written notice; provided, however, that if the Dealer rescinds all such objections during such sixty (60) day period, then this Agreement, including all proposed changes to any Schedule, shall remain in effect.

**19 GOVERNING LAW AND DISPUTES**

19.1 This Agreement is governed by and will be interpreted in accordance with the laws of the State of Illinois without reference to choice of law principles.

19.2 **The Parties agree that any controversies arising under or related to this Agreement shall be presented before any state court located in the county in which BOA's principal place of business is located or any federal court located in the district in which BOA's principal place of business is located, and the Parties hereby submits themselves to the exclusive jurisdiction of said courts. Each of the Parties waives any objection to jurisdiction and venue as provided in the immediately preceding sentence of any action related to or arising from this Agreement, and further agrees not to assert any defense based on jurisdiction or venue.**

19.3 **The Dealer and BOA waive trial by jury for any action related to or arising from this Agreement.**

19.4 The Dealer shall pay BOA all reasonable attorneys' fees and costs BOA incurs in any action to enforce this Agreement or that is related to it, or otherwise arises from the relationship between the Parties.

19.5 The Dealer shall indemnify, defend and save BOA, Bang & Olufsen and their respective successors and assigns, and their officers, stockholders, agents and employees, harmless from and against all claims, demands, costs, and expenses (including reasonable attorneys' fees and disbursements) of whatever nature, arising out of or related to this Agreement.

19.6 Absent any legislation or case law to the contrary, BOA is not prevented from bringing monetary claims against the Dealer before the ordinary courts at Bang & Olufsen's, BOA's or the Dealer's venue or from resorting to immediate legal steps such as injunctions.

19.7 **The Dealer waives all claims against BOA, any of its officers or employees, and any of its parents, subsidiaries or affiliates, for any lost profits, consequential, special, contingent or incidental damages and for punitive, exemplary or other enhanced damages, for any matters related to or arising from this Agreement.**

This Agreement has been executed in two (2) original copies, each Party receiving 1 copy.

Place: Lincolnshire, IL
Date: May 19, 2017

**For Bang & Olufsen America, Inc.:**

J. Siboni
Signature

JACOB SIBONI
Printed Name

Director
Printed Title

Place: Copenhagen Denmark
Date: 6-1-17

**For** M&W Luxury AV LLC
*[Dealer Legal name/entity]*

[signature]
Signature

David Junk
Printed Name

CEO
Printed Title

Confidential - Attorneys' Eyes Only

BANG & OLUFSEN

## Schedule 3.1 – Stores

This agreement applies to the following store(s) and location(s):

| | |
|---|---|
| Date: | July 31, 2017 |
| Retailer/Company name (LLC) | M & N Luxury AV, LLC |
| Store name (Trading name) | Bang & Olufsen South Coast Collection |
| Store ID (e.g. UK12345) | |
| Store category (B1 or SiS) | B1 |
| Street | 3323-B Hyland Ave, Ste 21 |
| Zip code | 92626 |
| City | Costa Mesa, CA |
| Country | USA |

Date of issue: May 26, 2015

*Confidential Attorneys Eyes Only*



Confidential – Attorneys' Eyes Only

# B1 Dealer Requirements

To ensure that dealers are able to present the complete Bang & Olufsen Product Portfolio all B1 Dealers must have the following minimum products on display

**Video:**

2 BeoVision Avants New Generation

- 1 must be either 85" or 75"
- 1 must be Avant 55" on table stand

1 BeoVision 14

- Brass/Smoked Oak Motorized FS
- Recommended Size 55"

2 BeoVision Horizon

- 1 must be 48"
- 1 must be 40"



**Audio:**

2 Essences

- 1 must be table-top mounted
- 1 must be wall-mounted

1 Moment

1 BeoSound 35

- Brass

1 BeoSound 2

1 BeoSound 1

- One BeoSound 1 or BeoSound 2 must be brass and 1 must be aluminum



Notes: The Home Theater and at least 1 main floor video system must have functioning rear speakers

Confidential – Attorneys' Eyes Only

# B1 Dealer Requirements

To ensure that dealers are able to present the complete Bang & Olufsen Product Portfolio all B1 Dealers must have the following minimum products on display

## Speakers

BeoLab 90 is optional



1 Pair BeoLab 20



2 Pair BeoLab 18

Minimum one pair must be mounted on floor stands and one pair must be wall mounted.

1 Pair Brass/Smoked Oak displayed with Moment on Audio Wall



BeoLab 19

If only one is on display, it must be combined with BeoLab 18 or BeoLab 3 or placed on a Speaker Wall



1 Pair BeoLab 17

Brass/Parisian Night/Black End Caps

If more than one pair is on display additional pairs must be shown in different mounting options



1 Pair Celestial



1 Pair Palatial



## WALL / 2 PANELS




- A9 MKII black
- M5 natural - can be moved to Multiroom Freestanding set-up
- A6 natural - Some stores: can be moved to Multiroom Wall set-up
- Beolit 17 stone grey
- A1 black, moss green and natural, 3 units
- P2 Black and sand stone
- A2 stone grey
- S8 MKII black

- A9 MKII Wall bracket: #2108
- A9 Front cover black: #6055
- A2 Shoulder leather strap black: #9758
- PLAY A2 Hook for Wall: #3665376, 2 units

- Multi Room Wall Sign is glued onto the Wall Panel: #3695020
- The Ear and Headphone Wall Panel is filled up with all available product and colour options

# WALL / 3 PANELS




- A9 MKII black - can be moved to Multiroom Freestanding set-up; cover change to grey
- M5 natural - can be moved to Multiroom Freestanding set-up
- A6 natural and oxidized brass - Some stores: natural can be moved to Multiroom Wall set-up
- Beolit 17 stone grey
- A1 black, moss green and natural, 3 units
- P2 Black and sand stone
- A2 stone grey and black
- S8 MKII black

- A9 MKII legs oak #2107
- A9 Front cover dark rose: #6055, 3 units
- A2 Shoulder leather strap black: #9758
- A2 Canvas strap, natural/royal blue
- PLAY A2 Hook for Wall: #3665376, 2 units

- Multi Room Wall Sign is glued onto the Wall Panel: #3695020
- The Ear and Headphone Wall Panel is filled up with all available product and colour options

Confidential - Attorneys' Eyes Only

## WALL / 4 PANELS






- A9 MKII black, white and dark rose, 3 units - one can be moved to Multiroom Freestanding set-up; cover change to grey
- M5 natural - can be moved to Multiroom Freestanding set-up
- A6 natural and oxidized brass - Some stores: natural can be moved to Multiroom Wall set-up
- Beolit 17 stone grey
- A1 black, moss green and natural, 3 units
- P2 black and sand stone
- A2 stone grey and black
- S8 MKII black

- A9 wall bracket: #2108
- A9 MKII legs oak: #2107, 2 units
- A9 Front cover black, white and dark rose: #6055, 3 units
- A2 Shoulder strap black: #9758
- A2 Canvas strap, natural/royal blue
- PLAY A2 Hook for Wall: #3665376, 2 units

- Multi Room Wall Sign is glued onto the Wall Panel: #3695020
- The Ear and Headphone Wall Panel is filled up with all available product and colour options

## TABLE LARGE





- A9 smoked oak
- H2 carbon blue
- H4 charcoal grey
- H5 black and dusty rose, 2 units
- H6 natural
- H7 black
- H8 black
- H9 argilla
- Form 2i black
- Earphones H3ANC gun metal grey
- Earphones H3 champagne and natural, 2 units
- Earset3i white and black, 2 units
- P2 royal blue
- M5 black
- Beolit 15 natural - Beolit 17 natural at arrival - optional
- A2 natural

Confidential - Attorneys' Eyes Only

# TABLE SMALL






- A9 smoked oak
- H2 carbon blue
- H4 charcoal grey
- H5 black and dusty rose, 2 units
- H6 natural
- H7 black
- H8 black
- H9 argilla
- Earphones H3ANC gun metal grey
- Earphones H3 champagne and natural, 2 units
- Earset3i white and black, 2 units
- P2 royal blue
- M5 black
- Beolit 15 natural - Beolit 17 natural at arrival - optional
- A2 natural

# EXHIBIT 4

BANG & OLUFSEN

**SCHEDULE 27 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**SPECIAL TERMS**

**1 Definitions**

1.1 In this Schedule 27, all capitalized terms used but not defined herein are used with the meaning assigned to them in the Agreement or any other Schedule to the Agreement. The following words and expressions shall have the meanings as defined below unless the context requires otherwise.

| | |
|---|---|
| **Northern California** | shall mean the geographical region within the Territory that comprises the northern part of the state of California, including the counties of Alameda, Alpine, Amador, Butte, Calaveras, Carson City, Colusa, Contra Costa, Curry, Del Norte, Douglas, El Dorado, Esmeralda, Fresno, Glenn, Humboldt, Inyo, Jackson, Josephine, Kings, Klamath, Lake, Lassen, Lyon, Madera, Marin, Mariposa, Mendocino, Merced, Mineral, Modoc, Mono, Monterey, Napa, Nevada, Placer, Plumas, Sacramento, San Benito, San Bernardino, San Francisco, San Joaquin, San Luis Obispo, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Solano, Sonoma, Stanislaus, Sutter, Tehama, Trinity, Tulare, Tuolumne, Washoe, Yolo and Yuba. |
| **San Francisco City** | shall mean the city of San Francisco located in Northern California. |

**2 Partner's future store openings**

2.1 As a condition for Partner's extension of the Territory on 24 August 2022, Partner undertakes to comply with the business plan below stipulating Partner's expansion and future store openings in Northern California, presented to B&O in accordance with clause 3 of Schedule 9.

2.2 In addition to the opening of Partner's first monobrand Bang & Olufsen store in the San Francisco City, located at 25 Division Street, San Francisco, CA 94103, as listed in Schedule 14, intended to open during November 2022, Partner shall open a second and a third monobrand Bang & Olufsen store in Northern California on or before the dates listed below.

2.3 <u>Second store opening in Northern California</u>

2.3.1 On or before 1 June 2024, Partner shall open a second monobrand Bang & Olufsen store in Northern California at a location approved by B&O.

2.3.2 Schedule 14 of the Agreement shall be updated accordingly with the location and other relevant details applying to the new physical store.

2.3.3 If Partner fails to open a second store in Northern California in accordance with clause 2.3.1 above, Partner shall lose its Right of First Offer to Northern California, pursuant to Schedule 9, unless Partner and B&O have entered into a separate written agreement stipulating otherwise.

2.4 <u>Third store opening in Northern California</u>

2.4.1 On or before 1 June 2025, Partner shall open a third monobrand Bang & Olufsen store in Northern California at a location approved by B&O.

2.4.2 Schedule 14 of the Agreement shall be updated accordingly with the location and other relevant details applying to the new physical store.

2.4.3 If Partner fails to open a third store in Northern California in accordance with clause 2.4 above, Partner shall lose its Right of First Offer to Northern California, pursuant to Schedule 9, unless Partner and B&O have entered into a separate written agreement stipulating otherwise.

**3 Term**

3.1 This Schedule 27 shall stay in full force and effect until Partner has fulfilled its obligations to open the two new monobrand Bang & Olufsen stores in accordance with clauses 2.3 and 2.4.

3.2 Notwithstanding the foregoing, this Schedule 27 may be terminated with immediate effect if:

3.2.1 Partner materially breaches any terms of this Schedule 27 or of the Agreement;

3.2.2 Partner becomes insolvent or enters into liquidation (whether compulsory or voluntarily, or for the purposes of amalgamation, reconstruction or composition with its creditors) or has a receiver appointed of all or any part of its assets or take any similar action in consequence of debt; or

3.2.3 Partner is convicted of a serious criminal offense.

**4 Miscellaneous**

4.1 Previous addenda and Schedule 27

4.1.1 This Schedule 27 supersedes previous versions of this schedule and any previous addenda to any distribution agreement between the parties.

4.2 Discrepancies

4.2.1 In case of discrepancies between this Schedule 27 (Special Terms) and any provision in the Agreement (including the Schedules but excluding this Schedule 27), the provisions of this Schedule 27 (Special Terms) shall prevail.

**5 Signatures**

5.1 This Schedule 27 has been executed in two original copies, each party receiving one copy.

| On behalf of Partner: | On behalf of B&O: |
|---|---|
| Date: 24/08/2022 | Date: 25/08/2022 |
| David Junk | |
| David Junk (Aug 24, 2022 22:00 PDT) | RN Costanzo (Aug 25, 2022 06:36 EDT) |
| Name: David Junk | Name: RN Costanzo |
| Title: Manager | Title: VP & GM Americas |

*Confidential – Attorneys' Eyes Only*

# EXHIBIT 5

# MASTER RETAILER AGREEMENT

This MASTER RETAILER AGREEMENT (this "**Agreement**") is dated and effective as of Nov 14, 2017 (the "***Effective Date***") by and between BANG & OLUFSEN AMERICA, INC., a Delaware corporation ("***BOA***") and M&N LUXURY AV LLC, a California limited liability company ("***Dealer***" and together with BOA, the "***Parties***"). Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the **Appendix**.

## Preliminary Statement

Dealer is an authorized Bang & Olufsen Dealer. Dealer would like to be the exclusive dealer for the sale of the Products in the Territory. BOA is willing to authorize Dealer to be the exclusive dealer for the sale of the Products in the Territory, subject to the terms and conditions of this Agreement.

NOW THEREFORE, in consideration of the covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

1. **Appointment as Master Retailer.**

(a) Subject to the terms, conditions and limitations contained in this Agreement, BOA grants Dealer the sole and exclusive right to open Bang & Olufsen Retail Stores and/or Shop-in-Shop Stores anywhere in the Territory and a non-exclusive right to market and sell Products on the Internet to End Users; provided, however, that in no event shall Dealer have the right to license any other Person to sell the Products other than as expressly permitted under the terms of this Agreement or any LDA between BOA and Dealer; provided, further, that the Bang & Olufsen Retail Stores located in the Territory as of the Effective Date that are owned and operated by either BOA or any subsidiary or affiliate thereof, or an independently owned Bang & Olufsen dealer, all of which are listed on **Schedule 1(a)**, shall be permitted to continue to operate until the earlier to occur of (i) the date that such Bang & Olufsen Retail Store is closed (in the case of Bang & Olufsen Retail Stores owned by BOA or any subsidiary or affiliate thereof) or (ii) the date the respective licensed dealer agreements expire or are otherwise terminated (in the case of Bang & Olufsen Retail Stores owned by an independent Bang & Olufsen dealer).

(b) Subject to Paragraph 2, Dealer shall, either directly or through one or more entities that are wholly owned and controlled by Dealer (together with Dealer, the "***Dealer Entities***"), open the Bang & Olufsen Retail Stores on the dates, at the locations and in the sequence set forth on **Schedule 1(b)** (the "***Store Opening Plan***"). In addition, any of the Dealer Entities may open other Bang & Olufsen Retail Stores and/or Shop-in-Shop Stores anywhere in the Territory provided that such Dealer Entity complies with the Store Opening Plan and the requirements for opening a Store set forth in Paragraph 2.

(c) Provided (i) the Dealer Entities are in compliance with the Store Opening Plan and (ii) no default or event of default shall exist under this Agreement or any LDA between BOA and any Dealer Entity as of December 31, 2017, then BOA agrees that it will enter into negotiations with Dealer about the possibility of expanding the scope of the Territory to include the State of California or such portion thereof as the Parties may mutually agree. During the time that BOA

and Dealer are conducting such negotiations, BOA agrees that it will not open any new Store in the State of California, either directly or through another licensed Bang & Olufsen dealer. Such negotiations will be conducted in good faith but neither Party is obligated to reach a definitive agreement with respect to expanding the scope of the Territory. Any agreement with respect to the expansion of the Territory must be evidenced by a written amendment to this Agreement that is signed by both Parties. Either Party can terminate such negotiations upon delivery of ten (10) days' prior written notice to the other Party. In addition, BOA shall have the right to immediately terminate such negotiations if Dealer is in default of its obligations under this Agreement or any Dealer Entity is in default of its obligations under the LDA to which it is a party.

(d) Except as otherwise provided in this Paragraph 1 or in Paragraphs 5 or 6, BOA shall not open or permit any Person other than the Dealer Entities to open any Bang & Olufsen Retail Store or Shop-in-Shop Store within the Territory, without Dealer's consent. Notwithstanding the provisions of the immediately preceding sentence, BOA and any parent, subsidiary or affiliate thereof shall have the right to (i) sell Products directly to its personnel and associates, governmental bodies or public institutions or diplomats, or commercial or industrial end-users or suppliers thereto (including "project sales" such as, but not limited to, sales for use in hotels and sales to builders and developers in connection with single-family and multi-family residential developments, including resort communities) for the purpose of their business (provided, however, that said suppliers do not resell the Products to either wholesalers, retailers or other resellers or to private end-users, except to the extent the Products are incorporated into a finished product delivered by a supplier); (ii) engage in Internet sales (whether on a website hosted by BOA or any other Person); (iii) permit other licensed Bang & Olufsen dealers located outside of the Territory to market and sell certain Products on the Internet to End Users located in the Territory; (iv) operate forms of distribution other than Bang & Olufsen Retail Stores and Shop-in-Shop Stores (such as, but not limited to, the sale of Products to B&O Pro Partners or other third party retailers); and (v) sell Products directly to End Users at Shop-in-Shop Stores, kiosks or any similar retail venue located within retail stores operated by a national or regional department store or "Big Box" store chain.

2. <u>Procedure for Opening Stores</u>.

(a) At least two (2) months prior to the estimated date that a Dealer Entity intends to open any Store, such Dealer Entity shall deliver written notice of its intention to open a Store (each, an "***Store Opening Notice***"). Each Store Opening Notice shall identify the precise location (by street address) at which such Dealer Entity intends to open such Store and shall be accompanied by a business plan for such Store that (i) shall be in reasonable detail; (ii) shall conform to the criteria for Bang & Olufsen Retail Store business plans, then generally in use with respect to the opening of Bang & Olufsen Retail Stores; (iii) includes a projection showing that such Store will be profitable within 36 months after the date such Store opens and (iv) contains a reasonable plan pursuant to which such Dealer Entity may obtain profitability within said 36-month period (each, a "***Store Business Plan***").

(b) Within twenty (20) days after receipt a Store Opening Notice and the related Store Business Plan, BOA shall notify Dealer in writing of BOA's approval or disapproval of the proposed location of the Store identified in the Store Opening Notice and the related Store Business Plan; provided, however, that if a proposed Store location is specifically identified in the Store

Confidential Attorneys' Eyes Only

Opening Plan, BOA shall be deemed to have consented to said location. Provided the related Store Business Plan conforms to the requirements in clauses (i) through (iv) of Paragraph 2(a), BOA's approval of a Store Business Plan shall not be unreasonably withheld; provided, further, that if BOA disapproves of a Store Business Plan, the Parties shall thereafter, in good faith, use commercially reasonable efforts to resolve all of BOA's objections and agree upon a mutually satisfactory Store Business Plan within twenty (20) days after the date BOA notifies Dealer of its disapproval. If the Parties are unable to agree upon a Store Business Plan within said 20-day period, the Store Business Plan shall be deemed to be disapproved by BOA. Dealer acknowledges that (i) any approval or disapproval of a Store location and/or a Store Business Plan shall be final and binding on Dealer and BOA and (ii) no approval as to a Store location (except as otherwise expressly provided in this Paragraph 2(b) with respect to any Store identified on the Store Opening Plan) and/or a Store Business Plan shall be deemed effective or binding on BOA unless made in writing.

(c) After the Store location identified in a Store Opening Notice and the related Store Business Plan are approved, BOA and such Dealer Entity shall thereafter execute and deliver an LDA for such Store within five (5) business days after the date such Dealer Entity receives written notice of BOA's approval.

3. **Plans and Construction of Stores**. BOA shall provide each Dealer Entity, at no cost to such Dealer Entity, with a suggested design plan for each Store that is the subject of an LDA between BOA and such Dealer Entity. BOA does not and shall not warrant, and shall not be liable for, the sufficiency of any such design plan or the compliance of any such design plan with all applicable laws, ordinances, codes, rules and regulation, and court orders. Each Dealer Entity shall be solely responsible for engaging an architect and an engineer licensed in the Territory to provide all necessary architectural and engineering drawing, designs, plans and specifications at such Dealer Entity's sole cost and expense. Such Dealer Entity shall also be solely responsible for obtaining all necessary governmental and quasi-governmental permits and approvals necessary to commence and complete construction of each Store at such Dealer Entity's sole cost and expense.

4. **B&O Pro Partners**. If BOA identifies a Person who is a potential B&O Pro Partner anywhere in the Territory (each, a "***Candidate***"), then BOA shall have the right to enter into an agreement directly with the Candidate pursuant to BOA's right to operate different forms of distribution under clause (iv) of the second sentence of Paragraph 1(d).

5. **ROFO**.

(a) Subject to the terms and conditions contained in this Agreement, and notwithstanding anything to the contrary contained in any LDA, if BOA believes it is advisable to have a Store opened anywhere in the Territory at any time (a "***New Store***"), BOA will first offer Dealer the right to open the New Store by delivering a New Store Offer Notice (which must include the material terms and conditions upon which BOA is offering Dealer the right to enter into an LDA for the New Store). Dealer will have thirty (30) days following receipt of a New Store Offer Notice within which to elect to commence the process described in Paragraph 5(c) (the "***Exploratory Process***").

(b) In the event Dealer declines to commence the Exploratory Process described in a New Store Offer Notice or does not respond in writing within the 30-day period prescribed in Paragraph 5(a), BOA will thereafter have the right to open the New Store, or cause it to be opened, at the location identified in the New Store Offer Notice, provided it does so on the same material terms and conditions set forth in the New Store Offer Notice (subject to any delay in opening the New Store due to circumstances beyond the reasonable control of the Person opening the New Store). If any of the material terms and conditions contained in a New Store Offer Notice are changed, then BOA will provide Dealer with another New Store Offer Notice, as to which the provisions of this Paragraph 5 will apply.

(c) In the event Dealer elects to commence the Exploratory Process in response to a New Store Offer Notice, Dealer will notify BOA in writing within the 30-day period prescribed in Paragraph 5(a) (the "***Election Notice***"). Within sixty (60) days after delivery of the Election Notice to BOA, Dealer will deliver a draft Store Business Plan to BOA for its approval. Within thirty (30) days after receipt of the draft Store Business Plan, BOA will notify Dealer in writing of BOA's approval or disapproval thereof. If BOA disapproves of the Store Business Plan, BOA will notify Dealer in writing of the reasons for such disapproval and the Parties will thereafter use commercially reasonable efforts to resolve all of BOA's objections and agree upon a mutually satisfactory Store Business Plan within thirty (30) days after the date BOA notifies Dealer of its disapproval. If the Parties are unable to agree upon a Store Business Plan within said 30-day period, BOA will have the rights described in Paragraph 5(b) hereof and Dealer shall have no further rights with respect the New Store except as otherwise provided in Paragraph 5(b). Within fifteen (15) days after the date BOA and Dealer agree upon a mutually satisfactory Store Business Plan as provided in this Paragraph 5(c), BOA and the applicable Dealer Entity will enter into an LDA for the New Store identified in the New Store Offer Notice.

(d) Dealer's right of first offer as provided in this Paragraph 5, and BOA's obligation to make Dealer any offer with respect to a New Store anywhere in the Territory is subject to the condition precedent that, as of the date BOA would otherwise be obligated to offer a New Store opportunity to Dealer, no default or event of default will have occurred and be continuing on the part of Dealer under this Agreement or under any LDA between a Dealer Entity and BOA.

(e) Notwithstanding anything contained in this Agreement to the contrary, Dealer's rights and options pursuant to this Paragraph 5 with respect to a specific New Store will terminate on the date on which Dealer declines, or is deemed to have declined, to pursue the Exploratory Process for such New Store under Paragraph 5(b); provided, however, that (i) nothing contained in this Paragraph 5(e) shall affect BOA's obligations or Dealer's rights with respect to any other New Store that BOA intends to open at any time during the Offer Period and (ii) if any of material terms and conditions contained in the New Store Offer Notice are changed, then BOA will provide Dealer with another New Store Offer Notice as to which the provisions of this Paragraph 5 shall apply.

6. <u>**Minimum Annual Purchase Goals**</u>.

(a) As a condition to being the exclusive Dealer in the Territory, the Dealer Entities, collectively, shall have actual net purchases of Products ("***Minimum Annual Purchase Goals***")

from BOA with respect to all Stores that the Dealer Entities own and operate in the Territory from time to time as follows:

| Time Period | Minimum Annual Purchase Goal |
|---|---|
| The period commencing on the date the first Store opens ("***Store Opening Date***") and ending on the last day of the month in which the first anniversary of the Store Opening Date occurs (the "***First Year***") | $797,000 |
| The twelve (12) month period commencing on the day immediately following the end of the First Year (the "***Second Year***") | $1,900,000 |
| The twelve (12) month period commencing on the day immediately following the end of the Second Year (the "***Third Year***") | $3,000,000 |

(b) Minimum Annual Purchase Goals for each succeeding twelve (12) month period after the Third Year shall be established within a reasonable period of time prior to the commencement of each such twelve (12) month period by mutual written agreement of BOA and Dealer. BOA agrees that the Minimum Annual Purchase Goals for the succeeding years cannot be increased by more than the yearly development in the S&P Global Luxury Index.

7. **Volume Bonus**.

(a) Dealer is entitled to a volume bonus calculated on the basis of all of the Dealer Entities' Qualifying Purchases in the Territory in the current Financial Year according to the applicable volume bonus table below:

| Bonus | Total Qualifying Purchases 2017/2018 – 2020/2021 |
|---|---|
| 2% | $300,000 - $599,999 |
| 3% | $600,000 - $899,999 |
| 5% | $900,000 - $1,199,999 |
| 7% | $1,200,000 - $1,599,999 |

| | |
|---|---|
| 9% | $1,600,000 - $2,099,999 |
| 11% | $2,100,000 - $2,699,999 |
| 13% | $2,700,000 or more |

In order for Dealer to achieve a higher volume bonus, each total Qualifying Purchase threshold must be exceeded. Once a threshold has been exceeded, Dealer will achieve the volume bonus applicable at that level on the Dealer Entities' entire Qualifying Purchases during the current Financial Year.

Based on the Qualifying Purchases for Financial Year 2017/2018 (i.e. 1 June 2017 - 31 May 2018), a preliminary (on-account) volume bonus for 2018/2019 will be set on July 1, 2018. The on-account percentage will consist of up to 85% of last year's Qualifying Purchases.

Since this is an estimate of the expected annual volume bonus to be earned, BOA has the right to change the on-account volume bonus applied to invoices unilaterally.

The on-account percentage will be granted/subtracted on each invoice during the fiscal year. The volume bonus will be calculated and settled at the end of the current Financial Year, after which the reconciled balance will be credited (or debited in the event of an overpayment) to the Dealer's account during the following month.

The volume bonus will be calculated on the aggregated Qualifying Purchases of all Stores operated by the Dealer Entities during the current Financial Year.

Bonus is based on Gross Purchase Price.

Bonus is paid as noted above, based on 85% of the expected annual bonus level.

(b) So long as this Agreement remains in effect, the provisions of this Paragraph 7 shall replace the provisions of Paragraph 3.2 of the Commercial Retail Conditions of each and every LDA to which any Dealer Entity is a party from time to time.

8. **Term and Termination.**

(a) This Agreement is entered into for an initial term of five (5) years commencing on the Effective Date. Upon expiration of the initial term, this Agreement shall automatically be renewed for one (1) additional term of five years unless either Party provides written notice to the other Party that it does not intend to renew this Agreement at least six (6) months prior to the expiration of the initial term.

(b) Without prejudice to any remedy either Party may have for breach or non-performance of this Agreement, BOA shall have the right to terminate this Agreement effective immediately upon the occurrence of any of the following events:

(i) If any Dealer Entity is in default of any of its obligations under any LDA after the expiration of all applicable grace or cure period;

(ii) If Dealer is in default of any of its obligations under this Agreement (including Dealer's obligation to satisfy the Minimum Annual Purchase Goals), and such default has not been cured within thirty (30) days after receipt of BOA's notice of default;

(iii) If Dealer is dissolved or liquidated, or a receiver is appointed for Dealer; or

(iv) If (A) Dealer files a petition in bankruptcy, or (B) an involuntary petition in bankruptcy is filed against Dealer and such petition is not dismissed within forty five (45) days thereafter, or (C) any assignment or composition of Dealer for the benefit of creditors occurs, or (D) a written warrant of attachment or any similar process is issued by any court against all or any substantial portion of Dealer's property or assets, and the writ, warrant of attachment, or similar process is not released or bonded within fifteen (15) days of the entry or levy.

(c) Upon any termination of this Agreement, all of Dealer's rights and all of BOA's obligations (including the rights and obligations under Paragraph 1) shall immediately terminate and be of no further force or effect.

9. **Representations and Warranties**.

(a) Dealer represents and warrants to BOA as follows:

(i) Dealer was duly organized and is validly existing under the laws of the jurisdiction in which it was organized and is duly authorized to transact business under the laws of each state in which the character of the properties owned or leased by it or the nature of its activities makes such qualification necessary. Dealer has full right, power and authority to execute, deliver and perform under this Agreement and to consummate the transactions described herein, and all required action and approvals therefor have been duly taken and obtained.

(ii) This Agreement and each other document executed or to be executed by Dealer pursuant hereto are, or will when executed, constitute the valid and legally binding obligations of Dealer, enforceable against it in accordance with its terms.

(iii) The execution and delivery of this Agreement by Dealer does not, and the consummation of the transactions contemplated hereby will not, violate or constitute an occurrence of default under any provision of, or conflict with, or result in acceleration of any obligation under, or give rise to a right by any party to terminate its obligations under, any indenture, lease, mortgage, agreement, order, or other material arrangement to which Dealer is a party or by which Dealer or any of its assets is bound or affected, or require a

filing or registration with, or the consent or approval of, any third party, court or governmental agency or authority, the consequences of which could reasonably be expected to have, either in any case or in the aggregate, a materially adverse effect on Dealer's ability to perform its obligations hereunder.

(iv) There is no action, suit, proceeding or investigation pending or, to the actual knowledge of Dealer, threatened against Dealer regarding the transactions contemplated in this Agreement.

(b) BOA represents and warrants to Dealer as follows:

(i) BOA was duly incorporated and is validly existing under the laws of the jurisdiction in which it was incorporated and is duly authorized to transact business under the laws of each state in which the character of the properties owned or leased by it or the nature of its activities makes such qualification necessary. BOA has full right, power and authority to execute, deliver and perform under this Agreement and to consummate the transactions described herein, and all required action and approvals therefor have been duly taken and obtained.

(ii) This Agreement and each other document executed or to be executed by BOA pursuant hereto are, or will when executed, constitute the valid and legally binding obligations of BOA, enforceable against it in accordance with its terms.

(iii) The execution and delivery of this Agreement by BOA does not, and the consummation of the transactions contemplated hereby will not, violate or constitute an occurrence of default under any provision of, or conflict with, or result in acceleration of any obligation under, or give rise to a right by any party to terminate its obligations under, any indenture, lease, mortgage, agreement, order, or other material arrangement to which BOA is a party or by which BOA or any of its assets is bound or affected, or require a filing or registration with, or the consent or approval of, any third party, court or governmental agency or authority, the consequences of which could reasonably be expected to have, either in any case or in the aggregate, a materially adverse effect on BOA's ability to perform its obligations hereunder.

(iv) There is no action, suit, proceeding or investigation pending or, to the actual knowledge of BOA, threatened against BOA regarding the transactions contemplated in this Agreement.

10. **Nature of Relationship**. This Agreement does not in any way create the relationship of principal and agent between Dealer and BOA, and in no circumstances shall Dealer, its agents or employees be considered the agents of BOA. Dealer shall not act or attempt to act or represent itself directly or by implication as agent of BOA, or in any manner assume or create or attempt to

assume or create any obligation or make any contract, agreement, representation or warranty on behalf or in the name of BOA, except such Product warranties as may be previously authorized in writing by BOA. No fiduciary relationship, special relationship, partnership, joint venture, agency, or employment is intended or created by this Agreement.

11. **Confidentiality**. From and after the Effective Date, Dealer and BOA shall each, except as required by law, keep confidential the existence and terms of this Agreement (collectively, the "***Confidential Information***"). Each Party may only disclose the Confidential Information to its key employees, attorneys, analysts, and accountants (any of said Persons, a "***Representative***") so long as each such Representative (other than any attorney) is under a confidentiality agreement comparable to this Paragraph 11 or agrees in writing to be bound by the terms of this Paragraph 11 in the same manner that Dealer is bound or is otherwise automatically bound under rules of professional conduct applicable to such Person. To the extent that any Confidential Information may include material subject to attorney/client privilege, work product privilege, or any other applicable privilege concerning pending or threatened legal proceedings or government investigations, the sharing of such material is not intended to, and shall not, waive or diminish in any way the confidentiality of such material or its continued protection under any of such privileges. If either Party or any of its Representatives breaches or threatens to breach any of the provisions of this Paragraph 11, the non-breaching shall be entitled to equitable relief by way of injunction or otherwise, in addition to any other rights and remedies otherwise available. The provisions of this Paragraph 11 shall not apply to: (a) any information which is in the public domain as of the Effective Date; (b) any information which becomes a part of the public domain after the Effective Date other than as a result of a breach of this Paragraph 11 by a Party, or as a result of a breach of a confidentiality obligation on the part of any other Person; (c) any information which a Party is required to furnish as a result of any applicable law, including any order, decree or subpoena of any court or other governmental authority of competent jurisdiction; or (d) any information which a Party receives from a third party who, to such Party's actual knowledge, is not under a confidentiality obligation to the other Party with respect to such information.

12. **Miscellaneous**.

(a) Any notice, request, consent, approval or demand given or made under this Agreement shall be in writing and shall be given in the following manner: (i) by personal delivery of such notice; or (ii) by mailing of such notice by certified mail, return receipt requested; or (iii) by sending facsimile transmission of such notice with confirmed transmission; or (iv) by sending e-mail transmission of such notice; provided notice is also delivered by one of the other methods specified in this Paragraph 12(a); or (v) by commercial overnight delivery of such notice. All notices shall be delivered to the addresses set forth in **Schedule 12(a)**. Notice served by certified mail shall be effective on the fifth (5th) Business Day after the date of mailing. Notice served by facsimile transmission shall be effective as of date and time of facsimile transmission, provided that the notice transmitted shall be sent on a Business Day during business hours (9:00 a.m. to 5:00 p.m. Central time). In the event facsimile notice is transmitted on a non-Business Day or during non-business hours, the effective date and time of notice is the first business hour of the next Business Day after transmission. Notice served by e-mail transmission shall be effective as of date and time of e-mail transmission, provided that the notice transmitted shall be sent on a Business Day during business hours and provided notice is also delivered by one of the other methods specified in this Paragraph 12(a), unless such further Notice requirement is waived by e-mail. In

the event e-mail notice is transmitted on a non-Business Day or during non-business hours, the effective date and time of notice is the first business hour of the next Business Day after transmission. Notice served by commercial overnight delivery shall be effective on the next Business Day following deposit with the overnight delivery company. For purposes hereof, the first "business hour" of a Business Day shall be 9:00 a.m. Central time.

(b) Whenever it is provided in this Agreement that a Party "may" perform an act or do anything, it shall be construed that such Party "may, but shall not be obligated to," so perform or so do. The following words and phrases shall be construed as follows: (a) "at any time" shall be construed as "at any time or from time to time;" (b) "any" shall be construed as "any and all;" (c) "include" and "including" shall be construed as "including but not limited to;" and (d) "will" and "shall" shall each be construed as mandatory. Except as otherwise specifically indicated, all references to paragraph numbers and letters shall refer to the paragraphs of this Agreement. The words "hereby," "hereof," "hereto," "herein" and "hereunder" and any similar terms shall refer to this Agreement as a whole and not to any particular paragraph. The word "hereafter" shall mean after the Effective Date and the word "heretofore" shall mean before the Effective Date. Words of the masculine, feminine or neuter gender shall mean and include the corresponding words of other genders, and words implying the singular number shall mean and include the plural number and vice versa. The paragraph headings are inserted in this Agreement for convenience only and are not intended to, and shall not be construed to limit, enlarge or affect the scope or intent of this Agreement or the meaning of any provision hereof. All references to any agreement or instrument (including this Agreement) shall be to such agreement or instrument as in effect from time to time, including any amendments, replacements, restatements, modifications and/or supplements thereto.

(c) Notwithstanding any laws of the Territory to the contrary, this Agreement, the rights and remedies of the Parties hereunder, all waivers and agreements herein contained and all claims, disputes and controversies related hereto, shall be governed by and construed in accordance with the laws of the State of Illinois without reference to the principles of conflicts of laws.

(d) In the event that any provision of this Agreement shall be held to be unenforceable or invalid, the remaining provisions of this Agreement shall nonetheless continue to be valid and enforceable as though the unenforceable or invalid provisions were not a part hereof.

(e) Each of the Parties has been represented by counsel and the terms of this Agreement have been fully negotiated. Each Party represents and warrants that it is satisfied with the terms incorporated herein and that is has executed this Agreement after independent investigation and without fraud, duress or undue influence. This Agreement shall be construed without regard to any presumption or other rule requiring construction against the Party causing this Agreement to be drafted.

(f) Dealer may not assign its interest in this Agreement without the express written consent of BOA, which consent may be withheld in its sole discretion. Any purported assignment of Dealer's interest herein, whether voluntarily or by operation of any applicable laws or otherwise, shall be ineffective as to BOA. No consent to an assignment of this Agreement shall release the assignee of the obligation to obtain consent to a subsequent assignment if such consent is otherwise required under the terms of this Paragraph 12(f).

(g) This Agreement may be amended or modified only by a written instrument executed by BOA and Dealer.

(h) This Agreement shall be binding upon, and inure to the benefit of the Parties and their respective successors and assigns.

(i) This Agreement is for the sole benefit of the Parties and no other Person shall be entitled to rely upon or receive any benefit from this Agreement or any provision hereof.

(j) No consent or waiver by a Party (either express or implied) to or of a breach of any representation, warranty or covenant contained herein shall be construed as a consent or waiver to or of any other or subsequent breach of the same or any other representation, warranty or covenant.

(k) DEALER AND BOA, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE STATE OF ILLINOIS, UNITED STATES OF AMERICA, WAIVES TRIAL BY JURY (TO THE FULLEST EXTENT PERMITTED BY LAW) AND FURTHER WAIVES ANY OBJECTION TO JURISDICTION AND VENUE OF ANY ACTION INSTITUTED HEREUNDER, AND FURTHER AGREES NOT TO ASSERT ANY DEFENSE BASED ON LACK OF JURISDICTION OR VENUE. BOA AND DEALER FURTHER ACKNOWLEDGE AND AGREE THAT ANY ACTION RELATED TO OR ARISING FROM THIS AGREEMENT OR ANY MATTERS HEREIN DESCRIBED MUST BE BROUGHT IN A STATE OR FEDERAL COURT LOCATED WITHIN COOK COUNTY, ILLINOIS, UNITED STATES OF AMERICA.

(l) IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY OPERATING LOSSES, LOST PROFITS, PUNITIVE DAMAGES, CONSEQUENTIAL DAMAGES OR ANY OTHER INCIDENTAL DAMAGES OR LOSSES DUE TO A BREACH OF THIS AGREEMENT.

(m) Dealer shall pay BOA all reasonable attorneys' fees and costs it incurs in any action to enforce this Agreement or that is related to it, or otherwise arising from the relationship between the Parties.

(n) This Agreement supersedes all prior agreements and understandings between the Parties relating to the subject matter hereof, including that certain Addendum to Licensed Dealer Agreement dated as of April 5, 2017 by and between the Parties (the "***Addendum to LDA***").

(o) Time is of the essence in this Agreement.

(p) Each Party hereby acknowledges and confirms that the terms and conditions of this Agreement were independently bargained for and are supported by good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

(q) All Schedules attached to this Agreement are incorporated herein by this reference.

(r) Neither Party shall not be responsible for or liable for failure to perform any part of this Agreement or for any delay in the performance of any part of this Agreement, directly or indirectly resulting from or contributed to by any foreign or domestic embargoes, acts of God or the public enemy; the adoption or enactment of any law, ordinance, regulation, ruling or order directly or indirectly interfering with the performance hereunder; or wars, fires, floods, explosions, strikes, factory shut downs, work stoppages, slow-downs or other differences with workmen; shortages of fuel, power, materials or labor, or delay in or lack of the usual means of transportation; action taken to carry out the intent or purpose of any law or administrative regulation or order having the effect of law; compliance with any request by a governmental agency or official thereof; extraordinary currency devaluations, taxes, or customs duties or other similar charges or assessments; or other events or contingencies beyond the reasonable control of the non-performing Party; provided, however, that the provisions of this Paragraph 12(R) shall not apply to any obligation involving the payment of money.

(s) The terms and conditions of this Agreement are in addition to and not a limitation on any of the terms and conditions of any LDA except as otherwise provided in Paragraph 7.

(t) This Agreement may be executed in two or more counterparts, each of which will be deemed an original, but all of which together constitute one and the same document. To facilitate execution of this Agreement, the Parties may execute and exchange counterparts of the signature pages to this Agreement by facsimile or other electronic form of communication (such as .pdf files).

13. <u>Release</u>.

(a) Effective as of the Effective Date, Dealer, for itself, its members and managers and David Junk (collectively, the "***Dealer Releasing Parties***"), irrevocably releases and discharges the Bang & Olufsen Released Parties from and against any Claims whatsoever, in law or in equity, which any of the Dealer Releasing Parties now has or may hereafter have against the Bang & Olufsen Released Parties (or any of them), related to or arising from: (i) any agreements, documents, instruments, financial information, understandings or arrangements (whether written or oral) that were entered into or existed at any time prior to the Effective Date in connection with or related to any LDA to which Dealer and BOA were parties and/or the Addendum to LDA; and/or (ii) any transactions, claims, disputes or controversies related thereto or arising therefrom; provided, however, that the foregoing release does not apply to any claims which first accrue after the Effective Date with respect to any LDA to which a Dealer Entity and BOA are parties.

(b) Effective as of the Effective Date, BOA, for itself, and the Bang & Olufsen Released Parties (collectively, the "***Bang & Olufsen Releasing Parties***"), irrevocably releases and discharges the Dealer Released Parties from and against any Claims whatsoever, in law or in equity, which any of the Bang & Olufsen Releasing Parties now has or may hereafter have against the Dealer Released Parties (or any of them), related to or arising from: (i) any agreements, documents, instruments, financial information, understandings or arrangements (whether written or oral) that were entered into or existed at any time prior to the Effective Date in connection with or related to any LDA to which Dealer and BOA were parties and/or the Addendum to LDA; and/or (ii) any transactions, claims, disputes or controversies related thereto or arising therefrom; provided, however, that the foregoing release does not apply to (x) any claims which first accrue

Case 2:24-cv-02230-DSF-KES Document 17-2 Filed 08/23/24 Page 104 of 290 Page ID #:2897

after the Effective Date with respect to any LDA to which a Dealer Entity and BOA are parties or (y) any monetary obligations that Dealer owes to BOA under any LDA entered into on or prior to the Effective Date that are unpaid as of the Effective Date.

(c) Each of the Dealer Releasing Parties and each of the Bang & Olufsen Releasing Parties (collectively, the "***Releasing Parties***") expressly waives all rights afforded by any statute (such as Section 1542 of the Civil Code of the State of California or any other comparable state statute) which limits the effect of a release with respect to unknown claims. Each Releasing Party understands the significance of its release of unknown claims and its waiver of statutory protection against a release of unknown claims (such as under Section 1542 of the California Civil Code or under any other comparable state statute). Each Releasing Party expressly waives Section 1542 of The Civil Code of the State of California, which states as follows:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MUTUALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

Each Releasing Party hereby specifically acknowledges and agrees that its waiver of known and unknown claims and of Section 1542 of the Civil Code of the State of California is knowing and voluntary.

(d) Each Party hereby acknowledges and confirms that the foregoing releases were independently bargained for and are supported by good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be entered into as of the Effective Date.

**BOA**:

BANG & OLUFSEN AMERICA, INC., a Delaware corporation

By: ______________________ Joshua Mitchell
Managing Director ~~Authorized Person~~

DEALER:

M&N LUXURY AV, LLC, a California limited liability company

By: ______________________
Name: Paul Junk
Title: Owner

## Appendix

"***Bang & Olufsen Retail Store***" or "***Store***" means, as of any date, a retail store selling a full range of the Products related accessories, and such other products as are generally permitted to be sold as of such date pursuant to an LDA.

"***B&O Pro Partner***" means any Person who is in the business of providing consumer electronics consulting, design, integration, installation and/or related services to end users of consumer electronics products and/or contractors, builders and developers who include consumer electronics products as part of a commercial or residential real estate product that is offered for sale or lease.

"***Bang & Olufsen Released Parties***" means, collectively: (i) BOA; (ii) the parent entities, subsidiaries and affiliates of BOA; (iii) the officers, directors, shareholders, managers, members, parent entities, subsidiaries, affiliates, employees and independent contractors of any of the Persons described in the foregoing clauses (i) and (ii), inclusive; (iv) any successors and assigns of any of the Persons described in the foregoing clauses (i) through (iii) inclusive that is a legal entity; and (v) any heirs, legal representatives, executors or legatees of any of the Persons described in the foregoing clauses (i) through (iii) inclusive who is an Individual.

"***Business Day***" means any day other than a Saturday, Sunday or legal holiday of the United States Government.

"***Claims***" means any claims, losses, suits, actions, causes of action, suits, debts, liens, damages, liabilities, obligations, penalties, awards, costs and/or expenses (including attorneys' fees and disbursements).

"***Dealer Released Parties***" means, collectively, (i) Dealer; (ii) the members and managers of Dealer; (iii) any successors and assigns of any of the Persons described in the foregoing clauses (i) and (ii); and (iv) any heirs, legal representatives, executors or legatees of any of the Persons described in the foregoing clauses (i) and (ii) inclusive who is an Individual.

"***End User***" means any Person initially purchasing any Product, with no intention of reselling the purchased Product, either as a result of (i) a personal visit to a Store located in the Territory; or (ii) any other contact through one of any other Permitted Means.

"***Individual***" means a natural person.

"***LDA***" means, as of any date, the standard form of Licensed Dealer Agreement generally used by BOA as of such date for the operation of Bang & Olufsen Retail Stores and, if applicable, as modified to permit the operation of Shop-in-Shop Stores.

"***New Store Offer Notice***" means, as to any New Store, a written notice from BOA to Dealer that identifies the location at which BOA believes the New Store should open and the approximate date by which BOA expects the New Store to open for business.

"***Permitted Means***" means any means of marketing or selling Products, or offering Products for sale, in the Territory that is authorized by BOA in writing from time to time.

"***Person***" means any Individual, corporation, partnership, association, limited liability company, joint-stock company, trust, unincorporated association, joint venture, governmental authority or any similar entity.

"***Products***" has the meaning specified in the LDA.

"***Shop-in-Shop Store***" means, as of any date, a retail store that is located within a larger retail location but has a separate store identity within such larger retail location that includes the interior and exterior appearance of a Bang & Olufsen Retail Store.

"***Territory***" means each of Orange county, San Diego county and Los Angeles county, located in the State of California in the United States of America.

Schedule 1(b)

**INITIAL STORE OPENING PLAN**

By October 1, 2017, a Dealer Entity shall complete the acquisition of the Bang & Olufsen Store 479 N Rodeo Drive, Los Angeles, California ("***Beverly Hills Store***")

By second anniversary of the acquisition of the Beverly Hills Store by a Dealer Entity, Dealer Entities shall operate no less than (two) 2 Bang & Olufsen Retail Stores within the Territory

By the second anniversary of the acquisition of the Beverly Hills Store by a Dealer Entity, Dealer Entities shall operate no less than four (4) Bang & Olufsen Retail Stores within the Territory

By the third anniversary of the acquisition of the Beverly Hills Store by a Dealer Entity, Dealer Entities shall operate no less than five (5) Bang & Olufsen Retail Stores within the Territory

*Confidential - Attorneys' Eyes Only*

# EXHIBIT 6

BANG & OLUFSEN

**BANG & OLUFSEN FRAMEWORK AGREEMENT**

This

**BANG & OLUFSEN FRAMEWORK AGREEMENT**
(this "**Agreement**")

was concluded on February 28, 2020 (the "**Effective Date**") between

**Bang & Olufsen America Inc.**
Company registration number 36-2688126
1209 Orange Street Wilmington
Delaware
United States of America

**Bang & Olufsen A/S**
Danish company registration number 41257911
Bang & Olufsen Allé 1
7600 Struer
Denmark

**B&O PLAY A/S**
Danish company registration number 33859643
Bang & Olufsen Allé 1
7600 Struer
Denmark

**Bang & Olufsen Operations A/S**
Danish company registration number 26035406
Bang & Olufsen Allé 1
7600 Struer
Denmark

(collectively "**B&O**")

and

**M&N Luxury AV LLC**
5741 Norwich Avenue
Van Nuys, California 91411
United States of America

(the "**Partner**")

(individually a "**Party**"; collectively the "**Parties**").

**CONTENTS**


| | | |
|---|---|---|
| 1 | Preamble | 3 |
| 2 | Definitions and interpretation | 4 |
| 3 | Appointment of Partner | 6 |
| 4 | Purchase of Products | 6 |
| 5 | Distribution and/or resale of Products | 7 |
| 6 | Resale from physical stores | 7 |
| 7 | Resale from non-physical locations | 7 |
| 8 | Personnel | 8 |
| 9 | Marketing and promotion | 8 |
| 10 | Governmental approval requirements | 8 |
| 11 | Intellectual property rights; Personal information | 8 |
| 12 | Limitations of liability | 9 |
| 13 | Term and termination | 10 |
| 14 | Consequences of termination | 11 |
| 15 | Transshipping | 12 |
| 16 | Geographic Sales Boundary | 12 |
| 17 | Confidentiality | 13 |
| 18 | Miscellaneous provisions | 13 |
| 19 | Release | 15 |
| 20 | Applicable law | 15 |
| 21 | Choice of Language | 15 |
| 22 | Schedules | 16 |
| 23 | Signatures | 16 |
| Appendix 1 | | 18 |

Page 5

## 1 Preamble

1.1 B&O, together with its subsidiaries, affiliated companies and partners, is engaged in the development, design, manufacture, marketing and sale of a highly distinctive and exclusive range of televisions, sound systems, loudspeakers and other existing or future audio and video equipment and services (the "**Products**").

1.2 B&O's Products are distributed and sold through an exclusive network of authorised distributors and resellers (the "**Network**"). As members of this Network, authorised partners become part of the B&O universe including not only Products but also the professional support functions offered from time to time from B&O to its distributors, resellers and other partners.

1.3 B&O wishes to appoint Partner as a member of its authorised distribution and reseller network, and Partner wishes to be appointed as a member of the Network on the terms and conditions set forth in this Agreement.

1.4 The Parties understand and acknowledge that the markets on which they operate are undergoing – and will continue to undergo – very significant changes in respect of the design, functionality and manufacturing of products and services and the way in which such products and services are marketed, sold and delivered.

1.5 In accordance with the foregoing, the provisions of this Agreement set forth the general terms for the cooperation between the Parties within the B&O authorised distribution and reseller network. The specific provisions on Partner's rights and obligations as a member of the Network are laid down in the Schedules and Sub-schedules (as defined below). B&O may from time to time amend, supplement or replace these Schedules and Sub-schedules in accordance with the terms of this Agreement. Partner understands and fully accepts that such amendments, supplements and/or replacements may significantly affect Partner's rights and obligations as an authorised distributor and/or reseller without this giving rise to any claim for compensation or any other recourse against B&O.

1.6 On the basis of these considerations, the Parties have concluded this Agreement (as defined below).

## 2 Definitions and interpretation

2.1 For the purposes of this Agreement, all capitalised terms not explicitly defined herein shall have the meanings as defined below:

| | |
|---|---|
| Agreement | this agreement with Schedules and Sub-schedules. |
| B&O | The following entities together with their subsidiaries and affiliated companies:<br>Bang & Olufsen America Inc., Company registration number 36-2688126, 1209 Orange Street, Wilmington, Delaware, United States of America.<br>Bang & Olufsen A/S, Danish company registration number 41257911, Bang & Olufsen Allé 1, 7600 Struer, Denmark.<br>B&O PLAY A/S, Danish company registration number 33859643, Bang & Olufsen Allé 1, 7600 Struer, Denmark.<br>Bang & Olufsen Operations A/S, Danish company registration number 26035406, Bang & Olufsen Allé 1, 7600 Struer, Denmark. |
| Change of Control | a transaction resulting in one or more third parties (directly or indirectly) obtaining a majority of shares and/or votes in Partner. |
| Confidential Information | any and all material, non-public, business-related information, written or oral, pertaining to a Party. |
| Distribution Concept | the B&O distribution concept described in Schedule 1. |
| Effective Date | the date set out above. |
| End-User | any purchaser of the Product(s) from the Partner who is the ultimate consumer for whom the Product is designed and who does not intend to resell the Product to a third party |
| Force Majeure | any event that either Party has not reasonably been able to predict, control, avoid or remedy, including – depending on the circumstances – defects or breakdowns of telecommunications networks or lines, server or computer breakdowns (e.g. due to virus or hacker attacks), disruptions of electricity supply, public |

Confidential - Attorneys' Eyes Only



| | |
|---|---|
| | authority prohibition or enforcement notices, strikes and lockouts, acts of terrorism, wars, civil wars, riots, natural disasters, nuclear accidents, epidemics, pandemic diseases, fires, floods, storms, sabotage, criminal damage and similar events. |
| Goodwill | all goodwill, reputation, value and commercial advantage related to the business conducted pursuant to this Agreement in connection with the Intellectual Property Rights and/or Products. |
| Intellectual Property Rights | any intellectual property rights, including patents, utility models, trademarks, trade names, designs, copyrights or rights in databases owned or licensed by B&O in all countries as well as any applications or renewals concerning such rights. |
| Network | the network of B&O distributors and resellers authorised to distribute and/or resell Products in the Territory. |
| Products | products and services as indicated in Schedule 2. |
| Reseller Concept | the B&O reseller concept described in Schedule 1. |
| Schedule | a schedule to this Agreement. |
| Sub-schedule | a sub-schedule to a Schedule to this Agreement. |
| Territory | the territory indicated in Schedule 3. |
| Tranship | shall mean the sale of Product(s) to any entity other than an End-User. |

2.2 This Agreement is the result of the Parties' negotiations, and it cannot be interpreted against a Party as a consequence of such Party having drafted one or more of the provisions of this Agreement.

2.3 Expressions such as "including" and similar expressions shall mean "including, but not limited to".

2.4 Nouns in the singular shall include the plural and vice versa. Nouns in the definite form shall include the indefinite form and vice versa.

2.5 The headings of this Agreement are for guidance only and shall have no separate legal effect on the understanding or interpretation of the provisions of this Agreement.

2.6 In case of any discrepancy between this Agreement (without Schedules and Sub-schedules) and the Schedules and/or Sub-schedules, this Agreement (without Schedules and Sub-schedules) shall take precedence.

**3 Appointment of Partner**

3.1 On the terms and conditions set forth in this Agreement, B&O appoints Partner as a member of the Network.

3.2 Partner shall comply with the applicable Distribution Concept and/or Reseller Concept(s) as set out in **Schedule 1** (as amended, supplemented or replaced from time to time by B&O).

3.3 As set forth in Schedule 1, Partner is appointed as an authorised distributor and/or reseller of Products listed in **Schedule 2** (as amended, supplemented or replaced from time to time by B&O) within the Territory set out in **Schedule 3** (as amended, supplemented or replaced from time to time by B&O).

3.4 The appointment of Partner is granted by B&O on a non-exclusive basis, and B&O may in its sole discretion appoint other distributors and resellers.

3.5 Nothing contained herein shall affect, modify or change the fact that B&O and Partner are separate legal entities and are not representatives or agents of each other. Partner specifically acknowledges that this Agreement does not create any agency or franchise relationship and that no direct or indirect fee has been paid by Partner in connection with the establishment of this buyer/seller relationship. This Agreement does not create a joint venture, partnership and/or agency relationship. B&O shall bear no responsibility, directly or indirectly, for the Partner's retail locations or for the transactions made through said retail locations.

**4 Purchase of Products**

4.1 Partner shall purchase Products from B&O in accordance with (a) the B&O terms and conditions laid down in **Schedule 4** (as amended, supplemented or replaced from time to time by B&O), (b) the commercial and payment terms laid down in **Schedule 5** (as amended, supplemented or replaced from time to time by B&O), (c) the reporting requirements set forth in **Schedule 6** (as amended, supplemented or replaced from time to time by B&O), and (d) the warranty terms set forth in **Schedule 7** (as amended, supplemented or replaced from time to time by B&O).

4.2 Partner shall order and purchase Products from B&O through the B&O ordering system as described in **Schedule 8** (as amended, supplemented or replaced from time to time by B&O).

4.3 Partner shall purchase its entire requirement for Products solely from B&O.

**5 Distribution and/or resale of Products**

5.1 Partner shall distribute and/or resell Products in accordance with (a) the B&O terms and conditions for distribution and/or retail resale laid down in **Schedule 9** (as amended, supplemented or replaced from time to time by B&O), and (b) the warranty terms set forth in Schedule 7.

5.2 If appointed a Distributor, Partner undertakes not to resell any Products to any party other than those listed as then current authorised members of the Network. A list of authorised members of the Network is included in **Schedule 10** (as amended, supplemented or replaced from time to time by B&O).

5.3 If appointed a Reseller, Partner undertakes not to resell any Products to any party other than an End-User.

5.4 If appointed as a distributor, Partner shall ensure that any authorised member of the Network, to which Partner distributes any Product(s), complies with the requirements in **Schedule 11** (as amended, supplemented or replaced from time to time by B&O).

5.5 Partner shall comply with the point of sale requirements set out in **Schedule 12** (as amended, supplemented or replaced from time to time by B&O).

5.6 Partner shall be entitled to market and sell permitted third party products as indicated in **Schedule 13** (as amended, supplemented or replaced from time to time by B&O).

5.7 Partner acknowledges that Partner has been informed of B&O's Unilateral Policy as it applies to the advertisement for sale of Products from Partner to End-Users in the United States. There is no agreement, express or implied, between B&O and Partner with respect to the advertised or resale pricing of Products. If any director, officer, employee, representative, or other agent of B&O tries to coerce Partner to agree to the price at which Partner advertises or resells B&O Products, such action shall be considered void, unauthorized, and without effect and Partner shall promptly notify B&O's Policy Coordinator at up-policy@bang-olufsen.dk.

**6 Resale from physical stores**

6.1 Partner may only sell Products from physical stores indicated in **Schedule 14** (as amended, supplemented or replaced from time to time by B&O).

6.2 Any physical stores from which Partner markets or sells Products shall fulfil the requirements laid down in **Schedule 15** (as amended, supplemented or replaced from time to time by B&O).

**7 Resale from non-physical locations**

7.1 Without execution of Schedule 16 of this Agreement, the Partner is expressly prohibited from advertising for resale and/or selling the Products on the Internet.

7.2 If the Partner is granted a right to resell Products from a non-physical location, including the Internet, Partner shall comply with the requirements for such sales as set out in **Schedule 16** (as amended, supplemented or replaced from time to time by B&O).

7.3 Provided that the Partner is granted a right to resell Products from a non-physical location, the visual identity of Partner's retail resale activities (if any) pertaining to Products, other than the operation of a physical store, shall comply with **Schedule 17** (as amended, supplemented or replaced from time to time by B&O.

**8 Personnel**

8.1 Partner is obliged to employ a sufficient number of suitably qualified personnel to ensure the proper fulfilment of its obligations under this Agreement.

8.2 If appointed as a reseller, Partner's personnel shall possess the qualifications and skills required in order to provide customers with high quality service and guidance and in-depth technical knowledge of Products.

8.3 Specific requirements to personnel and training are set out in **Schedule 18** (as amended, supplemented or replaced from time to time by B&O).

8.4 If appointed as a distributor, Partner shall procure that the personnel of any authorised member of the Network, to which Partner distribute any Product(s), complies with the requirements in Schedule 18.

**9 Marketing and promotion**

9.1 The marketing and promotion requirements for Partner are laid down in **Schedule 19** (as amended, supplemented or replaced from time to time by B&O).

**10 Governmental approval requirements**

10.1 The governmental approval requirements for Partner are laid down in **Schedule 20** (as amended, supplemented or replaced from time to time by B&O).

**11 Intellectual property rights; Personal information**

11.1 B&O retain all intellectual property rights in and to Products and the Intellectual Property Rights indicated in **Schedule 21** (as amended, supplemented or replaced from time to time by B&O).

11.2 Partner acknowledges that B&O exclusively owns the Intellectual Property Rights, and Partner shall only use these Intellectual Property Rights in connection with the proper operation of Partner's business within the Territory in accordance with this Agreement and only in the form and manner approved by B&O from time to time.

11.3 Except for Partner's rights under this Agreement, no right, title or interest in or to Products is granted or otherwise transferred by this Agreement. Partner must respect the rights of B&O in accordance with all applicable laws and the provisions of this Agreement.

Page 11.4 Partner must itself refrain from registering any intellectual property rights in and to Products, the Intellectual Property Rights and/or any part or derivative hereof. In the event that any such rights have already been registered before the execution of this Agreement, Partner must ensure that any such rights are assigned to B&O without compensation.

11.5 Partner shall:

(i) Inform B&O promptly of any potential, threatened, alleged or actual infringement of any of the Intellectual Property Rights,

(ii) Give B&O the exclusive right, if it so chooses, to control and direct the investigation and the defence or the settlement of such infringement if the infringement is issued against Partner,

(iii) Provide all assistance and information required by B&O in connection with the infringement, and

(iv) If B&O requests, and at B&O's expense, join in any court or other proceedings relating to the infringement.

11.6 The use of the Intellectual Property Rights is further regulated in **Schedule 22** (as amended, supplemented or replaced from time to time by B&O).

11.7 Partner's handling of personal information and data in connection with this Agreement is regulated in **Schedule 23** (as amended, supplemented or replaced from time to time).

**12 Limitations of liability**

12.1 B&O shall only be liable to Partner for damages howsoever arising, including but not limited to bodily injury caused by a Product, if the damage results from an error committed by B&O. However, B&O shall not be liable to Partner for any indirect, incidental, special, consequential, punitive, or exemplary damages arising out of or related to this Agreement under any legal theory, including but not limited to, operation losses, profit losses, consequential losses and other indirect losses, and in no event shall B&O's liability for damage on property exceed the amount of USD fifteen thousand (15,000). B&O is only liable to Partner for damages caused by a Product during a period of one (1) year from the later of:

(i) The date of delivery of Product to Partner, or

(ii) The date of delivery of Product to the end user, provided that such period does not exceed eighteen (18) months from delivery of Product to Partner.

12.2 The delay in delivery of any Product shall not entitle Partner to any kind of compensation or damages from B&O.

Page 10

## 13 Term and termination

13.1 This Agreement shall come into force on the Effective Date, and shall remain in force until terminated by one of the Parties.

13.2 Partner may terminate this Agreement with a prior written termination notice to B&O with a notice period as set out in **Schedule 24**. Partner cannot partially terminate this Agreement.

13.3 B&O may terminate this Agreement in full or in part, without liability, with a prior written termination notice to Partner with a notice period as set out in Schedule 24. For the avoidance of doubt, B&O may terminate this Agreement with effect for any part of this Agreement, including but not limited to one or more physical stores or one or more Products, without effect for the remaining part of this Agreement.

13.4 In the event of a material breach by Partner of this Agreement, B&O may terminate this Agreement, without liability, with immediate effect if such material breach is not cured within thirty (30) calendar days after written termination notice to Partner of such breach and of what is required to be done by Partner to remedy the breach. Material breach of this Agreement includes, but is not limited to, any of the following:

(i) Partner's failure to display Products in accordance with the requirements under the applicable Schedules.

(ii) Partner's sale of Products outside the Territory.

(iii) Partner's failure to comply with its payment obligations in due time stipulated in the relevant invoice or according to Schedule 5.

(iv) Partner's failure to comply with customer service requirements as set out in Schedule 7.

(v) Partner's failure to buy Products solely from B&O (see provision 4.3).

(vi) Partner's sale of Products to any other distributors and/or resellers than authorised members of the Network (see provision 5.2).

(vii) If appointed as a reseller, Partners' failure to comply with the internal or external appearance of the physical stores as set out in Schedule 15.

(viii) If appointed as a reseller, Partner's failure to accommodate with instructions from B&O regarding the internal or external appearance of the physical stores as set out in Schedule 15.

(ix) If appointed as a reseller, Partner's failure to comply with the physical stores lease obligations as set out in Schedule 15.

(x) Partner's failure to comply with the requirements as set out in Schedule 16.

(xi) Partner's failure to comply with the requirements to personnel and training as set out in Schedule 18.

(xii) Partner's breach of its marketing and promotion obligations as set out in Schedule 19.

(xiii) Partner's infringement or misuse of any of the Intellectual Property Rights, including use outside the Territory.

(xiv) Partner's breach of the confidentiality obligation including without limitation the duty to observe secrecy regarding new Product releases (see provision 17).

13.5 B&O reserves the right at any time to discontinue the production, sale or distribution of any of its Products, to change the design of its Products and any parts thereof, and to change its service, warranty, price, or other policies, without advance notice or obligation to the Partner of any kind whatsoever. Partner agrees that it shall have no claim against B&O or any of its agents or affiliates for failure to furnish such Products, whether or not such Products are of a model, design or type previously sold.

13.6 Neither B&O nor Partner shall be liable to the other by reason of the expiration or termination of this Agreement, including, without limitation, liability based in law or in equity, compensation, reimbursement, or damages for present or prospective profits, or on account of investments, expenditures or commitments made by Partner, or as a result of the establishment, development or maintenance of the Goodwill of B&O, the Partner or the Products.

## 14 Consequences of termination

14.1 Immediately upon the termination of this Agreement:

(i) Partner will pay any and all amounts owing to B&O and its related entities pursuant to this Agreement and all the rights under this Agreement granted to Partner will automatically cease;

(ii) Partner will discontinue any use of the Intellectual Property Rights; and

(iii) Partner will refrain from doing business under any name or in any manner that might give the impression that Partner is or was an authorised distributor and/or reseller of B&O or any of its related entities.

14.2 In case of termination of this Agreement, Partner acknowledges and agrees that the value of a luxury business such as B&O predominantly lies within Products and B&O brands and therefore Partner acknowledges and agrees that:

(i) Goodwill and any increase in value of Goodwill vests absolutely in B&O and that Partner is not entitled to any payment or other compensation whatsoever from B&O and its related entities for any increase in value of Goodwill that occurred

during the term of this Agreement unless otherwise provided for by mandatory provisions of the law applicable;

(ii) Partner must return to B&O any hard copies of manuals and any other materials provided by B&O (marketing, activity, advertising and promotional material) in its possession or control.

14.3 B&O acknowledges and agrees that provision 14.2(i) does not limit Partner from selling the business it operates under this Agreement in connection with the operation of that business and retaining the proceeds of such a sale, provided that B&O has previously approved the sale and the buyer in writing.

14.4 All obligations of the Parties which expressly or by their nature survive the termination of this Agreement will continue in full force and effect notwithstanding the termination of this Agreement.

14.5 Additional consequences of termination of this Agreement are laid down in **Schedule 25** (as amended, supplemented or replaced from time to time by B&O).

**15 Transshipping**

15.1 Partner shall not Transship the Products, specifically; it shall not sell or transfer any of the Products to any person or entity for resale. Partner shall not sell or offer for sale any product bearing a trademark, copyright, patent, or name associated with B&O, which Partner purchased or obtained from a source other than directly from B&O or a B&O Authorized Distributor. Partner shall not obscure or alter in any fashion any Product or its packaging.

15.2 **Liquidated Damages. For each occasion that Partner breaches provision 15 of this Agreement by engaging in the unauthorized sale of Products, in addition to all other remedies available to B&O under this Agreement and at law, Partner agrees to pay B&O, as liquidated damages and not as a penalty, the greater of the following amounts: (i) the costs and fees associated with B&O's investigation and enforcement regarding the Partner's unauthorized sales; or (ii) five times (5X) the MSRP of the Product(s) per unit of Product. The parties agree that these damages are not punitive.**

**16 Geographic Sales Boundary**

16.1 Partner may only sell and advertise for sale the Products within the Territory. B&O hereby expressly prohibits the Partner from soliciting or consummating sales outside the Territory without the express written approval by B&O.

16.2 **Liquidated Damages. For each occasion that Partner breaches provision 16 of this Agreement by engaging in the unauthorized sale of Products to any person or entity outside the Territory, in addition to all other remedies available to B&O under this Agreement and at law, Partner agrees to pay B&O, as liquidated damages and not as a penalty, the greater of the following amounts: (i) the costs and fees associated with B&O's investigation and enforcement regarding**

**the Partner's unauthorized sales; or (ii) five times (5X) the MSRP of the Product(s) per unit of Product. The parties agree that these damages are not punitive.**

**17 Confidentiality**

**17.1 Partner undertakes to keep strictly confidential all confidential information about B&O** and its related entities, its suppliers, customers, Products, releases of new Products and the structure and development of the Network. Any and all information of such nature is deemed business or operating secrets of B&O and its related entities.

17.2 During the term of this Agreement and after the expiration or termination hereof, neither Party may disclose to any third party any Confidential Information. Each party acknowledges and agrees that any Confidential Information received or obtained from the other party will be the sole and exclusive property of the other party and may not be used, disseminated or disclosed except as may be necessary to perform the obligations required under this Agreement or as may be required by law or any rules applying in a regulated stock market. Both parties are obliged to use the same degree of care in safeguarding Confidential Information as it uses for its own Confidential Information of like importance, but in no event less than a reasonable degree of care. If disclosure is required by law, the Party required to disclose Confidential Information shall reasonably cooperate with the other party (at the other party's request and expense) so that the other party may preserve the confidentiality of the Confidential Information.

17.3 Notwithstanding the foregoing, Confidential Information shall not include, and neither party will be liable for disclose of, any information received by the receiving Party under this Agreement, if the information:

(i) Is or becomes generally available to or known to the public through no wrongful act of the receiving party;

(ii) Was previously known by the receiving Party through no wrongful act of the receiving Party;

(iii) Was independently developed by the receiving Party without reference to the Confidential Information; or

(iv) Was lawfully disclosed to the receiving Party by a third party under no obligation of confidentiality to the other Party.

17.4 This confidentiality obligation shall survive the termination of this Agreement and shall remain in force as long as any of the information pursuant to provision 17.1 is of a confidential nature.

**18 Miscellaneous provisions**

18.1 Force majeure

18.1.1 Neither of the Parties is responsible to the other Party for any delay in performance or non-performance due to Force Majeure, but the affected Party must promptly upon the

occurrence of any such causes inform the other Party in writing, stating that such cause has delayed or prevented its performance hereunder and thereafter such Party must take all action within its power to comply with the terms of this Agreement as fully and promptly as possible.

18.1.2 Each Party is entitled to terminate this Agreement by thirty (30) days written notice to the other Party if performance of this Agreement continues to be impossible on account of any circumstances due to Force Majeure for a period of more than ninety (90) days.

18.2 Insurance

18.2.1 Partner is obliged to take out and maintain general liability insurance covering all of Partner's activities including service and installation and including public and employer's liability insurance. In addition, Partner is obliged to take out all other relevant insurances as may be requested at any time by B&O. Copies of all insurance policies must upon request be made available to B&O together with receipts for payment of premium.

18.3 Notices

18.3.1 Any notice to be given under this Agreement must be in writing and delivered as set out in **Schedule 26** (as amended, supplemented or replaced from time to time by B&O).

18.4 Severability

18.4.1 The invalidity of any term, condition or stipulation of this Agreement shall not affect the validity of the remaining terms, conditions and stipulations of this Agreement or the validity of this Agreement itself. In case of partial invalidity, the Parties agree to negotiate a new wording of the provision(s) in question to maintain the economic balance between the Parties as originally intended.

18.5 No waiver

18.5.1 The failure of any Party at any time to enforce any of the provisions of this Agreement or to exercise any right under this Agreement must in no way affect that Party's rights after any failure or constitute a waiver of that right.

18.6 Assignment

18.6.1 Partner may not assign or in any other way transfer its rights or obligations under this Agreement, including the authorisation contained herein, without the prior written consent of B&O.

18.6.2 B&O may assign its rights and obligations under this Agreement in full or in part to any entity within B&O or to a person or entity appointed by B&O as B&O's distributor and/or reseller in the Territory, and Partner will execute all necessary documents in a form B&O considers reasonably necessary to affect such an assignment. Furthermore, B&O is entitled to assign this Agreement in connection with a possible assignment of all or the majority of B&O's assets and liabilities.

18.7 Change of Control

18.7.1 Partner is not entitled to perform a Change of Control without the prior written consent of B&O, such consent not to be unreasonably withheld.

Page 45

18.8 Other provisions

18.8.1 Partner will duly execute and perform all such acts, deeds, matters and things (including the execution of documents) as may be reasonably required by B&O to enable B&O to obtain the full benefit and advantage of this Agreement and the transactions contemplated by this Agreement.

18.8.2 Where this Agreement refers to rights belonging to other entities within B&O, B&O is without limitation entitled to enforce such rights against Partner on behalf of other entities within B&O.

18.8.3 The terms and conditions of this Agreement (except for the Schedules and Sub-schedules which may be amended in accordance with provision 22.3) may be amended or varied only by a written document signed by the Parties.

18.9 Entire agreement

18.9.1 This Agreement with Schedules and Sub-schedules contains the entire Agreement between the Parties concerning Partner's sale of Products and supersedes any previous agreements between the Parties on the subject matter of this Agreement.

## 19 Release

19.1 Upon execution of this Agreement the parties, their subsidiaries, affiliates, heirs, representatives, successors, assigns, shareholders, officers, directors, employees and agents, hereby waive, fully release and discharge each other and its affiliates, employees, agents, heirs, representatives, successors, assigns, partners, joint ventures, websites, corporations, from any and all claims or causes of action (with the exception of unpaid purchase orders), known or unknown, from the beginning of the world to the Effective Date of this Agreement.

## 20 Applicable law

20.1 This Agreement shall be deemed to have been entered into and fully performed in the State of Delaware and shall be governed by and construed in accordance with the laws of the State of Delaware without regard for the conflicts of laws rules thereof.

20.2 Partner agrees that all controversies, disputes and claims arising out of this Agreement shall be adjudicated exclusively by a court of competent jurisdiction within New Castle County, State of Delaware or the United States District Court in Wilmington, Delaware, except that any judgment in any such action may be enforced in other jurisdictions by suit or in any other permitted manner. Partner irrevocably consents to the jurisdiction and venue of the state and federal courts of Delaware and waives any rights to seek a transfer of venue for any reason or to claim that the forum is inconvenient.

## 21 Choice of Language

21.1 The Parties hereto confirm that it is their wish that this Agreement as well as all other documents relating hereto, including notices, have been and shall be drawn up in the English language only.

## 22 Schedules

22.1 This Agreement has the Schedules (with Sub-schedules, if any) as set out in Appendix 1, which form an integral part of this Agreement.

22.2 B&O shall make current versions of the Schedules and Sub-schedules available to Partner by way of one or more of the means of communication set out in Schedule 26.

22.3 Subject to provision 22.4, B&O may amend, supplement or replace any and all of the Schedules and Sub-schedules at any time and in its sole discretion by providing prior written notice to Partner in accordance with Schedule 26.

22.4 If the amendment of a Schedule or Sub-schedules may materially affect the legal or financial position of Partner, such amendment can only be affected by written notice to Partner and with the notice period set out in Schedule 24.

22.5 Notwithstanding provisions 22.3 and 22.4, Schedule 24 may only be amended or varied by a written document signed by both Parties.

22.6 Any special terms under this Agreement are set out in **Schedule 27**. Notwithstanding provisions 22.3 and 22.4, Schedule 27 may only be amended or varied by a written document signed by both Parties.

## 23 Signatures

23.1 This Agreement has been executed in two original copies, each Party receiving one copy.

On behalf of B&O
Date: 03-03-20
[signature]
Name Brian Hansen
Position Head of mono.brand/CJ

On behalf of Partner
Date: 2-23-20
[signature]
Name David Jutz
Position Independent Dealer Bang & Olufsen of South Califo

Confidential Attorneys Eyes Only



On behalf of Partner

Date:

Name
Position

Date:

Name
Position

Case 2:24-cv-00230-DSF-KES Document 184-2 Filed 08/18/25 Page 76 of 194 Page ID [illegible]
*Confidential – Attorneys' Eyes Only*



**Appendix I**

| **Schedule no.** | **Content** | **Applicable (Y/N)** |
|---|---|---|
| Schedule 1 | Distribution and/or Reseller Concept(s) | Y |
| Schedule 2 | List of Products | Y |
| Schedule 3 | Territory | Y |
| Schedule 4 | B&O terms and conditions | N |
| Schedule 5 | Commercial and payment terms | Y |
| Schedule 6 | Reporting requirements | N |
| Schedule 7 | Warranty terms | Y |
| Schedule 8 | B&O ordering system | Y |
| Schedule 9 | B&O terms and conditions for distribution and/or retail resale | Y |
| Schedule 10 | List of authorised distributors and resellers | Y |
| Schedule 11 | Authorised Reseller Program | N |
| Schedule 12 | Point of sale requirements | Y |
| Schedule 13 | Permitted third party products | Y |
| Schedule 14 | List of physical stores | Y |
| Schedule 15 | Physical store requirements | Y |
| Schedule 16 | Requirements for sales from non-physical locations | Y |
| Schedule 17 | Visual identity requirements | Y |
| Schedule 18 | Requirements to personnel and training | Y |
| Schedule 19 | Marketing and promotion requirements | Y |
| Schedule 20 | Governmental approval requirements | Y |

Version 01, January 2019 - Framework Agreement - Monobrand US

Case 2:24-cv-02230-DSF-KES Document 97-2 Filed 03/18/25 Page 78 of 194 Page ID #:[illegible]


| | | |
|---|---|---|
| Schedule 21 | Intellectual Property Rights | Y |
| Schedule 22 | Use of the Intellectual Property Rights | Y |
| Schedule 23 | Handling of personal data | Y |
| Schedule 24 | Termination notice period | Y |
| Schedule 25 | Consequences of termination | Y |
| Schedule 26 | Requirements pertaining to notices | Y |
| Schedule 27 | Special terms | Y |

BANG & OLUFSEN

**SCHEDULE 1 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**
**DISTRIBUTION, RETAIL AND/OR CHANNEL CONCEPT(S)**

**1 Concepts of Appointment**

1.1 B&O has appointed Partner under the following concepts:

| **Distribution Concepts** | (Tick appropriate concept) |
|---|---|
| Monobrand | |
| Multibrand | |
| Custom Technology Integrators | |
| Custom Technology Integrator Wholesaler | |
| Enterprise | |
| Destocking/Outlet | |

| **Operating Concepts** | (Tick appropriate concept) |
|---|---|
| Cluster Partner | |
| Master Dealer | |
| Distributor | |
| Multibrand retailer | |

1.2 With respect to partners operating in retail the appointment will also include a specification of applicable retail concept per Store. Retail concepts are defined in Schedule 1A, section 3. Furthermore, partners operating in retail will be appointed under a specific channel classification and tier. Channel classifications and tiers are defined in Schedule 1A, section 4. The relevant retail concept(s) and channel classification(s)/tier(s) will be listed in Schedule 14.

1.3 Partner shall comply with the applicable concept(s) and requirements for the appointment as set out and described in Sub-schedule 1A to this Schedule 1 and other Schedules pertaining to the Agreement.

1.4 If Partner is appointed as a Custom Technology Integrator Wholesaler, Partner shall in addition comply with the requirements set forth in Sub-schedule 1B.

**2 Term and termination**

2.1 This Schedule 1 (with Sub-schedules) shall remain in effect while Partner has a valid and subsisting Agreement unless it is terminated earlier in accordance with terms provided for under this Schedule 1 (with Sub-schedules) or in the Agreement or other Schedules (with Sub-schedules) pertaining to the Agreement.

2.2 This Schedule 1 (with Sub-schedules) may be amended, supplemented or replaced at any time, to include additional conditions, by B&O in its sole discretion by providing prior written notice to Partner, which notice may be given as set out in Schedule 26.

2.3 This Schedule 1 (with Sub-schedules) automatically terminates upon expiration or termination of the Agreement.

Sub-schedule 1A – DISTRIBUTION, OPERATING, RETAIL AND CHANNEL CONCEPTS

BANG & OLUFSEN

**SUB-SCHEDULE 1A TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**DISTRIBUTION, OPERATING, RETAIL AND CHANNEL CONCEPTS**

**1. Distribution Concepts**

B&O has various distribution channels, which are categorized as follows:

1.1 Monobrand

1.1.1 A stand-alone retail store or clearly defined space solely dedicated to the sale of the Products made available to it by B&O and which is equipped, fitted up and furnished in accordance with B&O's visual identity requirements as set out in the Agreement.

1.1.2 A monobrand store will give new and existing customers a best in class brand and customer experience.

1.1.3 A monobrand store will generally be located in a prime retail location.

1.1.4 A monobrand store will receive access to support from B&O in respect of e.g. operational support, visual merchandising, training, store design and marketing material.

1.2 Multibrand

1.2.1 A physical and/or on-line retail store that carries a defined assortment of Products in a defined space as well as third party products.

1.2.2 A multibrand store will give a prime brand and customer experience to new and existing customers.

1.2.3 A multibrand store will receive access to some support from B&O in respect of e.g. visual merchandising, store design and marketing material.

1.3 Custom Technology Integrators

1.3.1 An entity authorised by B&O to distribute a defined assortment of Products for complex home integration systems involving tailor-made audio, television and multimedia installations for luxury residential developments as well as complex installations (e.g. smart homes, conference room/board room equipment, hotel facilities, etc.).

1.3.2 A Custom Technology Integrator will distribute a defined assortment of Products for complex installation projects while giving a prime brand and customer experience.

1.3.3 A Custom Technology Integrator will receive access to some support from B&O in respect of e.g. training.

1.4 Custom Technology Integrator Wholesalers

1.4.1 A Partner authorised by B&O to distribute a defined assortment of Products to Custom Technology Integrators.

1.4.2 A Custom Technology Integrator Wholesaler is a Partner who is also authorised by B&O to operate a retail Distribution Concept.

1.5 Enterprise

1.5.1 An entity authorised by B&O to distribute a defined assortment of Products to corporate end-users such as hotels, fashion retailers, restaurants, board rooms, luxury condominiums, yachts & cruise ships, etc.

1.5.2 An enterprise partner will distribute a defined assortment of Products while giving a prime brand and customer experience.

1.5.3 An enterprise partner will receive access to some support from B&O in respect of e.g. training.

Case 2:24-cv-02230-DSF-KES Document 91-2 Filed 08/23/25 Page 133 of 290 Page ID #:2511

1.6 Destocking/Outlet

1.6.1 An entity authorised by B&O to distribute a defined assortment of Products to end-users which are end-of-life and/or refurbished.

1.6.2 A destocking/outlet partner will be located in retail locations housing other luxury brand outlets and/or operating as a luxury brand online outlet conducting sales to private members and/or friends and family sales only.



1.6.3 A destocking/outlet partner will receive access to some support from B&O in respect of e.g. training.

**2. Operating Models**

B&O has various operating models for its partners. The Operating Models are categorized as follows:

2.1 Cluster partner

2.1.1 A cluster dealer owns and operates a cluster of resellers as defined above (including, as minimum, 1 monobrand store).

2.1.2 The cluster partner may have a right, within a predefined geographical area, to open and operate monobrand stores and/or a right to operate certain retail concepts in multibrand channels.

2.1.3 The cluster partner does not have the right to appoint sub dealers, unless otherwise agreed with B&O.

2.2 Master Dealer

2.2.1 A master dealer operates a large cluster of resellers as defined above in a designated geographical territory.

2.2.2 The master dealer has the right to appoint sub dealers (within all distribution concepts and subject to below channel classifications and tiering), who must always be approved by B&O before appointment.

2.3 Multibrand retailer

2.3.1 A multibrand retailer operates one or several multibrand physical and/or on-line retail stores.

2.4 Distributor

2.4.1 A distributor distributes Products to a network of stores authorised by B&O and subject to below channel classifications and tiering. A distributor may provide B2B sales as agreed by B&O.

## 3. Retail Concepts

For appointed monobrand and multibrand partners B&O operates with different retail concepts depending on the size of the store/relevant space. Partner shall ensure that the Store(s) comply with the concept of the appointment (as listed for each Store in Schedule 14). The retail concept further determines the required and available Product assortment. The retail concepts are as follows:



| Flagship store | Macro brand store | Brand store |
|---|---|---|
| **Location:** Key International Cities | **Location:** Key International & Metropolitan Cities | **Location:** All other cities |
| **Expected daily passing traffic:** 15.000 | **Expected daily passing traffic:** 15.000 | **Expected daily passing traffic:** 10.000 |
| **Size (m2):** Ca 150 m2 | **Size (m2):** Ca. 100 m2 | **Size (m2):** Ca 50 m2 |
| **Minimum Number of dedicated staff:** 5 | **Minimum Number of dedicated staff:** 2 | **Minimum Number of dedicated staff:** 1 |
| **Opening days (unless law prevents):** 340 | **Opening days (unless law prevents):** 340 | **Opening days (unless law prevents):** 340 |

| Shop-in-shop | Branded space | Table/Wall |
|---|---|---|
| **Location:** All cities | **Location:** All cities | **Location:** All Cities |
| **Expected daily incoming traffic:** 20.000 | **Expected daily incoming traffic:** 10.000 | **Expected daily incoming traffic:** 5.000 |
| **Size (m2):** Ca. 20 m2 | **Size (m2):** Ca 6 m2 | **Size (m2):** Ca 3m2 |
| **Minimum Number of dedicated staff:** 1 | **Minimum Number of dedicated staff:** 0 | **Minimum Number of dedicated staff:** 0 |
| **Opening days (unless law prevents):** 340 | **Opening days (unless law prevents):** 340 | **Opening days (unless law prevents):** 340 |

**4. Channel Classifications and Tiering**

The appointed monobrand partners' Store(s) shall be classified in retail channels and tiers which shall determine the available and permitted Product assortment.

Page 4 The classification of retail channel and tier will be determined by B&O in its sole discretion based on certain criteria.

*FOR THE US AND CA MARKET SPECIFICALLY:*

B&O expects to have the tier-criteria and classification of Partners ready for the US and CA market within 12-18 months (from June 2022). Until the tier-criteria has been finalized and implemented in the US and CA market, all Partners will be classified as "Elite" and have all rights and obligations associated with such classification, including access to the full Product assortment.

All Partners have been informed that upon introduction of the tier criteria in USA and Canada, certain Partners will be reclassified in B&O's sole discretion and without liability. Partner waives any right in connection with such re-classification and understand, agree and acknowledge that a re-classification may impact its rights and obligation under this Agreement.

The initial classification as "Elite" shall not prevent or be deemed a waiver for B&O to exercise any rights under this Agreement.

BANG & OLUFSEN

**SUB-SCHEDULE 1B TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**CUSTOM TECHNOLOGY INTEGRATOR WHOLESALER PROGRAM**

## 1 Program Purpose

1.1 The purpose of B&O's Custom Technology Integrator Wholesaler Program is to increase B&O's brand awareness within the business of sale, planning and installation of complex home integration systems, tailormade audio, television and complex multimedia installations, including to influence audio and television consideration during development and interior decoration processes.

1.2 Program Provided Partner wishes to participate in B&O's Custom Technology Integrator Wholesaler Program and be appointed and authorized as a Custom Technology Integrator Wholesaler, Partner undertakes to comply with the requirements laid down in this Sub-schedule 1B.

## 2 Definitions

2.1 All capitalised words and expressions shall have the same meaning as set out in the Agreement or as defined in this Sub-schedule 1B, unless the context requires otherwise.

| | |
|---|---|
| **Approved Purpose** | Partner's purchase and sale of the Products for the purpose of supplying and servicing Custom Technology Integrators conducting CTI Business within Partner's designated Territory, including Custom Technology Integrators' sale of Products to End-Users for Installation projects within Partner's Territory. |
| **CTI Account** | Partner's special account opened with B&O that relates to Partner's CTI Business sale, and which is strictly restricted to such Approved Purpose. |
| **CTI Business** | the business of sale, planning and Installation of Products to End-Users operated by Custom Technology Integrator. |
| **Custom Technology Integrator (CTI)** | an entity operating within Partner's Territory which has been authorised and approved in writing by B&O to conduct CTI Business and purchase Products from B&O or from a Custom Technology Integrator Wholesaler appointed by B&O to distribute such Products to End-Users. |
| **Custom Technology Integrator Wholesaler (CTI Wholesaler)** | Partners within the Network authorized to service Custom Technology Integrators on a wholesale basis in Partner's designated Territory in accordance with the Approved Purpose. |
| **Installation(s)** | complex home integration systems involving tailor-made audio, television and multimedia installations for luxury residential developments as well as complex installations (e.g. smart homes, conference room/board room equipment, hotel facilities, etc.). |

| | |
|---|---|
| **Showroom** | means one or more showrooms operated by Custom Technology Integrator in the Territory where the Products may be displayed to the public. |
| **Terms and Conditions for Custom Technology Integrators** | shall mean the applicable and most updated version of B&O's Terms and Conditions for Custom Technology Integrators which are available on: https://reseller.bang-olufsen.com/forms/customtechnologyintegrators |

**3 Appointment of Partner**

3.1 Provided Partner wishes to participate in B&O's Custom Technology Integrator Wholesaler Program and provided Partner complies with the requirements laid down in this Sub-schedule 1B, B&O may decide to appoint Partner as a CTI Wholesaler authorised to supply and service CTIs, having its registered offices within the Territory, on wholesale basis for the Approved Purpose.

3.2 The appointment of Partner as an authorised CTI Wholesaler is limited to (i) servicing the CTIs and (ii) a right and obligation for Partner to distribute a defined assortment of Products to CTIs for Installation projects to End-Users within the Territory.

3.3 The appointment of Partner as a CTI Wholesaler is granted by B&O on a non-exclusive basis, and B&O may in its sole discretion appoint other CTI Wholesalers, distributors and resellers (including entities within the B&O) to sell Products to CTIs within and/or outside the Territory.

3.4 B&O will conduct an annual assessment of Partner's performance as a CTI Wholesaler and Partner's CTI Business. Provided Partner does not comply with the requirements laid down in this Sub-schedule 1B, B&O may at its sole discretion withdraw Partner's appointment and authorisation as a CTI Wholesaler under this Custom Technology Integrator Wholesaler Program.

**4 General obligations of Partner**

4.1 If appointed and authorised as a CTI Wholesaler, Partner shall in addition to the terms and provisions of the Agreement (which shall apply mutatis mutandis) and this Sub-schedule 1B, comply with the Monobrand Reseller Concept as set out and described in Sub-schedule 1A and any other Schedule pertaining to the Agreement (as amended, supplemented or replaced from time to time by B&O).

4.2 Under B&O's Custom Technology Integrator Wholesaler Program, Partner agrees to resell the Products solely to CTIs, having its registered office within the Territory, for the Approved Purpose. In addition, Partner shall ensure that any CTI, to which Partner distributes any Product(s), is authorised by B&O as a CTI and complies with the Terms and Conditions for Custom Technology Integrators.

4.3 Partner, when acting as CTI Wholesaler, must not without the prior written approval from B&O in each individual case sell any Products intended for sale for Installations to any other than authorised CTI within the Territory.

## 5 Partner's purchase and resale of Products

5.1 Partner shall purchase its entire requirement of Products intended for Installations for CTIs by B&O and in accordance with the terms of the Agreement, however, when acting as a CTI Wholesaler, Partner is required to purchase the Products on its CTI Account (USExxxxx).

5.2 Products purchased by Partner on its CTI Account shall not count towards any bonus calculation in Schedule 5 but shall be included in the calculation of Partner's aggregate Qualifying Purchase (as defined in Schedule 5) of Products.

5.3 The commercial and payment terms for Partner's CIW Business, including prices, delivery and payment terms, is set forth in Schedule 5.

5.4 B&O may disclose to Partner a recommended pricelist for CTI but it remains Partner's sole responsibility to agree on the prices for any sale of Products to CTI and B&O shall not incur any liability or obligations in that connection.

## 6 Showroom

6.1 To fulfil its obligations under this Sub-schedule 1B and to strengthen Partner's CTI Business, Partner shall operate its Showroom to display Products for Installation projects and to interact with CTIs.

6.2 Notwithstanding the foregoing, Partner is entitled to sell Products from the approved Showroom to CTIs for Installation projects.

6.3 Partner shall display all Products in the showroom in accordance with the instructions set forth by B&O from time to time, including any visual merchandising standards, etc.

## 7 Resale from non-physical locations

7.1 Partner is not entitled to sell any Products from non-physical (Internet) locations to CTIs and/or End-Users.

## 8 Personnel and training

8.1 Partner is obliged to employ a sufficient number of suitably qualified personnel to ensure the proper fulfilment of its obligations under this Sub-schedule 1B.

8.2 Partner's personnel shall possess the qualifications and skills required in order to provide the CTIs with high quality service and guidance and in-depth technical knowledge of Products intended for their Installations.

8.3 Partner shall procure that the personnel of any CTI, to which Partner distributes any Product(s), possesses the qualifications and skills required in order to provide End-Users with high quality service and guidance and in-depth technical knowledge of Products.

8.4 Partner shall furthermore ensure that the personnel of Partner and any CTI, to which Partner distributes any Product(s), complies with and has completed all applicable and mandatory training provided by B&O from time to time.

8.5 Partner remains sole liable for adequate and required training (as deemed necessary by B&O from time to time) to the CTI.

8.6 Custom Technology Integrator Manager

8.6.1 If authorised as a CTI Wholesaler, Partner is obliged to appoint a suitably qualified Custom Technology Integrator Manager (the "**CTI Manager**") amongst Partner's personnel dedicated to Partner's CTI Business to ensure the proper fulfilment of its obligations under this Sub-schedule 1B.

8.6.2 Partner's CTI Manager shall be responsible for handling Partner's CTI Business and participate in monthly meetings with B&O relating to the CTI Business channel in the Territory.

8.6.3 Partner shall ensure that the CTI Manager possesses the required qualifications and skills to ensure that all CTIs (and ultimately End-Users) receive an integrated and seamless experience regardless of which CTI Wholesaler they choose to purchase Products from. In addition, the CTI Manager shall attend and pass (at all times) the mandatory training required for CTI Managers.

**9 Service and guarantee**

9.1 Acting as a CTI Wholesaler, Partner shall at all time ensure to provide CTIs with high quality service, guidance and in-depth technical knowledge of the Products in accordance with the requirements set forth in this agreement.

9.2 All Products sold by Partner as a CTI Wholesaler to CTIs are covered by the B&O limited warranty, see Schedule 7. When Partner is acting as a CTI Wholesaler, Partner shall ensure to comply with the requirements set forth in this Agreement, including, but not limited to, to provide the CTI with an original B&O limited warranty simultaneously with the completion of the sale of Products for an Installation project.

**10 Sales data and forecasting requirements**

10.1 For the purpose of among other things providing fast and efficient gathering of data of sales and status of inventory to improve its distribution system, Partner shall, when acting as CTI Wholesaler, comply with the forecasting and sales data requirements set out below.

10.2 Partner shall comply with the point of sale ("**POS**") requirements as set forth in Schedule 12 which shall apply *mutatis mutandis*.

10.3 In addition to the requirements set forth in Schedule 12, Partner undertakes to submit and provide B&O with sales data relating to the sale of the Products for the Approved Purpose, including the following extra information which strictly relates to its CTI Business:

(i) Overview of name, company registration number, state and zip code of each CTI, to which Partner has distributed any Product(s), and

(ii) Transactional information, including transaction date, transaction number, material description and transaction quantity, etc., of each CTI,

10.4 In addition, Partner undertakes to deliver forecasting on its CTI Business and agrees to use and comply with B&O's CRM and forecasting software systems and requirements, including updating its forecast on a daily basis in the B&O CRM system.

**11 Liability**

11.1 Partner remains primarily liable towards B&O for any acts or omissions, including any Transshipping or sale of Products outside the Territory, including sales conducted by a CTI to which Partner distributes any Product(s).

**12 CTI revenue sharing**

12.1 If Partner wishes to participate in B&O's Custom Technology Integrator Wholesaler Program and complies with the requirements laid down in this Sub-schedule 1B, Partner is entitled to a revenue share of the sales generated by B&O's sale of Products to CTIs and CTI Wholesalers, having its registered office within Partner's Territory, pursuant to the terms and conditions set forth in Sub-schedule 5F.

BANG & OLUFSEN

**SCHEDULE 2 TO THE BANG & OLUFSEN FRAMEWORK AGREEMENT**
**LIST OF PRODUCTS**

**1 Product assortment**

1.1 It is of strategic importance to B&O that its distribution channels constitute a strong and consistent retail ecosystem, which plays an active role in building and nurturing the B&O brand(s).

1.2 In particular, B&O wishes to:

i. Distribute Products through selected physical and non-physical retail channels; and

ii. Distribute, in addition to item 1.2(i), selected themes, versions or SKUs of Products in designated stores and/or in online channels which emphasize or support building a specific positioning of the brand.

1.3 The Products available for Partner relates to the each Store (either operated by Partner or a sub-partner) and is generally classified in accordance with the below Tier-model on Store level as further described in Schedule 1.

1.4 B&O shall determine, in its sole discretion, which Products shall be available for each of Partner's Stores in the Territory.

1.5 The updated product assortment list on Tier-level may at all time be accessed by Partner on the following URL:
ftp://ftp.bang-olufsen.dk/Marketing/Monobrand_ProductAssortment/

1.6 It shall remain Partner's sole responsibility to ensure and enforce that each Store in the Territory only receive and resell the Products designated to such Store. Non-compliance with this clause 1.6 shall be deemed a material breach of the Agreement.

BANG & OLUFSEN

**SCHEDULE 3 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**TERRITORY**

**1 Schedule 3 – Territory**

1.1 For the purpose of the Agreement, Territory shall have the meaning defined below:

| Zip | City |
|---|---|
| 93510 | Acton |
| 92301 | Adelanto |
| 91377 | Agoura Hills |
| 92536 | Aguanga |
| 91801<br>91802<br>91803<br>91804<br>91896<br>91899 | Alhambra |
| 92653<br>92656<br>92698 | Aliso Viejo |
| 91901<br>91903 | Alpine |
| 91001<br>91003 | Altadena |
| 92304 | Amboy |
| 92801<br>92802<br>92803<br>92804<br>92805<br>92806<br>92807<br>92808<br>92809<br>92812<br>92814<br>92815<br>92816<br>92817<br>92825<br>92850<br>92899 | Anaheim |
| 92305 | Angelus Oaks |
| 92539 | Anza |

| | |
|---|---|
| 92307<br>92308 | Apple Valley |
| 91006<br>91007<br>91066<br>91077 | Arcadia |
| 93420<br>93421 | Arroyo Grande |
| 90701<br>90702<br>90703 | Artesia |
| 93203 | Arvin |
| 93422<br>93423 | Atascadero |
| 90704 | Avalon |
| 93424 | Avila Beach |
| 91702 | Azusa |
| 92309<br>92364 | Baker |
| 93301<br>93302<br>93303<br>93304<br>93305<br>93306<br>93307<br>93308<br>93309<br>93311<br>93312<br>93313<br>93314<br>93380<br>93383<br>93384<br>93385<br>93386<br>93387<br>93388<br>93389<br>93390 | Bakersfield |
| 91706 | Baldwin Park |
| 92220 | Banning |
| 92222 | Bard |
| 92310<br>92311<br>92312 | Barstow |
| 92223 | Beaumont |

| | |
|---|---|
| 90270 | Bell Gardens |
| 90706<br>90707 | Bellflower |
| 90209<br>90210<br>90211<br>90212<br>90213 | Beverly Hills |
| 92314<br>92386 | Big Bear City |
| 92316 | Bloomington |
| 92225<br>92226<br>92280 | Blythe |
| 93205 | Bodfish |
| 91902<br>91908 | Bonita |
| 92003 | Bonsall |
| 93516<br>93596 | Boron |
| 91905 | Boulevard |
| 93064 | Brandeis |
| 92227 | Brawley |
| 92821<br>92822<br>92823 | Brea |
| 93427 | Buellton |
| 90620<br>90621<br>90622<br>90623<br>90624 | Buena Park |
| 91501<br>91502<br>91503<br>91504<br>91505<br>91506<br>91507<br>91508<br>91510<br>91521<br>91522<br>91523<br>91526 | Burbank |
| 93206 | Buttonwillow |
| 92230<br>92282 | Cabazon |

Case 2:24-cv-02230-DSF-KES Document 84-1 Filed 05/23/25 Page 94 of 194 Page ID #:2823

| | |
|---|---|
| 91302<br>91372 | Calabasas |
| 92231<br>92232 | Calexico |
| 93518 | Caliente |
| 92320 | Calimesa |
| 92233 | Calipatria |
| 93010<br>93011<br>93012 | Camarillo |
| 93428 | Cambria |
| 92054<br>92055 | Camp Pendleton |
| 91906 | Campo |
| 91303<br>91305<br>91306<br>91308<br>91309<br>91396 | Canoga Park |
| 93519 | Cantil |
| 92624 | Capistrano Beach |
| 92008<br>92009<br>92010<br>92011<br>92013<br>92018 | Carlsbad |
| 93013<br>93014 | Carpinteria |
| 90745<br>90746<br>90749<br>90895 | Carson |
| 93429 | Casmalia |
| 91310<br>91384 | Castaic |
| 92234<br>92235 | Cathedral City |
| 93430 | Cayucos |
| 92321 | Cedar Glen |
| 91311<br>91313 | Chatsworth |
| 91708<br>91710 | Chino |
| 91709 | Chino Hills |

| | |
|---|---|
| 91909<br>91910<br>91911<br>91912<br>91913<br>91914<br>91915<br>91921 | Chula Vista |
| 91711 | Claremont |
| 92236 | Coachella |
| 92324 | Colton |
| 90220<br>90221<br>90222<br>90223<br>90224 | Compton |
| 92877<br>92878<br>92879<br>92880<br>92881<br>92882<br>92883 | Corona |
| 92625 | Corona del Mar |
| 92118<br>92178 | Coronado |
| 92626<br>92627<br>92628 | Costa Mesa |
| 91722<br>91723 | Covina |
| 92325 | Crestline |
| 93432 | Creston |
| 90230<br>90231<br>90232<br>90233 | Culver City |
| 90630<br>90720 | Cypress |
| 92327 | Daggett |
| 92629 | Dana Point |
| 92014 | Del Mar |
| 93215<br>93216 | Delano |
| 91916 | Descanso |
| 92239 | Desert Center |
| 92240 | Desert Hot Springs |

| | |
|---|---|
| 91765 | Diamond Bar |
| 90090 | Dodgertown |
| 90239<br>90240<br>90241<br>90242 | Downey |
| 91009 | Duarte |
| 91917 | Dulzura |
| 93220 | Edison |
| 92019<br>92020<br>92022 | El Cajon |
| 92243<br>92244 | El Centro |
| 91731<br>91733<br>91734<br>91735 | El Monte |
| 90245 | El Segundo |
| 92023<br>92024 | Encinitas |
| 91316<br>91335<br>91416<br>91426<br>91436 | Encino |
| 92025<br>92026<br>92027<br>92030<br>92033<br>92046 | Escondido |
| 92332 | Essex |
| 92028<br>92088 | Fallbrook |
| 92333 | Fawnskin |
| 93224 | Fellows |
| 93015 | Fillmore |
| 93016 | Fillmore |
| 92331<br>92334<br>92335<br>92336<br>92337 | Fontana |
| 92708<br>92728 | Fountain Valley |
| 93222 | Frazier Park |

Confidential Attorneys' Eyes Only

| | |
|---|---|
| 93225 | |
| 92831<br>92832<br>92833<br>92834<br>92835<br>92836<br>92837<br>92838 | Fullerton |
| 92840<br>92841<br>92842<br>92843<br>92844<br>92845<br>92846 | Garden Grove |
| 90247<br>90248<br>90249 | Gardena |
| 91201<br>91202<br>91203<br>91204<br>91205<br>91206<br>91207<br>91208<br>91209<br>91210<br>91214<br>91221<br>91222<br>91224<br>91225<br>91226 | Glendale |
| 91740<br>91741 | Glendora |
| 93226 | Glennville |
| 93110<br>93111<br>93116<br>93118<br>93160<br>93199 | Goleta |
| 91344<br>91394 | Granada Hills |
| 92313 | Grand Terrace |
| 92341 | Green Valley Lake |
| 93433 | Grover Beach |

| | |
|---|---|
| 93483 | |
| 93434 | Guadalupe |
| 91931 | Guatay |
| 90710 | Harbor City |
| 90716 | Hawaiian Gardens |
| 90250<br>90251 | Hawthorne |
| 92249 | Heber |
| 92342 | Helendale |
| 92543<br>92544<br>92545<br>92546 | Hemet |
| 90254 | Hermosa Beach |
| 92340<br>92344<br>92345 | Hesperia |
| 92346 | Highland |
| 92347 | Hinkley |
| 92548 | Homeland |
| 90255 | Huntington Park |
| 92549 | Idyllwild |
| 92251 | Imperial |
| 92210 | Indian Wells |
| 92202 | Indio |
| 90301<br>90302<br>90303<br>90304<br>90305<br>90306<br>90307<br>90308<br>90309<br>90310<br>90311<br>90312 | Inglewood |
| 93527 | Inyokern |
| 92602 | Irvine |
| 92603 | |
| 92604 | |
| 92606 | |
| 92612 | |

| | |
|---|---|
| 92614 | |
| 92616 | |
| 92617 | |
| 92618 | |
| 92619 | |
| 92620 | |
| 92623 | |
| 92697 | |
| 91934 | Jacumba |
| 91935 | Jamul |
| 93528 | Johannesburg |
| 93558 | |
| 92252 | Joshua Tree |
| 92036 | Julian |
| 92509 | Jurupa Valley |
| 93531 | Keene |
| 93238 | Kernville |
| 90631 | La Habra |
| 90632 | |
| 90633 | |
| 92037 | La Jolla |
| 92038 | |
| 92039 | |
| 92092 | |
| 92093 | |
| 91941 | La Mesa |
| 91942 | |
| 91943 | |
| 91944 | |
| 90637 | La Mirada |
| 90638 | |
| 91747 | La Puente |
| 91749 | |
| 92247 | La Quinta |
| 92248 | |
| 92253 | |
| 91750 | La Verne |
| 92694 | Ladera Ranch |

| | |
|---|---|
| 92607<br>92651<br>92652<br>92654<br>92677 | Laguna Beach |
| 92637 | Laguna Hills |
| 92352 | Lake Arrowhead |
| 92530<br>92531<br>92532 | Lake Elsinore |
| 93240 | Lake Isabella |
| 92040 | Lakeside |
| 90711<br>90712<br>90713<br>90714<br>90715<br>90805 | Lakewood |
| 93241 | Lamont |
| 93539<br>93584<br>93586 | Lancaster |
| 90260<br>90261 | Lawndale |
| 91945<br>91946 | Lemon Grove |
| 92350<br>92354<br>92357 | Loma Linda |
| 90717 | Lomita |
| 93436<br>93437<br>93438 | Lompoc |
| 90755<br>90801<br>90802<br>90806<br>90808<br>90813<br>90814<br>90815<br>90822<br>90831<br>90832<br>90833<br>90834<br>90835 | Long Beach |

| | |
|---|---|
| 90844<br>90853 | |
| 90721 | Los Alamitos |
| 93440 | Los Alamos |
| 90002<br>90004<br>90005<br>90006<br>90009<br>90010<br>90011<br>90014<br>90016<br>90019<br>90020<br>90021<br>90024<br>90025<br>90029<br>90030<br>90032<br>90034<br>90035<br>90046<br>90047<br>90050<br>90052<br>90053<br>90054<br>90055<br>90058<br>90060<br>90062<br>90064<br>90069<br>90070<br>90072<br>90073<br>90075<br>90076<br>90079<br>90080<br>90081<br>90082<br>90083<br>90084<br>90086<br>90087<br>90088<br>90089 | Los Angeles |

Confidential Attorneys Eyes Only

| | |
|---|---|
| 90093<br>90094<br>90095<br>90096<br>90101 | |
| 93441 | Los Olivos |
| 93412 | Los Osos |
| 93249 | Lost Hills |
| 92356 | Lucerne Valley |
| 92338 | Ludlow |
| 90262 | Lynwood |
| 92358 | Lytle Creek |
| 90263<br>90264<br>90265 | Malibu |
| 92518 | March Air Reserve Base |
| 93252 | Maricopa |
| 90292<br>90295 | Marina del Rey |
| 93250 | Mc Farland |
| 93251 | Mc Kittrick |
| 92254 | Mecca |
| 92584<br>92585<br>92586<br>92596 | Menifee |
| 92359 | Mentone |
| 92655 | Midway City |
| 91345<br>91346<br>91395 | Mission Hills |
| 92675<br>92690<br>92691<br>92692 | Mission Viejo |
| 93502 | Mojave |
| 91016<br>91017 | Monrovia |
| 91762<br>91763 | Montclair |
| 90640 | Montebello |
| 91754<br>91755 | Monterey Park |
| 91020<br>91021 | Montrose |

Confidential – Attorneys Eyes Only

| | |
|---|---|
| 93020<br>93021 | Moorpark |
| 92551<br>92552<br>92553<br>92554<br>92555<br>92556<br>92557 | Moreno Valley |
| 92256 | Morongo Valley |
| 93442<br>93443 | Morro Bay |
| 91948 | Mount Laguna |
| 92561 | Mountain Center |
| 91759 | Mt Baldy |
| 92562<br>92563<br>92564 | Murrieta |
| 91951 | National City |
| 91319 | Newbury Park |
| 91322<br>91381 | Newhall |
| 92657<br>92658<br>92659<br>92660<br>92661<br>92663 | Newport Beach |
| 93444 | Nipomo |
| 92860 | Norco |
| 91343<br>91393 | North Hills |
| 91324<br>91325<br>91326<br>91327<br>91328 | Northridge |
| 90650<br>90651<br>90652 | Norwalk |
| 93022 | Oak View |
| 93445<br>93475 | Oceano |
| 92049<br>92051<br>92052<br>92056 | Oceanside |

| | |
|---|---|
| 92057<br>92058<br>92068 | |
| 92259 | Ocotillo |
| 93024 | Ojai |
| 91758<br>91761<br>91764 | Ontario |
| 93255 | Onyx |
| 92856<br>92857<br>92859<br>92861<br>92862<br>92863<br>92864<br>92865<br>92866<br>92867<br>92868<br>92869 | Orange |
| 92368 | Oro Grande |
| 93030<br>93031<br>93032<br>93033<br>93034<br>93035<br>93036 | Oxnard |
| 90272 | Pacific Palisades |
| 91333 | Pacoima |
| 92059<br>92061 | Pala |
| 92211<br>92255<br>92260<br>92261 | Palm Desert |
| 92263<br>92264 | Palm Springs |
| 93552<br>93590 | Palmdale |
| 92266 | Palo Verde |
| 92060 | Palomar Mountain |
| 91402<br>91412 | Panorama City |
| 90723 | Paramount |
| 91101<br>91102 | Pasadena |

| | |
|---|---|
| 91103<br>91104<br>91105<br>91106<br>91107<br>91108<br>91109<br>91110<br>91114<br>91115<br>91116<br>91117<br>91118<br>91124<br>91184 | |
| 93447 | Paso Robles |
| 93563 | Pearblossom |
| 92571<br>92572<br>92599 | Perris |
| 92329<br>92371 | Phelan |
| 90660<br>90661<br>90662 | Pico Rivera |
| 91962 | Pine Valley |
| 92372 | Pinon Hills |
| 92268 | Pioneertown |
| 93040 | Piru |
| 93448<br>93449 | Pismo Beach |
| 92870<br>92871 | Placentia |
| 90291<br>90293<br>90296 | Playa del Rey |
| 91767<br>91768<br>91769 | Pomona |
| 91963 | Potrero |
| 92064<br>92074 | Poway |
| 92065 | Ramona |
| 92066 | Ranchita |
| 92270 | Rancho Mirage |
| 92067<br>92091 | Rancho Santa Fe |

| | |
|---|---|
| 92688 | Rancho Santa Margarita |
| 92374<br>92375 | Redlands |
| 90277<br>90278 | Redondo Beach |
| 91337 | Reseda |
| 92376<br>92377 | Rialto |
| 93556 | Ridgecrest |
| 92378 | Rimforest |
| 92501<br>92502<br>92506<br>92508<br>92513<br>92514<br>92515<br>92516<br>92517<br>92519<br>92521 | Riverside |
| 93560 | Rosamond |
| 91770<br>91771<br>91772 | Rosemead |
| 92275 | Salton City |
| 92401<br>92402<br>92403<br>92405<br>92406<br>92408<br>92411<br>92412<br>92423<br>92427 | San Bernardino |
| 92672<br>92673<br>92674 | San Clemente |
| 92101<br>92102<br>92103<br>92104<br>92105<br>92106<br>92108<br>92110<br>92111<br>92112 | San Diego |

| | |
|---|---|
| 92113 | |
| 92114 | |
| 92115 | |
| 92116 | |
| 92117 | |
| 92119 | |
| 92120 | |
| 92121 | |
| 92122 | |
| 92123 | |
| 92124 | |
| 92126 | |
| 92127 | |
| 92129 | |
| 92130 | |
| 92131 | |
| 92137 | |
| 92138 | |
| 92139 | |
| 92142 | |
| 92143 | |
| 92149 | |
| 92150 | |
| 92152 | |
| 92154 | |
| 92158 | |
| 92159 | |
| 92160 | |
| 92161 | |
| 92163 | |
| 92164 | |
| 92165 | |
| 92166 | |
| 92167 | |
| 92168 | |
| 92169 | |
| 92170 | |
| 92171 | |
| 92172 | |
| 92173 | |
| 92174 | |
| 92175 | |
| 92176 | |
| 92177 | |
| 92179 | |
| 92182 | |
| 92186 | |
| 92187 | |
| 92190 | |
| 92191 | |
| 92192 | |

*Confidential - Attorneys' Eyes Only*

| | |
|---|---|
| 92193<br>92195<br>92196<br>92197<br>92198<br>92199 | |
| 91773 | San Dimas |
| 91340<br>91341 | San Fernando |
| 91775<br>91776<br>91778 | San Gabriel |
| 92581<br>92582 | San Jacinto |
| 92693 | San Juan Capistrano |
| 93401<br>93403<br>93405<br>93406<br>93408 | San Luis Obispo |
| 92078<br>92079 | San Marcos |
| 90732<br>90733<br>90734 | San Pedro |
| 92701<br>92702<br>92707<br>92711<br>92712<br>92735<br>92799 | Santa Ana |
| 93101<br>93102<br>93103<br>93105<br>93106<br>93107<br>93109<br>93120<br>93121<br>93130<br>93140<br>93190 | Santa Barbara |
| 91354<br>91355<br>91380<br>91382<br>91383<br>91385 | Santa Clarita |

| | |
|---|---|
| 93456<br>93458 | Santa Maria |
| 90401<br>90402<br>90403<br>90404<br>90405<br>90406<br>90407<br>90408<br>90409<br>90410<br>90411 | Santa Monica |
| 93060<br>93061 | Santa Paula |
| 93460 | Santa Ynez |
| 92070 | Santa Ysabel |
| 92071<br>92072 | Santee |
| 90740 | Seal Beach |
| 92273 | Seeley |
| 93263 | Shafter |
| 91401<br>91403<br>91411<br>91413<br>91423<br>91495 | Sherman Oaks |
| 91024<br>91025 | Sierra Madre |
| 93062<br>93065<br>93094 | Simi Valley |
| 92385 | Skyforest |
| 92075 | Solana Beach |
| 93464 | Solvang |
| 93066 | Somis |
| 90280 | South Gate |
| 91976<br>91977<br>91978<br>91979 | Spring Valley |
| 90680 | Stanton |
| 93067 | Summerland |
| 91353 | Sun Valley |
| 91041 | Sunland |

| | |
|---|---|
| 90742 | Sunset Beach |
| 90743 | Surfside |
| 91392 | Sylmar |
| 93268 | Taft |
| 91356<br>91357 | Tarzana |
| 91980<br>91987 | Tecate |
| 93581 | Tehachapi |
| 91780 | Temple City |
| 93465 | Templeton |
| 91358<br>91359<br>91360<br>91362 | Thousand Oaks |
| 90290 | Topanga |
| 90501<br>90502<br>90503<br>90504<br>90505<br>90506<br>90507<br>90508<br>90509<br>90510 | Torrance |
| 92678 | Trabuco Canyon |
| 93592 | Trona |
| 91042<br>91043 | Tujunga |
| 93276 | Tupman |
| 92780<br>92781<br>92782 | Tustin |
| 92391 | Twin Peaks |
| 91784<br>91785<br>91786 | Upland |
| 92082 | Valley Center |
| 91404<br>91407<br>91408<br>91409<br>91410<br>91499 | Van Nuys |
| 90294 | Venice |

| | |
|---|---|
| 93002<br>93005<br>93006<br>93007<br>93009 | Ventura |
| 91046 | Verdugo City |
| 92392<br>92393 | Victorville |
| 92081<br>92083<br>92084<br>92085 | Vista |
| 91788 | Walnut |
| 93280 | Wasco |
| 93283 | Weldon |
| 91790<br>91791<br>91792<br>91793 | West Covina |
| 92683<br>92684<br>92685 | Westminster |
| 92281 | Westmorland |
| 90602<br>90603<br>90604<br>90605<br>90607<br>90608<br>90609 | Whittier |
| 92595 | Wildomar |
| 90744<br>90748 | Wilmington |
| 93285 | Wofford Heights |
| 91364<br>91365 | Woodland Hills |
| 91367 | |
| 93287 | Woody |
| 92397 | Wrightwood |
| 92398 | Yermo |
| 92885<br>92886<br>92887 | Yorba Linda |
| 92284<br>92286 | Yucca Valley |

all located in the State of California in the United States of America.

1.2 The Territory outlined above is exhaustive and Partner shall not have any rights or obligations under the Agreement to and in any territory not listed above under 1.1.

BANG & OLUFSEN

**SCHEDULE 4 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**
**B&O TERMS AND CONDITIONS FOR PURCHASE OF PRODUCTS**

**1 Schedule 4 – B&O terms and conditions**

1.1 Intentionally left blank.

BANG & OLUFSEN

**SCHEDULE 5 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**COMMERCIAL AND PAYMENT TERMS**

**CONTENTS**

1 Term ....... 2
2 Prices....... 2
3 Quality Bonus ....... 2
4 Growth bonus ....... 5
5 Cluster bonus....... 5
6 B&O Special Programs ....... 6
7 Payment terms ....... 6
8 Delivery terms ....... 8
9 Promotion and marketing ....... 8
10 eCom revenue sharing ....... 9
11 B2B business conditions ....... 9

**1 Term**

1.1 This Schedule 5 shall apply from the financial year commencing on 1 June 2022 and ending on 31 May 2023 (the **Term**).

1.2 Prior to the expiration of the Term, B&O will notify Partner of the updated commercial and payment terms that shall govern the forthcoming financial year. If B&O does not communicate any new commercial and payment terms for the next financial year to Partner, the current, applicable terms shall apply for an additional Term.

**2 Prices**

2.1 The prices for the Products are the prices stipulated in B&O's price lists applicable from time to time.

2.2 For the purpose of the Agreement, this Schedule 5, Sub-schedules and the price list, the following words shall have the meaning set forth below:

(i) **MSRP** means Manufactured Suggested Retail Price.
(ii) **Basic Margin** means Product margin based on the MSRP.
(iii) **Gross Purchase Price** means MSRP less Basic Margin.

**3 Quality Bonus**

3.1 <u>Bonus calculation and determination</u>

3.1.1 Partner is entitled to bonus subject to Partner's performance on certain quality performance criteria. The bonus achieved by Partner will be calculated on the basis of Partner's total purchases excl. VAT of Products (excluding any Third Party Products and spare parts) during the Term at the prices stipulated in B&O's price list applicable from time to time, subtracted any campaign and/or Product specific discounts ("**Qualifying Purchases**").

3.1.2 A Partner is only entitled to quality bonus, if each of Partner's stores comply with the minimum product display requirements as set forth in the B&O Ordering System, cf. Schedule 15.

3.1.3 The various bonus schemes and percentages are as follows:

(i) Store Standard – 5%;
(ii) Training – 1%; and
(iii) POS Reporting on time – up to 2%;

whereby the quality bonus may vary from 0 – 8% during the Term.

3.2 <u>Store Standard Bonus</u>

3.2.1 Partner shall at any time during the Term ensure to comply with the requirements set forth in Schedule 15 and the B&O Ordering System (as amended from time to time), including, but not limited to, the minimum Product display requirements, Visual Merchandising Standards and the Concept Manual.

Page 3

3.2.2 Partner shall, in order to be eligible for the store standard bonus and in addition to the requirements set forth in Schedule 15 and the B&O Ordering System (as amended from time to time), ensure that all Products are on display and all colors are represented as advised by B&O from time to time no later than 30 days after the relevant Product is available for order through the B&O Ordering System. Additionally, Partner must comply with the below requirements:

(i) A minimum of 1 current Product is represented on display and for demonstration purposes.

(ii) A minimum of 1 permanent color variant is represented in the Store across all product categories.

(iii) All seasonal Products are displayed for duration of campaign as set forth in the B&O Ordering System.

(iv) The current Interior Collection is fully represented from launch until the next collection launch or until availability has ceased.

(v) Every Audio for Video Product variant is represented on display where applicable.

(vi) There is no Product on display that cannot be ordered from the B&O Ordering System after 30 days of end-of-life or discontinuation of the Product to include brackets and stands.

(vii) All demonstration equipment is fully operational and functional including full Bang & Olufsen BeoLink multi-room capabilities.

(viii) Partner is in compliance with the monthly checklist program.

3.2.3 If Partner at any time during the Term complies with clauses 3.2.1 and 0 above, and maintain such compliance throughout the Term, Partner shall be entitled to a store standard bonus of 5% calculated of the Qualifying Purchases (excl. VAT) in the Term. The requirements set forth in this Clause 3.2 apply to all Stores owned or operated by Partner.

3.2.4 If Partner fails to comply with the requirements in clauses 3.2.1 or 0 above in any of its Stores at any given time during the Term, the store standard bonus may, in addition to any other remedies available pursuant to the Agreement, be withdrawn in full or in part by B&O in its sole discretion without further notice.

3.2.5 Partner shall on request from B&O submit photographs, video material or similar relevant documentation to evidence compliance with the requirements in clauses 3.2.1 and 0 above. If Partner fails to submit such documentation (given a reasonable notice), Partner will not be eligible for store standard bonus.

Page 4 3.3 Training Bonus

3.3.1 Partner shall, in addition to the training requirements set forth in Schedule 18 (as amended from time to time), comply with the below training requirements in order to qualify for the training bonus:

(i) Partner shall ensure that all staff members involved with sales, installation and service of Products has completed all courses that are provided in the individual education plan.

(ii) If Partner employs both sales-/store staff and technical solution manager(s), Partner shall procure that both its sales-/store staff ; and (ii) Partner's technical solution managers completing the applicable training in order to qualify for the 2% training bonus.

3.3.2 If Partner at any time during the Term complies with the requirements in this provision 3.3, Partner shall be entitled to a training bonus of 1% calculated of the Qualifying Purchases (excl. VAT) in the Term.

3.4 Timely POS-reporting

3.4.1 In order for Partner to qualify for the **POS-reporting bonus,** Partner shall, at any time during the Term and in respect of each Partner's Stores, comply with the POS-requirements in Schedule 12 to the Agreement, including, but not limited to, timely delivery of sales reports and submitting of sales reports that satisfy the requirements thereto.

3.4.2 Based on timely delivery and submission of the sales reports as stipulated in Schedule 12 in each fiscal quarter, Partner shall be entitled to a bonus of 0% - 2% the following Bonus Quarter. The calculation of the bonus percentage is carried out as follows:

| Bonus (%) | Number of missed, late or non-compliant sales reports in a financial quarter |
|---|---|
| 2 | 0 |
| 1.5 | 1 |
| 1 | 2 |
| 0.5 | 3 |
| 0 | 3+ |

3.5 Payment of Bonus

3.5.1 Achieved bonuses will be settled solely as set-off by B&O on the invoices issued to Partner and no cash payments will be carried out.

Page 5 3.5.2 A Partner's applicable quality bonus (store standard, training and POS-reporting) will be calculated on basis of the performance in each fiscal quarter and be settled on-account to Partner's invoice in the following Bonus Quarter.

3.5.3 For the purpose of this Schedule 5, a "Bonus Quarter" shall be defined as a fiscal quarter of B&O plus one calendar month, which means that the first Bonus Quarter commence on July and expire by the end of September and the first payment of POS-reporting bonus will be carried out in the second Bonus Quarter (based on the performance of the first fiscal quarter). Payout during the first bonus quarter will be based on the quality bonuses from Q4 in FY21/22.

**4 Growth bonus**

4.1 Partner is entitled to a growth bonus calculated on the basis of Partner's Qualifying Purchases in the Term compared to Partner's Qualifying Purchases in the previous financial year running from 1 June 2021 to 31 May 2022.

4.2 The growth bonus shall be calculated as a percentage according to the table below:

| Growth in Qualifying Purchases (%) | Bonus (%) |
|---|---|
| 0 – 4.99% | 0.5% |
| 5.00 – 9.99% | 1 |
| 10.00 – 19.99 % | 2 |
| + 20% | 4 |

4.3 The growth bonus will be calculated by B&O and credited to Partner's account no later than 30 days after expiration of the Term.

**5 Cluster bonus**

5.1 Partner is entitled to an additional bonus based on the number of stores owned or operated by Partner in accordance with the below table:

| No. stores | Additional margin (%) |
|---|---|
| 2 | 2 |
| 3 | 4 |
| 4 | 5 |
| 5 or more | 6 |

5.2 In relation to new store openings, Partner shall be eligible for additional margin as cluster bonus (in accordance with the table above) as of the execution date of the lease agreement for the new store, provided that such new store is open for business within 3 months from the execution date of the lease agreement. If partner opens a new store without a lease agreement being signed, e.g. if Partner owns the premises itself, Partner shall be entitled to additional margin as cluster bonus as of the date of opening of the store.

**6 B&O Special Programs**

6.1 Partner is entitled to participate in the various B&O programmes (as may be cancelled, amended, changed or substituted from time to time in B&O's sole discretion), subject to the program descriptions as set out in the relevant sub-schedule to this Schedule 5.

6.2 At the date of this Schedule 5, the following programs apply:

(i) Custom Technology Integrator Wholesaler Program (Sub-schedule 1B)

(ii) Product Placement Program (Sub-schedule 5A);

(iii) Marketing Co-op Program (Sub-schedule 5B);

(iv) Luxury Property and Developer Program (MDU) (Sub-schedule 5C); and

(v) Interior Designer Program (Sub-schedule 5D).

6.3 In order for Partner to receive the discount / terms under any of the programs, Partner shall forward an e-mail containing order number and other relevant information to US-sales@bang-olufsen.dk and the local Retail Development Manager no later than 24 hours from placing the order. Failure to meet the deadline will result in the Partner not being entitled to any discount or special terms as described in each of the programmes.

**7 Payment terms**

7.1 The following payment terms apply:

7.1.1 Subject to a satisfactory credit evaluation made by B&O, the payment terms are 35 days from the invoice date.

7.1.2 For the purchase of new Products in connection with the launch of such new Products, payment terms are 90 days from the invoice date provided that the order is placed through the B&O Sales Operations and is limited to the amount of new Products as ascribed to the Partner based on the designated tier-level. The 90 days payment term for new Products is subject to satisfactory credit evaluation pursuant to provision 7.1.1. The credit evaluation is made by B&O in its sole discretion and cannot be challenged by Partner. The extended payment terms for new Products shall remain valid during the Term unless otherwise communicated by B&O (in any media).

7.1.3 For window display orders, the payment terms are 90 days from the invoice date provided that the order is placed through the B&O Sales Operations. The 90 days payment term for new window display orders is subject to satisfactory credit evaluation pursuant to provision 7.1.1. The credit evaluation is made by B&O in its sole discretion.

7.1.4 Provided that all conditions are fulfilled pursuant to provision 7.1.1, Partner will be granted a credit limit. B&O reserves the right, in its sole discretion, to change the credit limit without further notice to Partner.

7.1.5 If the credit limit granted to Partner in 7.1.1 is utilized in full, the payment terms shall automatically, and without notice to Partner, be prepayment/on-account.

7.1.6 Annual financial reports shall be submitted to B&O no later than one (1) month after publication with the relevant authorities. Annual reports are to be submitted via e-mail to: treasury@bang-olufsen.dk.

7.1.7 Other financial information, including but not limited to, periodic PNLs, balance sheets and cash flow forecasts shall be submitted to B&O or the B&O selected credit insurance provider on request.

7.1.8 Should Partner fail to provide the requested financial documentation, this may substantially impact the payment terms, B&O can offer Partner. Based on the evaluation of the requested material by B&O and/or the credit insurer, the payment terms may be adjusted.

7.1.9 Late payments (i.e. payments after due invoice date) will be charged administrative and interest fees equal to the lesser of 2% per month compounded monthly or the maximum amount permitted by applicable law.

7.1.10 All invoices, credit and debit notes will be sent electronically via e-mail to the e-mail address provided by Partner or otherwise in accordance with Schedule 25.

7.1.11 All sales are final except for Products returned due to a defect, as to which the standard manufacturer's warranty will apply.

7.1.12 Payment must be received at Bang & Olufsen America account by no later than the due date of the invoice.

7.1.13 A statement (including any and all invoices, credit notes, adjustments, etc.) will be deemed accurate unless Partner raises any questions or issues about it within 60 days after receiving it.

7.1.14 **All questions or issues must be submitted in writing by email to the following address: USfinance@bang-olufsen.dk**

7.1.15 Questions or issues raised by any other means (including telephone) will not be considered or deemed submitted. Partner is barred after that period from challenging the accuracy of a statement or invoice unless Partner previously notified B&O of any issues regarding it by email as described in this clause.

7.1.16 If any invoice is not paid in full by the due date, B&O shall have the right, at its option, to accelerate all amounts then due and owing by Partner by delivery of written notice to Partner. Upon delivery of such written notice, Partner shall immediately pay B&O all such outstanding amounts, including, but not limited to, all open invoices.

7.1.17 Product delivery will stop at B&O's discretion, until a settlement agreement has been made with B&O if Partner's account is not current.

7.1.18 As a condition of extending credit to Partner, B&O may require Partner to sign and deliver a security agreement in form and substance satisfactory to B&O in its sole discretion.

7.1.19 To improve Bang & Olufsen's ability to supply products to customers in a timely and accurate manner, Bang & Olufsen encourages monobrand partners to increase the transparency in their expected demand. The best way of doing this, is to place forward orders in ROS with a requested delivery date. The applicable terms as of 1 June 2022 that apply to cancelation and changes of orders are outlined in the "Forward Orders Policy" (Sub-schedule 5G) which is also available on beo.com. B&O may in its sole discretion change, amend or cancel the "Forward Orders Policy" without further notice.

7.1.20 Partner payment issues resulting in delivery stop will be considered the same as an order cancellation and the cancellation fee will apply.

**8 Delivery terms**

8.1 The terms of delivery are DDP (Incoterms 2020).

8.2 Partner shall at all times comply with the applicable delivery standard operating procedures (B&O delivery guidelines) which may be located through the B&O Ordering System and which includes provisions on, among other things, delay, loss or damaged goods and instructions regarding home delivery shipments.

8.3 Partner shall remain liable for any claim raised against B&O, including claims from any freight forwarders, as well as any damage to or loss of goods as a result of Partner's non-compliance with the delivery standard procedures.

**9 Promotion and marketing**

9.1 Partner shall participate in marketing campaigns and promotions as set forth by B&O from time to time.

9.2 Partner's participation in any marketing campaigns and promotions may be subject to a reasonable fee payable by Partner.

## 10 eCom revenue sharing

10.1 Partner is entitled to a revenue share of the sales conducted on the official B&O website pursuant to the terms and conditions set forth in Sub-schedule 5A.

## 11 B2B business conditions

11.1 Direct sales

11.1.1 B2B business shall for the purpose of this Schedule 5 mean Partner's sale of Products (excluding, for the avoidance of doubt, any third party products) intended for use by non-consumers, e.g. in hotels, with or without software that interacts with the hotel's information system, in restaurants, property developments, excluding sales to Custom Technology Integrators (as defined in Sub-schedule 1B) (the "**B2B Business**").

11.1.2 Products intended for such B2B Business can be purchased by Partner at the prices set forth in clause 2, including all quality bonuses set forth in clause 3 and the cluster bonus set forth in clause 5, provided that Partner prior to its purchase has registered its B2B project in the required monthly pipeline reporting and the B2B distributor to which Partner intends to sell Products is authorised by B&O via B&O's website (https://corporate.bang-olufsen.com/en/become-a-retailer)t o sell Products. In turn and in case of a B2B project, B&O will provide a reasonable amount of support to help securing the best possible solution for the customer.

11.1.3 Ordering will take place on Partner's standard account, while orders intended for purchase by Custom Technology Integrators shall take place on a separate CTI account (as defined in Sub-schedule 1B).

11.2 CTI revenue sharing

11.2.1 If Partner participates in B&O's Custom Technology Integrator Wholesaler Program and complies with the requirements laid down in this Sub-schedule 1B, Partner is entitled to a revenue share pursuant to the terms and conditions set forth in Sub-schedule 5F.

BANG & OLUFSEN

**SUB-SCHEDULE 5A TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**PRODUCT PLACEMENT DISPLAY PROGRAM**

**1 Program Purpose**

1.1 The purpose of B&O's Product Placement Display Program is to increase brand awareness and generate new customer leads by lending Products to qualified business establishments throughout Partner's local city within the Territory (the "**Local Businesses**").

**2 Local Business' Incentive**

2.1 The selected Local Business(es) will have the opportunity to elevate their current space with the latest and most iconic B&O Products. They will receive a customized consultation from their local Partner to determine which Products that complement their current décor. The Product assortment made available by the Partner to the Local Business(es), will be lend to the Local Business(es) for the minimum duration of one (1) calendar year. Product training will be offered to the Local Business(es)' staff to ensure quality and comfort when promoting and talking about the B&O brand and the Products.

**3 Partner Incentive**

3.1 Provided the terms and conditions listed below in provision 4 are complied with (which is determined in B&O's sole discretion), Partner shall be entitled to receive 25% off Partner's Gross Purchase Price relating to the identified Product assortment to be lend to the Local Business(es), inclusive of any staged or flexible (when combined with a staged) Products for the use of external product placement.

**4 Terms and conditions**

4.1 In order for Partner to participate in B&O's Product Placement Display Program, Partner shall comply with the following terms and conditions:

4.1.1 Partner must be in good financial standing and not have any overdue invoices.

4.1.2 Partner's Store(s) must comply with B&O's current Corporate Visual Identity Manual, Concept Manual and Visual Merchandising Standards, as prescribed in Schedule 15, and Partner shall display the full product range.

4.1.3 The selected Local Business(es) must be pre-approved in writing by B&O (both by B&O's local Retail Business Development Manager and B&O's local Head of Marketing).

4.1.4 Before the Product order can be placed, B&O's approval of the Local Business pursuant to provision 4.1.3, as well as the legal contract entered between Partner and the Local Business, must be signed and submitted to B&O's Retail Business Development Manager.

4.1.5 All orders must be submitted directly by Partner in the B&O Ordering System with the reference "Product Placement Display Order". Once the order has been placed in the B&O Ordering System, Partner shall, no later than 24 hours after placing an order, email ussales@Bang-Olufsen.dk and B&O's Retail Business Development Manager the order number to receive the discount listed above in provision 3.1.

4.1.6 Partner will receive the discount listed above in provision 3.1 in the form of an account credit, after the order has been invoiced and both the invoice issued by B&O to Partner, as well as documentation of the loan of Products to the Local Business are received by B&O.

4.1.7 Partner undertakes full responsibility and liability for the full product placement, including installation, service, theft, destruction etc.

4.1.8 If any of the terms and conditions of this Product Placement Display Program are not complied with, Partner shall repay the discount received upon purchase of such Product. The repayment shall be made on a dollar-for-dollar basis without depreciation or any other deduction. The repayment may, at B&O's sole discretion, be carried out as a cash repayment or by way of debiting Partner's account with B&O.

**5 How it can be applied**

5.1 All products within B&O's Staged portfolio are eligible. Products within the Flexible product portfolio are not applicable unless combined with a Staged product.

BANG & OLUFSEN

## SUB-SCHEDULE 5B TO BANG & OLUFSEN FRAMEWORK AGREEMENT
## MARKETING CO-OP PROGRAM

**1 Program Purpose**

1.1 The purpose of B&O's Marketing Co-Op Program is to assist Partner increase its local marketing initiatives by offering funding on qualified activities. The Marketing Co-Op Program will ensure collaborative planning between the B&O's marketing team and Partner.

1.2 Participation in B&O's Marketing Co-Op Program is voluntary, however, valuable for and between B&O and Partner.

1.3 If Partner decides to participate in B&O's Marketing Co-Op Program at the beginning of the Term commencing on 1 June 2022, Partner must commit to maintaining a 12-months marketing plan in partnership with the B&O America Marketing team. The first marketing planning meeting will be in held in May 2022.

1.4 Partners who decline to participate in the Marketing Co-Op Program will not have access to marketing support and marketing co-op funds made available by B&O.

**2 Partner Incentive**

2.1 A marketing calendar will be developed by the B&O Marketing Manager containing the global activities, national activities and product launches planned throughout the Term. The marketing calendar is subject to changes at B&O's sole discretion and is to be used as a guide by Partner.

2.2 Partner is expected to use this marketing calendar for guidance and as a template to develop a local marketing plan, inclusive of regional promotions, events and programming. Development of a local marketing plan will be required before any co-op activities are approved by B&O and the marketing plan must be maintained and followed throughout the Term to continue participation in the Marketing Co-Op Program.

2.3 Provided the terms and conditions listed below in provision 3 are complied with (which is determined in B&O's sole discretion), Partner shall be entitled to receive up to 5% off Partner's Qualifying Purchases in the previous financial year running from 1 June 2021 to 31 May 2022, rounded to the nearest whole dollar, to activate complimentary local activities, if Partner contributes with no less than 50% of the expense to the marketing activities covered by the marketing calendar.

**3 Terms and conditions**

3.1 In order for Partner to participate in B&O's Marketing Co-Op Program, Partner shall comply with the following terms and conditions:

3.1.1 Partner must be in good financial standing and not have any overdue invoices.

3.1.2 Partner's Store(s) must be in compliance with B&O's current Corporate Visual Identity Manual, Concept Manual and Visual Merchandising Standards, as prescribed in Schedule 15, and Partner shall display the full product range.

3.1.3 A co-created marketing calendar by month should be developed before any marketing activities can qualify for this program. The calendar must also be kept up to date to receive continuous consideration and approval on future activities. Any marketing activities and/or campaigns marked as mandatory in the marketing plan, shall be carried out by Partner.

3.1.4 At Partner's and B&O's first marketing planning meeting, Partner and B&O shall together determine the allocated spend per quarter relating to marketing activities included in the marketing calendar and covered by this program.

3.1.5 Partner is obliged to solely make use of B&O's assets for each qualified activation and Partner is not entitled to create its own B&O assets without a pre-approval from and involvement of B&O's US Marketing team, as outlined in the Marketing Guidelines and brand manual, as prescribed in Schedule 19.

3.1.6 Partner must obtain a written approval from B&O's Head of Marketing at and/or Marketing Manager prior to execution of any marketing activities covered by this program.

3.1.7 Partner shall submit the proposed activity details, projected spend and the intended post metrics in written form to B&O to receive the required approval. Upon review, B&O's Head of Marketing and/or Marketing Manager will provide approval of the activity and confirm the level of funding back in written form.

3.1.8 To receive the approved funding from B&O, Partner shall submit a copy of the invoice relating to the marketing activity in question to B&O's Retail Business Development Manager and Marketing Manager, along with the written approval for the activation and proof of performance. Proof of performance should include photos of the live execution and any applicable post metrics such as reach, views, target demographic information, etc.

3.1.9 Receipt of B&O's contribution of funds towards the approved marketing will be determined based on the approved activity in question. Examples of payment include but are not limited to B&O paying for the activity in full, Partner paying the initial invoice in full and receiving reimbursement, B&O splitting the cost up front, etc.

3.1.10 The co-op allocation of funds will be assessed, allocated and possibly revised every quarter. Funds allocated to a specific quarter that have not been spend will not be carried over to the forthcoming quarter(s), and B&O has the right to take back such unused funds. Any unutilized portion of the B&O marketing contribution shall not be paid to or credited to Partner nor shall it be automatically allocated or carried over to the following Term. Partner shall not have any claim towards B&O for such unutilized portion of the B&O marketing contribution.

3.1.11 B&O may, in its sole discretion, credit Partner's account if Partner, for whatever reason, does not pay or reimburse B&O for its portion of any marketing contribution in accordance with this Sub-schedule 5B.

**4 Recommended Applications**

4.1 Recommended marketing activities include, but are not limited to, regional social media, targeted social media campaigns, digital search optimization, key word search ads, development of complimentary sales materials, printing of sales materials, local event sponsorships, direct mail campaigns, local out of home placement, etc.

## SUB-SCHEDULE 5C - Luxury Property and Developer Program (MDU)

**Program Purpose:**

An incentive to attract premium luxury property partners and developers by providing a low voltage framework and the opportunity to market the new location as a "Bang & Olufsen building".

**Developer Incentive:**

Selected designers can receive Bang & Olufsen wiring and connectors at the competitive offer of B&O's cost price. Developers will also receive access to Bang & Olufsen's marketing assets for promotional materials and the opportunity to also take advantage of the 'Product Display Program' to stage a demo unit with latest products from the Bang & Olufsen portfolio.

**Partner Incentive:**

If all qualifications are met, B&O will offer the wiring and connectors at B&O's cost price. Support from the B&O Retail Business Development Manager will be offered to assist in the development of pre-configured packages and support from the Marketing Manager will be available to review and develop associated promotional materials.

**Terms:**

1. Partner must be in good financial standing and not have any overdue invoices.
2. Store must be in compliance with current merchandising guidelines and displaying full product range.
3. Approval from the Retail Business Development Managers and Head of Marketing on each prospective developer to ensure the project aligns with the B&O brand strategy.
4. In order to offer the discounted pricing on wiring and connectors the Partner must provide the prospective developer's general contractor license number, or equivalent accreditation, and receive agreement in writing that the property will be marketed as a Bang & Olufsen building with usage of B&O assets in promotional materials.
5. All promotional materials must be approved by the Marketing Manager before public use.
6. The approved pricing on the wiring and applicable components will be offered in the form of a discount on the original invoice.

**How it can be applied:**

After receiving approval from the Retail Business Development Manager on the prospective developer, the Partner can offer all wiring components at the agreed upon price with written confirmation that the developer will promote the property as a Bang & Olufsen building.

BANG & OLUFSEN

# SUB-SCHEDULE 5D TO BANG & OLUFSEN FRAMEWORK AGREEMENT
# INTERIOR DESIGNER PROGRAM

## 1 Program Purpose

1.1 The purpose of B&O's Interior Designer Program is to increase B&O's brand awareness within the accredited design world, including to influence audio consideration during a creative interior process. Ultimately, this will increase Partner's potential customer base and expand the distribution of B&O's Products.

## 2 Sales Commission

2.1 As part of B&O's Interior Designer Program, accredited and B&O authorised designers and interior decorators ("**Interior Designers**") can get a sales commission on B&O's Product portfolio. The sales commission must be agreed directly between Partner and the relevant Interior Designer(s) engaged by Partner.

## 3 Dealer Incentive

3.1 Provided the terms and conditions listed below in provision 4 are complied with (which is determined in B&O's sole discretion), Partner shall be entitled to purchase Products to supply Interior Designers for specific decoration and interior projects at the Gross Purchase Price minus a discount of 7.5%.

3.2 The 7.5% discount will be settled solely as set-off by B&O on the invoice issued to Partner covering the Product purchase fulfilling the relevant order from the Interior Designer.

3.3 For the avoidance of doubt, the 7.5% discount shall solely apply to the specific Products ordered by Partner for an Interior Designer and that are subject to a sales commission to the Interior Designer.

## 4 Terms and conditions

4.1 In order for Partner to participate in B&O's Interior Designer Program, Partner shall comply with the following terms and conditions:

4.1.1 Partner must be in good financial standing and current with all payments and invoices.

4.1.2 The Interior Designer(s) to which Partner intends to distribute Products, shall be approved and authorised by B&O as an Interior Designer, via the link https://reseller.bang-olufsen.com/forms/interiordesigners.

4.1.3 The sales commission to be paid to the Interior Designer by Partner shall be presented on a separate non-consumer facing invoice issued by the Interior Designer to Partner, clearly stating "sales commission". A copy of the invoice shall be submitted to B&O.

4.1.4 A second consumer facing invoice shall be issued by Partner (to the end-user in question) clearly stating the purchase of each Product at the agreed full retail price (subject to applicable laws, including information to the end-user on the sale being subject to a sales commission). A copy of the invoice shall be submitted to B&O.

4.1.5 Partner shall provide its B&O Retail Business Development Manager with the relevant Interior Designer's NCIDQ number, proof of ASID membership, or equivalent licensed and recognized accreditation no later than at the time of placing the order with B&O. All orders must be submitted directly by Partner and approved by the local B&O Retail Business Development Manager. To receive the 7,5% discount on the Gross Purchase Price, Partner shall inform the B&O Retail Business Development Manager and US Sales of the order number within 24 hours of placing the order.

4.1.6 B&O's 7.5% contribution to Partner shall solely apply to new stock. URI items are not included.

4.1.7 This Interior Designer Program cannot be combined with any other programs or promotions available to Partner under the Agreement.

**5 How it can be applied:**

5.1 All Products within B&O's Staged and Flexible portfolios are eligible.

**SUB-SCHEDULE 5E - 2020 Presidents Day Floor Sample Sale**

**Program Purpose:**

Bang & Olufsen is offering an annual floor sample sale to assist our partners in alleviating inventory that has been discontinued or difficult to sell through. There will also be an opportunity to review the inventory lists from other partners, should you be in need of a specific product.

**Customer Incentive:**
For a limited time (February 14-17) save up to XX% (to be determined based on product availability) during our floor sample sale. Product availability may vary from store to store & certain exclusions may apply.

**Partner incentive:**

B&O will sponsor up to 50% of the predetermined customer discount that is applied to demo/floor sample products. These funds will be given as a credit on future purchases. Promotional marketing assets will be provided to promote awareness of the sale.

**Terms:**

1. Partner must be in good financial standing and not have any overdue invoices.
2. Store must be in compliance with current merchandising guidelines and displaying full product range.
3. Partner must submit a full product list, with photos, of the items it would like to include in the sale to their Retail Business Development Manager no later than on January 24th.
4. Discounts will be determined by B&O in its sole discretion and Partner agrees to sell at the approved display price.
5. All discounted prices cannot be advertised.
6. If original packaging is required to fulfill the sale, it will be the Partner's sole responsibility to secure the materials. No further discounts or credits will be extended to offset the packaging.
7. A replenishment order must be submitted to ensure merchandising compliance, in the B&O Ordering System with "Display Replenishment" as the reference no later than February 28 in order to qualify for the account credit. Once order has been placed in the B&O Ordering System, Partner must email USsales@Bang-Olufsen.dk and their Retail Business Development Manager with order number no later than 24 hours after placing an order.

**How it can be applied:**

B&O will provide the approved marketing materials that can be used within your local market. Each promotional piece should be used by the Partner to promote the sale and can be combined with the 'Marketing Co-Op Program'.

Case 2:24-cv-02230-DSF-KES Document 71-2 Filed 01/09/25 Page 131 of 194 Page ID #:1260

BANG & OLUFSEN

**SCHEDULE 5F TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**REVENUE SHARING MODEL**

**1 Preamble**

1.1 B&O Products are distributed and sold through a number of distribution and sales channels, including an e-commerce platform operated directly by B&O (the "**e-Com Platform**") and a number of authorised Custom Technology Integrators (the "**CTIs**") who are supplied with Products by authorised Custom Technology Integrator Wholesalers (the "**CTI Wholesalers**") or by B&O directly.

1.2 In line with B&O's brand values and commitment to deliver high quality, B&O wishes to adopt an omni-channel approach to sales where customers receive an integrated and seamless experience regardless of which channel they choose to purchase from. B&O wishes for its Partners to support such approach.

1.3 In accordance with the foregoing, B&O has decided to create a revenue sharing model where a part of the online revenue of the e-Com Platform and a part of the revenue generated by the CTIs and CTI Wholesalers are shared with Partner based on the conditions set out below (the "**Revenue Sharing Model**").

1.4 On the e-Com Platform, B&O has implemented a communication and service app called HERO which enables visitors of the e-Com Platform, located within the United States of America, to chat with a B&O monobrand partner located near the visitor, while also generating leads. Partner may voluntarily choose to use the HERO services to communicate with visitors of the e-Com Platform located within Partner's Territory.

1.5 Provided Partner wishes to make use of the HERO services, Partner will be obliged to pay a mandatory quarterly fee. In return, Partner will be rewarded with 10% of the revenue generated on the basis of the HERO app, in accordance with the Revenue Sharing Model set out below.

**2 Term and termination**

2.1 This Schedule 5F is effective from 1 June 2023 or from the Effective Date of the Agreement, whichever is later (the "**Effective Date**").

2.2 This Schedule 5F shall remain in effect while Partner has a valid and subsisting Agreement unless it is terminated earlier in accordance with terms provided for under this Schedule 5F or in the Agreement or other Schedules (with Sub-schedules) pertaining to the Agreement.

2.3 This Schedule 5F may be amended, supplemented or replaced at any time by B&O in its sole discretion by providing prior written notice to Partner. This Schedule 5F automatically terminates upon expiration or termination of the Agreement.

## 3 Revenue Sharing Model

3.1 Scope

3.1.1 Online revenue shall mean the actual revenue, taking into account any discounts, generated from sales to End-Users in the Territory on the e-Com Platform, excluding VAT, any Product returns and revenue from employee sales (the "**Online Revenue**").

3.1.2 CTI revenue shall mean the actual revenue, taking into account any discounts, generated from sales to Custom Technology Integrator Wholesalers and Custom Technology Integrators having their registered offices within the Territory (the "**CTI Revenue**"). The CTI Revenue shall be based on B&O's resale price to the Custom Technology Integrator Wholesalers respectively the Custom Technology Integrators. For the avoidance of doubt, the CTI Revenue shall solely cover B&O's direct sales to the CTIs and CTI Wholesalers, and not sales made by the CTI Wholesalers to the CTIs.

3.1.3 HERO revenue shall mean the actual revenue, taking into account any discounts, generated from online sales made to End-Users, located within the United States of America, purchasing Products via HERO on the basis of a chat conversation with a B&O monobrand partner (the "**HERO Revenue**"). Physical sales made to End-Users in one of B&O's monobranded stores after an End-User have communicated via HERO shall not be covered by the HERO Revenue.

3.1.4 Revenue from all Products (including accessory products) available for purchase directly via the e-Com Platform to End-Users, as well as via the CTIs (and the CTI Wholesalers) shall be included in the Online Revenue respectively the CTI Revenue. The e-Com Platform may display certain Products which cannot be purchased directly via the e-Com Platform. For purchase of these certain Products End-Users are directed to the "Find a Store" feature listing the stores where the End-User can purchase these certain products. Revenue from these certain Products is not considered Online Revenue.

3.2 Online Margin

3.2.1 The margin to be shared with Partner under this Revenue Sharing Model shall constitute 15% of the Online Revenue (the "**Online Margin**").

3.3 CTI Margin

3.3.1 Partners shall be entitled to receive part of the CTI Revenue under this Revenue Sharing Model.

3.3.2 The margin to be shared with the Partner under this Revenue Sharing Model shall constitute 5% of the CTI Revenue (the "**CTI Margin**").

3.4 HERO Margin

3.4.1 Partners who have chosen to make use of HERO shall be rewarded with 10% of the HERO Revenue generated in the United States of America via HERO (the "**HERO Margin**").

**4 Principles of Allocation**

4.1 Allocated zip code

4.1.1 Allocated zip code shall mean the zip code in which the Partner's Store is located (or zip codes allocated to Partner by B&O from time to time).

4.1.2 Partner will be allocated one (or more) zip code(s) per Store for each physical store location(s) listed in Schedule 14.

4.1.3 If multiple Stores are operated within the same zip code, each Store will be eligible for the full Online Margin and CTI Margin provided that the Stores are operated by different Partners and satisfy the remaining criteria set herein.

4.1.4 If Partner operates multiple Stores in different zip codes, each Store will be eligible for the Online Margin and the CTI Margin subject to the remaining criteria.

4.2 Full allocation

4.2.1 Partner shall be entitled to full Online Margin if any of the following criteria are met:

i) Shipment is delivered to an End-User at an address within Partner's allocated zip code.

ii) End-User chooses to use the Click & Collect feature and collects the Product(s) in Partner's Store. In this case, Partner will receive the Online Margin and reimbursement for the Partner's cost of purchasing the Product from B&O. Reimbursement of cost of purchasing the Product will be calculated based on the Product's listed price according to the price list, excluding VAT, applicable at the time of reimbursement (the "**Partner Purchase Price**"). This provision will only apply once the Click & Collect feature has been fully launched at Partner's Store.

4.2.2 Partner shall be entitled to full CTI Margin if any of the following criteria are met:

i) Shipment is delivered to a CTI having its registered office within Partner's allocated zip code.

ii) Shipment is delivered to a CTIW having its registered office within Partner's allocated zip code.

**5 Payment terms**

5.1 Margin payments

5.1.1 The Online Margin, CTI Margin and HERO Margin will be calculated and paid via a credit note on quarterly basis following B&O's financial year. The credit note will be issued 45 days after expiry of each quarter meaning that payments will be made on 15 July, 15 October, 15 January and 15 April.

Case 2:24-cv-02230-DSF-KES Document 184-2 Filed 09/23/26 Page 185 of 290 Page ID #:6363




5.2 Partner Purchase Price reimbursements

5.2.1 Partner Purchase Price reimbursements from the Click & Collect feature will be credited on a monthly basis. The credit note will be issued based on current month plus 30 days.

5.3 Changes

5.3.1 B&O reserves the right, in its sole discretion, to change the frequency and/or timing of payments.

Case 2:24-cv-02230-DSF-KES Document 184-2 Filed 09/23/26 Page 186 of 290 Page ID #:2955
Confidential - Attorneys Eyes Only

BANG & OLUFSEN

**SCHEDULE 6 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**
**REPORTING REQUIREMENTS**

## 1 Schedule 6 – Reporting requirements

1.1 Intentionally left blank.

BANG & OLUFSEN

**SCHEDULE 7 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**WARRANTY TERMS AND SERVICE REQUIREMENTS**

**CONTENTS**

1 Assistance and service provided to Partner ........ 2
2 Customer service ........ 2
3 Warranty ........ 2
4 Warranty registration, claim handling, return policies etc. ........ 3
5 Costs for repair ........ 5
6 Support ........ 5

1 **Assistance and service provided to Partner**

1.1 B&O continuously strives to develop the Network in close cooperation with Partner. B&O provides Partner with any reasonable assistance and services prior to and after the opening of the physical stores to help Partner optimize its sales processes and provide the best possible after sales service to the customers.

1.2 This Schedule stipulates the general terms and conditions in relation to B&O's limited warranty (the "Limited Warranty") including the service and support offered by B&O as well as the Partner's obligations in this respect.

2 **Customer service**

2.1 Partner must comply with B&O's requirements for customer service as set out in the Agreement, including, but not limited to, guidance on and demonstration of Products, delivery and installation of Products, and repairs of Products.

2.2 Installation and repairs must be performed either by an authorised B&O service technician/installer within Partner's organisation or by an external authorised B&O service technician/installer ("Service Providers").

2.3 Partner shall simultaneously with the completion of the sale of a Product (i) provide the customers with an original invoice and the required B&O warranty data; (ii) enter the relevant customer data in B&O Ordering System via the contact card and (iii) register the sold Product to commence the warranty period on the Product.

2.4 If Partner does not comply with the obligation in this clause 2 all warranty obligations towards customer shall be borne by Partner at its own liability and for its own expense.

3 **Warranty**

3.1 Partners obligations towards customers

3.1.1 All Products sold by Partner shall, simultaneously with the completion of the sale, be delivered to the customers with the applicable Limited Warranty. The applicable Limited Warranty for the customers (depending on the relevant Product) may be found via the link.

3.1.2 B&O may update the Limited Warranty from time to time in its sole discretion. If Partner provides any additional warranty to customers, Partner must explicitly specify that such additional warranty is provided solely by Partner, and that B&O has no obligations in connection therewith.

3.1.3 Partner shall at all times be the first point of contact for the customers, e.g. in relation to warranty matters. B&O provides helpdesk support to Partners on technical and Product related matters which the Partner may use when assisting the customers.

3.2 B&O's obligations towards Partner

3.2.1 B&O provides a six (6) months stock warranty to Partner. Partner is responsible for making sure to sell out Products within the stock period. If a Product is sold after the six (6) months stock period Partner will carry the warranty liability for the extended period.

3.2.2 B&O offer a thirty (30) days dead-on-arrival (DOA) period. This DOA period is only valid for HW failures which can be rectified by replacing the Product with a new Product. All other costs than the replacement Product is borne by Partner.

## 4 Warranty registration, claim handling, return policies etc.

4.1 Warranty registrations procedure

4.1.1 All warranty and claim registration must be made by Partner in B&O Ordering System.

4.1.2 It shall remain the sole responsibility of Partner to complete the warranty registration in B&O Ordering System no later than five (5) business days after conclusion of a sale and/or installation of a Product. The registration shall always include the serial number of the Product.

4.2 Claim handling

4.2.1 All claims raised by customers shall be evaluated individually by Partner and handled via the claim system in B&O Ordering System. B&O fulfils its Limited Warranty obligations via the Service Providers. Any customer with a claim/alleged claim has the right to have the Product examined and diagnosed by a Service Provider.

4.2.2 Defective Products: Products that are confirmed defective by Partner within the applicable period of the Limited Warranty shall be handled in accordance with the process and by a Service Partner as prescribed which may include to complete the customer journey (on behalf of the customer) via the link. The relevant process will depend on the nature of the Product.

4.2.3 Partner is obliged to assist B&O or Service Providers in all matters related to handling of warranty claims from customers, including but not limited to providing B&O or the Service Providers, with all information reasonably requested by it to validate whether or not a defect is covered by the Limited Warranty.

4.2.4 No claim must be sent to B&O before the repair of the Product (within the warranty period) is completed.

4.3 Return policies, procedures and safety recalls

4.3.1 Partner is obliged to follow the return procedures and the service profile guidelines that are further described in the B&O Retail Portal – "BeoWise" that can be found through B&O Ordering System.

4.3.2 In case of a safety recall Partner shall comply with the instructions given by B&O. A safety recall can be caused by e.g. a faulty wall bracket, production failure etc. Partner will be informed as soon as practically possible about a safety recall either directly or via the newsletter.

4.3.3 If Partner experience a safety issue, Partner shall immediately inform B&O thereof.

4.4 Repairs

4.4.1 It is Partner's sole responsibility to assist all customers requesting or requiring repair service. The obligation to assist all customers apply irrespective of where the Product was purchased.

4.4.2 Partner shall handle the entire repair process for the customer, which shall include establishing contact with the Service Provider, following up on the repair status, and

keeping the customer informed during the repair process of the expected finalisation of the repair and delays.

4.4.3 If B&O has provided any form of compensation on a non-guarantee repair or has offered a commercial solution, Partner shall ensure that such amount of compensation is visible on the customer's invoice.

4.4.4 Partner shall keep a copy of the customer invoice for at least three (3) years and must provide the invoice to B&O upon request.

## 5 Costs for repair

5.1 Costs related to repair of Products within the applicable Limited Warranty period shall be borne by B&O.

5.2 Costs for repair of Products with an expired Limited Warranty shall be settled by the customer towards the relevant Service Provider.

5.3 If Partner has granted a warranty on a Product which extends the Limited Warranty, any costs related to repair of such Product shall be borne solely by Partner.

5.4 If Partner has provided the end customer with installation services for a Product which needs repair, any related costs for de-installation/re-installation shall be borne solely by Partner.

## 6 Support

6.1 The B&O North American sales office team will provide local support for any queries Partner may have in relation to the Limited Warranty.

6.2 Additionally, the retailer support (located in Struer, Denmark) may provide assistance in relation to technical issues Partner may have.

6.3 Partner may find relevant guidelines and manuals for warranty, service and installation via B&O Ordering System.

BANG & OLUFSEN

**SCHEDULE 8 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**B&O ORDERING SYSTEM**

## 1.0 Ordering and delivery

### 1.1 Ordering of products

All ordering of Products (including marketing materials, spare parts and permitted third party products) must take place via the B&O Ordering System (ROS).

Information about the permitted third party products may be found via BEOnews.

### 1.2 Cancellation or modification of confirmed orders

It is the Partner's sole responsibility to check that an order is correct before submittal. Once submitted and confirmed, Partner cannot make further changes to the order. If changes to quantities, variants, delivery date, delivery place, etc. are needed this should be handled by sales support before the order deadline. Any orders submitted, and past deadline cannot be changed. Please note that changes to orders will be subject to a fee.

### 1.3 Shipment and order deadlines

The order deadline for each country can be found in the B&O Ordering System.

In case of requirements for shipments outside normal delivery schedule, Partner should agree on such special delivery with the B&O sales support. UPS shipments may be required to accommodate such special shipment requirements (depending of the size and type of Products). UPS shipments, large shipments, certain long-distance shipments and urgent shipments will be subject to an additional fee payable by Partner.

No cross-border deliveries will be accepted, i.e. delivery to another country than Partner's domiciled country.

Partner's may request delivery to an address other than the Partners (store/stock). Guidelines on such special deliveries may be found via the B&O Ordering System and be subject to an additional fee.

### 1.4 Delivery procedure

Partner shall comply with the delivery standard operating procedures as set forth in the B&O Ordering System upon delivery of Products.

B&O will provide no compensation or damages to Partner, if the delivery standard operating procedures is not followed by Partner.

Case 2:24-cv-02230-DFK-KES Document 97-184-2 Filed 03/18/25 Page 193 of 290 Page ID #:23871
*Confidential - Attorneys' Eyes Only*

BANG & OLUFSEN

**SCHEDULE 9 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**
**TERMS AND CONDITIONS FOR RESALE**

**CONTENTS**


1 No exclusivity ..... 2
2 Master Dealer - Preferred B&O partner ..... 2
3 Limited exclusivity to distribution channel, Right of first offer ..... 2
4 Business Plan ..... 3
5 Obligations of the Partner ..... **Error! Bookmark not defined.**
6 No charge ..... 4

**1 No exclusivity**

1.1 Partner is granted the right to distribute Products in the Territory subject to the terms and conditions of the Agreement.

1.2 Partner is appointed on a non-exclusive basis, including non-exclusivity to any Products.

**2 Cluster Partner - Preferred B&O partner**

2.1 Partner is appointed as a Cluster Partner in the Territory, whereby Partner shall be entitled and obligated to establish and operate physical stores and conduct sales in the Territory either (i) itself and/or (ii) via authorisation of third party sub-dealers within the Territory to establish and operate physical stores and conduct sales on behalf of Partner.

2.2 Partner's authorisation of sub-dealers under clause 2.1 is subject to (i) prior written approval by B&O and (ii) sub-dealer's submission to the authorised reseller programme, cf. **Schedule 11**. Any sub-dealer authorised under Partner and approved by B&O shall comply with the retail concepts and the channel classification and tiering as set for the in Schedule 1 (and the sub-schedules thereto). It remains Partner's sole responsibility and liability that all sub-dealers comply with the terms and provision thereof.

2.3 Nothing in this Agreement shall exclude B&O's right to establish stores, appoint sales representatives, authorise custom installers, conduct enterprise sales or in any other way restrict B&O's right to market, sell or distribute Products either itself or through an appointed third party partner in the Territory.

**3 Limited exclusivity to distribution channel, Right of first offer**

3.1 Partner shall have a limited exclusivity to open and operate the following monobrand stores: "macro brand stores" and "brand stores", cf. Sub-schedule 1A to Schedule 1 within the Territory, however subject to the modifications set forth in clause 3.2 below (the "Limited Exclusivity").

3.2 <u>Right of first offer</u>

3.2.1 Subject to the terms and conditions contained in this Agreement, if B&O believes it is advisable to have one of the following monobrand stores: "macro brand store"; "brand store" or "Shop-in-Shops" (as defined in Sub-Schedule 1A) opened anywhere in the Territory at any time (a "New Store"), B&O will first offer Partner the right to open the New Store by delivering a new store offer notice (which must include the material terms and conditions for opening the New Store) (the "New Store Offer Notice"). Partner will have thirty (30) days following receipt of a New Store Offer Notice within which to elect to commence the process described in clause 3.2.3 (the "Exploratory Process").

3.2.2 In the event Partner declines to commence the Exploratory Process described in a New Store Offer Notice or does not respond in writing within the 30-day period prescribed in clause 3.2.1, B&O will thereafter have the right to open the New Store, or cause it to be opened by a third-party partner, at the location identified in the New Store Offer Notice, provided it does so on the same material terms and conditions set forth in the New Store Offer Notice. If the material terms and conditions contained in a New Store Offer Notice

are substantially changed, B&O will provide Partner with another New Store Offer Notice, as to which the provisions of this clause 3.2 will apply.

3.2.3 In the event Partner elects to commence the Exploratory Process in response to a New Store Offer Notice, Partner will notify B&O in writing within the 30-day period prescribed in clause 3.2.1 (the "Election Notice"). Within thirty (30) days after delivery of the Election Notice to B&O, Partner will deliver a draft store business plan that (i) shall be in reasonable detail; (ii) shall conform to the criteria for Bang & Olufsen retail store business plans, applicable with respect to the opening of Bang & Olufsen retail stores and (iii) includes a projection showing that such store will be profitable within 36 months after the date such store opens (the "Store Business Plan") to B&O for its approval.

3.2.4 Within thirty (30) days after receipt of the draft Store Business Plan, B&O will notify Partner in writing of B&O's approval or disapproval thereof. If B&O disapproves of the Store Business Plan, B&O will notify Partner in writing of the reasons for such disapproval and the Parties will thereafter use commercially reasonable efforts to resolve all of B&O's objections and agree upon a mutually satisfactory Store Business Plan within thirty (30) days after the date B&O notifies Partner of its disapproval. If the Parties are unable to agree upon a Store Business Plan within said 30-day period, B&O will have the rights described in clause 3.2.2 hereof and Partner shall have no further rights with respect to the New Store.

3.2.5 Partner's right of first offer as provided in this clause 3.2, and B&O's obligation to make Partner any offer with respect to a New Store anywhere in the Territory is subject to the condition precedent that, as of the date B&O would otherwise be obligated to offer a New Store opportunity to Partner, no default or event of default will have occurred and be continuing on the part of Partner under this Agreement or under any other agreement between Partner and B&O.

3.2.6 Notwithstanding anything contained in this Agreement to the contrary, Partner's rights and options pursuant to this clause 3.2 with respect to a specific New Store will terminate on the date on which Partner declines, or is deemed to have declined, to pursue the Exploratory Process for such New Store under clause 3.2.2.

3.3 <u>Flagship store</u>

3.3.1 Notwithstanding clause 3.2 above, B&O has the right at any time to open and operate a monobrand flagship store ("Flagship Store") in larger cities/capitals in the Territory without offering such store opening to Partner in accordance with the provision above under 3.2.

3.3.2 A Flagship store shall be fully owned and operated by B&O or via a third party duly appointed by B&O.

**4 Business Plan**

4.1 Partner must prepare and present to B&O a five (5) year business plan for the operation of the Stores and the development of the Territory.

## 5 No charge

5.1 B&O has not charged and will not charge any fee, direct or indirect, for entering into the Agreement, the right to sell the Products or the right to use the Intellectual Property Rights. No such fee or charge is or will be included in any prices or payments for Products or other items sold or services rendered by B&O to Partner.

5.2 Partner shall be precluded from contending that any such fee or charge was included in any price or payment for Products or other items sold or services rendered by B&O to Partner unless Partner contends in writing to B&O within sixty (60) days after the Products or other items were sold or services were provided by B&O that the prices or payments for Products or other items sold or services included any such fee or charge.

BANG & OLUFSEN

**SCHEDULE 10 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**
**PERMITTED RESALE**

## 1 Schedule 10 – Permitted Resale

1.1 Partner is not entitled to resell any Product to other than End-Users within the Territory.

BANG & OLUFSEN

**SCHEDULE 12 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**POINT OF SALE REQUIREMENTS**

**1 POS systems and submission of data**

1.1 For the purpose of among other things providing fast and efficient gathering of data of sales and status of inventory, creating customer behaviour statistics, optimising support functions, reducing costs in the distribution chain and in general increasing customer satisfaction, Partner shall install and use B&O's point of sales system, Beopos ("**POS**"), that is capable of retaining and analysing the shop data as set forth below (as amended, supplemented or changed from time to time).

**2 POS Requirements**

2.1 B&O is constantly seeking to improve the distribution system and in this regard B&O wishes to achieve a further degree of transparency in its retail business, in order to improve B&O's ability to continuously adapt and adjust the portfolio of products; offered services and support; and stock management, for the benefit of B&O as well as the distribution network.

2.2 Partner undertakes to either (i) use the POS system as provided or made available by B&O (as amended, supplemented or replaced from time to time); or (ii) Partner's own POS system, subject to delivery of the POS Data (as defined below). Partners' own POS System shall be approved by B&O.

2.3 Partner undertakes to make the POS Data (as defined below) available to B&O either (i) via the B&O POS system; (ii) or its own POS system through the API's (web services) provided by B&O; or (iii) delivered to B&O or any third party appointed by B&O on a weekly basis, cf. below.

2.4 Partner shall procure that B&O receives the below POS data (the "POS Data") either via (i) its POS system, (ii) via the API's provided by B&O or (iii) manually. B&O shall have access to/receive the information specified below:

(a) <u>In relation to the store</u>:

(i) Store Identifier;
(ii) Store name, address and city; and
(iii) Daily inventory status per B&O material number.

(b) <u>In relation to store sale</u>:

(i) Date and time for each sale;
(ii) Invoice number;
(iii) Units sold per transaction;
(iv) B&O Material Number;
(v) Serial numbers; and
(vi) Monthly total retail sales revenue.

(c) In relation to each customer:

(i) Customer postal code; and
(ii) Customer residence country.

(d) Miscellaneous information:

(i) Retail sales targets for the coming 12 months; and
(ii) Any other information reasonably required by B&O, taking the purpose described below in 2.8 into consideration.

2.5 If the POS Data is not delivered directly through Partner's POS system or the API's, Partner shall ensure to send to B&O the POS Data in a media reasonably requested by B&O on a weekly basis and no later than on every Tuesday in each week. As at the time of this Schedule 12, the relevant media for submission of POS Data is via a CSV or Excel file and in the format supplied by B&O.

2.6 The POS Data shall be forwarded electronically to: playreports@bang-olufsen.dk and submit_bo@e2open.com, and any other recipient as instructed by B&O from time to time. All POS Data submitted manually shall be encrypted before forwarded onto the specified recipients. Any submission of non-encrypted POS Data will be deleted and is not deemed as a submission of the POS Data in accordance with the provision of this Schedule 12.

2.7 It is Partner's sole responsibility that the POS Data provided to B&O is accurate and correct.

2.8 The gathered POS Data will form an integral part of B&O's management of the distribution system and create improved retail insights, including regional market trends, stock levels for click and collect solutions, analyzing marketing and campaign effectiveness etc.

2.9 B&O will only to use the POS Data in accordance with the purpose as described above.

BANG & OLUFSEN

**SCHEDULE 13 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**PERMITTED THIRD PARTY PRODUCTS**

Permitted third party products shall for the purpose of the Agreement mean the range of third-party products which B&O from time to time has specified to be sold in connection with the sale of Products and which are sourced by Partner from either B&O or from third party suppliers designated or approved by B&O.

BANG & OLUFSEN

**SCHEDULE 14 TO BANG & OLUFSEN FRAMEWORK AGREEMENT LIST OF PHYSICAL STORES**

This Agreement applies to the following physical store(s) and location(s):

| Name of Store/ Store ID | Location/ Address (incl. ZIP or postal code)/ Country | Retail Format* | Retail Concept* | Latest refit date | Net Sqm | Tier* |
|---|---|---|---|---|---|---|
| Bang & Olufsen West Hollywood | 106 N. Robertson Blvd West, Hollywood, CA, 90048 | B&O Creative | Other local design | September 1st 2021 | NET: 1200 SQFT | Tier 1 - Elite |
| | | | | | | |
| Bang & Olufsen Costa Mesa | 3323-B, Hyland Ave., Costa Mesa, CA, 92626 | B&O Brand house | SSC 2.0 | N/A | NET: | Tier 1 - Elite |
| USOU000091 | | | | | | |
| Bang & Olufsen Pasadena | 650 E Colorado Blvd, Pasadena, CA, 91101 | B&O Brand house | SSC 2.0 | September 2020 | NET: | Tier 1 - Elite |
| USOU000098 | | | | | | |
| Bang & Olufsen La Jolla | 7851 Girard Ave, La Jolla, CA, 92037 | B&O Brand house | SSC 2.0 | N/A | NET: | Tier 1 - Elite |
| USOU000021 | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Bang & Olufsen San Francisco<br>X | 25 Division St., San Francisco, CA, 94103 | B&O Brand House | SSC 2.0 | 2022 | NET: 1000SQFT | Tier 1 - Elite |

*subject to approval/appointment by B&O

Any changes or additions to the above lists are subject to B&O's prior written approval.

BANG & OLUFSEN

**SCHEDULE 15 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**PHYSICAL STORE REQUIREMENTS**

**CONTENTS**

1 Definitions ........................................ 2
2 Stores ........................................ 2
3 Store opening hours ........................................ 4
4 Partner's Status ........................................ 5

**1 Definitions**

1.1 For the purpose of this Schedule 15 the following terms shall have the following meanings:

| | |
|---|---|
| Corporate Visual Identity Manual | the manual setting forth the requirements to inter alia font, use of Intellectual Property Rights, logos etc. as attached as Schedule 17 (as and supplemented from time to time) and which may be found by Partner via the B&O Ordering System. |
| Concept Manual | the applicable concept manual for the monobrand stores as amended and supplemented from time to time and which may be found by Partner via the B&O Ordering System. |
| Store | the physical stores listed in Schedule 14 |
| Parts List | the elements used to furnish and equip the Stores as amended and supplemented from time to time. The applicable Parts List may at all times, and on request by Partner, be handed out via the B&O store design team. |
| Visual Merchandising Standards | The manual in place from time to time setting forth the requirements for visual merchandising in the Stores and which may be found by Partner via the B&O Ordering System. |

**2 Stores**

2.1 <u>Store appearance, visual identity etc.</u>

2.1.1 Partner shall build the Store fronts and equip, fit up and furnish the Stores in accordance with

i. The applicable Corporate Visual Identity Manual;

ii. The applicable Concept Manual (as amended, supplemented or replaced from time to time); and

iii. The applicable Visual Merchandising Standards.

2.2 The Stores shall at all times be equipped and fitted up with elements from the Parts List approved by B&O.

2.2.1 All elements on the Parts List shall at all times be purchased by Partner from B&O or a third party supplier designated or approved by B&O.

2.2.2 Partner is not entitled to commence the operation of any Store until the Store has been equipped, fitted up and furnished in accordance with B&O's specifications and the Store in writing has been approved ready for operation by B&O.

2.2.3 Partner shall comply with and implement all campaigns regarding window display, interior or exterior shop decoration, and special product promotions etc. which from time to time are initiated by B&O. This implies that Partner in connection with launches of new Products is required to purchase the number of new Products considered adequate by B&O for that purpose. Furthermore, Partner is required to purchase all elements on the Parts List and/or any other elements required by B&O in connection with new window displays.

2.2.4 Partner cannot without the express, written consent of B&O change the internal or the external appearance of the Stores. Partner shall maintain the Stores and carry out all such repairs and improvements as required and deemed necessary by B&O in order to maintain a visual identity of superior quality. B&O may from time to time instruct Partner to make changes of the internal and/or external appearance of the Stores in order to comply with changes in B&O's Concept Manual.

2.2.5 Partner is not entitled to sell or otherwise dispose the elements purchased via the Parts List to third parties without the express written consent from B&O.

2.3 Store design, interior and visual merchandising standards

2.3.1 On an ongoing basis, Partner is required to update, renew and optimize its physical space, concept and instore campaign. Partner agrees that it shall remodel and renovate its B&O displays, floor space, and concept no less often than every sixty (60) months. No less than fifty-four (54) months after its last Store remodel, Partner shall obtain advice and consent from B&O for its Store changes. Failure to comply with this section shall constitute a material breach of the Agreement enabling B&O to terminate the Agreement upon ninety (90) days notice.

2.3.2 All applicable standards, guidelines, installation guides etc. are available for Partner through the B&O Ordering System under "store design" or via the Parts List, as applicable.

It is Partner's sole responsibility to regularly check the B&O Ordering System and at all times comply with the requirements set forth in the guidelines therein. Non-compliance with the applicable guidelines and standards are deemed to be a material breach of the Agreement.

2.4 How to order materials

2.4.1 The elements on the Parts List are outsourced to a third party designated by B&O (in its sole discretion). The relevant details of such third party may be found via the Parts List.

2.5 Store leases

2.5.1 Upon written request from B&O Partner must use all reasonable endeavours to ensure that B&O obtains:

a. a right to substitute and take over all rights and obligations of Partner in respect of a lease of the Stores in the event that Partner breaches the lease agreement or terminates the lease agreement pursuant to which it occupied the Stores and to ensure that B&O in this event receives copies of all notices from the landlord including without limitation notice of termination whether statutory or otherwise in a reasonable time to decide whether it will exercise the right to substitute Partner on reasonable conditions; and

b. a right to substitute and take over all rights and obligations of Partner in respect of a lease of the Stores in the event that the Agreement is terminated due to Partner's breach of the Agreement; and

c. a right to acquire the lease of the Stores on similar conditions as the lease are offered to any third party in the event that Partner has a right to assign its rights under the lease agreement to a third party. The price to be paid by B&O is limited to the amount corresponding to the market value for the right to assignment as set out in clause 2.5.2.

2.5.2 In the event that B&O exercises its right to take over a lease according to clauses 2.5.1 a or b, Partner may request that B&O pays to Partner the market value, if any, of the right of assignment of the lease. If the Parties cannot agree on the market value, the market value shall be determined as the average of the market value determined by two (2) independent real estate valuers with local knowledge of whom one (1) shall be appointed by Partner and one (1) shall be appointed by B&O. The Parties shall pay the costs to the valuer appointed by them. Absent any manifest error the market value calculated as the average of the two valuations shall be final and binding on the Parties and not subject to review by arbitration or court proceeding. B&O shall be entitled to set-off money owed by Partner to B&O against payment for the lease.

2.5.3 Partner shall submit a copy of the lease agreement for the Stores and any amendments thereto to B&O.

**3 Store opening hours**

3.1 Partner shall, subject to applicable law, keep its Store(s) open for business in normal retail hours within the Territory every day of the week, save for national or federal banking holidays.

**4 Partner's Status**

4.1 Partner must always refer to his status as an independent retailer operating in Partner's own name and for his own account. At no time may Partner refer to himself as B&O or its subsidiaries or affiliated companies, hold himself out as a subsidiary, business division, agent or employee of B&O or its subsidiaries or affiliated companies. Partner must only use the Intellectual Property Rights in accordance with the terms and conditions of the Agreement.

4.2 Partner shall operate the Stores in a separate limited liability entity having as its only objective to operate the Stores (Special Purpose Vehicle).

BANG & OLUFSEN

**SCHEDULE 16 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**REQUIREMENTS FOR SALE FROM NON-PHYSICAL STORES**

**CONTENTS**


1 Online sales ..... 3
2 Website ..... 3
3 Market places ..... 4
4 Product data and demonstration prior to sale ..... 4
5 Warranties for online sales ..... 5
6 Services ..... 5
7 Confirmation of Order ..... 5
8 Delivery and installation ..... 5
9 Social Media, applications etc. ..... 6
10 Internet sales requirements ..... 6
11 Page Title / Title Tags ..... 9
12 Customer Service ..... 9
13 Internet sales – Recommendations ..... 9
14 Customer Service ..... 10
15 Applicable law ..... 11
16 Compliance ..... 11
17 Approved Websites: ..... 12

**1 No online sales**

1.1 Partner is not entitled to conduct any sale of Products from any channel other than the physical Store(s) authorised under this Agreement, including but not limited to, sale on the internet, social media etc.

1.2 Any unauthorised sale in violation of the above clause 1.1 is deemed a material breach of the Agreement.

[PLEASE CHOOSE EITHER THIS OR THE BELOW DEPENDING ON THE AUTHORISATION GRANTED TO THE RELEVANT PARTNER]

**1 Online sales**

1.1 It is of utmost importance to B&O that any marketing and sales under the usage of the Intellectual Property Rights pursuant to the Agreement on the internet meets consumer expectations and is consistent with B&O´s exclusive image as a luxury brand. Moreover, as being Partner in the Network it is a key element that all online marketing and sale is subject to consistency in the way that Products are marketed and sold online whereby the goodwill of the Bang & Olufsen brand is protected.

1.2 Partner undertakes to comply with B&O's E-commerce guidelines for the use of the internet for the resale of the Products. The applicable E-commerce requirements and guidelines may be found via the B&O Ordering System and it is Partner's sole responsibility, at all times, to have read and be familiar with the requirements set forth therein.

1.3 When using the internet for the resale of the Products, Partner shall also comply with B&O's Corporate Visual Identity Manual as set forth in Schedule 17 to the Agreement (and the applicable version may at all times be found via the B&O Ordering System) with regard to electronic usage.

1.4 B&O may at any time require that Partner provides B&O with evidence and documentation of compliance with the E-commerce guidelines. Partner is obliged to comply with such request immediately and without undue delay and in no event later than within 10 working days.

**2 Website**

2.1 For any website ("the Website") used by Partner and approved by B&O to market and sell the Products, Partner is obliged exclusively to use the graphic user interface at all time required and made available by B&O. Hence, all pictures, photos, graphics, audio and video to be used on the Website shall be made available by B&O to Partner, and Partner shall not be entitled to make any modifications to any internet templates provided by B&O.

2.2 Partner is entitled to market and sell Products from a Website provided always that

a. B&O has approved the final graphic user interface of the Website;

b. Partner is the sole owner of the domain name used for the Website;

c. the Website complies – and remain compliant – with Partner's obligations under the Agreement including this Schedule 16;

d. No sale of Products are conducted outside the Territory; and

e. The Website has been listed as approved in this Schedule 16.

2.3 Partner's Website shall be a secure site for customer transactions, which in particular shall mean:

(i) The Website shall be minimum SSL (https) 256-bit compliant; and
(ii) SLA (server uptime) shall be kept at a minimum of 99%.

2.4 The Website shall be operated in Partner's own name, and Partner shall ensure that the domain name is not likely to cause confusion with the B&O names and trademarks. Inter alia any inclusion of any B&O trademark (whether registered or unregistered) in the domain name is deemed to cause confusion.

2.5 Linking to any website owned or operated by B&O or its subsidiaries or affiliated companies requires written approval from B&O.

2.6 All costs related to the Website, including hosting, ongoing service and management, shall be borne solely by Partner.

2.7 It shall be expressly stated on the Website that

a. the Website is owned and operated by Partner;

b. Partner is responsible for the content, marketing and purchases on the Website; and

c. B&O has no, and will not assume any, liability for the content, marketing and purchases on the Website.

2.8 Partner must ensure that the Website and all content hereon, is exposed in a way consistent with what would reasonably be expected taking the B&O name and Intellectual Property Rights into consideration.

**3 Market places**

3.1 Partner shall not be entitled to distribute or sell, neither directly nor indirectly, any Products on any marketplace. "Marketplace" shall mean online platform and/or e-commerce site (in any media), generally open for public trade, enabling sale of goods by multiple third parties.

**4 Product data and demonstration prior to sale**

4.1 Partner shall ensure that customers receive adequate, correct and updated Product information on the Website, including technical information and information on compatibility to other AV products.

4.2 Partner shall offer and ensure to advertise on the Website, the possibility to have Products demonstrated prior to purchase either at the physical Store(s) of Partner or at the physical premises of other authorised members within the Network.

Case 2:24-cv-02230-DSF-KES Document 71-2 Filed 08/05/25 Page 162 of 194 Page ID #:2391

4.3 Partner shall, furthermore, before issuance of a final order confirmation offer the possibility for internet customers to receive advice on and demonstration of Products by way of e-mail assistance.

**5 Warranties for online sales**

5.1 Partner is obliged to offer the same terms of warranty for online sales as sales conducted in its physical Store(s).

5.2 All warranties must be available to consumers in writing on the Website prior to the sale of a Product.

**6 Services**

6.1 Partner is obliged to offer the same services as set out in the Agreement or in national law to consumers on the Website as provided at Partner's physical Store(s).

**7 Confirmation of Order**

7.1 Immediately after a consumer has placed an order, the Partner shall submit an electronic order confirmation containing as a minimum the following information:

i. Specification of Products ordered;

ii. Price inclusive value added tax;

iii. Freight/carriage and expenses (paid by the Partner);

iv. Confirmation of shipment of the Product (when shipped);

v. Estimated delivery date;

vi. Name of the delivery company or courier;

vii. E-mail and contact details of the Partner;

viii. Information regarding warranty and service issues; and

ix. Any additional information required by mandatory rules within the Territory, which, for the avoidance of doubt, is the Partner's sole responsibility to comply with at all times.

7.2 Partner is obliged to ensure that only end consumers or authorised members of the Network are allowed to buy Products on the Website.

**8 Delivery and installation**

8.1 Partner shall ensure that all orders are delivered to the consumer within the time of delivery agreed.

8.2 Partner is obliged to secure that demonstration and installation (for Products that require demonstration and installation), including wiring, of the delivered Products takes place by Partner or another authorised member of the Network who is authorised in such demonstration and installation at the time of delivery.

**9 Social Media, applications etc.**

9.1 All requirements set forth in this Schedule 16 relating to Websites shall apply mutatis mutandis to all online marketing and sales, including but not limited to marketing and sales via applications, Facebook, Instagram and other social media.

**10 Internet sales requirements**

10.1 Display Product images:

10.1.1 Partner shall use only those Product images, athlete images, marketing banners and video clips provided or authorised in writing by B&O (which may be found via the B&O Ordering system, or on any other platform as instructed by B&O from time to time) ("Authorised Images") on any website, advertisement, sponsored link, or any other online marketing used, paid for or associated with Partner.

10.1.2 Partner shall only display Products (and any permitted third-party products) and is not entitled to display any products from other manufacturers unless otherwise agreed in writing with B&O.

10.2 Display and describe products using authorised marks:

10.2.1 Partner shall accurately describe Products using trademarks owned by B&O or its subsidiaries or affiliated companies (the "Authorised Marks").

10.2.2 The Authorised Marks shall always be followed by the generic word for the Product. They shall never be used in the possessive or in the plural. The Authorised Marks shall always be displayed in a way that distinguishes them from other surrounding words, e.g., by appearing in initial caps or full caps, such as "B&O" or "Bang & Olufsen" and used in conjunction with the ® or ™ designation as directed by B&O (or any company within the B&O Group).

10.2.3 Partner shall prominently display Authorised Marks on each Product page.

10.2.3.1 Partner must not, without prior written approval from B&O or relevant third-party, as the case may be, use trademarks of B&O's third-party business partners.

10.3 Shipping:

10.3.1 Partner shall provide an estimated shipping date at the time of the customer's order. For Products on stock, Partner shall use its best efforts to ship Products within three (3) - five (5) business days from the customer's order.

10.3.2 Partner shall have a mechanism in place for confirming to the ordering customer each order placed through its Website and when each order was shipped to the destination designated by the ordering customer. Partner shall further provide the capability for customers to track the shipment and obtain updates on the status of delivery.

10.4 Product recommendations:

10.4.1 Partner shall have a mechanism in place to display Products that will be of the most interest to the customer, based on customer's prior purchase history.

10.5 Non-affiliation with official B&O websites:

10.5.1 Partner shall not suggest or imply that its Website, advertisement, sponsored link, or any other on-line marketing used or paid for by Partner is in any way related to any official B&O website or any website owned and operated by B&O or its subsidiaries or affiliated companies. However, the Partner may on Partner's Website reference Partner as an "Bang & Olufsen Authorised Reseller".

Examples of Prohibited Phrases: Terms such as "Official Bang & Olufsen Headquarters", "B&O Home" and "B&O Official Store" are always prohibited.

10.6 Paid search (including but not limited to Google Adwords and Bing Ads):

10.6.1 Partner may not use Dynamic Keyword Insertion or any similar search tool when bidding on any Authorised Marks or any trademark used or owned by B&O or its subsidiaries or affiliated companies.

10.6.2 All Authorised Marks in the Partner's ad text shall appear with the correct spelling and capitalization.

10.6.3 There is no restriction on normal Google Adwords

10.7 Programmatic/Display and Affiliate Programme: If the Partner choses to use programmatic/display and affiliate programme or any similar set-up where Partner rewards a third-party for directing customers from third-party platform to Partner's Website, the Partner shall ensure that such third-party complies with the requirements set out in this Schedule in respect of display requirements.

10.8 Superlatives:

10.8.1 Partner shall not use superlatives to describe the quantity of Product inventory, the pricing of Products, or the B&O online shopping experience, on any website, in any advertisement, sponsored link, or any other online marketing used, paid for or associated with Partner.

Examples of prohibited phrases are: "largest available online offering of Bang & Olufsen", "lowest prices – B&O" or "best Bang & Olufsen website".

10.9 Adware/spyware/pop-up advertisements:

10.9.1 Partner shall not partner with any third party that uses adware, spyware or other software to engage in pop-up or pop-under advertising and/or generating non-user initiated activity (e.g., forced clicks or redirects).

10.9.2 Popup or pop-under advertising and/or non-user initiated activity that is based on keyword searches, textual triggers, or screen-scraping associated with any trademarks used or owned by B&O or its subsidiaries or affiliated companies or any common misspelling or confusingly similar trademarks is strictly prohibited.

10.9.3 Partner shall ensure compliance with applicable laws with respect to all other types of online behavioral advertising.

10.10 Policies and procedures for customer returns, refunds and exchanges:

10.10.1 Partner shall display its policies and procedures for customer returns, refunds and exchanges on its Website.

10.10.2 Partner shall provide the customers with a 30 days free return option when purchasing via the Partner's Website.

10.10.3 Partner shall provide the customers free shipping and free return of Products purchased on its Website.

10.10.4 Partner's Website shall clearly and conspicuously set forth that (i) Partner, and not B&O, is making the sale to the customer and (ii) the terms and conditions directly and indirectly applying to service, installations, repairs, returns, refunds and exchanges by customers are those of Partner, and not B&O.

10.11 Visual Guidelines:

10.11.1 Partner's Website shall comply with the visual guidelines as amended from time to time. The current B&O visual guidelines are available in the B&O Ordering System.

**11 Page Title / Title Tags**

11.1 Page title / Title tags:

11.1.1 Page title/title tag refers to the text used to name or entitle a web page. A page title/title tag can be viewed by looking at the top of the browser window for the page in question. Only the Authorised Marks may be used in the page title/title tag of any website page used or owned by Partner and such use is limited to once per page title/title tag.

11.1.2 No variations, misspellings, prefixes, suffixes or hyphenated extensions of the Authorised Marks are allowed. Other words may be used in conjunction with the Authorised Marks in the page title/title tag so long as such words do not violate any other sections of this Appendix.

**12 Customer Service**

12.1 Physical address, landline telephone number and e-mail address:

12.1.1 Partner shall have a physical street address, a landline telephone number and an e-mail address for contact by its customers and shall advise customers on its Website of this physical address, the landline telephone number and the e-mail address. Post office boxes and mobile telephone numbers are not sufficient.

12.1.2 Partner shall use its best efforts to provide such telephone service on a toll-free basis.

12.1.3 Partner shall comply with applicable laws relating to customer hotlines, including in respect of maximum prices for telephone service and free waiting loops.

12.2 Customer support hours of operation:

12.2.1 The telephone line and online support service shall be available during best industry practice opening hours for customer support online (and at least on weekdays from 9 a.m. to 5 p.m.). Outside of these hours, the customer shall be able to leave an email, a chat message and/or voicemail requesting customer support.

12.2.2 Partner shall use its best efforts to respond to customer emails and/or voicemails as soon as possible (but under no circumstances later than the next business day).

12.3 Easy ordering process:

12.3.1 Partner shall provide the capability for customers to place their orders fully and completely through Partner's Website. Partner shall not require customers to use telephone calls, faxes and/or hard-copy correspondence to complete their orders nor permit orders to be fulfilled only through telephone calls, faxes and/or hard copy correspondence.

12.4 Inventory:

12.4.1 Partner shall maintain sufficient stocks of Products to satisfy customer demand. Partner may in case of situations of out of stock refer customers to www.bang-olufsen.com.

**13 Internet sales – Recommendations**

13.1 Customer reviews:

13.1.1 Partner is recommended to provide the capability for customers to submit customer reviews on Partner's Website. Partner is also recommended to allow customer to submit

an overall rating of Products, using a five star rating system. These customer reviews and ratings are recommended to be accessible on the single Product page.

13.2 Product zoom and/or showing from multiple angles and in multiple settings:

13.2.1 Partner is recommended to provide the capability for customers on a single Product page to easily zoom into the primary Product image and/or show the Product from multiple angles. Partner is further recommended to show both Product images and Products in lifestyle settings.

13.3 Display dynamic content:

13.3.1 Partner's Website is recommended to be able to display dynamic content, including, but not limited to, video clips.

13.4 What's new:

13.4.1 Partner's Website is recommended to have a specific section devoted to displaying and highlighting new Products.

13.5 Interactive catalog:

13.5.1 Partner's Website is recommended to include an interactive Product catalog. If possible, the interactive catalog is recommended to include features that maximise customer interaction with the catalog, such as call-out boxes, embedded video, hyperlinks, shopping carts and photo galleries. Furthermore, Partner is recommended to link to the B&O App as well as the B&O Augmented Reality App.

**14 Customer Service**

14.1 Click-to-call/Click-to-talk:

14.1.1 Partner is recommended to have a mechanism in place to allow the customer to click on a link that will permit the customer to speak directly with a customer service representative in real- time, either by voice-based or text-based computer communication.

14.2 Wish list:

14.2.1 Partner is recommended to have a mechanism in place allowing the customer to bookmark Products that the customer wishes to buy in the future.

14.3 Express check out:

14.3.1 Partner is recommended to provide the capability for prior customers to bypass any sign in process and go directly to "order review" using the customer's primary shipping and billing information.

14.4 Pre-orders:

14.4.1 Partner is recommended to provide the capability for customers to preorder Products not yet available for sale.

14.5 Account history:

14.5.1 Partner is recommended to provide the capability for customers to view their account history, including date of purchase, Product quantity, Product price and total price.

14.6 Return labels:

14.6.1 Partner shall provide the capability for customers to print out return labels online or have the return label provided via e-mail from the Partner.

**15 Applicable law**

15.1 U.S. Law:

15.1.1 Partner shall adhere to and comply with all pertinent state and federal laws, regulations, statutes and rules applicable to taking orders or conducting business over or through the internet.

15.1.2 Partner's marketing and sale of Products on the Website shall comply with laws, regulations and best practice applicable to sales made online, including in particular the laws on consumer rights, data and personal information protection, and cancellation rights. Further, to meet consumer expectations and to maintain the goodwill of B&O for internet marketing and sales and to further create consumer goodwill by enhancing the level of consumer protection, Partner shall in relation to sales outside Partner's own jurisdiction comply also with all laws, regulations and best practices applicable within the country of the buyer save for jurisdictions where applicable laws, regulations and best practices stipulates less protection than within Partner's own jurisdiction.

15.1.3 It remains the sole responsibility of Partner to comply with all applicable laws, regulations and best practices as set forth above under this clause 15 and Partner agrees to defend and hold harmless B&O or its subsidiaries or affiliated companies for any liability or damages suffered by B&O or its subsidiaries or affiliated companies as a result of Partner's non-compliance with applicable laws, provisions or best practice.

**16 Compliance**

16.1 Establishment of policies and procedures:

16.1.1 Each of Partner's employees who are involved in internet sales shall be provided with a copy of this Schedule 16.

16.1.2 Partner shall establish policies and procedures that will ensure compliance with Schedule 16 to the Agreement (including the Schedules) and shall take affirmative steps to ensure compliance with Schedule 16 to the Agreement (including the Schedules).

16.2 Certification:
Partner shall at all times (when conducting sales through its Website) obtain and maintain an ISO 27001, ISAE 3402 or other similar certification.

16.3 Violations:
16.3.1 B&O shall have the sole, complete and final discretion to decide whether the content of a particular website, advertisement, sponsored link, on-line marketing violates the Agreement (including the Schedules).

## 17 Approved Websites:

a. ____________________

b. ____________________

c. ____________________

BANG & OLUFSEN

**SCHEDULE 17 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**VISUAL IDENTITY REQUIREMENTS**

**1 Corporate Visual Identity Manual (Brand Manual)**

1.1 The applicable Corporate Visual Identity Manual (Brand Manual) can at all times be located online via:

http://brandmanual.bang-olufsen.com

1.2 On the first login, Partner may be required to obtain a password in order to access the Corporate Visual Identity Manual (Brand Manual) via the process described online.

BANG & OLUFSEN

**SCHEDULE 18 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**REQUIREMENTS TO PERSONNEL AND TRAINING**

## 1 Training requirements

1.1 Training requirements to Partner and Partner's employees

1.1.1 Mandatory training is required for owners, shop managers, technical solution managers and other personnel involved in the operation of the physical stores and/or sales (the "Managers").

1.1.2 The Managers shall attend and pass or must have attended and passed (at all times), the introduction training (local market or Struer, Denmark). Additionally, all Managers must have attended the selling skills training within the last three years and the technical sales course.

1.1.3 For Managers who have not attended the two-days selling skills course within the last three years, a mandatory one-day sales refresher course will be held.

1.1.4 Technical solution managers shall attend and pass or must have attended and passed (at all times), the certified installer foundation training.

1.1.5 A minimum of at least one delegate per Store must attend the annual product and marketing classroom trainings when available.

1.1.6 All of Partner's retail staff involved with the sale, installation or service of Products is required to complete the BEOCADeMY courses that are provided in their individual education plan as such education plan is communicated and notified to Partner through BEOCADeMY (the education plan reflects all current product and soft skill courses). New employees shall (i) complete all BEOCADeMY courses no later than 3 months from their first employment date; and (ii) complete all mandatory classroom trainings no later than 6 months from their first employment date.

1.1.7 All of Partners technical staff are invited to attend and pass the induction training. It is required that at least one technician of Partner shall attend the technical classroom and online training/s when provided.

1.1.8 Store owners and other staff (having a job title of "other") that are not involved in the sale and/or installation and/or service of Products may participate in relevant training activities (on a voluntary basis when deemed relevant to their daily work).

1.1.9 It is Partner's sole responsibility that its employees at any time have completed the required training.

1.2 Training courses, fees etc.

1.2.1 Training is conducted online and/or in-house at locations designated by B&O.

1.2.2 For in-house courses there are no course fees; the only costs payable by Partner are for accommodation and expenses related to travel. Course tuition, materials and lunches are provided free of charge by B&O.

1.2.3 All course bookings shall be made online via BEOCADeMY. All bookings or cancellations (as the case may be) are valid upon Partner's receipt of written confirmation.

1.2.4 All confirmed bookings will be subject to a EUR 150 charge in the event of non-arrival or cancellation later than 48 hours before course commencement. The cancellation fee for the induction course in Struer is EUR 300.

**2 Staff standards**

2.1 Partner is under an obligation to ensure that an adequate number of store staff is present in the store(s) during store opening hours. The amount of staff required may depend on store size, store traffic and store location. B&O may in its sole discretion instruct Partner to staff any store with more staff in order to ensure customer satisfaction equal to the B&O brand value.

BANG & OLUFSEN

**SCHEDULE 19 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**MARKETING AND PROMOTION REQUIREMENTS**

**CONTENTS**

1 Marketing and promotion ....................2
2 CRM Database ....................2

*Confidential - Attorneys' Eyes Only*



## 1 Marketing and promotion

1.1 Marketing activities and approval

1.1.1 For each financial year, B&O sets out the promotion and marketing activities, Product releases and campaigns planned for the various parts of the Territory.

1.1.2 Subject to Clause 1.1.3, Partner may in addition to the marketing activities included in the Marketing Plan make additional local marketing and promotional activities.

1.1.3 All proposed marketing activities and local campaigns shall be submitted to B&O for pre-approval before Partner is initiating any steps to have any marketing material drafted, prepared or otherwise finalized or activated.

1.1.4 All costs (if any) related to marketing activities and local campaigns initiated and executed by Partner (with approval from B&O), including, without limitation, production costs and costs to external consultants, shall be borne solely by Partner.

1.2 Guidelines and standards

1.2.1 B&O will provide reasonable marketing guidance and assistance to Partner. Enclosed as Sub-schedule 19A to this Schedule 19 are the general, overall marketing guidelines (the "**Marketing Guidelines**").

1.2.2 B&O will continuously provide certain marketing material and guidelines, including a brand manual and the corporate visual identity, to Partner. All applicable marketing material may be located by Partner in the B&O Ordering System, online and/or by mail.

1.3 Compliance

1.3.1 It is Partner's sole responsibility to comply with all applicable guidelines and standards provided by B&O from time to time through the B&O Ordering System (or otherwise) and B&O has no, and will not assume any, liability for any proposed marketing activities by Partner not being approved by B&O in accordance with Clause 1.1.3 above, nor will B&O take on any responsibility, liability or pay any compensation to Partner for any third party costs accrued by Partner for any marketing activities not being approved by B&O.

1.4 Marketing fee

1.4.1 Partner pays marketing fees to B&O as set forth in the applicable Commercial & Payment Terms (Schedule 5) for its access to and benefits of use of the Intellectual Property Rights, including, but not limited to, the Bang & Olufsen brand, POS Material, participation in joint marketing and promotion activities etc.

## 2 CRM Database

2.1 Partner shall register all customers in the B&O CRM database in accordance with the guidelines provided for in the Marketing Guidelines and as part thereof obtain and file for

documentation purposes acceptances from the customers of their entry into the CRM database.

2.2 In order to ensure that the customers' communication with B&O is operated in a professional manner and to avoid e.g. that customers receive multiple copies of identical marketing material, B&O may in the interest of the customers instruct that general marketing campaigns from B&O (as opposed to marketing campaigns initiated by Partner) are distributed to the customers from a partner designated by B&O.

2.3 All rights to personal information and data in the CRM database belong to B&O. Partner must only use the CRM database for the purpose of the Agreement and may not sell, license or otherwise dispose of such personal information and data without the prior written approval of Bang & Olufsen in each individual case.

SUB-SCHEDULE 19A – MARKETING GUIDELINES

BANG & OLUFSEN

## SUB-SCHEDULE 19A TO BANG & OLUFSEN FRAMEWORK AGREEMENT
## MARKETING GUIDELINES

### Marketing

Global Marketing is responsible for defining the marketing strategy and activities. To create a strong and meaningful brand experience for our customers, we believe in telling a coherent story across touch-points such as CRM, Website, PR, Events, Partnerships, Social Media and advertising with the key focus to attract existing/new customers, strengthen brand awareness and drive traffic into the stores.

### B&O's approach to Global marketing

Marketing creates a toolbox for our most important campaigns with focus on new product launches and key products. During the year, we deliver strong sales promotions with flexible timing and clear messages. There is focus on digital while we ensure print and online media planning go hand in hand. Marketing also creates local material (Ads, POS material etc.) for retailers to activate locally. With regards to PR, B&O runs Global and National launch press event and, at the same time, provides a set of PR tools and guidelines that stores can use for appropriate purposes. Finally, Marketing aims to extend the welcome program (CRM) gradually into a loyalty program.

You are welcome to contact your ARM or PR/Marketing Manager and get more detailed description of each PR/Marketing activities and Retailer Marketing Pack.

### Local activities to run by stores

Your activation at store level is crucial to leverage the success of any PR/marketing campaign. With the help of your ARM and PR/Marketing Manager you should:

- Participate in regular, targeted mailings. The aim is to bring people back into the store.
- Make follow-up calls on mailings/ leads to ensure contact and effectiveness on campaigns sent globally.
- Update your websites regularly and ensure your local content is accurate and up-to-date.
- Make use of the press releases, use them as a reason to contact your local press or invite your local press to store events.
- Arrange instore/out-of-store events, open weekend events to drive traffic into your store to experience products.
- Make use of the marketing tools available for campaigns and activate them at a local level.
- Ensure customers are warranty registered in your system and data entry is correct including email permission.
- Embrace local partnerships, get involved with local golf clubs, automotive dealers and other like-minded partners who have a similar customer profile to yours.

### Marketing materials and tools

We offer two kind of materials, placed in two locations:

**RetailMarketingTools:** is for ready-to-use material (such as POS materials (A4 sign, Street stopper, Postcards, Window banner artwork) / CRM tools (Cover letter artwork, brochures, invitation artwork) / Social Media (local posts for Facebook, Instagram) / Films). You find the link in the B&O Ordering System as shown below

Page 2 **Marketing Portal:** Here you can create local content without any special computer programs - templates are available for your use (for example Retailer Ads / Online banners).




When it comes to **merchandising material** such as B&O bags, Gift items, Power Banks, we have an online merchandising accessible on http://webshop.linknetwork.dk/
If you have further questions, please contact your ARM or local marketing supporter.

**Customer Relationship Management (CRM) guidelines**
The aim of Customer Relationship Management in B&O is to ensure that the customer receives relevant information and feels a strong connection to both the B&O brand and their local shop. The hub for storing and accessing all customer information is the B&O Ordering System (Retail Operating System) where all tools for updating and handling customer information is gathered (contact card, warranty and campaign modules).

The Global CRM team support your store by activating global newsletters, campaigns and an automated loyalty program. The loyalty program ensures that customers with email permissions receive a personal email with their warranty the day after purchase and further personalized automated emails at intervals with the aim to increase sales based on purchase history or behavior. These complex programs are running continuously and yield high return purchase from customers.

To build a successful relationship and leverage the potential of our global program we need you to help us by ensuring that the following criteria is met:

1. You actively capture and update master data from customers/prospects visiting your stores and ensure accurate registration of data
2. You ensure e-mail permission from the customer
3. You ensure warranty registration of all products sold to customers
4. You use the pipeline management systems and concepts available at any time, to convert customer/prospect interest in products into closing sales
5. You participate in global/regional DM/EM marketing campaigns prepared by B&O

You will also have the possibility to use the data stored in the B&O Ordering System to launch your own campaigns towards a segmented part of your database.

Page 3 **B&O Ordering System guidelines**

For more information about how to work with both customer card, campaigns and warranty, click at the orange question mark on the overview page in each section




For further questions, please contact your local Area Retail Manager or local marketing department.

BANG & OLUFSEN

**SCHEDULE 20 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**
**GOVERNMENTAL APPROVAL REQUIREMENTS**

**1. General Requirements**

1.1 Partner shall comply with all applicable laws of the Territory from time to time concerning Products and must keep B&O informed of any relevant changes to them. In particular but without limitation, Partner shall:

i) at its own expense obtain all necessary permissions, consents, and licenses to enable Partner to market and sell Products in the Territory,

ii) obtain any other governmental permission, consent or license or make any registration necessary for the full and legal operation and performance of this Agreement; and

1.2 If present or future approval requirements according to provision 1.1 demand technical changes, additions to or removals from Products, B&O shall cooperate with Partner in order to implement the necessary technical changes, additions and or/removals. However, if in the sole opinion of B&O it is not feasible or financially sustainable for whatever reason to make the technical changes, additions and/or removals, B&O reserves the right not to make such technical changes or additions to Products, and to exclude the distribution of such Product in the Territory, either partly or completely.

**2 Sanctions**

2.1 Partner represents and warrants that;

(i) neither Partner nor any of its subsidiaries or any director, officer, or to the best of their knowledge, employee, agent, affiliate or representative hereof, is an individual, or entity (in this paragraph a "**Person**") that is, or is owned or controlled by a Person that is;

a. the subject of any economic and financial sanctions laws, regulations or trade embargoes imposed, administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union or any member states hereof, Her Majesty's Treasury of the United Kingdom, Global Affairs Canada or other relevant sanctions authority (collectively, "**Sanctions**"), nor

b. located, organized or resident in a country or territory that is the subject of Sanctions.

(ii) it has not knowingly engaged in, is not now knowingly engaged in, and will not engage in, any dealings or transactions with any Person, or in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions.

2.2 If at any time (i) B&O's performance of any of its obligations under the Agreement, in the reasonable opinion of B&O is likely to be deemed in violation of Sanctions by a relevant authority, (ii) Partner or any Person is likely to be deemed in violation of Sanctions by a relevant sanctions authority or (iii) a relevant sanctions authority approaches B&O or the Partner due to potential Sanctions violations:

(a) B&O and Partner shall, upon becoming aware of such event, promptly notify each other and provide reasonable details of the relevant circumstances and of what steps or actions, if any, B&O and Partner has taken or expects to take to avoid being in violation of Sanctions;

(b) B&O and Partner shall consult with each other regarding such likely violation of Sanctions and any possible remedy thereof for a period of not less than ten (10) business days and B&O shall premptly take such steps as may be reasonably available to them to avoid or remedy such violation of Sanctions; and

(c) if within thirty (30) Business Days following the end of the consultations referred to in (b) above, B&O or Partner has not been able to avoid or remedy such violation of Sanctions, B&O is entitled to terminate the Agreement without liability by written notice to Partner,

provided that such measures stated in (a) – (c) above would not in themselves constitute a violation of Sanctions and to the extent legally permissible.

**3 Anti-corruption and anti-bribery laws**

3.1 Partner represents and warrants for itself and each member of Partner's group, that Partner has conducted its businesses in compliance with applicable anti-corruption and anti-bribery laws in any jurisdiction where Partner directly or indirectly conduct business and has instituted and maintained policies and procedures designed to promote and achieve compliance with such laws.

3.2 It is the intent of Partner and B&O, and Partner represents and warrants to B&O, that no payment of money or provision of anything of value will be offered, promised, paid or transferred, directly or indirectly, by any person or entity, to any government official, government employee, or employee of any company owned in part by a government, political party, political party official, or candidate for any government office or political party office to induce such organizations or persons to use their authority or influence to obtain or retain an improper business advantage for Partner or for B&O or which would otherwise constitute or have the purpose or effect of public or commercial bribery, acceptance of or acquiescence in extortion, kickbacks or other unlawful or improper means of obtaining business, or any improper advantage, with respect to any of Partner's activities related in any way to this Agreement, including without limitation any payment of money or provision of anything of value to any employee of any current or potential customer in order to secure a sale or other business advantage.

3.3 Any violation of applicable anti-corruption or anti-bribery laws conducted by Partner or any member of Partner's group constitute a material event of default of the Agreement which entitles B&O to terminate the Agreement without notice and with immediate effect.

Any termination under this clause 3 is made without liability for B&O and shall not entitle Partner to any compensation of any kind.

3.4 If Partner or any member of Partner's group is found to be liable for any breaches or violations of applicable anti-corruption or anti-bribery laws in any jurisdiction and such breach or violation, as the case may be, result in B&O being liable to pay any compensation or claim to a third party or a public authority, Partner shall indemnify B&O for such claim without any right of set-off.

**4 Export Control Laws**

4.1 Export Control Laws are important to comply with in order to ensure the control of exports, transfer, brokering and transit of dual-use items or other items for military use to countries or individuals, who are banned from receiving such items. Dual-use items are considered in general to include software and technology, which can be used for both civil and military purposes.

4.2 Partner represents and warrants to B&O that Partner shall comply with all relevant Export Control Laws and that Partner will take no action that will cause Partner or B&O to violate any such laws. Key Export Control Laws are considered to include U.S. Export Controls in the form of Export Administration Regulations as administered by the Bureau of Industry and Security and the EU Export Control regime as set by Regulation (EC) No 428/2009.

4.3 Partner specifically represents and warrants to B&O that it is aware that products and technical data supplied by B&O are subject to Export Control Laws, and that Partner, if Partner has contractual rights to export products, will comply with all applicable restrictions regarding exports, re-exports and transfers, including obtaining any required country licenses, authorizations, and/or approvals for movement of products across borders.

4.4 Partner further represents and warrants to B&O that Partner will:

a) provide B&O with the information necessary for B&O to seek new export authorizations and/or to ensure compliance with Export Control Laws;

b) inform each of its customers (where the circumstances suggest the customer may be exporting) of applicable restrictions on exports, re-exports, or transfers at the time Partner resells or otherwise disposes of any product or technical data supplied by B&O to such customer; and

c) implement and maintain controls as appropriate to comply with Export Control Laws.

**5 Monitoring and Ensuring Compliance**

5.1 Partner agrees that should it learn or have reason to know of any violation, possible violation, or suspected violation of any law or regulation applicable to Partner's activities related to this Agreement, including but not limited to Sanctions, Anti-Corruption Laws

and Export Control Laws, or of any government investigation into the same, Partner shall immediately contact B&O cf. Schedule 26, to report such matter to B&O. Partner shall cooperate fully and completely with B&O in connection with any B&O efforts to investigate or review records resulting from such disclosures.

5.2 To the extent permitted by applicable laws and regulations, Partner agrees that B&O shall have reasonable access to Partner's books and records and shall have the right to audit them on a periodic basis to ensure Partner's compliance with all laws and regulations applicable to Partner's activities related to this Agreement, including but not limited to Sanctions, Anti-Corruption Laws and Export Control Laws, and with the provisions of this Agreement. Partner represents and warrants that it will keep complete and accurate records of all transactions and expenses related to its business under this Agreement. Such records will include in reasonable detail the purpose of each expense and the receipt and distribution of assets. Partner's failure to participate in any audit pursuant to this Agreement will be grounds for termination of this Agreement.

5.3 Partner shall cooperate fully and promptly with any compliance investigation B&O may initiate to review Partner's performance under any/all provisions of this Agreement.

5.4 Partner shall upon request provide certifications of compliance with all laws and regulations applicable to Partner's activities related to this Agreement in the form provided from time to time by B&O, including but not limited to Sanctions, Anti-Corruption Laws and Export Control Laws. If Partner assess training is needed within Sanctions, Anti-Corruption Laws and Export Control Laws for any stakeholders engaged in the performance of this Agreement, Partner must seek to provide such training. If this is not feasible, the Partner can obtain support from B&O to provide relevant training-material.

5.5 To the extent permitted by applicable law, B&O may withhold shipments or payments under this Agreement, and terminate this Agreement immediately, if it believes, in good faith, that Partner has breached any provision of this Agreement or has violated or caused B&O to violate any laws or regulations applicable to Partner's activities related to this Agreement, including but not limited to Sanctions, Anti-Corruption Laws and Export Control Laws. B&O shall not be liable to Partner for any claims, losses, or damages related to B&O's decision to exercise its rights under this provision.

BANG & OLUFSEN

**SCHEDULE 21 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**INTELLECTUAL PROPERTY RIGHTS**

Intellectual Property Rights shall include any intellectual property rights, including patents, utility models, trademarks, designs, copyrights or rights in databases owned or licensed by B&O (or any its subsidiaries or affiliated companies) in all countries as well as any applications or renewals concerning such rights.

BANG & OLUFSEN

## SCHEDULE 22 TO BANG & OLUFSEN FRAMEWORK AGREEMENT

## USE OF THE INTELLECTUAL PROPERTY RIGHTS

**1 Partner's use of the Intellectual Property Rights**

1.1 Partner must only use the Intellectual Property Rights, including, but not limited to all trademarks owned by B&O or its subsidiaries or affiliated companies, in connection with distribution and/or resale from physical stores and/or non-physical stores.

1.2 Partner may use the B&O trademarks on its letterhead, envelopes, order sheets, cars, signs, decoration or advertising or any other stationery items in connection with the Agreement provided that Partner comply with all requirements set forth in the Agreement, including B&O's Corporate Visual Identity Manual as set forth in Schedule 17.

1.3 Partner may refer to itself as an authorised B&O Retailer but may not use any Intellectual Property Rights or names or trademarks confusingly similar to the trademarks owned by B&O or its subsidiaries or affiliated companies in or as part of Partner's company name or secondary name.

BANG & OLUFSEN

**SCHEDULE 23 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**
**HANDLING OF PERSONAL DATA**

**CONTENTS**

1 Compliance with applicable laws .......... 2
2 Obtaining of End User data (Partner) .......... 2
3 Ownership to and use of CRM Database .......... 3

**1 Compliance with applicable laws**

1.1 As a result of entering into the Agreement, Partner will collect, use, share and otherwise process personal data on behalf of B&O in its daily operations of the Store (S) including online stores, if applicable, e.g. in connection with concluding sales of Products.

1.2 In this Schedule, "personal data" means data in any form that identifies, directly or indirectly, an individual natural person. Any capitalized term not defined in this Schedule has the meaning given in the Agreement.

1.3 In order for B&O and Partner to comply with applicable laws and regulations related to the privacy and security of personal data, including as and when applicable CAN-SPAM, TCPA and PIPEDA (collectively, "Data Protection Laws, "as amended, supplemented or changed from time to time), Partner agrees to the personal data processing terms (the "Data Protection Terms") substantially in the form set out in Sub-schedule 23A.

1.4 For the avoidance of doubt, complying with the Data Protection Terms does not mean that Partner will comply with Data Protection Laws. Partner is solely responsible for ensuring that Partner complies with Data Protection Laws.

**2 End User Personal Data (Partner)**

2.1 Partner's responsibilities

2.1.1 Partner shall ensure registration of all End Users in the B&O CRM database.

2.1.2 The Partner shall obtain from each End User and prospective customer (each, a "Prospect"), at least the following information (collectively, "Contact Information"):

i. Full name;

ii. E-mail address, mobile telephone number or mailing address and other contact details when available; and

iii. Information about End User's purchase, including serial or product no.

2.1.3 Partner also shall ensure that the Contact Information related to Prospects is registered in the B&O CRM database. The Contact Information related to Prospects will be stored in the B&O CRM database for no more than 4 (four) weeks and thereafter deleted unless the Prospect has given his/ her express and documented consent for further processing of his / her personal data or an actual purchase is conducted within the given period.

2.2 B&O responsibilities

2.2.1 B&O shall contact End Users and Prospects via e-mail, sms or similar electronic medium in order for the End User or Prospect to be directed to a relevant landing page where the End User may give his / her consent for receiving marketing communications.

2.2.2 For End Users or Prospects for which B&O has no e-mail address or telephone number for sms communication, B&O shall provide Partner with direct marketing slips to be sent to the End User's or Prospect's physical address in order to obtain the End User's or Prospect's consent for receiving marketing communications. Direct marketing slips are available from B&O.

**3 Ownership to and use of CRM Database**

3.1 B&O owns all rights in and to data (including personal data) in the CRM database ("CRM Data") belong to B&O. Partner must only use the obtained personal data and the CRM database to perform its obligations under the Agreement (including this Schedule 23) and may not sell, copy, transfer, license or dispose of the CRM Data without the prior written approval of Bang & Olufsen in each such case.

3.2 In order to ensure that the End Users' communications with B&O are conducted in a professional manner (e.g., to avoid sending End Users multiple copies of material communications), B&O may require that Partner, on behalf of B&O, distribute B&O's marketing materials.

SUB-SCHEDULE 23A – PERSONAL DATA PROCESSING TERMS

BANG & OLUFSEN

**SCHEDULE 24 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**TERMINATION NOTICE PERIOD**

**1 Schedule 24 – Termination notice**

1.1 The termination notice for either Party to terminate this Agreement for convenience is 6 months.

BANG & OLUFSEN

**SCHEDULE 25 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**CONSEQUENCES OF TERMINATION**

**1 Additional consequences of termination of the Agreement**

1.1 Unless otherwise provided for by mandatory provisions of the law applicable, B&O has the right but not the obligation within thirty (30) days after termination, to purchase from Partner any or all inventory related to the operation of one or more physical stores at the market value but never more than the lowest of either its purchase price or book value according to Partners accounts. B&O arranges for transportation, insurance and any related costs associated with transport of the inventory to a location designated by B&O. In the event of termination as a result of a material breach by the Partner, the Partner shall however pay any such cost associated with transportation following a repurchase.

1.2 As regards any remaining stock which is not repurchased by B&O, Partner may continue to sell such Products provided that Partner continues to comply with the terms of this Agreement.

BANG & OLUFSEN

**SCHEDULE 26 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**REQUIREMENTS PERTAINING TO NOTICES**

**1 Notices**

1.1 Any notice to be given under the Agreement must be in writing and either delivered by hand, sent by registered and ordinary mail or by email to the addresses of the Parties set out in below in clause 2.

| **Permitted Method** | **Date on which notice deemed given and received** |
|---|---|
| Personal delivery | On date of delivery if left at the address of the relevant Party before 5pm on a business day and otherwise on the next business day |
| Registered mail | Upon delivery |
| E-mail | On receipt of an automated delivery receipt or confirmation of receipt from the relevant server if before 5pm on a business day and otherwise on the next business day |
| Automatically generated e-mail notice distributed from B&O's platform for partner contracts | On receipt of an automated delivery receipt or confirmation of receipt from the relevant server if before 5pm on a business day and otherwise on the next business day |

**2. The addresses of the both B&O and Partner are as set forth below:**

| **Name of Party** | **Address** | **E-mail address** | **Marked for the attention of:** |
|---|---|---|---|
| B&O | Bang og Olufsen Allé 1<br>DK-7600 Struer<br>Denmark | legal@bang-olufsen.dk | Head of Legal |
| The Partner | 5741 Norwich Avenue<br>Van Nuys, California 91411<br>United States of America | davidjunkam@gmail.com | Mr. David Junk |

BANG & OLUFSEN

**SCHEDULE 27 TO BANG & OLUFSEN FRAMEWORK AGREEMENT**

**SPECIAL TERMS**

## 1 PURPOSE AND BACKGROUND

1.1 As of the Effective Date, Partner operates the Stores (as listed in Schedule 14). Partner intends to operate several Stores within the Territory area as a monobrand Cluster Partner.

1.2 Partner purchased the B&O owned operated monobrand store, located at 479 North Rodeo Drive, Beverly Hills, California (the **Transaction**), subject to the terms of an Asset Purchase Agreement dated 1 February 2018 (the **APA**).

1.3 Partner was subsequently licensed as a dealer under (i) a Master Retailer Agreement, dated 17 November 2017 (the **MRA**); and (ii) a Licensed Dealer Agreement, dated 1 June 2017 (the **LDA**), each as entered into between the Partner and B&O.

1.4 As part of the Transaction, the Parties entered into a side letter agreement, dated 14 November 2017, whereby Partner agreed to amend, and be bound by, updated terms under a new distribution agreement or terminate said without incurring any liability. The Parties have, by means of this Agreement, entered into a new Agreement as stipulated in the side letter agreement.

## 2 ADDITIONAL START UP PAYMENT TO PARTNER

2.1 *Store opening support*

2.1.1 As Part of the initial discussions, Partner and B&O discussed various options for store opening support which did not form part of the executed APA, MRA or LDA.

2.1.2 Partner has subsequently claimed that it was under the impression that the initial start up bonus should have been included in the MRA, APA, LDA or any other agreement between the Parties which has been denied by B&O.

2.1.3 Irrespective of the above, and in order to assist Partner on future store openings, B&O will, subject to the provisions of this Schedule 27 and the Agreement, pay to Partner a

one-off, lumb sum of USD 150,000.00 (the **Store Opening Amount**) as an extraordinay payment and settlement of any previous and future discussions.

2.1.4 Payment of the Store Opening Amount is subject to Partner waives any request or claim against or towards B&O for any start up bonus or support implied under any agreement both now and in the future.

2.1.5 Payment of the Store Opening Amount shall be carried out by way of crediting Partner's account with B&O.

2.1.6 Failure by Partner to comply with the requirements in 2.1.42.1.3, shall result in immediate repayment of the full Store Opening Amount by Partner to B&O.

2.2 *Schedule 5 (Commercial and Payment Terms)*

2.2.1 Save for the amendments made under Clause 2.1, all other terms and conditions in Schedule 5 (Commercial and Payment Terms) shall apply between the parties and nothing in this Schedule 27 shall be deemed or interpreted as a waiver of any rights or obligations set forth therein.

**3 THE EXISTING AGREEMENTS**

3.1 The MRA and LDA

3.1.1 This Agreement, including this Schedule 27, supersedes the MRA and LDA which shall no longer have any legal effect between the Parties as of the Effective Date

3.2 The APA

3.2.1 The APA, including the store opening plan agreed between the Parties under the APA, shall remain in full force and effect and apply between the Parties mutatis mutandis.

*Confidential - Attorneys' Eyes Only*

# EXHIBIT 7

*Confidential - Attorneys' Eyes Only*

**EXHIBIT A**

**M&N LUXURY**

ECONOMIC DAMAGES CALCULATION

DATE OF VALUE: 12/31/24

| | | |
|---|---|---|
| Lost Profits Plus Interest, 1/1/23 - 12/31/24 | [a] | 3,790,000 |
| Lost Business Value, 12/31/24 | [b] | 7,972,000 |
| Lost Store Expansion Opportunity | [c] | 1,405,000 |
| Total Economic Damages | | 13,167,000 |

[a] See EXHIBIT B.
[b] See EXHIBIT C.
[b] See EXHIBIT D.

*Confidential - Attorneys' Eyes Only*

**EXHIBIT B**

**M&N LUXURY**

LOST PROFITS CALCULATION: 2023-2024

DATE OF VALUATION: 12/31/24

| | | 2023 | 2024 | Total |
|---|---|---|---|---|
| Total Operating Profit - "But For" | [a] | 1,429,094 | 1,726,900 | 2,614,013 |
| Total Operating Profit - Actual | [b] | -125,139 | -180,884 | -848,004 |
| Lost Profits | | 1,554,233 | 1,907,784 | 3,462,017 |
| Years from Midpoint to Date of Value | | 1.4972 | 0.5000 | |
| Simple Interest at 10.0% | [c] | 232,703 | 95,389 | 328,092 |
| Lost Profits Plus Interest | | 1,786,936 | 2,003,173 | 3,790,110 |
| **Rounded** | | | | **3,790,000** |

[a] Assuming the absence of Defendant's alleged harmful acts. See EXHIBIT B-1.

[b] Taking into account Defendant's alleged harmful acts. See EXHIBIT B-2.

[c] We express no opinon as to the appropriateness of the interest rate utilized in this calculation.

*Confidential - Attorneys' Eyes Only*

**EXHIBIT B-1**
**M&N LUXURY**
PROFIT & LOSS STATEMENTS -- "BUT-FOR" SCENARIO
SOURCE: QUICKBOOKS RECORDS COMPILED BY MANAGEMENT
$S

| | Actual as Reported | | | | | | | Adjustment | | | | | | | | Adjusted ("But-For") | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| Revenue | | | | | | | | | | | | | | | | | | | | | | |
| La Jolla | 0 | 444,453 | 1,058,316 | 1,466,616 | 1,237,680 | 707,317 | 1,149,558 | | | | | | 716,015 | 487,273 | [a] | 0 | 444,453 | 1,058,316 | 1,466,616 | 1,237,680 | 1,423,332 | 1,636,832 |
| West Hollywood | 1,246,194 | 1,620,783 | 1,589,562 | 1,501,010 | 1,475,023 | 1,256,219 | 1,279,894 | | | | | | 440,057 | 670,824 | [b] | 1,246,194 | 1,620,783 | 1,589,562 | 1,501,010 | 1,475,023 | 1,696,276 | 1,950,718 |
| Pasadena | 0 | 0 | 0 | 1,209,964 | 1,830,353 | 1,443,433 | 1,689,069 | | | | | | 661,473 | 731,572 | [c] | 0 | 0 | 0 | 1,209,964 | 1,830,353 | 2,104,906 | 2,420,642 |
| South Coast Plaza | 1,584,764 | 1,705,944 | 1,185,301 | 1,753,632 | 2,602,658 | 1,516,048 | 2,252,950 | | | | | | 1,346,875 | 896,266 | [d] | 1,584,764 | 1,705,944 | 1,185,301 | 1,753,632 | 2,602,658 | 2,862,923 | 3,149,216 |
| San Francisco | 0 | 0 | 0 | 0 | 108,370 | 1,150,422 | 1,782,840 | | | | | | 212,778 | 125,640 | [e] | 0 | 0 | 0 | 0 | 108,370 | 1,363,200 | 1,908,480 |
| Total Revenue | 2,830,958 | 3,771,180 | 3,833,179 | 5,931,222 | 7,254,083 | 6,073,439 | 8,154,311 | 0 | 0 | 0 | 0 | 0 | 3,377,199 | 2,911,576 | | 2,830,958 | 3,771,180 | 3,833,179 | 5,931,222 | 7,254,083 | 9,450,638 | 11,065,887 |
| Cost of Goods Sold | | | | | | | | | | | | | | | | | | | | | | |
| La Jolla | 0 | 255,683 | 759,745 | 801,150 | 699,082 | 429,210 | 670,593 | | | | | | 434,488 | 284,250 | [f] | 0 | 255,683 | 759,745 | 801,150 | 699,082 | 863,698 | 954,843 |
| West Hollywood | 716,173 | 834,903 | 994,241 | 761,177 | 773,904 | 686,205 | 733,922 | | | | | | 240,380 | 384,666 | [f] | 716,173 | 834,903 | 994,241 | 761,177 | 773,904 | 926,585 | 1,118,588 |
| Pasadena | 0 | 0 | 0 | 657,185 | 1,259,373 | 817,210 | 920,330 | | | | | | 374,498 | 398,615 | [f] | 0 | 0 | 0 | 657,185 | 1,259,373 | 1,191,708 | 1,318,945 |
| South Coast Plaza | 743,527 | 771,429 | 791,549 | 876,952 | 1,325,249 | 761,737 | 1,209,561 | | | | | | 676,737 | 481,186 | [f] | 743,527 | 771,429 | 791,549 | 876,952 | 1,325,249 | 1,438,474 | 1,690,747 |
| San Francisco | 0 | 0 | 0 | 0 | 58,082 | 523,711 | 930,635 | | | | | | 96,864 | 65,584 | [f] | 0 | 0 | 0 | 0 | 58,082 | 620,575 | 996,218 |
| Total Cost of Goods Sold | 1,459,700 | 1,862,015 | 2,545,534 | 3,096,463 | 4,115,691 | 3,218,073 | 4,465,041 | 0 | 0 | 0 | 0 | 0 | 1,822,966 | 1,614,301 | | 1,459,700 | 1,862,015 | 2,545,534 | 3,096,463 | 4,115,691 | 5,041,039 | 6,079,342 |
| % of Total Revenue | | | | | | | | | | | | | | | | 51.6% | 49.4% | 66.4% | 52.2% | 56.7% | 53.3% | 54.9% |
| Gross Profit | | | | | | | | | | | | | | | | | | | | | | |
| La Jolla | 0 | 188,770 | 298,571 | 665,466 | 538,598 | 278,107 | 478,965 | 0 | 0 | 0 | 0 | 0 | 281,527 | 203,023 | | 0 | 188,770 | 298,571 | 665,466 | 538,598 | 559,634 | 681,989 |
| West Hollywood | 530,021 | 785,879 | 595,321 | 739,833 | 701,118 | 570,014 | 545,972 | 0 | 0 | 0 | 0 | 0 | 199,678 | 286,157 | | 530,021 | 785,879 | 595,321 | 739,833 | 701,118 | 769,692 | 832,130 |
| Pasadena | 0 | 0 | 0 | 552,780 | 570,980 | 626,223 | 768,739 | 0 | 0 | 0 | 0 | 0 | 286,975 | 332,957 | | 0 | 0 | 0 | 552,780 | 570,980 | 913,198 | 1,101,696 |
| South Coast Plaza | 841,237 | 934,515 | 393,752 | 876,680 | 1,277,408 | 754,311 | 1,043,389 | 0 | 0 | 0 | 0 | 0 | 670,139 | 415,080 | | 841,237 | 934,515 | 393,752 | 876,680 | 1,277,408 | 1,424,450 | 1,458,469 |
| San Francisco | 0 | 0 | 0 | 0 | 50,288 | 626,711 | 852,205 | 0 | 0 | 0 | 0 | 0 | 115,914 | 60,057 | | 0 | 0 | 0 | 0 | 50,288 | 742,625 | 912,262 |
| Total Gross Profit | 1,371,258 | 1,909,165 | 1,287,645 | 2,834,758 | 3,138,393 | 2,855,366 | 3,689,271 | 0 | 0 | 0 | 0 | 0 | 1,554,233 | 1,297,274 | | 1,371,258 | 1,909,165 | 1,287,645 | 2,834,758 | 3,138,393 | 4,409,598 | 4,986,545 |
| Operating Expense | | | | | | | | | | | | | | | | | | | | | | |
| La Jolla | 5,138 | 534,278 | 490,360 | 643,090 | 518,558 | 494,135 | 676,728 | | | | | | | -122,102 | [g] | 5,138 | 534,278 | 490,360 | 643,090 | 518,558 | 494,135 | 554,626 |
| West Hollywood | 533,597 | 669,418 | 691,796 | 623,685 | 743,316 | 752,176 | 893,627 | | | | | | | -122,102 | [g] | 533,597 | 669,418 | 691,796 | 623,685 | 743,316 | 752,176 | 771,525 |
| Pasadena | 0 | 0 | 2,895 | 579,452 | 701,966 | 634,968 | 702,027 | | | | | | | -122,102 | [g] | 0 | 0 | 2,895 | 579,452 | 701,966 | 634,968 | 579,926 |
| South Coast Plaza | 981,955 | 751,634 | 636,229 | 794,798 | 861,967 | 685,494 | 869,166 | | | | | | | -122,102 | [g] | 981,955 | 751,634 | 636,229 | 794,798 | 861,967 | 685,494 | 747,064 |
| San Francisco | 0 | 0 | 0 | 0 | 319,065 | 413,731 | 728,606 | | | | | | | -122,102 | [g] | 0 | 0 | 0 | 0 | 319,065 | 413,731 | 606,504 |
| Total Operating Expense | 1,520,691 | 1,955,330 | 1,821,280 | 2,641,025 | 3,144,873 | 2,980,504 | 3,870,154 | 0 | 0 | 0 | 0 | 0 | 0 | -610,510 | | 1,520,691 | 1,955,330 | 1,821,280 | 2,641,025 | 3,144,873 | 2,980,504 | 3,259,645 |
| Net Operating Income | | | | | | | | | | | | | | | | | | | | | | |
| La Jolla | -5,138 | -345,509 | -191,788 | 22,375 | 20,040 | -216,028 | -197,763 | 0 | 0 | 0 | 0 | 0 | 281,527 | 325,125 | | -5,138 | -345,509 | -191,788 | 22,375 | 20,040 | 65,499 | 127,363 |
| West Hollywood | -3,577 | 116,462 | -96,475 | 116,147 | -42,198 | -182,162 | -347,654 | 0 | 0 | 0 | 0 | 0 | 199,678 | 408,259 | | -3,577 | 116,462 | -96,475 | 116,147 | -42,198 | 17,515 | 60,605 |
| Pasadena | 0 | 0 | -2,895 | -26,672 | -130,986 | -8,745 | 66,711 | 0 | 0 | 0 | 0 | 0 | 286,975 | 455,059 | | 0 | 0 | -2,895 | -26,672 | -130,986 | 278,230 | 521,771 |
| South Coast Plaza | -140,718 | 182,882 | -242,476 | 81,882 | 415,441 | 68,817 | 174,223 | 0 | 0 | 0 | 0 | 0 | 670,139 | 537,182 | | -140,718 | 182,882 | -242,476 | 81,882 | 415,441 | 738,956 | 711,405 |
| San Francisco | 0 | 0 | 0 | 0 | -268,777 | 212,980 | 123,599 | 0 | 0 | 0 | 0 | 0 | 115,914 | 182,159 | | 0 | 0 | 0 | 0 | -268,777 | 328,894 | 305,757 |
| Total Net Operating Income | -149,433 | -46,165 | -533,635 | 193,733 | -6,480 | -125,139 | -180,884 | 0 | 0 | 0 | 0 | 0 | 1,554,233 | 1,907,784 | | -149,433 | -46,165 | -533,635 | 193,733 | -6,480 | 1,429,094 | 1,726,900 |
| Total Operating Expense | | | | | | | | | | | | | | | | 1,520,691 | 1,955,330 | 1,821,280 | 2,641,025 | 3,144,873 | 2,980,504 | 3,259,645 |
| Less: Depreciation Expense (Source: M&L P&L Statement) | | | | | | | | | | | | | | | | -180,958 | -56,951 | -55,072 | | | | |
| Less: Interest Expense (Source: M&L P&L Statement) | | | | | | | | | | | | | | | | -23,715 | -113,655 | -75,961 | -71,188 | -17,575 | -36,437 | -77,408 |
| Equals: Adjusted Operating Expense (Excluding Interest Expense) | | | | | | | | | | | | | | | | 1,316,018 | 1,784,724 | 1,690,247 | 2,569,838 | 3,127,298 | 2,944,068 | 3,182,237 |

[a] According to Douglas Moore and David Junk of M&N luxury LLC ("M&N Management"), revenues at M&N's stores were negatively impacted by B&O permitting competitors to encroach on M&N's territory. M&N's revenues recovered partially in 2024, as its stores continued to mature and adapt to competition. M&N Management stated that, absent the actions of B&O, revenues at the La Jolla store would have increased by 15% over the prior year in 2023 and by 15% over the prior year in 2024. See calculation below.

*La Jolla Store*

| | | | |
|---|---|---|---|
| Year | 2022 | 2023 | 2024 |

**EXHIBIT B-1**
**M&N LUXURY**
PROFIT & LOSS STATEMENTS -- "BUT-FOR" SCENARIO
SOURCE: QUICKBOOKS RECORDS COMPILED BY MANAGEMENT

| | | | |
|---|---|---|---|
| Revenues - Actual | 1,237,680 | 707,317 | 1,149,558 |
| Revenues - "But-For" | | 1,423,332 | 1,636,832 |
| % Change from Prior Year | | 15.0% | 15.0% |
| Adjustment | | 716,015 | 487,273 |

[b] M&N Management stated that, absent the actions of B&O, revenues at the West Hollywood store would have increased by 15% over the prior year in 2023 and by 15% over the prior year in 2024. See calculation below.

*West Hollywood*

| Year | 2022 | 2023 | 2024 |
|---|---|---|---|
| Revenues - Actual | 1,475,023 | 1,256,219 | 1,279,894 |
| Revenues - "But-For" | | 1,696,276 | 1,950,718 |
| % Change from Prior Year | | 15.0% | 15.0% |
| Adjustment | | 440,057 | 670,824 |

[c] M&N Management stated that, absent the actions of B&O, revenues at the Pasadena store would have increased by 25% over the prior year in 2023 and by 25% over the prior year in 2024. See calculation below.

*Pasadena*

| Year | 2022 | 2023 | 2024 |
|---|---|---|---|
| Revenues - Actual | 1,830,353 | 1,443,433 | 1,689,069 |
| Revenues - "But-For" | | 2,104,906 | 2,420,642 |
| % Change from Prior Year | | 15.0% | 15.0% |
| Adjustment | | 661,473 | 731,572 |

[d] M&N Management stated that, absent the actions of B&O, revenues at the South Coast Plaza store would have increased by 10% over the prior year in 2023 and by 10% over the prior year in 2024. See calculation below.

*South Coast Plaza*

| Year | 2022 | 2023 | 2024 |
|---|---|---|---|
| Revenues - Actual | 2,602,658 | 1,516,048 | 2,252,950 |
| Revenues - "But-For" | | 2,862,923 | 3,149,216 |
| % Change from Prior Year | | 10.0% | 10.0% |
| Adjustment | | 1,346,875 | 896,266 |

[e] M&N Management stated that, absent the actions of B&O, revenues at the San Francisco store would have increased by 60% over the prior year in 2023 and by 40% over the prior year in 2024. See calculation below.

*San Francisco*

| Year | 2022 | 2023 | 2024 |
|---|---|---|---|
| Revenues - Actual | 108,370 | 1,150,422 | 1,782,840 |
| Revenues - Actual (Annualized) [a] | 852,000 | 1,150,422 | 1,782,840 |
| Revenues - "But-For" | | 1,363,200 | 1,908,480 |
| % Change from Prior Year | | 60.0% | 40.0% |
| Adjustment | | 212,778 | 125,640 |

[a] Sales for 2022 started in November, with about $38,000 realized in November and about $71,000 received in December. AS November was considered a stsrt-up month, 2022 is annualized by multiplying $71,000 by 12.

[f] See calculation below:

| | Cost of Goods Sold as % of Revenue - Actual [A] - per EXHIBIT B-2 | | Revenues - Adjusted [B] - see above | | Cost of Goods Sold - Adjusted [C] = [A] * [B] | | Cost of Goods Sold - Actual [D] - per EXHIBIT B-2 | | Cost of Goods Sold - Adjustment - [C] - [D] | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2023 | 2024 | 2023 | 2024 | 2023 | 2024 | 2023 | 2024 | | |
| La Jolla | 60.7% | 58.3% | 1,423,332 | 1,636,832 | 863,698 | 954,843 | 429,210 | 670,593 | 434,488 | 284,250 |
| West Hollywood | 54.6% | 57.3% | 1,696,276 | 1,950,718 | 926,585 | 1,118,588 | 686,205 | 733,922 | 240,380 | 384,666 |
| Pasadena | 56.6% | 54.5% | 2,104,906 | 2,420,642 | 1,191,708 | 1,318,945 | 817,210 | 920,330 | 374,498 | 398,615 |
| South Coast Plaza | 50.2% | 53.7% | 2,862,923 | 3,149,216 | 1,438,474 | 1,690,747 | 761,737 | 1,209,561 | 676,737 | 481,186 |
| San Francisco | 45.5% | 52.2% | 1,363,200 | 1,908,480 | 620,575 | 996,218 | 523,711 | 930,635 | 96,864 | 65,584 |
| Total | | | 9,450,638 | 11,065,887 | 5,041,039 | 6,079,342 | 3,218,073 | 4,465,041 | 1,822,966 | 1,614,301 |

[g] Legal expense on the 2024 P&L is assumed related to the subject litigation, and therefore deducted to arrive at adjusted operating expense.

*Confidential – Attorneys' Eyes Only*

**EXHIBIT B-2**

**M&N LUXURY**

PROFIT & LOSS STATEMENTS

SOURCE: QUICKBOOKS RECORDS COMPILED BY MANAGEMENT

| | $s | | | | | | | % of Revenue | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| Revenue | | | | | | | | | | | | | | |
| La Jolla | 0 | 444,453 | 1,058,316 | 1,466,616 | 1,237,680 | 707,317 | 1,149,558 | NM | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| West Hollywood | 1,246,194 | 1,620,783 | 1,589,562 | 1,501,010 | 1,475,023 | 1,256,219 | 1,279,894 | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Pasadena | 0 | 0 | 0 | 1,209,964 | 1,830,353 | 1,443,433 | 1,689,069 | NM | NM | NM | 100.0% | 100.0% | 100.0% | 100.0% |
| South Coast Plaza | 1,584,764 | 1,705,944 | 1,185,301 | 1,753,632 | 2,602,658 | 1,516,048 | 2,252,950 | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| San Francisco | 0 | 0 | 0 | 0 | 108,370 | 1,150,422 | 1,782,840 | NM | NM | NM | NM | 100.0% | 100.0% | 100.0% |
| Total Revenue | 2,830,958 | 3,771,180 | 3,833,179 | 5,931,222 | 7,254,083 | 6,073,439 | 8,154,311 | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of Goods Sold | | | | | | | | | | | | | | |
| La Jolla | 0 | 255,683 | 759,745 | 801,150 | 699,082 | 429,210 | 670,593 | NM | 57.5% | 71.8% | 54.6% | 56.5% | 60.7% | 58.3% |
| West Hollywood | 716,173 | 834,903 | 994,241 | 761,177 | 773,904 | 686,205 | 733,922 | 57.5% | 51.5% | 62.5% | 50.7% | 52.5% | 54.6% | 57.3% |
| Pasadena | 0 | 0 | 0 | 657,185 | 1,259,373 | 817,210 | 920,330 | NM | NM | NM | 54.3% | 68.8% | 56.6% | 54.5% |
| South Coast Plaza | 743,527 | 771,429 | 791,549 | 876,952 | 1,325,249 | 761,737 | 1,209,561 | 46.9% | 45.2% | 66.8% | 50.0% | 50.9% | 50.2% | 53.7% |
| San Francisco | 0 | 0 | 0 | 0 | 58,082 | 523,711 | 930,635 | NM | NM | NM | NM | 53.6% | 45.5% | 52.2% |
| Total Cost of Goods Sold | 1,459,700 | 1,862,015 | 2,545,534 | 3,096,463 | 4,115,691 | 3,218,073 | 4,465,041 | 51.6% | 49.4% | 66.4% | 52.2% | 56.7% | 53.0% | 54.8% |
| Gross Profit | | | | | | | | | | | | | | |
| La Jolla | 0 | 188,770 | 298,571 | 665,466 | 538,598 | 278,107 | 478,965 | NM | 42.5% | 28.2% | 45.4% | 43.5% | 39.3% | 41.7% |
| West Hollywood | 530,021 | 785,879 | 595,321 | 739,833 | 701,118 | 570,014 | 545,972 | 42.5% | 48.5% | 37.5% | 49.3% | 47.5% | 45.4% | 42.7% |
| Pasadena | 0 | 0 | 0 | 552,780 | 570,980 | 626,223 | 768,739 | NM | NM | NM | 45.7% | 31.2% | 43.4% | 45.5% |
| South Coast Plaza | 841,237 | 934,515 | 393,752 | 876,680 | 1,277,408 | 754,311 | 1,043,389 | 53.1% | 54.8% | 33.2% | 50.0% | 49.1% | 49.8% | 46.3% |
| San Francisco | 0 | 0 | 0 | 0 | 50,288 | 626,711 | 852,205 | NM | NM | NM | NM | 46.4% | 54.5% | 47.8% |
| Total Gross Profit | 1,371,258 | 1,909,165 | 1,287,645 | 2,834,758 | 3,138,393 | 2,855,366 | 3,689,271 | 48.4% | 50.6% | 33.6% | 47.8% | 43.3% | 47.0% | 45.2% |
| Operating Expense | | | | | | | | | | | | | | |
| La Jolla | 5,138 | 534,278 | 490,360 | 643,090 | 518,558 | 494,135 | 676,728 | NM | 120.2% | 46.3% | 43.8% | 41.9% | 69.9% | 58.9% |
| West Hollywood | 533,597 | 669,418 | 691,796 | 623,685 | 743,316 | 752,176 | 893,627 | 42.8% | 41.3% | 43.5% | 41.6% | 50.4% | 59.9% | 69.8% |
| Pasadena | 0 | 0 | 2,895 | 579,452 | 701,966 | 634,968 | 702,027 | NM | NM | NM | 47.9% | 38.4% | 44.0% | 41.6% |
| South Coast Plaza | 981,955 | 751,634 | 636,229 | 794,798 | 861,967 | 685,494 | 869,166 | 62.0% | 44.1% | 53.7% | 45.3% | 33.1% | 45.2% | 38.6% |
| San Francisco | 0 | 0 | 0 | 0 | 319,065 | 413,731 | 728,606 | NM | NM | NM | NM | 294.4% | 36.0% | 40.9% |

*Confidential – Attorneys' Eyes Only*

**EXHIBIT B-2**

**M&N LUXURY**

PROFIT & LOSS STATEMENTS

SOURCE: QUICKBOOKS RECORDS COMPILED BY MANAGEMENT

| | $s | | | | | | | % of Revenue | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| Total Operating Expense | 1,520,691 | 1,955,330 | 1,821,280 | 2,641,025 | 3,144,873 | 2,980,504 | 3,870,154 | 53.7% | 51.8% | 47.5% | 44.5% | 43.4% | 49.1% | 47.5% |
| Net Operating Income | | | | | | | | | | | | | | |
| La Jolla | -5,138 | -345,509 | -191,788 | 22,375 | 20,040 | -216,028 | -197,763 | NM | -77.7% | -18.1% | 1.5% | 1.6% | -30.5% | -17.2% |
| West Hollywood | -3,577 | 116,462 | -96,475 | 116,147 | -42,198 | -182,162 | -347,654 | -0.3% | 7.2% | -6.1% | 7.7% | -2.9% | -14.5% | -27.2% |
| Pasadena | 0 | 0 | -2,895 | -26,672 | -130,986 | -8,745 | 66,711 | NM | NM | NM | -2.2% | -7.2% | -0.6% | 3.9% |
| South Coast Plaza | -140,718 | 182,882 | -242,476 | 81,882 | 415,441 | 68,817 | 174,223 | -8.9% | 10.7% | -20.5% | 4.7% | 16.0% | 4.5% | 7.7% |
| San Francisco | 0 | 0 | 0 | 0 | -268,777 | 212,980 | 123,599 | NM | NM | NM | NM | -248.0% | 18.5% | 6.9% |
| Total Net Operating Income | -149,433 | -46,165 | -533,635 | 193,733 | -6,480 | -125,139 | -180,884 | -5.3% | -1.2% | -13.9% | 3.3% | -0.1% | -2.1% | -2.2% |

*Confidential - Attorneys' Eyes Only*

**EXHIBIT C**

**M&N LUXURY**

LOST BUSINESS VALUE

DATE OF VALUATION: 12/31/24

| | | Total |
|---|---|---|
| Equity Value - "But-For" | [a] | 8,270,000 |
| Equity Value - Actual | [b] | 297,776 |
| Lost Business Value | | 7,972,224 |
| **Rounded** | | **7,972,000** |

[a] See EXHIBIT C-1.

[b] See EXHIBIT C-6.

*Confidential - Attorneys' Eyes Only*

**EXHIBIT C-1**

**M&N LUXURY**

EQUITY VALUE -- "BUT-FOR" SCENARIO

DATE OF VALUE: 12/31/24

| Method | Approach | Equity Value Indication | | Weight [c] | Weighted Value [d] |
|---|---|---|---|---|---|
| Discounted Cash Flow | Income | $8,458,085 | [a] | 60.0% | 5,074,851 |
| Guideline Transactions | Market | $8,000,000 | [b] | 40.0% | 3,200,000 |
| Equity Value | | | [e] | | $8,274,851 |
| Rounded | | | | | $8,270,000 |

[a] See EXHIBIT C-2.

[b] See EXHIBIT C-4.

[c] Due to limited comparability of guideline companies, the income approach is accorded greater weight.

[d] Equity Value Indication * Weight.

[e] Sum of weighted values.

**EXHIBIT C-2**
**M&N LUXURY**
DISCOUNTED CASH FLOW METHOD -- INDICATED EQUITY VALUE ("BUT-FOR" SCENARIO)
DATE OF VALUATION: 12/31/24

| 12 ME 12/31 | Fn: | 2025 | 2026 | 2027 | 2028 | 2029 | Terminal Year |
|---|---|---|---|---|---|---|---|
| Total Revenue | [a] | 12,363,324 | 13,512,702 | 14,537,602 | 15,467,800 | 16,241,190 | 16,728,425 |
| Less: Cost of Goods Sold | [b] | -6,799,828 | -7,431,986 | -7,995,681 | -8,507,290 | -8,932,654 | -9,200,634 |
| Equals; Gross Profit | | 5,563,496 | 6,080,716 | 6,541,921 | 6,960,510 | 7,308,535 | 7,527,791 |
| | | | | | | | |
| Less: Operating Expense | [c] | -3,436,816 | -3,677,393 | -3,898,037 | -4,092,938 | -4,256,656 | -4,384,356 |
| | | -27.8% | -27.2% | -26.8% | -26.5% | -26.2% | -26.2% |
| Equals: EBITDA | | 2,126,680 | 2,403,323 | 2,643,884 | 2,867,571 | 3,051,879 | 3,143,436 |
| Less: Depreciation | [d] | -60,000 | -60,000 | -60,000 | -60,000 | -60,000 | -60,000 |
| Equals: EBIT | [d] | 2,066,680 | 2,343,323 | 2,583,884 | 2,807,571 | 2,991,879 | 3,083,436 |
| Less: Estimated Income Taxes at 28.0% | [e] | -578,670 | -656,130 | -723,488 | -786,120 | -837,726 | -863,362 |
| Equals: Net Profit | | 1,488,009 | 1,687,192 | 1,860,397 | 2,021,451 | 2,154,153 | 2,220,074 |
| | | | | | | | |
| Debt-Free Net Cash Flow | | | | | | | |
| Add: Net Profit | | 1,488,009 | 1,687,192 | 1,860,397 | 2,021,451 | 2,154,153 | 2,220,074 |
| Add: Depreciation | [d] | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 |
| -/+ Incr./(Decr.) In Working Capital | [f] | -84,820 | -137,633 | -71,743 | -65,114 | -54,137 | -34,106 |
| Less: Capital Expenditures | [g] | -60,000 | -60,000 | -60,000 | -60,000 | -60,000 | -60,000 |
| = Debt-Free Net Cash Flow | | 1,403,189 | 1,549,560 | 1,788,654 | 1,956,338 | 2,100,016 | 2,185,967 |

| Calculation of Terminal Value | | |
|---|---|---|
| Discount Rate | [h] | 23.0% |
| Less: Long-Term Growth Rate | [i] | -3.0% |
| Equals: Terminal Cap. Rate | | 20.0% |
| | | |
| Cash Flow, Terminal Year | [j] | 2,185,967 |
| Divided by: Terminal Capitalization Rate | | 20.0% |
| Equals: Terminal Value | | 10,929,836 |

| | | | | | | | Terminal Value |
|---|---|---|---|---|---|---|---|
| Debt-Free Net Cash Flow/Terminal Value | | 1,403,189 | 1,549,560 | 1,788,654 | 1,956,338 | 2,100,016 | 10,929,836 |
| Discount Rate | [h] | 23.0% | | | | | |
| Years in Period | | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |

# EXHIBIT C-2
## M&N LUXURY
DISCOUNTED CASH FLOW METHOD -- INDICATED EQUITY VALUE ("BUT-FOR" SCENARIO)
DATE OF VALUATION: 12/31/24

| | | | | | | | Terminal |
|---|---|---|---|---|---|---|---|
| Discount Period (Years) | [k] | 0.5000 | 1.5000 | 2.5000 | 3.5000 | 4.5000 | 4.5000 |
| Present Value Factor | [l] | 0.9017 | 0.7331 | 0.5960 | 0.4845 | 0.3939 | 0.3939 |
| Present Value of Debt-Free Net Cash Flow/Terminal Value | [m] | 1,265,213 | 1,135,928 | 1,066,015 | 947,929 | 827,274 | 4,305,669 |

| Value Conclusion | | $s | % of Total |
|---|---|---|---|
| Total Net Present Value, Interim Cash Flows | [n] | 5,242,360 | 54.9% |
| Add: Net Present Value, Terminal Value | [n] | 4,305,669 | 45.1% |
| Equals: Business Enterprise Value (Market Value of Invested Capital) | [n] | 9,548,029 | 100.0% |
| Less: Long-Term Liabilities | [o] | -1,973,711 | |
| Add: Loan from Shareholder | [o] | 595,878 | |
| Add: Loan from M&N Luxury San Francisco | [o] | 123,488 | |
| Add: PPP Loan | [o] | 164,402 | |
| Equals: Equity Value | | 8,458,085 | |

[a] See calculation below. Source for projected growth rates: discussions with M&N management.

| | Estimate | Forecast | | | | | |
|---|---|---|---|---|---|---|---|
| | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | Terminal Year |
| *La Jolla* | | | | | | | |
| Revenue | 1,636,832 | 1,800,515 | 1,944,556 | 2,080,675 | 2,205,516 | 2,315,791 | 2,385,265 |
| % Change from Prior Year | 15.0% | 10.0% | 8.0% | 7.0% | 6.0% | 5.0% | 3.0% |
| *West Hollywood* | | | | | | | |
| Revenue | 1,950,718 | 2,145,789 | 2,317,453 | 2,479,674 | 2,628,455 | 2,759,877 | 2,842,674 |
| % Change from Prior Year | 15.0% | 10.0% | 8.0% | 7.0% | 6.0% | 5.0% | 3.0% |
| *Pasadena* | | | | | | | |
| Revenue | 2,420,642 | 2,662,706 | 2,875,722 | 3,077,023 | 3,261,644 | 3,424,726 | 3,527,468 |
| % Change from Prior Year | 15.0% | 10.0% | 8.0% | 7.0% | 6.0% | 5.0% | 3.0% |
| *South Coast Plaza* | | | | | | | |
| Revenue | 3,149,216 | 3,464,137 | 3,741,268 | 4,003,157 | 4,243,347 | 4,455,514 | 4,589,179 |
| % Change from Prior Year | 10.0% | 10.0% | 8.0% | 7.0% | 6.0% | 5.0% | 3.0% |
| *San Francisco* | | | | | | | |
| Revenue | 1,908,480 | 2,290,176 | 2,633,702 | 2,897,073 | 3,128,838 | 3,285,280 | 3,383,839 |
| % Change from Prior Year | 40.0% | 20.0% | 15.0% | 10.0% | 8.0% | 5.0% | 3.0% |

# EXHIBIT C-2
## M&N LUXURY
DISCOUNTED CASH FLOW METHOD -- INDICATED EQUITY VALUE ("BUT-FOR" SCENARIO)
DATE OF VALUATION: 12/31/24

| | | | | | | | Terminal |
|---|---|---|---|---|---|---|---|
| Total Revenue | 11,065,887 | 12,363,324 | 13,512,702 | 14,537,602 | 15,467,800 | 16,241,190 | 16,728,425 |
| *% Change from Prior Year* | *17.1%* | *11.7%* | *9.3%* | *7.6%* | *6.4%* | *5.0%* | *3.0%* |

[b] See calculation below.

| | Estimate | | | Forecast | | | |
|---|---|---|---|---|---|---|---|
| | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | Terminal Year |
| Total Revenue | 11,065,887 | 12,363,324 | 13,512,702 | 14,537,602 | 15,467,800 | 16,241,190 | 16,728,425 |
| Cost of Goods Sold | 6,079,342 | 6,799,828 | 7,431,986 | 7,995,681 | 8,507,290 | 8,932,654 | 9,200,634 |
| *% of Total Revenue* | *54.9%* | *55.0%* | *55.0%* | *55.0%* | *55.0%* | *55.0%* | *55.0%* |

[c] See calculation below.

| | Estimate | | | Forecast | | | |
|---|---|---|---|---|---|---|---|
| | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | Terminal Year |
| Operating Expense (Excl. Interest) | 3,182,237 | 3,436,816 | 3,677,393 | 3,898,037 | 4,092,938 | 4,256,656 | 4,384,356 |
| *% Change from Prior Year* | *10.7%* | *8.0%* | *7.0%* | *6.0%* | *5.0%* | *4.0%* | *3.0%* |

[d] Estimated based on historical depreciation levels during years when depreciation expense was recorded (2018-2020).

[e] Combined state and federal corporate tax rate.

[f] The Company's working capital requirements are forecast as a percent of sales; this calculation is presented below.

| | | 2025 | 2026 | 2027 | 2028 | 2029 | Term. Yr. |
|---|---|---|---|---|---|---|---|
| Estimated Working Capital - Beginning Balance | [1] | 723,436 | 808,256 | 945,889 | 1,017,632 | 1,082,746 | 1,136,883 |
| Revenue (Annualized) | [2] | 12,363,324 | 13,512,702 | 14,537,602 | 15,467,800 | 16,241,190 | 16,728,425 |
| Working Capital Requirement as % of Net Sales | [3] | 6.54% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% |
| Working Capital Requirement | [4] | 808,256 | 945,889 | 1,017,632 | 1,082,746 | 1,136,883 | 1,170,990 |
| Increase/(Decrease) in Working Capital | [5] | $84,820 | $137,633 | $71,743 | $65,114 | $54,137 | $34,106 |

[1] Source for beginning balance: amounts per balance sheet as of 12/31/24. Thereafter equal to prior year's ending balance.

[2] Source: DCF projection.

[3] Amount for 2025 estimated by dividing beginning working capital balance by 2024 adjusted sales. Thereafter, percentage rounded to 7%.

[4] Net Sales (Annualized) * Working Capital Requirement as % of Net Sales.

[5] Working Capital Requirement, less Working Capital - Beginning Balance.

[g] Capital expenditures are projected to equal depreciation expense.

[h] Source: EXHIBIT C-3.

[i] Long-term growth rate somewhat higher than inflation rate is used for terminal year.

[j] Forecasted cash flow as of terminal year.

*Confidential – Attorneys' Eyes Only*

**EXHIBIT C-2**

**M&N LUXURY**

DISCOUNTED CASH FLOW METHOD -- INDICATED EQUITY VALUE ("BUT-FOR" SCENARIO)

DATE OF VALUATION: 12/31/24

Terminal

[k] The discount period equals the number of years from the date of value to the mid-point of the forecasted period in question.

[l] The present value factor is computed as 1/(1+k)^DP, where k is equal to the discount rate and DP equals the discount period.

[m] The present value of debt-free cash flow and the terminal value is computed by multiplying the debt-free cash flow or terminal value by the corresponding present value factor.

[n] The sum of the present values of interim cash flows and the terminal value equals Business Enterprise Value.

[o] Under this approach, value is first determined on a debt-free basis. Then, outstanding long-term debt is deducted to arrive at equity value. See M&N balance sheet as of 12/31/24 for debt amounts. Intercompany debt, loan from shareholder, and PPP loan (assumed forgivable) are added back.

**EXHIBIT C-3**

**M&N LUXURY**

DISCOUNT RATE CALCULATION - BUILD-UP METHOD

DATE OF VALUE: 12/31/24

| | | |
|---|---|---|
| Risk-Free Rate | [a] | 4.86% |
| Plus: Equity Risk Premium | [b] | 6.70% |
| Plus: Size Premium | [c] | 4.58% |
| Plus: Industry Risk Premium (Discount) | [d] | 1.74% |
| Plus: Firm-Specific Risk Premium | [e] | 5.00% |
| Equals: Cost of Equity | [f] | 22.89% |
| Rounded | | 23.00% |

[a] A 4.86% Risk Free Rate (RFR) was selected, representing the 20-Year Treasury Constant Maturity Rate available on 12/31/2024 at the Federal Reserve Bank.

[b] A 6.70% Equity Risk Premium (ERP) was selected, representing the Historical ERP calculated using the S&P 500 average annual return of 11.94% derived from CRSP data for the 1928 - 2024 period and a 5.24% 20-year T-Bond average annual return (Reconstructed) for the same

[c] A 4.58% Size Premium (SP) was selected. The Size Premium was based on CRSP decile 10 which included 691 firms with an equity market capitalization size ranging from $1,108,000 to $304,479,000 in Q4 2024. The CRSP decile 10 mean annual return reached 19.07% between 1928 and 2024. The mean annual return for the S&P 500 for the same period was 11.94%. The difference between the CRSP mean decile return and the S&P 500 mean return was adjusted by the beta of CRSP decile 10 of 1.38.

*Calculation:*

| | | | | | | |
|---|---|---|---|---|---|---|
| Predicted Premium Based on Beta Alone: | | | | | | |
| ERP * 10th Decile Beta = | 6.70% | x | 1.38 | = | 9.25% | |
| Actual Observed Premium: | | | | | | |
| Small Stock Return - Average Bond Yield = | 19.07% | - | 5.23% | = | 13.84% | |
| Difference = | | | | | 4.59% | *Size Premium (difference from above due to rounding)* |

[d] An implied 1.74% Industry Risk Premium (IRP) was calculated using an industry beta of 1.26 selected based on professional judgment. The 5-Year industry beta for 2024 US Specialty Retail was sourced from Salvidio & Partners and included 46 firms. Implied Industry Risk Premium = (Industry Beta * ERP) - ERP = (1.26 * 6.70%) - 6.70%.

**EXHIBIT C-3**

**M&N LUXURY**

DISCOUNT RATE CALCULATION - BUILD-UP METHOD

DATE OF VALUE: 12/31/24

[e] A 5% Company Specific Risk Premium (CSRP) was selected based on professional judgment.

Factors considered include the significantly small size of the business relative to public companies, level of competition in the retail industry, and the possibility that revenues and profits would not materialize as forecasted. These risk factors are mitigated by such positive factors as a highly recognized brand name (B&O), M&N management's track record of experience in the marketplace, and M&N's achievement of growing its B&O stores at rates that were in line or in excess of its 5-year business plan during 2018-2022 (see presentation titled "Bang & Olufsen: A California Success Story").

[f] Sum of Risk-Free Rate, Equity Risk Premium, Size Premium, Industry Premium (Discount), and Firm-Specific Risk Premium.

**EXHIBIT C-4**

**M&N LUXURY**

CALCULATION OF VALUE - GUIDELINE TRANSACTIONS METHOD - "BUT-FOR" CONDITION

DATE OF VALUE: 12/31/24

$s

| Benefit Stream | Amount | Selected Multiple | | Value | Weight [b] | Weighted Value [c] |
|---|---|---|---|---|---|---|
| Adjusted EBITDA, 12ME 12/31/24 | 1,804,308 | 5.00x | [a] | 9,021,541 | 100.0% | 9,021,541 |
| Indicated Value | | | | | [d] | 9,021,541 |
| Add: Current Assets | | | | | [e] | 1,606,683 |
| Less: Current Liabilities | | | | | [e] | -883,247 |
| Less: Long-Term Liabilities | | | | | [e] | -1,973,711 |
| Less: Loan to M&N Luxury Pasadena | | | | | [f] | -288,088 |
| Less: Loan to M&N Luxury Installation | | | | | [f] | -366,467 |
| Add: Loan from M&N Luxury San Francisco | | | | | [f] | 123,488 |
| Add: Loan from Shareholder | | | | | [g] | 595,878 |
| Add: PPP Loan | | | | | [h] | 164,402 |
| Equals: Business Enterprise Value | | | | | | 8,000,479 |
| Rounded | | | | | | 8,000,000 |

[a] See calculation below for earnings measure.

| | | |
|---|---|---|
| Operating Profit, "But-For" Scenario, 12ME 12/31/24 | 1,726,900 | See EXHIBIT B-1. |
| Add: Interest Expense, 12/31/24 | 77,408 | Source: M&N P&L statement, 12ME 12/31/24 |
| Equals: EBITDA | 1,804,308 | |

See EXHIBIT C-5 for multiple selection.

[b] EBITDA multiple is weighted 100% in this analysis.

[c] Indicated Value * Weight.

[d] Sum of weighted values.

[e] In computing value, a "pure play" multiple was used which only included fixed assets and intangibles. Thus, current assets are added and total liabilities deducted to arrive at equity value. Source: M&N AV Balance Sheet as of 12/31/24.

[f] Intercompany debt eliminated. Source: M&N AV Balance Sheet as of 12/31/24.

*Confidential - Attorneys' Eyes Only*

**EXHIBIT C-4**

**M&N LUXURY**

CALCULATION OF VALUE - GUIDELINE TRANSACTIONS METHOD - "BUT-FOR" CONDITION

DATE OF VALUE: 12/31/24

$s

[g] For valuation purposes, the shareholder loan is assumed equivalent to equity, and is added back. Source: M&N AV Balance Sheet as of 12/31/24.

[h] PPP debt assumed forgivable and is therefore added back. Source: M&N AV Balance Sheet as of 12/31/24.

*Confidential - Attorneys' Eyes Only*

**EXHIBIT C-5**
**M&N LUXURY**
GUIDELINE TRANSACTIONS (SOURCE: DEALSTATS.COM)

| | | | | | | Sale | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Trans # | SIC | NAICS | Business Description | Location | Transaction Type | Date | Pure Play MVIC [a] | Sales | EBITDA | EBITDA/ Sales | PPMVIC/ Sales | PPMVIC / EBITDA | |
| 1 | 5731 | 443142 | Audio-Visual Entertainment Retail Center | NC | Asset | 11/30/23 | 475,000 | 208,755 | 57,201 | 27.4% | 2.28 | 8.30 | |
| 2 | 5731 | 449210 | Retail Audio Video Sales | AZ | Asset | 06/30/22 | 1,626,000 | 4,915,084 | 377,363 | 7.7% | 0.33 | 4.31 | |
| 3 | 5731 | 449210 | Home Theater and Smart Home Sales and Installation Business | FL | Asset | 03/15/22 | 950,000 | 1,187,430 | 267,810 | 22.6% | 0.80 | 3.55 | |
| 4 | 5731 | 449210 | Home Theater Sales and Installation Business | FL | Asset | 03/11/22 | 155,000 | 550,000 | 23,000 | 4.2% | 0.28 | 6.74 | |
| 5 | 5731 | 449210 | Retail and Wholesale of Audiophile, Home Audio, Video, and Mobile (On-The-Go) Audio (both physical store and online) | PA | Asset | 06/30/21 | 5,250,000 | 9,110,979 | 1,770,165 | 19.4% | 0.58 | 2.97 | |
| 6 | 5731 | 449210 | Sells Home Sound Video Systems | FL | Asset | 12/17/10 | 650,000 | 1,445,427 | 192,548 | 13.3% | 0.45 | 3.38 | |
| 7 | 5731 | 449210 | Sells Multi-Room Audio Systems | TX | Stock | 11/03/09 | 3,454,000 | 8,559,044 | -5,081,008 | -59.4% | 0.40 | NA | |
| | | | Count | | | 7 | 7 | 7 | 7 | 7 | 7 | 6 | |
| | | | Mean | | | 01/05/19 | 1,794,286 | 3,710,960 | -341,846 | 5.0% | 0.73 | 4.87 | |
| | | | Median | | | 03/11/22 | 950,000 | 1,445,427 | 192,548 | 13.3% | 0.45 | 3.93 | |
| | | | Minimum | | | 11/03/09 | 155,000 | 208,755 | -5,081,008 | -59.4% | 0.28 | 2.97 | |
| | | | 10th Percentile | | | 07/06/10 | 347,000 | 413,502 | -2,018,603 | -21.2% | 0.31 | 3.17 | |
| | | | Lower Quartile | | | 03/24/16 | 562,500 | 868,715 | 40,101 | 5.9% | 0.37 | 3.42 | |
| | | | Upper Quartile | | | 05/07/22 | 2,540,000 | 6,737,064 | 322,587 | 21.0% | 0.69 | 6.13 | |
| | | | 90th Percentile | | | 01/23/23 | 4,172,400 | 8,779,818 | 934,484 | 24.5% | 1.39 | 7.52 | |
| | | | Maximum | | | 11/30/23 | 5,250,000 | 9,110,979 | 1,770,165 | 27.4% | 2.28 | 8.30 | |
| | | | Average (Excluding Minimum and Maximum) | | | 11/13/19 | 1,431,000 | 3,331,397 | 183,584 | 13.4% | 0.51 | 4.49 | |
| | | | M&N Luxury: "But For," 12 ME 12/31/24 | | | | | 11,065,887 | 1,726,900 | 15.6% | | 5.00 | [b] |

[a] MVIC equals the deal price. Pure Play MVIC, or PPMVIC, excludes the value of current assets - that is, it only includes the value of fixed assets and intangible assets. Thus, in deriving equity value the subject company's current assets must be added, and current and long-term liabilities deducted. Companies not explicitly in home audio or theater (e.g., car stereo retailers) are not included.

[b] The subject company is larger than the guideline companies in terms of revenues, and would have been expected to continue to grow significantly. In light of this, a multiple somewhat above the average excluding the minimum and maximum is considered appropriate. See EXHIBIT C-3 for a discussion of factors influencing the multiple selection. A revenue multiple was not applied in this case due to the high variability in observed multiples.

*Confidential - Attorneys' Eyes Only*

**EXHIBIT C-6**
**M&N LUXURY**
EQUITY VALUE - ACTUAL
DATE OF VALUATION: 12/31/24

| | Book Value as of 12/31/24 [a] | Adjustment | | Estimated Fair Market Value (Liquidation Basis) |
|---|---|---|---|---|
| ASSETS | | | | |
| Current Assets | | | | |
| Cash | 390,078 | 0 | [b] | 390,078 |
| Other Current Assets | | | | |
| BizX Credit | 990 | 0 | [b] | 990 |
| Inventory | 617,926 | 1,282,074 | [c] | 1,900,000 |
| LH Improvement Credit | -26,888 | 0 | [b] | -26,888 |
| Loan to M&N Luxury Pasadena | 288,088 | -288,088 | [d] | 0 |
| M&N Luxury Installation | 366,467 | -366,467 | [d] | 0 |
| Non Cash Payments Received | -129 | 0 | [b] | -129 |
| Sound and Shades | -29,849 | 29,849 | [e] | 0 |
| Total Other Current Assets | 1,216,605 | 657,368 | | 1,873,973 |
| Total Current Assets | 1,606,683 | 657,368 | | 2,264,051 |
| Total Fixed Assets | 853,970 | -813,136 | [f] | 40,835 |
| Other Asset -- Security Deposit RD | -33,920 | 0 | [b] | -33,920 |
| TOTAL ASSETS | 2,426,734 | -155,768 | | 2,270,966 |
| LIABILITIES AND EQUITY | | | | |
| Liabilities | | | | |
| Current Liabilities | | | | |
| Accounts Payable | 61,740 | 0 | [b] | 61,740 |
| Credit Cards | 73,804 | 0 | [b] | 73,804 |
| Other Current Liabilities | | | | |
| CDTFA Payable | 221,968 | 0 | [b] | 221,968 |
| Customer Deposits | 360,369 | 0 | [b] | 360,369 |
| Deposits on Hold | 1,536 | 0 | [b] | 1,536 |
| Payroll Liabilities | -48,606 | 0 | [b] | -48,606 |
| Payroll Tax Credit | 212,436 | 0 | [b] | 212,436 |
| Total Other Current Liabilities | 747,702 | 0 | | 747,702 |
| Total Current Liabilities | 883,247 | 0 | | 883,247 |
| Long-Term Liabilities | | | | |
| Loan From M&N Luxury San Francisco | 123,488 | -123,488 | [d] | 0 |
| Loan From Shareholder | 595,878 | -595,878 | [d] | 0 |

*Confidential - Attorneys' Eyes Only*

**EXHIBIT C-6**
**M&N LUXURY**
EQUITY VALUE - ACTUAL
DATE OF VALUATION: 12/31/24

| | Book Value as of 12/31/24 [a] | Adjustment | | Estimated Fair Market Value (Liquidation Basis) |
|---|---|---|---|---|
| SBA Cares Act Loans | | | | |
| 2nd PPP Loan | 164,402 | -164,402 | [g] | 0 |
| SBA EIDL Loan #2 | 494,888 | 0 | [b] | 494,888 |
| SBA EIDL Loan #2 | 469,569 | 0 | [b] | 469,569 |
| SBA Loan Deferred Payments | 35,661 | 0 | [b] | 35,661 |
| Total SBA Cares Act Loans | 1,164,520 | -164,402 | | 1,000,118 |
| SBA Loan - 6002 | 89,826 | 0 | [b] | 89,826 |
| Total Long-Term Liabilities | 1,973,711 | -883,768 | | 1,089,943 |
| Total Liabilities | 2,856,958 | -883,768 | | 1,973,190 |
| Equity | -406,764 | 704,540 | | 297,776 |
| TOTAL LIABILITIES AND EQUITY | 2,450,194 | -179,228 | [h] | 2,270,966 |
| Fair Market Value of Equity - Liquidation Basis | | | | 297,776 |

This calculation estiamtes the liquidation value of M&N as an offset to lost business value.

[a] Source: M&N AV balance sheet per QuickBooks (accrual basis).
[b] Book value assumed equal to fair market value.
[c] Adjusted to amount M&N eventually received for sale of inventory.
[d] Intercompany item eliminated.
[e] Eliminated, as assumed unrelated to subject business.
[f] Reduced to book value of vehicle (asset assumed saleable in liquidation).
[g] PPP loan eliminated, as assumed it will eventually be forgivable.
[h] Adjusted to equal fair market value of assets less fair market value of liabilities.

*Confidential – Attorneys' Eyes Only*

**EXHIBIT D**
**M&N LUXURY**
VALUATION OF LOST STORE EXPANSION OPPORTUNITY
DATE OF VALUATION: 12/31/24

| | | |
|---|---|---|
| Value of lost store opportunity as of 12/31/23 | [a] | 1,277,598 |
| Years to Date of Value | | 1.00 |
| Simple Interest at 10.0% | [b] | 127,760 |
| Lost Value Plus Interest | | 1,405,358 |
| **Rounded** | | **1,405,000** |

[a] See EXHIBIT D-1.
[b] We express no opinion as to the appropriateness of the interest rate utilized in this calculation.

*Confidential Attorneys' Eyes Only*

**EXHIBIT D-1**
**M&N LUXURY**
DISCOUNTED CASH FLOW METHOD -- VALUATION OF CONTRACT TO OPEN NEW STORES: SAN JOSE AND PALO ALTO
DATE OF VALUATION: 12/31/23

| 12 ME 12/31 | Fn: | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | Terminal Year |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | | | | | | | | | |
| Revenue - San Jose | [a] | 850,000 | 1,360,000 | 1,904,000 | 2,284,800 | 2,627,520 | 2,890,272 | 3,063,688 | 3,216,873 |
| Revenue - Palo Alto | [a] | | 850,000 | 1,360,000 | 1,904,000 | 2,284,800 | 2,627,520 | 2,890,272 | 3,063,688 |
| Total Revenue | | 850,000 | 2,210,000 | 3,264,000 | 4,188,800 | 4,912,320 | 5,517,792 | 5,953,960 | 6,280,561 |
| Gross Profit | [b] | 382,500 | 994,500 | 1,468,800 | 1,884,960 | 2,210,544 | 2,483,006 | 2,679,282 | 2,826,252 |
| % of Revenue | | 45.0% | 45.0% | 45.0% | 45.0% | 45.0% | 45.0% | 45.0% | 45.0% |
| Less: Operating Expense (Excl. Depreciation) - San Jose | [c] | -480,000 | -500,000 | -600,000 | -618,000 | -636,540 | -655,636 | -675,305 | -695,564 |
| Less: Operating Expense (Excl. Depreciation) - Palo Alto | [c] | | -480,000 | -500,000 | -600,000 | -618,000 | -636,540 | -655,636 | -675,305 |
| Equals: EBITDA | | -97,500 | 14,500 | 368,800 | 666,960 | 956,004 | 1,190,830 | 1,348,341 | 1,455,383 |
| Less: Depreciation | [d] | -42,000 | -86,400 | -91,200 | -96,000 | -100,800 | -63,600 | -24,000 | -24,000 |
| Equals: EBIT | | -139,500 | -71,900 | 277,600 | 570,960 | 855,204 | 1,127,230 | 1,324,341 | 1,431,383 |
| Less: Estimated Income Taxes at 28.0% | [e] | 39,060 | 20,132 | -77,728 | -159,869 | -239,457 | -315,624 | -370,815 | -400,787 |
| Equals: Net Profit | | -100,440 | -51,768 | 199,872 | 411,091 | 615,747 | 811,606 | 953,525 | 1,030,596 |
| Debt-Free Net Cash Flow | | | | | | | | | |
| Add: Net Profit | | -100,440 | -51,768 | 199,872 | 411,091 | 615,747 | 811,606 | 953,525 | 1,030,596 |
| Add: Depreciation | [d] | 42,000 | 86,400 | 91,200 | 96,000 | 100,800 | 63,600 | 24,000 | 24,000 |
| -/+ Incr./(Decr.) In Working Capital | [f] | -150,000 | -150,000 | -189,600 | -138,720 | -108,528 | -90,821 | -65,425 | -48,990 |
| Less: Capital Expenditures | [d] | -210,000 | -222,000 | -24,000 | -24,000 | -24,000 | -24,000 | -24,000 | -24,000 |
| = Debt-Free Net Cash Flow | | -418,440 | -337,368 | 77,472 | 344,371 | 584,019 | 760,385 | 888,100 | 981,605 |

| Calculation of Terminal Value | | |
|---|---|---|
| Discount Rate | [g] | 25.0% |
| Less: Long-Term Growth Rate | [h] | -3.0% |
| Equals: Terminal Cap. Rate | | 22.0% |
| Cash Flow, Terminal Year | [i] | 981,605 |
| Divided by: Terminal Capitalization Rate | | 22.0% |
| Equals: Terminal Value | | 4,461,843 |

| | | | | | | | | | Terminal Value |
|---|---|---|---|---|---|---|---|---|---|
| Debt-Free Net Cash Flow/Terminal Value | | -418,440 | -337,368 | 77,472 | 344,371 | 584,019 | 760,385 | 888,100 | 4,461,843 |
| Discount Rate | [g] | 25.0% | | | | | | | |

# EXHIBIT D-1
## M&N LUXURY
### DISCOUNTED CASH FLOW METHOD -- VALUATION OF CONTRACT TO OPEN NEW STORES: SAN JOSE AND PALO ALTO
### DATE OF VALUATION: 12/31/23

| | | | | | | | | | Terminal |
|---|---|---|---|---|---|---|---|---|---|
| Years in Period | | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 1.0000 |
| Discount Period (Years) | [j] | 0.5000 | 1.5000 | 2.5000 | 3.5000 | 4.5000 | 5.5000 | 6.5000 | 6.5000 |
| Present Value Factor | [k] | 0.8944 | 0.7155 | 0.5724 | 0.4579 | 0.3664 | 0.2931 | 0.2345 | 0.2345 |
| Present Value of Debt-Free Net Cash Flow/Terminal Value | [l] | -374,264 | -241,401 | 44,348 | 157,704 | 213,960 | 222,858 | 208,232 | 1,046,163 |

| Value Conclusion | | $s | % of Total |
|---|---|---|---|
| Total Net Present Value, Interim Cash Flows | [m] | 231,436 | 18.1% |
| Add: Net Present Value, Terminal Value | [m] | 1,046,163 | 81.9% |
| Equals: Business Enterprise Value (Market Value of Invested Capital) | [m] | 1,277,598 | 100.0% |
| Less: Long-Term Liabilities | [n] | 0 | |
| Equals: Equity Value | | 1,277,598 | |

According to the Second Amended Complaint, Due to Plaintiff's outstanding performance and Defendants' satisfaction with Plaintiff's operations and revenue, Plaintiff was encouraged in 2022 to open additional stores in Northern California, in San Jose and Palo Alto. Other documents indicate that M&N was required to open the first store no later than June 2024 and the second store no later than June 2025.

Based on the above, the analysis assumes that, but for the actions of Defendants, M&N world have opened the first additional store at the start of 2024 and the second additional store at the start of 2025.

[a] Growth Trend is based on that experienced and anticipated for the San Francisco location in the absence of the alleged harmful actions by Defendant.

*San Francisco*

| Year | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | Term. Yr. |
|---|---|---|---|---|---|---|---|---|---|
| Revenues - Actual | 108,370 | | | | | | | | |
| Revenues - Actual (Annualized) [a] | 852,000 | | | | | | | | |
| Revenues - "But-For" | | 1,363,200 | 1,908,480 | 2,290,176 | 2,633,702 | 2,897,073 | 3,128,838 | 3,285,280 | 3,383,839 |
| % Change from Prior Year | | 60.0% | 40.0% | 20.0% | 15.0% | 10.0% | 8.0% | 5.0% | 3.0% |

[a] See M&N Damage analysis for estimated and projected revenues for the San Francisco store.

| Assumed Growth Trend for New Stores | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| Revenue | 850,000 | 1,360,000 | 1,904,000 | 2,284,800 | 2,627,520 | 2,890,272 | 3,063,688 | 3,216,873 | 3,313,379 |
| % Change from Prior Year | | 60.0% | 40.0% | 20.0% | 15.0% | 10.0% | 6.0% | 5.0% | 3.0% |

[b] Historical average gross margin experienced across stores. See below:

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Total Revenue | 2,830,958 | 3,771,180 | 3,833,179 | 5,931,222 | 7,254,083 | 6,073,439 | 8,154,311 |
| Gross Profit | 1,371,258 | 1,909,165 | 1,287,645 | 2,834,758 | 3,138,393 | 2,855,366 | 3,689,271 |
| % of Revenue | 48.4% | 50.6% | 33.6% | 47.8% | 43.3% | 47.0% | 45.2% |
| Average, 2022-2024 | 45.2% | | | | | | |
| Forecast | 45.0% | | | | | | |

**EXHIBIT D-1**
**M&N LUXURY**
DISCOUNTED CASH FLOW METHOD -- VALUATION OF CONTRACT TO OPEN NEW STORES: SAN JOSE AND PALO ALTO
DATE OF VALUATION: 12/31/23

Terminal

[c] See calculation below. Operating expense measured as a percent of revenues based on San Francisco store and B&P pro forma. See below:

| San Francisco Store | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | Term. Yr. |
|---|---|---|---|---|---|---|---|---|---|
| Revenues - But For | 852,000 | 1,363,200 | 1,908,480 | 2,290,176 | 2,633,702 | 2,897,073 | 3,128,838 | 3,285,280 | |
| Operating Cost - But For (Excl. Legal Fees) | 319,065 | 413,731 | 606,504 | | | | | | |
| % of Revenue | | 30.4% | 31.8% | | | | | | |
| | | | | | | | | | |
| Pro Forma Operating Expense per B&O (concept store, 1,400 sq. ft.) | | | | | | | | | |
| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | | |
| Pro Forma Operating Expense (Excl. Depreciation) | 483,020 | 493,756 | 540,423 | 574,998 | 608,029 | 638,313 | 648,247 | | |

| Assumed Operating Expense for New Stores | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| Revenue | 850,000 | 1,360,000 | 1,904,000 | 2,284,800 | 2,627,520 | 2,890,272 | 3,063,688 | 3,216,873 | 3,313,379 |
| Operating Expense [1] | 480,000 | 500,000 | 600,000 | 618,000 | 636,540 | 655,636 | 675,305 | 695,564 | 716,431 |
| % Change from Prior Year | | 4.2% | 20.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |

[1] Year 1 cost estimated to equal approximate pro forma costs for years 1 and 2, and to reach approximate cost for San Francisco for year 3 (greater of pro forma or San Francisco). Costs increased by 3% thereafter/ Note: estimated costs are generally similar to if somewhat higher than the above pro forma costs.

[d] See calculation below.

| Year | Capital Expenditures [1] | | | | Depreciation (5-Year Straight Line) | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | San Jose | Palo Alto | Total | | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | Term Yr |
| ### | 210,000 | | 210,000 | 2024 | 42,000 | 42,000 | 42,000 | 42,000 | 42,000 | | | |
| ### | 12,000 | 210,000 | 222,000 | 2025 | | 44,400 | 44,400 | 44,400 | 44,400 | 44,400 | | |
| ### | 12,000 | 12,000 | 24,000 | 2026 | | | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 | |
| ### | 12,000 | 12,000 | 24,000 | 2027 | | | | 4,800 | 4,800 | 4,800 | 4,800 | 4,800 |
| ### | 12,000 | 12,000 | 24,000 | 2028 | | | | | 4,800 | 4,800 | 4,800 | 4,800 |
| ### | 12,000 | 12,000 | 24,000 | 2029 | | | | | | 4,800 | 4,800 | 4,800 |
| ### | 12,000 | 12,000 | 24,000 | 2030 | | | | | | | 4,800 | 4,800 |
| Term Yr | 12,000 | 12,000 | 24,000 | Term Yr | | | | | | | | 4,800 |
| | | | | Total | 42,000 | 86,400 | 91,200 | 96,000 | 100,800 | 63,600 | 24,000 | 24,000 |

[1] Initial capital expenditure taken from B&O pro forma for concept store, 1,400 sq. ft. Thereafter, lower capex (1/5 of total annual capex projected for 5 stores) in lost business value analysis) is projected.

[e] Combined state and federal tax rate.

[f] The Company's working capital requirements are forecast as a percent of sales; this calculation is presented below.

*Confidential - Attorneys' Eyes Only*

**EXHIBIT D-1**
**M&N LUXURY**
DISCOUNTED CASH FLOW METHOD -- VALUATION OF CONTRACT TO OPEN NEW STORES: SAN JOSE AND PALO ALTO
DATE OF VALUATION: 12/31/23

| | | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | Terminal Term. Yr. |
|---|---|---|---|---|---|---|---|---|---|
| Estimated Working Capital - Beginning Balance | [1] | 0 | 150,000 | 300,000 | 489,600 | 628,320 | 736,848 | 827,669 | 893,094 |
| Revenue (Annualized) | [2] | 850,000 | 2,210,000 | 3,264,000 | 4,188,800 | 4,912,320 | 5,517,792 | 5,953,960 | 6,280,561 |
| Working Capital Requirement as % of Net Sales | [3] | 17.65% | 13.57% | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% | 15.00% |
| Working Capital Requirement | [4] | 150,000 | 300,000 | 489,600 | 628,320 | 736,848 | 827,669 | 893,094 | 942,084 |
| Increase/(Decrease) in Working Capital | [5] | $150,000 | $150,000 | $189,600 | $138,720 | $108,528 | $90,821 | $65,425 | $48,990 |

[1] Assumes zero beginning balance. Thereafter equal to prior year's ending balance.
[2] Source: DCF projection.
[3] Amount for 2024 and 2025 estimated by dividing Working Capital Requirement by Revenue. Thereafter, equals approximate average percentage for 2024 and 2025.
[4] For 2023, amount equals display stock requirement per B&O pro forma for concept store, 1,400 sq. ft. Another amount is added in 2024 with addition of store #2. Thereafter equals revenue * working capital
[5] Working Capital Requirement, less Working Capital - Beginning Balance.

[g] Source: EXHIBIT D-2.
[h] Long-term growth rate somewhat higher than inflation rate is used for terminal year.
[i] Forecasted cash flow as of terminal year.
[j] The discount period equals the number of years from the date of value to the mid-point of the forecasted period in question.
[k] The present value factor is computed as 1/(1+k)^DP, where k is equal to the discount rate and DP equals the discount period.
[l] The present value of debt-free cash flow and the terminal value is computed by multiplying the debt-free cash flow or terminal value by the corresponding present value factor.
[m] The sum of the present values of interim cash flows and the terminal value equals Business Enterprise Value.
[n] No debt assumed, as capital expenditures are assumed fully incurred in the cash flow forecast.

**EXHIBIT D-2**

**M&N LUXURY**

DISCOUNT RATE CALCULATION - BUILD-UP METHOD

DATE OF VALUE: 12/31/23

| | | |
|---|---|---|
| Risk-Free Rate | [a] | 4.20% |
| Plus: Equity Risk Premium | [b] | 6.45% |
| Plus: Size Premium | [c] | 4.83% |
| Plus: Industry Risk Premium (Discount) | [d] | 1.74% |
| Plus: Firm-Specific Risk Premium | [e] | 8.00% |
| Equals: Cost of Equity | [f] | 25.22% |
| Rounded | | 25.00% |

[a] A 4.20% Risk Free Rate (RFR) was selected, representing the 20-Year Treasury Constant Maturity Rate available on 12/29/2023 at the Federal Reserve Bank.

[b] A 6.45% Equity Risk Premium (ERP) was selected, representing the Historical ERP calculated using the S&P 500 average annual return of 11.80% derived from CRSP data for the 1928 - 2023 period and a 5.36% 20-year T-Bond average annual return (Reconstructed) for the same

[c] A 4.83% Size Premium (SP) was selected. The Size Premium was based on CRSP decile 10 which included 735 firms with an equity market capitalization size ranging from $1,576,000 to $211,212,000 in Q4 2023. The CRSP decile 10 mean annual return reached 19.08% between 1928 and 2023. The mean annual return for the S&P 500 for the same period was 11.80%. The difference between the CRSP mean decile return and the S&P 500 mean return was adjusted by the beta of CRSP decile 10 of 1.38.

*Calculation:*

| | | | | | |
|---|---|---|---|---|---|
| Predicted Premium Based on Beta Alone: | | | | | |
| ERP * 10th Decile Beta = | 6.45% x | 1.39 = | 8.97% | | |
| Actual Observed Premium: | | | | | |
| Small Stock Return - Average Bond Yield = | 19.10% - | 5.37% = | 13.73% | | |
| Difference = | | | 4.76% | *Size Premium (difference from above due to rounding)* | |

[d] An implied 1.74% Industry Risk Premium (IRP) was calculated using an industry beta of 1.27 selected based on professional judgment. The 5-Year industry beta for 2023 US Specialty Retail was sourced from Salvidio & Partners and included 59 firms. Implied Industry Risk Premium = (Industry Beta * ERP) - ERP = (1.27 * 6.45%) - 6.45%.

*Confidential - Attorneys' Eyes Only*

**EXHIBIT D-2**

**M&N LUXURY**

DISCOUNT RATE CALCULATION - BUILD-UP METHOD

DATE OF VALUE: 12/31/23

[e] A 8.00% Company Specific Risk Premium (CSRP) was selected based on professional judgment.
Factors considered include the significantly small size of the business relative to public companies, level of competition in the retail industry, and the possibility that revenues and profits would not materialize as forecasted. These risk factors are mitigated by such positive factors as a highly recognized brand name (B&O), M&N management's track record of experience in the marketplace, and M&N's achievement of growing its B&O stores at rates that were in line or in excess of its 5-year business plan during 2018-2022 (see presentation titled "Bang & Olufsen: A California Success Story"). An additioal premium is appluied to account for risks and potential delays associated

[f] Sum of Risk-Free Rate, Equity Risk Premium, Size Premium, Industry Premium (Discount), and Firm-Specific Risk Premium.

*Confidential - Attorneys' Eyes Only*

# EXHIBIT 8

GROBSTEIN TEEPLE

# HOWARD B. GROBSTEIN

**Partner | CPA/CFF, CFE**

## Areas of Expertise

Practice focus in the following key areas:

- **Fraud Investigations** – Representation of fiduciaries and private parties in numerous and complex fraud cases with alleged losses ranging from $25,000 to approximately $1 billion. Representations include court appointed receivers, monitors, special masters, and private parties in regulatory, equity, and international matters.
- **Forensic Reconstructions** –Acts as forensic accountant in litigation and insolvency matters, reconstructing records related to disputes, litigation, fraudulent conveyances, solvency analyses, and other situations.
- **Litigation Consulting/Expert Witness** – Court Appointed/Stipulated Position consulting and/or expert witness in litigation cases and has testified at arbitration, deposition, and in federal and state courts.
- **Insolvency Matters** – Has acted as a chapter 7 and chapter 11 bankruptcy trustee and frequently serves as a post-confirmation liquidating trustee and has served as a Chapter 11 examiner and receiver in several cases; represents bankruptcy trustees, debtors, creditors, creditor committees, receivers, special masters, assignees, and attorneys in insolvency cases. Involved in numerous cases, most of which involved complex forensic or fraud related issues.
- **Neutral Accountant and Court's Own Expert** – Acts as the court appointed neutral accountant to resolve complicated accounting and financial disputes in state court actions. Has been appointed as the court's own expert as directed by federal bankruptcy judges in bankruptcy matters.
- **Fiduciary Positions** –Acted as provisional director, interim board member, liquidating trustee, receiver, partition referee, independent board member, chief restructuring officer (CRO), fractional/interim CFO, assignee for the benefit of creditors, Chapter 7 and Chapter 11 bankruptcy trustee, and responsible officer.
- **Fractional CFO/Controller** –Frequently acts as a fractional/interim CFO and controller for companies and organizations in need of temporary or long-term, part time assistance with financial and strategic oversight.

## Certifications and Licenses

- Certified Public Accountant
- Certified Fraud Examiner
- Certified Financial Forensics (AICPA)

## Education

- Bachelor of Science, Business Administration – Emphasis in Accounting
  California State University, Northridge, 1994

## Professional Affiliations

- Past Co-Chairperson of the California Receivers Forum (Los Angeles & Orange County); current member
- Past President of Los Angeles Bankruptcy Forum
- Past member of AICPA Task Force for drafting questions for the Certified in Financial Forensics Designation
- Member of Association of Certified Fraud Examiners
- Past Member of the Board of Directors and Past Treasurer of Turnaround Management Association
- Member of California Society of CPA's
- Member of American Institute of CPA's

## Speaking Engagements

- Participated in seminar for Association of Certified Fraud Examiners on the topic of Fraud Related to COVID 19
- Participated in seminar at California Receivers Forum on the topic The Accountant for the Court-Appointed Receiver.
- Presented a seminar to the Trustee Administrator's Group on searching for hidden assets in Chapter 7 proceedings.
- Participated in a seminar at California Receivers Forum on SEC Receiverships.
- Participated in a seminar at California Receivers Forum on Complex Receiverships.

## Publications

- *Fraud Casebook: Lessons* from *the Bad Side of Business*, July 2007. Co-authored chapter.
- *Reviving the Financially Distressed Business*, February 2019. Authored chapter.

## Civic and Community Activities

- Former member of the Board of Directors, former Treasurer, and Chairman of the Finance Committee of Heart of Los Angeles (HOLA), a non-profit organization providing after school programs and tutoring to inner-city youth.
- Founder and President of Cory Fights Back, a non-profit organization dedicated to raising funds for providing financial assistance to families dealing with ovarian cancer and funding research for early detection research related to ovarian cancer.

## Community Awards

- 2023, 2024, 2025 and 2026 named one of the top 100 accountants in Los Angeles by the Los Angeles Business Journal
- Finalist for Best Executive Director of an emerging non-profit by the Los Angeles Business Journal
- 40 Under 40 Award; San Fernando Valley Business Journal

# EXAMPLES OF EXPERIENCE

## Fiduciary Services

*(Chief Restructuring Officer, Receiver, Partition Referee, Bankruptcy Trustee / Liquidating Trustee, Assignee for the Benefit of Creditors, Examiner, etc.)*

- **Independent President, CEO and Liquidating Trustee** to Verity Health System (VHS Liquidating Trust) – Appointed as the Liquidating Trustee for VHS Liquidating Trust. Verity Health System owned and operated several hospitals in California and is the second largest hospital bankruptcy ever filed in the United States. Acting as President and Trustee to transition hospitals from Debtor to purchasers and to wind down all aspects of the operations and activities. Currently prosecuting 9-figure litigation against Blue Shield/ Blue Cross. Prosecuted and settled litigation claims against failed buyer for breach of contract. Prosecuting anti-trust lawsuit against Blue Shield/BlueCross. Negotiated and sold captive insurance company. Resolving avoidance actions with gross of over $500 million. Addressed litigation related to hospitals including over 150 medical malpractice, employee, and general liability claims. Worked closely with trust advisory board, hospital board and other constituents to effectively manage the terms of the plan of reorganization. Addressing dissolution of hospital entities, related foundations, and benefit plans. Evaluating and preparing final tax returns for the entities and benefit plans.
- **Chief Restructuring Officer** to William Jordan Investments, Inc. et. al. – Retained as Chief Restructuring Officer ("CRO") to run, oversee operations of, and wind down 26 entities in chapter 11. Businesses involved significant real estate holdings in numerous states throughout the country, deeds of trust, investments in operating businesses, and entitlement of raw land. Reconstructed books and records to determine amounts invested or loaned by creditors and members, monetized numerous assets in various states and stages including REO properties, commercial properties, notes receivable, and others. Worked with developers to entitle a high-end luxury assisted living facility for sale to third parties.
- **Chief Restructuring Officer** to Namco Capital Group, Inc. – Acted as Chief Restructuring Officer at the direction of the Official Committee of Unsecured Creditors. Analyzed and liquidated a portion of $2 billion in real estate holdings through approximately 100 different entities. Prepared bankruptcy schedules and Statement of Financial Affairs. Prepared monthly operating reports and met other court reporting requirements. Analyzed numerous real property assets to determine whether to liquidate, return to lender, or hold. Performed forensic investigation and financial activity of entities.
- **Chief Restructuring Officer** to Nationwide Beverage Bottling, Inc. – Acted as Chief Restructuring Officer for a water bottling plant in a chapter 11 proceeding. Increased production and sales by 300%, reduced costs and renegotiated certain expenses, restructured employee composition, and related salaries, negotiated sale of substantially all assets; investigated financial activity of debtor and insiders.

- **Independent Board Member** of a Movie and Experiential Production Company (subject to NDA) – Acted as independent board member to assist disputing partners with operational, financial and tax matters related to the company. Participated in regular board meetings, oversaw financial and operational matters by working with accounting and operational staff. Resolved disputes between two board members/owners.
- **Chief Restructuring Officer** to Tarzana Plaza Community Association – Acted as the Chief Restructuring Officer of the homeowners Association for a 100-unit condominium complex. Addressed litigation against prior board members for potential defalcations and breach of fiduciary duty; Managed necessary repairs, maintenance and budgeting.
- **Receiver** in the matter of MUFG Union Bank v. NMA, et al. – Appointed by the Superior Court of California as the Receiver of National Merchants Association, a significant credit card processing company, and other related entities (approximately $800,000 in processed transactions per day). Operated business for approximately one year. Negotiated agreements with boarding bank, negotiated settlement between Plaintiff, Defendant, and receivership to resolve disputed issues and provide payment to the bank. Prepared forensic accounting regarding improper transactions alleged by Plaintiff MUFG Union Bank asserted against Defendant NMA.
- **Receiver** in the matter of MBMJ Capital LLC v. Sabemos Beverages, LLC, et al. – Appointed by the Superior Court of California as the Receiver of Sabemos Beverages, LLC, a liquor distributor. Wound down operations, negotiated transactions with warehouses regarding unpaid rent. Prepared forensic accounting related to alleged improper transactions by officers and directors.
- **Chapter 11 Trustee and Liquidating Trustee** to Kendall Frozen Fruits – Appointed as Chapter 11 Trustee to operate frozen berry distributor. Managed complete operations for approximately one year and a half. Negotiated exit of one shareholder; oversaw ordering, sales, employees, and all operations. Prepared monthly operating reports to report to the OUST, prepared corporate tax returns, negotiated terms of plan and disclosure statement, successfully reorganized case with projected 100% payout to unsecured creditors. (Bond Posted)
- **Chapter 11 & 7 Trustee** for Irontrac – Appointed as Chapter 7 Trustee to wind down and liquidate heavy equipment owner/lessor. Took possession of inventory of heavy equipment and conducted auction through Ritchie Brothers. Prepared forensic reconstruction of transactions between the Debtor and related entities/individuals. Reconstructed accounts receivable and commenced litigation, as necessary. Performed avoidance action analysis and commenced litigation against appropriate parties. Prepared necessary tax filings.
- **Liquidating Trustee** to New Meatco Liquidating Trust – Appointed as Liquidating Trustee. Entity was a mass wholesale distributor of meat and seafood products. Prosecuted D&O claims and recovered in excess of $7 million. Prosecuted preference and insider claims in excess of $1 million.
- **Liquidating Trustee** to Gospel Light Liquidating Trust – Appointed as Liquidating Trustee. Entity was a publisher of religious books. Case involved analysis of financial records to determine potential actions against insiders and potential preference recipients.
- **Liquidating Trust**ee – Appointed as Liquidating Trustee of LFI liquidating Trust. Prior to the trust being formed, the entities were the subject of a regulatory receivership entitled SEC v. Carver. The trust was created to preserve potential value in highly speculative investments in biotech firms. As trustee, liquidated millions in stock for the benefit of creditors.

- **Chapter 7 trustee** – Appointed as Chapter 7 Trustee for Meteor Games. Entity developed video game applications for use on smartphones and other devices. Reconstructed financial records in order to identify and trace the fraudulent use of company capital and assets for the benefit of principles and insiders. Commenced litigation against insiders and ultimately settled claims for the benefit of creditors.
- **Chapter 11 Trustee** for Diamond Decisions, Inc. –An apparel manufacturing and distribution company. Discovered potential fraudulent investment scheme involving approximately $40 million. Performed forensic reconstruction of financial records for purposes of analyzing potential fraudulent conveyances, potential preferential transfers, and other causes of action. Made criminal referral to the Department of Justice resulting in incarceration of the company's owner.
- **Chapter 11 Trustee** for Welded Fixtures – Appointed as Chapter 11 trustee for welding manufacturing and fabrication company. Operated business for several months, prepared projections and budget to actual analyses on regular basis in order to maintain operations. Negotiated settlement with principal which resulted in payment in full to all creditors. Case was subsequently dismissed.
- **Chapter 11 Trustee** for DIVA Systems Corporation – Appointed as Chapter 11 trustee of company which held a significant library of intellectual property related to video on demand and interactive program guide. Prosecuted litigation against proposed purchaser of assets who backed out of transaction immediately prior to plan confirmation. Negotiated a settlement with the defendant wherein the estate received $39.5 million (approximately 1.5 million more than lawsuit). Sold intellectual property and other assets. Successfully confirmed a plan of liquidation and was appointed as Liquidating Agent.
- **Chapter 11 Trustee** for EonXchange, LLC – Appointed as Chapter 11 trustee for an emissions credits brokerage and optimal transaction software creator. The case involved an entity, its three wholly owned subsidiaries and their managing member. Successfully substantively consolidated three related subsidiaries into the bankruptcy estate and succeeded by stipulation to entirely substantively consolidate the managing member (an individual) into the Debtor's estate. Negotiated the liquidation of two multi-million-dollar pieces of real estate. Performed extensive fraud and forensic investigation used for litigation and prosecution by U.S. Attorney. Referred fraudulent activity to US Attorney resulting in indictment and guilty plea of managing member.
- **Chapter 11 Examiner** of optometry business– Appointed as Examiner for medical practice. Evaluated operations of the debtor including a review of the assets, liabilities, revenues, and expenses for several year period of activity. Evaluated transactions between the debtor and related parties and provided a report to the United States Trustee and the Bankruptcy Court.
- **Chapter 11 Examiner** – Appointed as Examiner in a case involving a garbage disposal company. Conducted forensic analysis in an extremely short period of time and provided report to United States Trustee recommending appointment of a trustee.
- **Chapter 11 Examiner** – Appointed as Examiner in the matter of ChineseInvestors.com. The case involved a company that raised funds from investors and lenders to build an investment website requiring subscriptions. The Debtor maintained operations in the US and China. Investigated transactions related to loans, investments, disbursements, and transfers. Drafted report and recommended the appointment of a trustee. The Court concurred and a trustee was appointed.

## Court Appointed/Stipulated Positions

- **Partition Referee** – Acted as Court appointed partition referee in dispute involving family members who commonly owned a commercial property. Negotiated a settlement among the parties involving the liquidation of the asset and allocation of proceeds.
- **Partition Referee** – Sheldon F. Bergen, et. al., v. Bernard P. Richman – Acted as Court appointed partition referee in dispute involving a family residence. Sold family residence and distributed proceeds pursuant to Court's order.
- **Partition Referee** – FB Ventura Blvd., LLC – Currently acting as partition referee in dispute between partners. Recently sold commercial bank building owned by the partnership for approximately $12 million.
- **Neutral Accountant** in State Court Dispute – Appointed by Superior Court judge as neutral accountant to resolve post-closing working capital dispute related to an entertainment company.
- **Neutral Accountant** in State Court Dispute – Appointed by Superior Court Judge as neutral accountant to resolve business dispute between two shareholders of computer component company. Issues included alleged diversion of corporate assets, diversion of corporate opportunity, reconstruction of allegedly destroyed accounting records, analysis of tax implications of transactions, and analysis of business operations. Neutral accountant prepared an extensive report on findings and testified at multi-day trial.
- **Neutral Accountant** in State Court Dispute – Selected and Appointed by State Court Judge to act as neutral accountant to resolve business dispute between a medical practitioner and management company. Reconstructed financial records for several years. Analyzed alleged embezzlement of funds for personal use by a management company. Analyzed transactions and related them to management contract to identify potential improprieties. Traced financial activities through accounting records and banking information. Prepared extensive and detailed report on findings.
- **Neutral Accountant** in State Court Dispute – Stipulated neutral accountant to resolve dispute between partners involving several real estate companies holding numerous commercial real estate properties. Reconstructed and evaluated receipts, disbursements, distributions, tax implications and other matters related to approximately 13 properties covering a 13-year period of time.
- **Assignee for the Benefit of Creditors** – Acted as the assignee for the benefit for creditors for a meat distribution company. Obtained valuation of assets, conducted auction of all personal property, negotiated settlements with insiders, litigated receivables and other actions with third parties, prepared tax returns.
- **Assignee for the Benefit of Creditors** – Acting as assignee for the benefit of creditors for an advertising company. Obtained valuation of assets, negotiated settlement of insider claims, conducted claims process, liquidating real property out of state, addressing tax issues related to assignment, collecting receivables.
- **Successor Trustee** – Designated as successor trustee in estate by three feuding siblings. Marketed and sold large commercial retail property in Texas. Prepared required court and tax documents for trust and distributed funds.

- **Disbursing Agent** for E-Styles –Retained jointly by Debtor and Creditor Committee of a company that sold baby and child development toys and products. Worked with administrator to reconcile bifurcation of pre- and post- petition accounts payable. Reconciled true-up amounts related to sale of assets pursuant to bankruptcy order. Reconstructed financial activity to prepare income, sales, and payroll tax returns. Preparation of avoidance action analyses. Appointed as post-confirmation disbursing agent.

## Fractional CFO/Controller Positions

- **Fractional CFO** for California State University, Dominguez Hills **–** Retained and acted as the fractional CFO for the California State University, Dominguez Hills for approximately one year. Acted as the entire accounting function for the university's foundation which is responsible for almost all financial aspects of the university including, but not limited to, the Dignity Health Center (former home to the Galaxy and Chargers), student union, bookstores, parking, Philanthropic Foundation, and food services. Prepared departmental budgets, budget-to-actual analyses, maintained general ledgers and monthly reporting, analyzed specific contemplated development projects, reconstructed, and analyzed philanthropic activities going back 10 years, participated in university board meetings to provide updates on activities, assisted with retention of permanent accounting department, prepared, and presented closing report.
- **Fractional controller** for Infinity Capital – Retained for hard money lender for approximately one year. Analyzed all existing loans, managed day-to-day operations, oversaw management of firm, collections, accounts payable, bank reconciliations, new loan transactions and assisted with negotiations of disposition of business.
- **Fractional CFO** for Youth Policy Institute – Provided services to non-profit organization to assist with wind down of operations. Managed daily operations, general ledger, communications with lenders and ultimate filing of bankruptcy.
- **Fractional CFO** for Confidential Non-Profit – Acted as fractional CFO for legal services non-profit firm due to sudden departure of CFO with no notice. Maintained daily operations including, donations, accounts payable, general ledger, fundraising, and payroll. Met daily with executive director to provide operational updates. Participated in board meetings to provide financial reports and updates. Assisted with retention of permanent CFO.
- **Fractional CFO** for Confidential Non-Profit – Acted as fractional CFO to youth services non-profit organization. Assisting with high- level strategic planning issues. Participate in finance committee meetings and board meetings to assist with financial reporting.

## Services Provided to Fiduciaries

*(Receivers, Trustees, Special Masters, Monitors, and Provisional Directors)*

- **Forensic accountant to equity receiver** in Lehman Brothers Bank FSB v. Beverly Hills Estates Funding et al. –to reconstruct books and records related to fraud against lenders in mortgage borrowing scheme wherein defendants provided inflated values of home sales/purchases in order to obtain inflated loans. Created databases and custom reports containing thousands of data lines to reflect incoming and outgoing sources of funds. Traced flow of funds in convoluted scheme

involving over 40 entities and individuals and over 350 different bank accounts covering a four-year period of time. Prepared detailed flow charts and narrative analyses tracing flow of funds. Successfully traced lender's funds to the fraudulent acquisition of numerous assets including homes, vehicles, aircraft, artwork, and wine.

- **Forensic Accountant to court appointed Monitor** in Mattel v. MGA –. Retained to assist the monitor with analyzing monthly net income reporting and inventory balances on a global basis. Analyzed stand-alone accounting offices in numerous locations worldwide including throughout Europe and parts of Asia. Analyzed internal controls and reliability of financial reporting and provided reports on findings to court appointed Monitor. Evaluated monthly reporting and conducted testing for accuracy. Provided consulting to court appointed Monitor on disputed accounting issues.
- **Accountant and Operational Manager to court appointed receiver** in Schrage v. Schrage – Shareholder Dispute. Dispute involving the operation, wind down and sale of four large car dealerships with annual revenues in excess of $300 million per year. Evaluated operations, closed unprofitable business centers, operated the daily operations until sales took place, negotiated with auto manufacturers, secured and unsecured creditors, auto finance companies, evaluated flooring issues, prepared monthly financial reports, addressed customer purchase issues, and evaluated insurance matters. Additionally, determined tax implications of sales of dealerships and real property, managed numerous tax audits, and negotiated settlements with taxing authorities. Worked with Department of Labor on 401(k) wind down and resolutions.
- **Accountant to court appointed receiver** in SEC Regulatory Case – Reconstructed financial records for approximately 70 bank accounts covering an eight-year period of time to identify assets for liquidation by the receiver, potential fraudulent activity, sources of funds and investor identities, determine uses of funds and potential fraudulent transfers, and analyze tax implications of potential fraud scheme. Assisting various federal agencies with investigation into activities of defendants.
- **Accountant to court appointed receiver** in SEC Regulatory Case – Reconstructed financial books and records to demonstrate existence of a fraud scheme committed against unsuspecting investors. Created relational database to report financial activities of investors including approximately 35,000 banking transactions. Prepared reports reflecting funds traced in and out of bank accounts in order for Receiver and counsel to pursue claims. Resolved complex tax issues and assisted with negotiation of resolution to tax claims filed against receivership estate.
- **Accountant to court appointed receiver** in SEC Regulatory Case –Reconstructed financial records related to potential fraudulent investment scheme with multiple locations throughout the United States. Traced funds through numerous bank accounts and prepared relational database to generate custom reports reflecting sources and uses of funds and analyzing potential domestic and international fraudulent transfers.
- **Accountant to court appointed equity receiver** for Wickes Furniture & Master Design, Inc. –of the parent company of a large, nationwide furniture retailer and sister company. Reconstructed significant international transactions involving related party companies in Taiwan, Cayman Islands and China, including inter-company loans and transfers of funds in excess of $46 million. Assisted with operations of affiliated entities. Negotiations of forbearance agreements for secured creditors involved. Provided extensive accounting and tax consultation to the receiver, attorneys,

and investment bankers with regard to the sales of two large companies with total transaction values exceeding $200 million. Coordinated financial statement audit of affiliates and consolidated US Parent Corporation. Prepared consolidated group tax returns for federal and multi-state filings for several years. Identified and recovered tax refunds previously unidentified by big 4 accounting firm exceeding $11 million.

- **Forensic accountant retained by receiver** In Re: State of California v. Daniel Gossai –Regulatory action to recover and reconstruct books and records related to an alleged fraud against the People of the State of California involving a false high school diploma program preying on foreign immigrants. Reviewed financial records, traced sources and uses of funds, and provided relevant information to receiver and the Office of the Attorney General. A database was created in order to maintain all transactions and generate information-specific custom reports.
- **Accountant to Chapter 7 Trustee** for Indymac Bancorp –Conducted forensic analysis and manage tax issues. Reconstructed financial activity between debtor and FDIC seized subsidiary – Indymac Bank N.A. Compiled financial information on potential insider and preferential payment transactions. Managed preparation of complex tax returns including carryback claims. Managed tax issues including analysis of worthless stock deduction, IRS audits and dispute with FDIC regarding substantial refunds.
- **Accountant to Chapter 11 trustee** for Marion "Suge" Knight / Death Row Records –in the Knight case and special accountant to the Chapter 11 Trustee in the Death Row Records case. Conducted royalty audits to determine whether amounts were due to bankruptcy estates for both cases. Reviewed initial recording and other contracts and prepared damage analyses. Assisted with complex tax issues and negotiations of settlement of IRS claims. Assisted with preparation of avoidance action analysis.
- **Accountant to Chapter 11 trustee** in Smith & Sons, Inc. (APT Ambulance & APT Medical) – Operating ambulance companies. Successfully testified as expert witness on behalf of trustee on the issue of substantively consolidating non-debtor corporations into bankruptcy estate. Created accounting system to accurately report results of operations. Prepared cash flow projections with continuous updates for purpose of assisting trustee with preparation of plan of reorganization. Analyzed tax effects of plan of reorganization.
- **Accountant to Chapter 11 trustee and then Chapter 11 liquidating trustee as forensic accountant** for Powerlift Corporation –Bankruptcy proceeding involving large commercial equipment leasing company. Engagement involved preparing cash flow projections, evaluating operations, analyzing leasing agreements with customers, negotiating settlements of outstanding leases, preparing tax returns, and analyzing unusual transactions between company and insiders.
- **Accountant and Financial Advisor to Chapter 7 Trustee** for Brea Community Hospital – Reconstructed incomplete accounting records to provide accounting, tax and litigation support services to trustee and counsel. Analyzed fraudulent conveyance of multi-million-dollar real property and assisted counsel with solvency and litigation support issues.
- **Accountant and Financial Advisor to Chapter 7 Trustee** for Century City Doctors Hospital –for liquidating hospital. Removed, managed, and maintained four server towers containing commingled financial and patient medical records for two years. Established protocol for security and privacy of medical information. Responded to subpoenas and requests for medical records.

Conducted investigation into potential insider and preferential payments. Prepared solvency and fraudulent conveyance analyses. Prepared officer compensation study. Completed tax returns on an annual basis and issued K-1s to approximately 400 members.

- **Accountant to Chapter 11 and Chapter 7 Trustee** for Granada Hills Community Hospital – Prepared cash flow projections to determine viability of operation. Prepared financial wind down plan in order to cease operations. Prepared analysis of use of loan proceeds as part of fraud investigation. Prepared analysis related to factored receivables involving dispute with secured creditor. Prepared weekly budget to actual analysis for use of cash collateral.
- **Accountant and Financial Advisor to Chapter 7 Trustee** for APX Holdings, LLC et al. –Logistics and shipping company. Prepared potential preference analysis involving gross preferences totaling approximately $165 million. Prepared tax returns involving approximately 15 related companies filing tax returns in 20 different states.

## Forensic, Litigation Consulting, & Expert Witness Matters

- **Forensic Accountant** to Educational Software Company – Retained to investigate potential embezzlement and alleged fraudulent activity by former CFO. Worked closely with the CEO, new CFO and counsel to determine whether the former CFO entered into transactions that were for his personal benefit at the expense of the company. GT obtained electronic ledgers and extracted relevant data which was then analyzed to determine the nature and purpose of thousands of transactions. GT prepared a report on its findings.
- **Forensic Accountant** for Non-Profit Organization (Confidential) – Engaged to identify and quantify embezzlement of approximately $1.7 million by accounts receivable clerk. Conducted a fraud investigation. Prepared a custom database and analyzed daily transactions in order to quantify defalcation. Prepared detailed report on findings for insurance purposes, which resulted in maximum recovery of insurance proceeds on policy. Suspect was sentenced to ten years in prison and deportation.
- **Forensic Accountant** in SunCal Management – Retained by bankruptcy trustee in large real esetate company to analyze alter-ego and insolvency issues. Debtor was a substantial land and property developer. The trustee alleges that millions of dollars passed between the management company and related single purpose entities. Reconstructed financial records, traced funds between entities and prepared expert report. Depositions and trial are pending.
- **Forensic Accountant** in Divorce Proceeding – Retained to conduct forensic accounting and valuations of businesses (mortgage and lending businesses) owned by community and separately. Prepared forensic tracing. Valued several businesses. Determined monthly income, expenses and prepared declarations regarding spousal and child support.
- **Forensic Accountant** in Divorce Proceeding - Retained to conduct forensic accounting and valuations of businesses (Coffee manufacturing, wholesale, and retail businesses) owned by community and separately. Prepared forensic tracing. Valued several businesses. Determined monthly income, expenses and prepared declarations regarding spousal and child support.

- **Forensic Accountant** for Private university to investigate diversion of grant funds for unauthorized purposes and administration of same. Traced receipts and disbursements, reviewed administrative roles related to management of funds, calculated damages as a result of the misappropriations, prepared report on findings regarding source and use of funds and mismanagement pursuant to terms of contracts.
- **Forensic Accountant** retained by a major film and television studio to investigate alleged improper diversion of funds by retained management company. Reconstructed multiple years of financial activity and calculated damages due to management company's embezzlements. Testified at deposition on findings.
- **Forensic Accountant** engaged by apparel company to determine damages related to a breach of contract by foreign supplier. Reviewed contractual agreements between supplier and client, identified time of breach of contract and prepared damage calculations based on a determination of sales that likely would have occurred had the contract not been breached. Case settled.
- **Forensic Accountant** engaged by multi-billion-dollar real estate fund to evaluate terms of contract with venture partner. Evaluated transactions related to approximately seven commercial rental buildings. Project included identifying improper transactions and preparing a report on damages resulting from improper reporting of certain expenses.
- **Forensic Accountant** engaged by bank to investigate alleged improper inter-account transfers and embezzled transactions involving 80 different bank accounts under numerous different account names controlled by one person. Reconstructed the activity using source documentation including banking records. Created a tracing analysis and reports identifying particular transactions as requested by counsel. Testified at deposition.
- **Forensic Accountant** engaged by escrow insurer to analyze activity involving the alleged illicit activity taking place in escrow accounts. Prepared a reconstruction and generated reports identifying the disposition of funds.
- **Forensic Accountant** to Secured Creditor Regarding Lender/Borrower Dispute – Retained by secured creditor to analyze rent rolls and expenses for a shopping mall in order to determine whether the borrower was misappropriating funds or mismanaging the property which resulted in a default on the loan.
- **Forensic Accountant** to Secured Creditor Regarding Lender/Borrower Dispute – Retained by secured creditors with loan in excess of $500 million to trace proceeds of loan to determine whether borrower properly utilized cash collateral for property. Traced funds for numerous multi-million-dollar advances from lender through ledgers and banking information to determine disposition of funds. Reported findings to lender.
- **Forensic Accountant** in Re: Zengen, Inc. v. Comerica Bank – Provided forensic consulting on behalf of bank related to monies that were allegedly fraudulently withdrawn or transferred by an officer of the plaintiff's corporation. Analyzed source documents including bank statements, canceled checks, wire notices and other transactions. Traced receipts and disbursements and ultimate disposition of alleged misappropriated funds and reported findings to counsel.

- **Forensic Accountant** in Re: I-Haeng Huh v. California Bank & Trust – Retained by counsel for the bank to reconstruct financial activity in 35 bank accounts held at the Defendant in order to determine whether such funds were misappropriated. Traced deposits from foreign accounts to the local bank accounts, reconstructed disbursement activity utilizing source documentation, and prepared detailed reports summarizing findings.
- **Forensic Accountant** for AT&T Wireless Services, Inc. – Employed for the purpose of conducting agreed-upon procedures to determine violation of dealer contract terms. Services involved evaluation of contracts entered into between AT&T and major distributors and identifying breaches of the agreement and quantify damages. Determined inventory sold by client to dealers who allegedly disposed of inventory in a manner inconsistent with contract terms. Prepared damage calculations and reports on findings. Testified at Deposition.
- **Forensic Accountant** for Ameriquest Financial, Inc. – Engaged by counsel for lender to analyze financial effects of loan made to borrower and foreclosure on property. Analyzed loan history of borrower consisting of nine different loans. Prepared expert report and exhibits.
- **Forensic Accountant** in Re: Easy Riders, Inc. – Engaged by liquidating trustee to analyze potential preference and fraudulent conveyance transactions. Utilized tracing techniques related to transfers of funds from related entities. Analyzed ordinary course of business between debtor and creditor. Analyzed accounting and tax treatment of debt as it related to issues pertaining to the potential fraudulent conveyance. Prepared expert report and testified in U.S. Bankruptcy Court.
- **Forensic Accountant** in Re: Markley v. Stearns – Engaged by Court-Appointed Special Master in a dispute involving several members of related LLCs with worldwide real estate holdings. Evaluated the relationship of the accountant to the LLCs for alleged improper activity and prepared report on findings. Testified at deposition.
- **Special Litigation Accountant** to White Collar Criminal Attorney - Reconstructed financial books and records for individual and related corporations for eight years in order for defendant to properly report financial activities to taxing authorities. Involved the analysis and reconstruction of thousands of transactions. Worked closely with criminal counsel to determine reporting requirements of authorities.
- **Forensic Accountant** for Warner-Chappel Music – Employed by creditor as expert witness to evaluate and adjust balance sheet provided by debtor to creditor in order to obtain credit of almost $4 million. Analyzed balance sheet, prepared adjustments based on analysis of documents. Testified in U.S. Bankruptcy Court regarding material misstatements identified.
- **Chapter 7 and Chapter 11 Trustee representations** – As the accountant to numerous trustees (chapter 7 and chapter 11), prepared dozens of insolvency analyses and corresponding expert reports. Reconstructed records and prepared book to market value adjustments.

## Creditor & Debtor Representations

- **Accountant and Financial Advisor to Debtor** First Federal Financial Corp., the parent company of a community bank seized by the FDIC. Managing preparation of complex tax returns including carryback claims. Managed tax issues including analysis of worthless stock deduction, IRS audits and dispute with FDIC regarding substantial refunds.

- **Accountant and Financial Advisor to Debtor** Harrington West Financial Group, Inc. –, the parent company of a community bank seized by the FDIC. Managing preparation of complex tax returns including carryback claims. Managed tax issues including analysis of worthless stock deduction, IRS audits and dispute with FDIC regarding substantial refunds.
- **Accountant and Financial advisor** to Creditors Committee for PPA Holdings, LLC – Performed financial advisory services for the Official Committee of Unsecured Creditors. Prepared cash flow projections for numerous entities holding income generating real estate, working closely with committee and counsel to analyze Debtor expenses on a monthly basis.
- **Accountant and Financial Advisory to Creditor Committee** in Re: Fatburger – Retained by the Official Committee of Unsecured Creditors to perform forensic analyses pertaining to the Debtor's pre- and post-petition operations of the owner of numerous fast food burger outlets.
- **Accountant and Financial Advisory to Creditor Committee** Custom Food Products, Inc. – Engaged by the Unsecured Creditors Committee and Bondholders Committee to analyze officer compensation, debt and equity restructuring and preferential payments. Provided in-depth industry study on comparable officer compensation. Worked with debtor-in-possession and financial advisors to evaluate proposals for debt and equity restructuring totaling in excess of $100 million. Performed potential preference analysis with total payments exceeding $26 million.
- **Accountant & Financial Advisor jointly retained by Debtor and Creditor Committee** for Franchise Pictures, Inc. – Accountant to Debtor-in-Possession & Unsecured Creditor Committee for Film Production Company. Engaged as forensic accountant to evaluate transactions between numerous related parties. Extracted data from computer system and analyzed transactions. Evaluated film and production related costs as part of film library valuation.

## Summary of Testifying Experience

- Smith & Sons, Inc. – United States Bankruptcy Court - Testified as expert witness in the Central District of California on behalf of a Chapter 11 trustee on the issue of substantively consolidating non-debtor corporations into the bankruptcy estate. Prepared analyses indicating that the finances of the Debtor and those of the two non-Debtor entities were so entangled that to untangle them would have been impossible or cost prohibitive.
- Warner-Chappel Music v. Stephen Call – United States Bankruptcy Court – Engaged by creditor to prepare expert report on evaluation of a balance sheet prepared by Debtor, which was used to obtain credit of approximately $4 million. Reconstructed balance sheet of individual and prepared all required adjustments. Testified in the Northern Division of the Central District of California on findings.
- Markley v. Stearns – Superior Court of California, Los Angeles – Engaged by Special Master to evaluate transactions between a group of related LLCs and their accountant. Testified at deposition regarding multi-million-dollar loan transactions and the related interest charges between the accountant and his clients.
- AT&T Wireless Services, Inc. v. Worldwide Wireless, Inc. – Superior Court of California, San Diego – Engaged by corporation to identify fraudulent use and transfer of inventory in order to benefit from incentive program. Testified at arbitration on findings.

- Easy Riders, Inc. – United States Bankruptcy Court – Engaged by liquidating trustee to analyze certain aspects of potential preference and fraudulent conveyance transactions. Employed tracing techniques related to transfers of funds from related entities. Analyzed ordinary course of business between debtor and creditor. Analyzed accounting and tax treatment of debt as it related to issues pertaining to the potential fraudulent conveyance. Prepared expert report and testified at deposition in U.S. Bankruptcy Court.
- Federal Grand Jury Testimony (July 2006) – Engaged by Office of the United States Attorney as summary witness in real estate fraud action. Reconstructed financial records, traced use of funds, and identified assets and specific transactions associated with illegal activity.
- Federal Grand Jury Testimony (March 2007) – Engaged by Office of the United States Attorney as summary witness in real estate fraud action. Reconstructed financial records, traced use of funds, and identified assets and specific transactions associated with illegal activity.
- United States of America v. Joseph Babajian et al. (July 2009) – Testified at Federal trial as summary witness on behalf of the United States of America. Reconstructed financial records, traced use of funds, and identified assets and specific transactions associated with illegal activity.
- Lavian v. Boodaie – Superior Court of California, Los Angeles (June 2010) – Testified as percipient witness regarding the existence of a potential Ponzi scheme in a large real estate investment company.
- Conrad Asher v. Rhinox – Superior Court of California, Los Angeles (February 2012) – Testified as arbitration hearing regarding damages related to contractual dispute and corporate opportunity involving licensing of products.
- Chalant II, LLC v. The Restful Group LP et al. – United States Bankruptcy Court (May 2013) – Testified as an expert witness for Creditors regarding reconstruction of financial activity and tracing of funds related to investments made, transfers between related parties, and disposition of funds.
- James H. Donell as Permanent Receiver for NewPoint Financial Services, Inc. v. Nixon Peabody LLP- Testified as percipient witness regarding reconstruction of financial records previously prepared.
- United States Bankruptcy Court, San Jose (May 2014) – Testified as an expert witness in the Northern District of California on behalf of a Debtor in a fraudulent transfer dispute with the Trustee. Reviewed documents provided and prepared analysis of the transfers. Testified at trial on the findings of the analysis.
- Superior Court of California, Los Angeles, (June 2014) – Engaged by financial institution as expert witness in embezzlement action. Reconstructed financial records, traced use of funds, and identified assets and specific transactions associated with illegal activity. Testified at deposition.
- LA Micro v. Frankel, Superior Court of California, Los Angeles, (November 2014 and December 2014) – Engaged at direction of Court as Neutral Accountant to resolve issues between parties involved in dispute associated with dissolution of business. Testified as Neutral Accountant over multiple days based on report on findings.

- Shim v. Min, Superior Court of California, Los Angeles, (June 2015) – Engaged by a court-appointed Receiver to evaluate the records of several entities to determine ownership percentages which were subject of dispute in a divorce proceeding. Testified as to the gross cash flows available for spousal support based upon outside valuations and cash flows of the various entities.
- Chanaz v. Chanaz, Superior Court of California, Los Angeles, (January 2016) – Engaged by Defendant as an expert witness in a partnership dispute involving multiple commercial buildings. Involved reconstructing income, expenses, contributions, and distributions to partners. Traced funds between business and personal bank accounts. Prepared expert report and testified at deposition.
- Third Street Partners, United States Bankruptcy Court, Los Angeles, (June 2016) – Acting as Chapter 7 Bankruptcy Trustee and testified as a percipient witness in a case brought by a creditor against the Debtor's principal.
- Dorothy Hamilburg, United States Bankruptcy Court, Santa Barbara, (April 2016 Deposition; July 2016 Trial) – Engaged as expert witness for Debtor-in-possession to testify on matters related to remainder estate valuation and life estate issues as they relate to alleged damages asserted by a creditor. Testified at deposition.
- United States Bankruptcy Court, Santa Ana, (June 2016) – Engaged by Chapter 7 Trustee and subpoenaed by the Office of the United States Trustee to testify on issues related to the OUST objection to discharge of Debtor. Reconstructed shipping and receiving information, inventory balances and wire transfers between the Debtor and alleged overseas vendors. Testified at deposition.
- L. Scott Apparel, United States Bankruptcy Court, Los Angeles, (August 2016) – Acting as Liquidating Trustee and testified at trial as a percipient witness in action against former member of Debtor for fraudulent transfer.
- Irvin v. Kelley, Superior Court of California, Los Angeles, (November 2016) – Engaged as expert witness by Plaintiff in shareholder dispute and corporate dissolution action. Reconstructed financial records related to embezzlement and theft of corporate opportunity by shareholders. Testified at deposition.
- Brittani Newman v. Knit Creations, Inc., Superior Court of California, Los Angeles (February 2018) – Engaged as expert witness by Plaintiff in dispute regarding alleged unpaid commissions by wholesale apparel manufacturer. Testified as to damages which included unpaid commissions, bonuses, travel and show expenses.
- [Confidential] Superior Court of California, Los Angeles (August 2018) – Engaged as expert witness by Defendant to opine on the net worth of an insurance company and its parent company.
- Oren Cohen vs. Avraham Hassid, et al., Superior Court of California, Los Angeles (August 2018 Deposition, September 2018 Deposition, September - October 2018 trial) – Engaged as expert witness by Defendant/Cross Complainant to analyze accounting records, trace funds, evaluate potential embezzlement, quantify potential theft of corporate opportunity, and calculate damages related to a partnership dispute involving real estate.

- Alona Hassid v. Eyal Cohen-Bashi, Superior Court of California, Los Angeles (January 2019 deposition) - Engaged as expert witness by Defendant/Cross Complainant to analyze accounting records, trace funds, evaluate potential embezzlement, quantify potential theft of corporate opportunity, and calculate damages related to a partnership dispute related to real estate.
- Tal Hassid v. Eyal Cohen-Bashi, Superior Court of California, Los Angeles (March 2019 and February 2020) – Engaged as expert witness by Defendant/Cross Complainant to analyze accounting records, trace funds, evaluate potential embezzlement, and quantify potential theft of corporate opportunity, and calculate damages related to partnership dispute involving garage door company.
- Seror v. Muennichow, United States Bankruptcy Court, San Fernando Valley Division (August 2019 trial) – Engaged as an expert witness for Chapter 7 trustee to analyze potential fraudulent transfers by Debtor. Testified at trial.
- Rho v. Bank of Hope, Superior Court of California, Los Angeles (August 2019) – Engaged as an expert witness by Defendant to testify on bank's obligations pursuant to trust agreement related to a visa scam perpetrated by a third party.
- Millennium Park Partners v, AvalonBay Communities, Superior Court of California, San Jose (November 2020) - Retained by Defendant to determine fund flow through waterfall calculation related to a development of apartments, condominiums, office building, infrastructure, and backbone. Testified at deposition. Case settled.
- BGM Pasadena LLC v. Pasadena Apts-7, LLC Superior Court of California, Los Angeles) – Testified at deposition and arbitration hearing on breach of agreement related to promissory notes.
- Riverside Christian School, US Bankruptcy Court, Riverside (January 2021) – Testified at deposition for the plaintiff on issues related to fraudulent transfer, breach of fiduciary duties and deepening insolvency. The Debtor was a Christian private school. The chapter 7 trustee commenced litigation against several insiders related to loans made and payments received by members of the board of directors.
- Morovati v. Morovati, Superior Court of California, Los Angeles (August 2021) - Testified at deposition and arbitration trial for plaintiff in a shareholder dispute regarding distributions, alleged conversion of assets, alleged false tax reporting and corresponding damages.
- Schecter v. Schecter, Superior Court of California, Los Angeles (December 2021) – Testified at deposition for defendants in an owner dispute regarding use of business funds for personal purposes.
- Sara DeRosa v. Viacomcbs Inc. et al., US District Court – Central District of California (June 2022) – Testified at deposition for plaintiff in a wage claim action.
- In re Hologenix, LLC, United States Bankruptcy Court, Los Angeles Division (August 2022 deposition and trial) – Engaged as an expert witness for Chapter 7 debtor to provide an expert opinion on Debtor's solvency as of certain dates and provide plan and best interest of creditors test consulting. Testified at deposition and trial.
- Vitality Health Plans, Inc. v. Sanjay Patil et. al. Superior Court of California, Orange County (April 2023) – Retained as an expert witness and testified at Arbitration hearing regarding alleged damages to a healthcare plan due to actions by a potential buyer of the plan.

- New Icon Inc. v. Daniel Kang et. al. – Superior Court of California, Riverside County. Retained as an expert witness in a dispute involving the solvency of a producer of apparel. GT determined the solvency at several points in time when multi-million-dollar distributions were made to members of the company. Testified at Deposition and trial.
- In re ThunderRoad Motorcycle Trust 2016-1 et. al. v. Vervent, Inc. et. al., Superior Court of California, Los Angeles (January 2024) – Engaged as expert witness to provide testimony on damages related to alleged mismanagement of loan portfolio by loan servicer. Testified at deposition.
- Providence Industries, LLC v. LuLaRoe, LLC et. al. Superior Court of California, Riverside County (August and October 2024) – Retained as expert witness and testified at deposition and trial regarding fraudulent transfers.
- Santa Anita Convalescent Hospital Center, Inc. et. al. v. Mildred DeCastro, Inc. et. al., Superior Court of California, Los Angeles (August 2025 and November 2025) – Engaged as an expert witness to provide rebuttal testimony regarding a billing dispute between two companies. Client prevailed.
- CS Bio Co. et. al. v. Comerica Bank, US District Court, California (October 2025) – Retained as an expert witness by defendant to testify on plaintiff's allegations of fraud, negligent misrepresentation, and promissory estoppel regarding a failed $13.6 million loan for construction.
- Nice Wave International Limited v. SF Prosperity 2, LLC, and Michael Tzu-Wen Wang, Superior Court of California, San Mateo County (November 2025) – Engaged as an expert witness to provide testimony regarding a dispute between entities involving the alleged improper use of investment proceeds and misappropriation of funds.

**PROOF OF SERVICE**

I, Kylie Green, declare:

I am a citizen of the United States and employed in San Francisco County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is DLA Piper LLP (US), 555 Mission Street, Suite 2400, San Francisco, California 94105. On May 1, 2026, I served a copy of the within document(s):

**PLAINTIFF'S EXPERT WITNESS DISCLOSURE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 26(A)(2), INCLUDING THE EXPERT REPORT OF HOWARD B. GROBSTEIN**

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, the United States mail at San Francisco, California addressed as set forth below.

☒ by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

Johnathan A. Coleman
K&L GATES LLP
10100 Santa Monica Blvd, 8th Floor
Los Angeles, CA 90067
Email: Chief.Coleman@klgates.com

*Attorneys for Defendant/Counterclaim Plaintiff*
*Bang & Olufsen America, Inc.*

Christopher S. Finnerty
Lindsay S. Bishop
John C. Blessington
Shaina M. Lefkowitz
K&L GATES LLP
One Congress Street, Suite 2900
Boston, MA 02114
Email: Chris.Finnerty@klgates.com
Lindsay.Bishop@klgates.com
John.Blessington@klgates.com
Shaina.Lefkowitz@klgates.com

*Attorneys for Defendant/Counterclaim Plaintiff*
*Bang & Olufsen America, Inc., Bang & Olufsen A/S, B&O Play A/S, Bang & Olufsen Operations A/S*

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on May 1, 2026, at San Francisco, California.

Kylie Green