*Confidential - Attorneys' Eyes Only*

# Expert Rebuttal Report of Howard B. Grobstein, CPA|CFF, CFE

**In Re: M&N LUXURY AV, LLC.,**
**a California limited liability company, Plaintiff**

**v.**

**BANG & OLUFSEN AMERICA INC., a Delaware corporation; BANG & OLUFSEN A/S, a Danish company; B&O PLAY A/S, a Danish company; BANG & OLUFSEN OPERATIONS A/S, a Danish company, Defendants**

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CASE NO.: 2:24-cv-02230-DSF-KES**

Expert Rebuttal Report of Howard B. Grobstein, CPA|CFF, CFE
June 1, 2026

EXHIBIT
tabbies
8

**EXHIBITS**

**EXHIBIT 1:** Framework Agreement

**EXHIBIT 2:** Crockett Report

**EXHIBIT 3:** Complaint

**EXHIBIT 4:** Counterclaims

**EXHIBIT 5:** M&N Sales Spreadsheet (MN_00069607)

**EXHIBIT 6:** M&N Inventory Master List (MN_0001187)

**EXHIBIT 7:** M&N Sales Spreadsheet with Geographic References (MN_00070387)

**EXHIBIT 8:** Keller, K.L. "Conceptualizing, Measuring, and Managing Customer-Based Brand Equity," Journal of Marketing 57, no. 1 (1993): pp. 1–22.

**EXHIBIT 9:** Everett, R.L. & Kinrich, J.H. "Lost Profits Damages: Principles, Methods, and Applications," 2nd ed. Valuation Products and Services (2022), pp. 69-78.

**EXHIBIT 10:** Dawar, N. & Pillutla, M.M. "Impact of Product-Harm Crises on Brand Equity," Journal of Marketing Research 37, no. 2 (2000): pp. 215-226.

**EXHIBIT 11:** Cleeren, van Heerde & Dekimpe, "Rising from the Ashes," Journal of Marketing 77(2) (2013), pp. 58-77.

**EXHIBIT 12:** Yu et al. "The Influence of Negative Publicity on Brand Equity: Attribution, Image, Attitude and Purchase Intention," Journal of Product & Brand Management (2018), pp. 440-451.

**EXHIBIT 13:** Curriculum Vitae of Howard B. Grobstein

## I. ENGAGEMENT DESCRIPTION

I, Howard B. Grobstein, through my accounting firm Grobstein Teeple LLP (herein collectively referred to as "GT," "We," or "Our"), was retained by DLA Piper LLP ("DLA") on behalf of its client M&N Luxury AV, LLC ("Client" and/or "M&N") to provide a rebuttal expert opinion in response to the expert opinion of B. Erin Crockett, Ph.D. ("Crockett" and "Crockett Report," respectively) of NERA Economic Consulting ("NERA"), made on behalf of Bang & Olufsen America, Inc., Bang and Olufsen A/S, B&O Play A/S, and Bang and Olufsen Operations A/S (herein collectively referred to as "B&O," "Defendants").

## II. LIMITING CONDITIONS

GT prepared this rebuttal report and related exhibits solely for the purposes of the engagement described above and, thus, this report should not be relied upon for any other purpose. We have not performed an audit, review, or examination, as defined by the American Institute of Certified Public Accountants, of any of the information relied upon in this report. This report may not be used for any other purpose without the express written consent of Howard B. Grobstein or an authorized designee of Grobstein Teeple LLP. Should additional information be presented, we retain the right to amend this report and exhibits.

## III. SUMMARY OF FINDINGS

Based on the documents and information received and reviewed by GT, and the analyses performed by GT and contained herein, GT expresses the following opinions:

1. The conclusions contained in the Crockett Report are unsubstantiated and speculative. They do not rise to the level of expert opinion, and the Crockett Report does not therefore amount to an expert damages report.
2. Crockett fails to provide the data, calculations, or assumptions necessary to understand how she arrived at her damages figures. Crockett presents insufficient information to enable replication or verification of her conclusions. Hence, her conclusions are not reliable.
3. The Crockett Report does not quantify, and offers no evidence to support, any of the alleged losses or compensatory (i.e., economic) damages claimed by B&O in its Counterclaims. Indeed, Crockett repeatedly claims (without basis) that these are impossible to quantify.
4. The only alleged damages Crockett seeks to quantify are liquidated damages under Section 16.2 of the Framework Agreement. These are not pleaded in the counterclaims and are tied solely to alleged brand damage to B&O. However, these alleged damages do not reasonably correlate to or compensate for any such damage evidenced by B&O, which is minimal, let alone the damage actually incurred (which M&N denies completely).
5. The Crockett Report's liquidated damages calculation is incorrect and flawed because: (1) it assumes all relevant sales by M&N were unauthorized; (2) it seeks to include sales which were commenced and, therefore, authorized, pre-termination; and (3) it is improperly based almost entirely on sales made within M&N's Territory, which are not subject to the liquidated damages provision in FA 16.2.

## IV. KEY DEFINED TERMS

All terms not expressly defined herein shall have the meaning contained in the GT Expert Report dated May 1, 2026.

## V. OVERALL APPROACH

In performing its work, GT reviewed and analyzed the following:

- Opening Expert Report Regarding Damages ("Crockett Report") submitted by B. Erin Crockett ("Crockett") dated May 1, 2026.
- Documents produced simultaneously with Crockett Report, including but not limited to:
  - Excel spreadsheet presenting M&N sales (MN_00069607).
  - Excel spreadsheet presenting MSRP amounts by product number (MN_00001187).
- Updated excel spreadsheet of MN_00069607 presenting M&N sales with geographic references (MN_00070387).
- Framework Agreement ("FA"), and in particular Section 16 ("Geographic Sales Boundary"), Section 16.2 ("Liquidated Damages"), and Schedule 3 ("Territory").
- Plaintiff's Second Amended Federal Complaint filed March 18, 2025.
- B&O's Answer to Plaintiff's Second Amended Complaint, Affirmative Defenses, and Amended Counterclaims filed May 30, 2025 ("Counterclaims").
- Communications with and information received from M&N management via telephone on March 5, 2026, March 12, 2026, and May 28, 2026.

We understand from the above-referenced pleadings and M&N's contentions in the case that:

- B&O improperly terminated the FA, and hence incorrectly characterized post-termination sales as unauthorized.
- The Liquidated Damages clause of Section 16 of the FA does not apply to any sales undertaken by M&N.

## VI. CASE BACKGROUND

Please refer to the case background in GT Expert Report dated May 1, 2026. Additional relevant information is presented below.

The Crockett Report does not offer any evidence of actual economic damage to B&O as a result of M&N's alleged actions. Indeed, Crockett does not even attempt to allege this. Crockett recites counsel's legal explanation of compensatory damages, but fails to offer any evidence, explanation, application, or analysis of such damages in this case. Rather, the sole basis on which the Crockett Report claims and calculates damages is under the Liquidated Damages provision in FA Section 16.2, which Crockett maintains is intended to compensate for brand damage to B&O. However, such damages are not pled in the Counterclaims.

Section 16 of Framework Agreement ("Geographic Sales Boundary")

Section 16.1 states: "Partner [M&N] may only sell and advertise for sale the Products within the Territory. B&O hereby expressly prohibits the Partner from soliciting of consummating sales outside the Territory without the express written approval of B&O."

16.2 is titled "Liquidated Damages." This section states:

> "For each occasion that Partner breaches provision 16 of this Agreement by engaging in the unauthorized sale of Products to any person or entity outside the Territory, in addition to all other remedies available to B&O under this Agreement and at law, Partner agrees to pay B&O, as liquidated damages and not as a penalty, the greater of the following amounts: **(i) the costs and fees associated with B&O's investigation and enforcement regarding the Partner's unauthorized sales; or (ii) five times (5x) the MSRP[1] of the Product(s) per unit of Product**. The parties agree that these damages are not punitive." (Emphasis added.)[2]

Crockett's conclusion that liquidated damages are applicable is based solely on legal conclusions provided by B&O's counsel. (Crockett Report, paragraph 30.) Crockett offers no independent evidence or analysis to support the application of liquidated damages in this case. Furthermore, Crockett offers no evidence to support an argument that liquidated damages are reasonable and proportionate in this case, rather this is merely assumed. Crockett fails to provide any evidence to rebut the argument that the liquidated damages provision and the application of liquidated damages in this case are unconscionable. Additionally, Crockett does not identify any "costs and fees associated with" any investigation or enforcement performed by B&O relating to sales by M&N. Rather, Crockett applies only the 5x MSRP formula.

B&O Counterclaims Against M&N

On May 30, 2025, B&O set forth in its Answer several counterclaims against M&N. Included in these were M&N's alleged violations of the FA. In Paragraph 92, the Answer states:

> "M&N materially breached the Framework Agreement by, inter alia, continuing to sell Bang & Olufsen products after termination in violation of Schedule 25, ¶ 1.1, continuing to use the Bang & Olufsen Marks after termination in violation of ¶ 14.1 of the Framework Agreement, and failing to abide by the terms of the confidentiality provision in violation of ¶¶ 17.1 and 17.2 of the Framework Agreement."

B&O claims various types of compensatory damages in its counterclaims. These include "direct, consequential, and incidental losses and lost profits" (Counterclaims, paragraphs 87 and 94), and "lost money...lost sales revenue, fees, and other costs" (Counterclaims, paragraph 106). Nowhere in its Counterclaims does B&O claim liquidated damages under Section 16 of the FA or otherwise. The Crockett Report does not attempt to quantify any actual direct, consequential, incidental losses, lost money, lost sales revenue, or other costs.

[1] Manufacturer's Suggested Retail Price.
[2] The liquidated damages clause is found only in Section 15 of the FA addressing transshipping (i.e., selling product for resale) and Section 16 of the FA addressing the Geographic Sales Boundary.

Calculation of Damages Allegedly Incurred by B&O per Crockett

The Crockett Report was issued on May 1, 2026. The objective was to "...to analyze what damages would be appropriate in the event that the Court finds M&N liable for the counterclaims brought by Bang & Olufsen."[3] Attached hereto as Exhibit 2 is the Crockett Report. Prior to Crockett's report, B&O had not pled entitlement to liquidated damages under the FA.

Crockett estimates these liquidated damages as follows:

> "Liquidated damages in this matter range from $11 million, based on products that M&N appears to have sold post-termination of the contract, to nearly $16 million, if liquidated damages are also available for sales where the "project commenced before termination." (Section II of the Crockett Report (Summary of Opinions).)

Based on the explanations in Crockett's report, and without the benefit of Crockett's underlying calculations (which have not been produced), Crockett has computed liquidated damages by: (1) taking a list of M&N's sales of B&O product produced by M&N, including both pre-and post-termination sales (MN_00069607 - attached as Exhibit 3); (2) ascribing an MSRP for each sale item (based on an inventory master list also produced by M&N, MN_0001187 - attached as Exhibit 4); (3) totaling up all MSRP line items; and (4) multiplying the results by five.

The Crockett Report contains no calculations that show either her allocation of MSRP values or the subtotals under Table 1. This is obviously problematic as it prevents GT from verifying her calculations, which are thus unreliable. For example, some of the categorized sales amounts in Table 1 under the column "M&N Sales" do not match the corresponding sales contained in document MN_00069607. Specifically:

- Sales in the "Closeout" category under the "M&N Sales" column in Table 1 amount to $1,646,384.83. However, according to MN_0069607, sales under this category total $1,638,859.13.[4]
- Sales in the "Project Commenced Before Termination" category under the "M&N Sales" column in Table 1 amount to $710,367.39. However, according to MN_0069607, sales under this category amount to total $692,370.39.[5]

---

[3] See Crockett Report, paragraph 13.
[4] $1,638,859.13 computed by filtering MN_0069607 under sales type "Closeout" and summing the "Sales Amount" column.
[5] $992,370.39 computed by filtering MN_0069607 under sales types "Project Commenced Pre-Aug. 15 2024" and "Pre-Termination Project commenced 6/24/2024," and summing the "Sales Amount" column.

Crockett's liquidated damages are presented in the below table (Crockett Report, paragraph 56).

**Table 1: Liquidated Damages by Sales Category**

| Sales Type | Units Sold | M&N Sales | Value at MSRP | Liquidated Damages |
|---|---|---|---|---|
| Closeout | 1,072 | $1,646,384.83 | $2,215,603.25 | $11,078,016.25 |
| Project Commenced Before Termination | 318 | $710,367.39 | $956,208.00 | $4,781,040.00 |
| Internal or Administrative | 24 | $8,652.67 | $14,206.00 | $71,030.00 |
| eBay | 11 | $3,890.01 | $5,077.01 | $25,385.05 |
| Anonymized | 11 | $2,217.00 | $3,541.00 | $17,705.00 |
| **TOTAL** | **1,436** | **$2,371,511.90** | **$3,194,635.26** | **$15,973,176.30** |

## VII. REBUTTAL TO EXPERT OPINIONS OF B. ERIN CROCKETT

The following are GT's rebuttals to Crockett's specific assumptions and damage calculations.

1. ***Crockett's conclusions are unsubstantiated, speculative, and not an expert damages opinion.***

The Crockett Report's "conclusions" consist of the following:

(1) Recitations of legal argument provided by B&O's counsel. For example:

> "I understand from counsel that post-termination sales constitute a breach of the Framework Agreement." (Crockett Report, paragraph 30.)
>
> "Counsel informs me that following Bang & Olufsen's termination of the Framework Agreement, every sale made by M&N would rightly constitute an unauthorized sale per provision 16." (Crockett Report, paragraph 30.)
>
> "[B]ut for post-termination breach, M&N's inventory of Bang & Olufsen products would have been returned to Bang & Olufsen for resale directly to consumers or through authorized resellers." (Crockett Report, paragraph 36.)

(2) Recitations of factual contentions from B&O's witnesses. For example:

> "I understand from Bang & Olufsen's Claus Homark Jensen, Senior Director of Finance and Commercial Operations EMEA and Americas, that Bang & Olufsen would have sold some or all of M&N's inventory either directly to consumers or through authorized resellers. I understand that one important reason that Bang & Olufsen sought to repurchase the

inventory from M&N and sell it through other channels is to maintain the value of the Bang & Olufsen brand." (Crockett Report, paragraph 37.)

"These policies are consistent with Bang & Olufsen's understanding that discounted prices can have an impact on brand value." (Crockett Report, paragraph 46.)

"I understand that significant discount pricing by a reseller such as M&N can negatively impact Bang & Olufsen and other authorized resellers." (Crockett Report, paragraph 47.)

"I understand that the consumer experience of purchasing Bang & Olufsen products is also important from a branding perspective." (Crockett Report, paragraph 48.)

"There are indicia of potential brand value diminishment that Bang & Olufsen has suffered due to M&N's actions, although it is difficult to reliably quantify those harms." (Crockett Report, paragraph 49.)

Crockett's conclusions lack any form of meaningful expert analysis and are merely arguments from B&O's witnesses and its counsel dressed up as expert evidence.

***2. Crockett fails to provide any supporting information for her damages calculations.***

See above section "Calculation of Damages Allegedly Incurred by B&O per Crockett" (page 5) for discussion. As the numbers within the Crockett Report cannot be replicated, the conclusions are insufficiently supported and cannot be relied upon as a measure of damages.

***3. The Crockett Report does not articulate any alleged economic damages.***

Crockett does not identify any actual economic loss (other than alleged, nebulous, and unquantified brand damage) that B&O has purportedly incurred as a result of M&N's alleged actions. Crockett recites the legal definition of expectation, loss and "reliance damages," but does not offer any evidence that such damages arise here. (Crockett Report, paragraph 34.) Based on this lack of evidence, it is therefore impossible to conclude that B&O has suffered any financial loss as a result of M&N's sales.

Crockett states in paragraph 36 of her report, "M&N's inventory of Bang and Olufsen's products would have been returned to Bang and Olufsen for resale directly to consumers through authorized resellers." This is incorrect. M&N was only required to resell its inventory back to B&O following an agreement (between M&N and B&O) on price. M&N was not required to return any product gratis. Following an agreement on price, resale of any remaining inventory to B&O, and onward sale, B&O would not have made any material additional profits. Moreover, neither Crockett nor B&O have sought to suggest any profit would arise either on repurchase from M&N or onward resale.

***4. The Crockett Report only asserts unpleaded liquidated damages tied solely to alleged brand damage to B&O and which do not reasonably correlate to or compensate for any such damage claimed (let alone incurred) by B&O.***

The only form of alleged damage on which Crockett seems to ground her calculation is purported and nebulous brand damage to B&O. Crockett maintains that the purpose of the Framework Agreement's liquidated damages clause is to compensate for brand damage which is allegedly difficult to quantify. The specific "indica of brand damage" that Crockett outlines are as follows: (1) B&O's alleged inability to

repurchase from M&N and sell it through other channels (Crockett Report, paragraph 37); (2) M&N selling product at a discounted rate (Crockett Report, paragraph 47); (3) sale by M&N of a limited number of products through eBay (Crockett Report, paragraph 47); and (4) two post-sale customer servicing issues (Crockett Report, paragraphs 41 and 42).

Crockett contends that these factors amount to "negative brand information" that could result in a negative attitude towards B&O and or purchase intention. However, Crockett offers no evidence or analysis of any negative impact on the B&O brand resulting from these factors. Indeed, Crockett performs none of the expected analyses that would typically be performed in assessing brand damage. When undertaking an expert analysis of brand damage, this process typically requires the following or similar procedures:

(1) Defining the alleged brand injury. This may entail identifying the characteristics of the specific brand asset allegedly harmed, which include the relevant customer population, geography, product line, sales channel, and time period.[6]
(2) Establishing a pre-event baseline. This involves documenting the brand's condition before the alleged harm using available evidence such as sales, margins, pricing, market share, customer retention, complaints, reviews, and brand-perception measures.[7]
(3) Define the causal connections between the alleged triggering events and brand damage. The analyst should specify the negative customer experiences at issue, including timing, frequency, severity, duration, customer exposure, and whether the complaints or experiences were publicized through traditional media, social media, online reviews, forums, marketplace platforms, or other public channels.[8]
(4) Testing awareness and attribution. The analyst should determine, through surveys, questionnaires, or online feedback and social media, whether relevant customers knew of the negative experiences and whether they attributed those experiences to the brand, rather than to a dealer, distributor, salesperson, location, or other third party.[9]
(5) Measuring consumer response. The analyst should also assess again, through surveys, questionnaires, online feedback and social media, and/or sales analysis, whether the experiences materially affected consumer perception or behavior, including trust, perceived quality, brand attitude, purchase intent, willingness to recommend, repeat purchasing, or switching behavior.[10]
(6) Comparing against controls and accounting for alternative causes. In this case, this might entail comparing post-event performance against appropriate controls, such as unaffected territories, product lines, customer groups, time periods, or comparable brands. Additionally, the analyst should assess whether any observed decline might have been caused by other factors, which in

---

[6] See Keller, K.L. "Conceptualizing, Measuring, and Managing Customer-Based Brand Equity," Journal of Marketing 57, no. 1 (1993): pp. 1–2, p. 7.
[7] See Everett, R.L. & Kinrich, J.H. "Lost Profits Damages: Principles, Methods, and Applications," 2nd ed. Valuation Products and Services (2022), pp. 71-78.
[8] See Dawar, N. & Pillutla, M.M. "Impact of Product-Harm Crises on Brand Equity," Journal of Marketing Research 37, no. 2 (2000): pp. 215, 219, and 225.
[9] See Dawar, N. & Pillutla, M.M. "Impact of Product-Harm Crises on Brand Equity," Journal of Marketing Research 37, no. 2 (2000): pp. 218-220. See also the article cited by Crockett: Yu et al. "The Influence of Negative Publicity on Brand Equity: Attribution, Image, Attitude and Purchase Intention," Journal of Product & Brand Management, Vol. 27, Issue 4 (2018): 440-451. The latter article is about the importance of blame attribution in assessing potential adverse impacts on a brand.
[10] See Keller, K.L. "Conceptualizing, Measuring, and Managing Customer-Based Brand Equity," Journal of Marketing 57, no. 1 (1993): pp. 8, 14 (Table 1).

this case might include market trends, seasonality, pricing changes, advertising changes, product lifecycle, competitor conduct, or a broader product category decline.[11]

(7) Distinguishing temporary disruption from durable impairment. The analyst should determine whether the alleged effect was short-term dissatisfaction or lasting damage to brand equity, loyalty, pricing power, or future cash flows.[12]

(8) Only after causation is supported and brand harm established would the analyst then quantify economic damages using an appropriate method.

However, Crockett's report does none of this, and therefore fails to prove any brand damage at all. Crockett's damages theory is novel at best and further is unsupported by the depth and weight of data that would be required to support an analysis for damages of this complexity and magnitude.

Crockett repeatedly states that brand damage is impossible to quantify. Thus, Crockett accepts at face value that 5x MSRP is a proportional basis on which to calculate liquidated damages. However, this is an aggressive multiple that is not typically imposed by one party on another. Further, Crockett provides no analysis, research, or justification to support the application of 5x MSRP in this context, or to otherwise rebut the argument that this level of liquidated damages is a penalty against M&N and a windfall for B&O, without any connection to actual damage.

As noted above, Crockett does not compute any direct financial loss resulting from the purported brand damage. It is notable in this regard that Crockett does not offer any alternative calculation of liquidated damages under the first part of FA 16.2 – i.e., the costs and fees associated with investigation and enforcement regarding unauthorized sales.

Further, the limited examples of alleged brand damage cited in the Crockett Report provide no basis to justify liquidated damages in the amount of 5X MSRP. Crockett primarily relies on two alleged customer dissatisfaction occurrences which took place post-termination.

- One related to the servicing of a $1,400 Sound Bar.
- The other related to a customer deposit.

M&N disputes any wrongdoing in connection with these instances. Moreover, neither of these incidents were publicized in the press or social media or otherwise made public in a way that could impact B&O's wider brand.[13]

Crockett also seeks to support her argument that negative customer experiences could damage B&O's brand by misquoting an article in the *Journal of Brand Management,* stating: "[m]ost previous research suggest[s] negative brand information has a negative effect on attitude towards a brand and/or purchase intention."[14] However, Crockett uses this quote out of context. The cited article does not state that

---

[11] See Everett, R.L. & Kinrich, J.H. "Lost Profits Damages: Principles, Methods, and Applications," 2nd ed. Valuation Products and Services, pp. 78-79,

[12] See Cleeren, van Heerde & Dekimpe, "Rising from the Ashes," Journal of Marketing 77(2) (2013), p. 63.

[13] B&O_031739-740 cited in the Crockett Report contains a purported submission of a complaint to "7 On Your Side" (a consumer advocacy segment of channel ABC). However, no evidence is provided that would confirm the submission was accepted. Furthermore, research does not suggest that any of the cited complaints against B&O – whether by the Lipians or by Ms. Yin – were actually made public.

[14] Source: Yu et al. "The Influence of Negative Publicity on Brand Equity: Attribution, Image, Attitude and Purchase Intention," *Journal of Product & Brand Management*, Vol. 27, Issue 4 (2018): 440-451, p. 440.

negative experiences necessarily damage a brand. To the contrary, the sentence immediately preceding the quoted sentence states: "It is a widely held belief that negative brand information negatively influences all aspects of a brand, **yet it is unclear if this is the case.**"[15] (Emphasis added.) The article then discusses studies in which negative information increased sales or improved consumer views of a brand, and concludes that "more research is needed to better understand the responses that are likely to be triggered by negative brand information."[16]

The cited article also makes clear that the existence of negative information is not sufficient to discern damage to a brand. Instead, it explains that consumers exposed to negative publicity often consider "what caused the negative publicity and who should be blamed."[17] The article cited by Crockett indicates the need for further analysis, including whether consumers attributed the negative experience to the brand, the severity and nature of the information, and the resulting effect, if any, on consumer attitudes or purchase intent. These are the exact procedures necessary for assessing brand damage which are missing from the Crockett Report, as identified above. Therefore, even the admitted evidence that Crockett cites in support of alleged brand damage actually supports the opposite conclusion and highlights the deficiencies of her methodology.

Generally, Crockett provides no evidence of any negative public reaction, loss of sales, damage to reputation, or other adverse impact on B&O's brand resulting from M&N's sales either through its stores, through eBay, or through the two cited customer servicing incidents. And finally, Crockett offers no support for the contention that M&N's sales of B&O product at a discounted rate for a brief period, in one part of its global network, and in connection with the closing down of a limited number of its stores (relative to its full global footprint) has tarnished B&O's image as a luxury, exclusive brand.

Ultimately, Crockett arrives at a damages figure of almost $15 million, which is devoid of any connection to actual harm suffered and which lacks any evidentiary support.

***5. The Crockett Report's liquidated damages calculation is incorrect and flawed.***

Crockett's liquidated damages calculation is based on the false assumption that M&N's sales fall within the scope of FA 16.2. This is incorrect. First, according to counsel, due to B&O's improper termination of the Framework Agreement, it follows that M&N's post-termination sales were not unauthorized. Second, the calculation includes pre-termination sales which Crockett admits may not fall within the scope of liquidated damages. (Crockett Report, paragraph 56.) M&N contends they do not. Third, liquidated damages under FA 16.2 only arise in relation to sales made outside M&N's Territory. However, almost all of the sales contained in Exhibit 3 were made within M&N's Territory. Attached as Exhibit 5 (MN_00070387) is an updated version of the same spreadsheet confirming the location of each sale. That spreadsheet identifies the store in which each sale was executed. All stores were within M&N's Territory. Therefore, even if liquidated damages applied (which is denied), they would be minimal, and far less than the overinflated figure of $14.9 million.

---

[15] Source: Yu et al. "The Influence of Negative Publicity on Brand Equity: Attribution, Image, Attitude and Purchase Intention," Journal of Product & Brand Management, Vol. 27, Issue 4 (2018): 440-451, p. 440.
[16] Source: Yu et al. "The Influence of Negative Publicity on Brand Equity: Attribution, Image, Attitude and Purchase Intention," Journal of Product & Brand Management, Vol. 27, Issue 4 (2018): 440-451, p. 440.
[17] Source: Yu et al. "The Influence of Negative Publicity on Brand Equity: Attribution, Image, Attitude and Purchase Intention," Journal of Product & Brand Management, Vol. 27, Issue 4 (2018): 440-451, p. 440.

## VIII. PROFESSIONAL QUALIFICATIONS

Howard B. Grobstein, CPA/CFF, CFE

Howard Grobstein is a partner with Grobstein Teeple LLP, a consulting and accounting firm located in Woodland Hills, California. Mr. Grobstein is a certified public accountant licensed in the State of California, and a certified fraud examiner certified by the Association of Certified Fraud Examiners. He has been involved in small and large forensic examinations and fraud related cases, working on behalf of governmental agencies, corporations, individuals, receivers, special masters, bankruptcy trustees, and law firms. He has testified at depositions, arbitrations, and at trials both in federal and state courts.

Mr. Grobstein co-authored a chapter in the *Fraud Casebook: Lessons from the Bad Side of Business* and authored a chapter in the book *Reviving the Financially Distressed Business.*

Attached as Exhibit 13 is the *curriculum vitae* of Howard B. Grobstein.

## IX. DATA OR INFORMATION RELIED UPON

See section V above.

## X. TESTIMONY EXPERIENCE

See EXHIBIT 13.

## XI. COMPENSATION

Grobstein Teeple LLP is being compensated for fees and costs based on its normal hourly rates.