# Ex. 3

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

M&N LUXURY AV, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY,

Plaintiff,

Case No. 2:24-CV-02230-DSF-KES

vs.

BANG & OLUFSEN AMERICA, INC., A DELAWARE CORPORATION; BANG & OLUFSEN A/S, A DANISH COMPANY; B&O PLAY A/S, A DANISH COMPANY; BANG & OLUFSEN OPERATIONS A/S, A DANISH COMPANY; AND DOES 1-25,

Defendants.

______________________________

AND RELATED COUNTERCLAIMS.

____________________________________________________

VIDEOTAPED DEPOSITION OF HOWARD B. GROBSTEIN
Los Angeles, California
Wednesday, June 17, 2026

Reported by:
MARIA ELLERSICK
CSR No. 10531
Job No. 8275584
PAGES 1 - 124

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

M&N LUXURY AV, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY,

Plaintiff,

Case No. 2:24-CV-02230-DSF-KES

vs.

BANG & OLUFSEN AMERICA, INC., A DELAWARE CORPORATION; BANG & OLUFSEN A/S, A DANISH COMPANY; B&O PLAY A/S, A DANISH COMPANY; BANG & OLUFSEN OPERATIONS A/S, A DANISH COMPANY; AND DOES 1-25,

Defendants.

______________________________

BANG & OLUFSEN AMERICA, INC., A DELAWARE CORPORATION; BANG & OLUFSEN A/S, A DANISH COMPANY; B&O PLAY A/S, A DANISH COMPANY; BANG & OLUFSEN OPERATIONS A/S, A DANISH COMPANY,

Counterclaim-Plaintiffs

vs.

M&N LUXURY AV, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY,

Counterclaim-Defendant.

____________________________________________________

Videotaped Deposition of HOWARD B. GROBSTEIN, taken on behalf of Defendants, at 10100 Santa Monica Boulevard, 8th Floor, Los Angeles, California, beginning at 9:40 a.m. and ending at 2:05 p.m. on Wednesday, June 17, 2026, before MARIA ELLERSICK, Certified Shorthand Reporter No. 10531.

APPEARANCES:

For Plaintiff:

THE FREEDMAN FIRM, PC
BY: MICHAEL G. FREEDMAN
Attorney at Law
1801 Century Park East, Suite 450
Los Angeles, California 90067
(310) 285-2210
Email: michael@thefreedmanfirm.com

For Defendants:

K&L GATES, LLP
BY: LINDSAY S. BISHOP (Via videoconference)
BY: SHAINA M. LEFKOWITZ (Via videoconference)
BY: JOHN C. BLESSINGTON
Attorneys at Law
10100 Santa Monica Boulevard, 8th Floor
Los Angeles, California 90067
(310) 552-5051
Email: lindsay.bishop@klgates.com

APPEARANCES (Continued):

Videographer:

Jesse E. Navarro

# INDEX

| WITNESS | | EXAMINATION |
|---|---|---|
| HOWARD B. GROBSTEIN | | |
| | BY MS. BISHOP | 10 |

## EXHIBITS


| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Bang & Olufsen's Notice of Deposition of M&N Luxury, AV, LLC's, Expert Howard B. Grobstein | 11 |
| Exhibit 2 | Plaintiff's Expert Witness Disclosure Pursuant to Federal Rule of Civil Procedure 26(A)(2); Expert Report of Howard B. Grobstein, dated 5/1/26; supporting materials for report | 17 |
| Exhibit 3 | Letter from Sam Bodle of DLA Piper to Christopher Finnerty and Lindsay Bishop of K&L Gates, dated 5/5/26 | 36 |
| Exhibit 4 | "Bang & Olufsen: A California Success Story," presentation material | 45 |

EXHIBITS (Continued):


| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 5 | E-mail from Rick Costanzo to Kristian Tear, dated 4/26/23 | 57 |
| Exhibit 6 | E-mail exchange between David Junk and Ulrich Wohn, date ending 10/5/19 | 102 |
| Exhibit 7 | E-mails from David Junk to Ulrich Wohn, dated 12/19/19 and 12/18/19 | 104 |
| Exhibit 8 | Expert Rebuttal Report of Howard B. Grobstein, dated 6/1/26 | 111 |

Los Angeles, California; Wednesday, June 17, 2026

9:40 a.m.

THE VIDEOGRAPHER: Good morning. We're going on the record at 9:40 a.m. on Wednesday, June 17, 2026. 09:39:46

Please note that the microphones are sensitive and may pick up whispering and private conversations.

Please mute your phones at this time. 09:39:57

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video recorded deposition of Expert Howard B. Grobstein taken by 09:40:08 counsel for Defendant in the M&N Luxury AV, LLC, versus Bang & Olufsen America, Incorporated, et al., filed in the United States District Court for the Central District of California, Case No. 2:24-CV-02230-DSF-KES. 09:40:33

The location of the deposition is 10100 Santa Monica Boulevard in Los Angeles, California.

My name is Jesse E. Navarro representing Veritext Legal Solutions, and I'm the videographer. I'm not related to any party in this action, nor am 09:40:46

I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney. 09:40:58

MS. BISHOP: Good morning, everyone. My name is Lindsay Bishop. I'm counsel for Bang & Olufsen. With me in Boston is my colleague Shaina Lefkowitz, and with you all in California is my colleague John Blessington. 09:41:11

MR. FREEDMAN: Good morning. I'm Michael Freedman for the Plaintiff M&N Luxury AV, LLC.

THE VIDEOGRAPHER: And will the court reporter please introduce yourself and administer the oath to the deponent, and then counsel may proceed. 09:41:23

THE REPORTER: Good morning. My name is Maria Ellersick. I am a Certified Shorthand Court Reporter, CSR No. 10531. 09:41:33

HOWARD B. GROBSTEIN,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MS. BISHOP:

Q Thank you, everyone. Good morning, Mr. Grobstein. As I said, my name is Lindsay Bishop. It's nice to meet you, and thank you for your patience bearing with us as we got our AV situation sorted out. 09:41:53

Mr. Grobstein, you have given deposition testimony previously; right?

A That's correct. 09:42:02

Q Okay. So I'm sure you're familiar with the rules of the road, but I'll just go over them briefly.

Please let me finish asking a question before you begin answering so that the court reporter can pick up your answer to my question fully. If you do not understand a question, please let me know, and I can do my best to rephrase it. 09:42:12

If you need a break at any time, please let me know. We're not heroes here. Breaks are welcome if you need them. Just ask that you finish answering with my question before you ask for the break. 09:42:22

We will be marking some exhibits as we go. 09:42:38

As you can see on the table, there's some hard copies for you to review. But if you have any questions about those exhibits, we can sort those out as we go.

Okay. Let's get started here. I'd like to start with what we'd like to premark as Bang & Olufsen Exhibit No. 1, which is the Notice of deposition of M&N Luxury AV, LLC's, Expert Howard B. Grobstein, dated May 22nd, 2026. 09:42:56

(Exhibit 1 was marked for identification by the court reporter.) 09:43:13

BY MS. BISHOP:

Q Please let me know, Mr. Grobstein, when you've had an opportunity to take a look at that document. 09:43:30

A I've looked at that.

Q Have you seen Exhibit 1 before, Mr. Grobstein?

A Yes, I have.

Q Okay. And it's your understanding that you are here to testify today on behalf of M&N Luxury in connection with the opinion report you disclosed for M&N Luxury; correct? 09:43:36

A That's correct.

Q Mr. Grobstein, can you please state for the 09:43:54

record your current employer?
A Yes. It's Grobstein Teeple, LLP.
Q And what is your position with Grobstein Teeple?
A I'm the managing partner. 09:44:08
Q What do your duties entail as a managing partner?
A Primarily to oversee strategy for the firm, its growth, and to work and do the work that I do.
Q How long have you been with Grobstein Teeple? 09:44:27
A The firm started in the beginning of 2013.
Q And have you held the role of managing partner since 2013?
A Yes, I have. 09:44:42
Q Can you please describe your educational background?
A Sure. I got a Bachelor's of Science in Business Administration with an emphasis in accounting from California State University of 09:44:57 Northridge in 1994, I think.
Q Okay. And do you hold any graduate degrees?
A I do not.
Q No Masters or Doctorates? 09:45:12

A No.
Q Do you currently hold any licenses or certifications?
A Yes, I do. I have -- I'm a CPA and a Certified Forensic -- Certified Fraud Investigator -- oh, my gosh. A CFE. 09:45:29
Q Is that -- does CFE stand for Certified Fraud Examiner?
A Examiner, yes. Sorry. I lost the word. Yes, a Certified Fraud Examiner, yes. And oh, my gosh. And certified in financial forensics, which is through the AICPA, which also promulgates the CPA license. 09:45:43
Q Okay. And you used the acronym CPA. That's Certified Public Accountant, I presume? 09:45:59
A Correct.
Q Okay. And your licenses as a CPA and a CFE are both current?
A Yes.
Q You're not an economist; is that right, Mr. Grobstein? 09:46:09
A That is correct.
Q Have you taken any courses in your professional career in economics?
A I've probably taken limited, you know, 09:46:29

one-off courses, not like series of courses or anything like that.
Q What about any courses in econometrics?
A I don't believe so, no.
Q In your professional work, is there ever an occasion where you need to run a multiple variable regression? 09:46:46
A Generally speaking, no.
Q What about in your professional experience, running a Chow test? 09:47:06
A No.
Q Okay. Mr. Grobstein, how many times have you been retained as a damages expert in litigation over the past five years?
A I'd have to go back and look. Maybe half a dozen times. 09:47:25
Q To the best of your recollection, how many of those engagements were on behalf of plaintiffs as opposed to on behalf of defendants?
A I actually don't remember. I'd have to go back and look. 09:47:41
Q To the best of your recollection, how many times have you been qualified as a testifying expert by a court in the past five years?
A Maybe 10 -- 10 to 12. 09:47:55

Q Have you ever had a court exclude or limit your testimony under Daubert or the Federal Rule of Evidence 702?
A No.
Q Have you had your expert opinion testimony criticized or limited in a written court decision? 09:48:11
A I don't believe so.
Q Have you ever testified in any matter as an expert involving a single brand retailer?
A Ask me the question again. I'm sorry. 09:48:50
Q Sure. I'm happy to. Have you ever testified as an expert in a matter involving a single brand retailer?
A Yes.
Q Can you describe that matter? 09:49:03
A Yes. I testified a couple years ago in a matter involving a company called LuLuRoe, which is -- it's a little unique for a retailer, but they did -- it was sort of a pyramid type thing where they had individual people that sold their apparel. 09:49:20 It was a pyramid scheme where it's more about getting new people to sell under you than the actual apparel itself.
Q Who did you testify on behalf of in that matter? 09:49:36

A I testified on behalf of the plaintiff. It was the company that supplied LuLuRoe with their product.
Q And what was the scope of your engagement on behalf of the plaintiff supplier entity in that matter? 09:49:54
A It involved alterego, fraudulent transfer, tracing of funds, use of funds.
Q Are you finished? Sorry.
A Yes, I am. Sorry. 09:50:13
Q Okay.
A Sorry about that.
Q And is that testimony consistent with expert testimony you provided in your professional career? 09:50:27
A Yes.
Q Have you ever testified as an expert in any matter involving a franchise relationship?
A I don't believe so.
Q Mr. Grobstein, do you have specific professional experience in the premium audio/visual retail industry? 09:50:46
A I don't.
Q Do you have professional experience in the consumer electronics industry? 09:50:59

A I don't believe so.
Q And have you -- in the course of your professional career, have you ever had the opportunity to prepare a sales forecasting analysis for a premium audio/visual retailer? 09:51:16
A No.
Q What about for a consumer electronics retailer?
A No.
Q Mr. Grobstein, you were retained by 09:51:29 DLA Piper on behalf of M&N to provide an opinion regarding M&N's alleged damages in this action; correct?
A That's correct.
MS. BISHOP: I'd like to show you what 09:51:49 we'll mark as B&O's Exhibit 2.
(Exhibit 2 was marked for identification by the court reporter.)
MS. BISHOP:
Q Mr. Grobstein, I'll represent to you that 09:51:54 this is the narrative portion of your expert report that you disclosed in this action, and I'll give you ample time to have a look at it.
A Thank you.
I have that in front of me. 09:52:46

Q Okay. Excellent. Mr. Grobstein, does this appear to be a true and accurate copy of the narrative expert disclosure that you submitted in this case?
A Yes, it does. 09:53:01
Q And I will just put on the record, Mr. Grobstein, I understand that you also supported some materials that were very large via zip file. I have not printed those in the copy that is directly in front of you. We have them should we need them, 09:53:17 but I just wanted to be clear exactly what we provided to you is your report with the underlying exhibits, but not those supporting materials appended to them.
A Thank you. 09:53:29
Q Mr. Grobstein, the May 1, 2026, report that we've marked as B&O Exhibit 2, that supports the sum total of your opinions that you've disclosed in this matter; correct?
A Correct, but we filed a rebuttal -- 09:53:50
Q You have --
A I'm so sorry. We filed a rebuttal report as well.
Q Correct. But what is Exhibit 2 for you is your opening opinion report on behalf of M&N as to 09:54:04

M&N's alleged damages; correct?
A That's correct.
Q It's distinct from your rebuttal report?
A Correct. Thank you.
Q Mr. Grobstein, it appears from your experience as set forth in this exhibit that you've been involved in many litigations through the years. Is that fair to say? 09:54:18
A Yes.
Q You are not a lawyer, however, Mr. Grobstein; correct? 09:54:27
A Correct.
Q And just so that we're clear, you're not offering any opinion in this case as to liability; right? 09:54:39
A Correct.
Q You're not opining as to whether Bang & Olufsen breached the contract or violated any law?
A Correct. 09:54:48
Q And the same as to M&N, you're not opining as to whether M&N breached any contract or any law; correct?
A That's correct.
Q And you're not offering an opinion on the 09:54:57

contract terms within the parties' agreement, the framework agreement; correct?

A Correct.

Q You're not offering an opinion as to any of its terms or the schedules within the framework agreement are enforceable; correct? 09:55:11

A Correct.

Q And you're not offering any opinion on the interpretation of any contract term in the framework agreement; correct? 09:55:25

A Correct.

Q And would you agree that the interpretation of the framework agreement and its terms is beyond the scope of your engagement as disclosed in your opinion report in this case; correct? 09:55:37

A That's correct.

Q Would you agree that the interpretation of a contract term is a legal determination?

A Yes.

Q And that determination is something that's 09:55:47 outside of your qualifications and experience as a CPA and a CFE?

A That's correct.

Q And you're not offering a legal opinion as to whether Bang & Olufsen properly terminated the 09:56:06

framework agreement; correct?
A That's correct.
Q For purposes of your opening opinion report, you make the assumption, however, that Bang & Olufsen improperly terminated the framework agreement; is that right? 09:56:21
A That's correct.
Q And that assumption is based upon information provided to you by M&N or its counsel?
A Correct. 09:56:32
Q And for purposes of your opinions, you also assume that Bang & Olufsen's conduct caused M&N's damage; correct?
A Correct.
Q Did you do anything to independently verify whether the conduct alleged to have been undertaken by Bang & Olufsen actually occurred? 09:56:48
A Other than reviewing the materials that I was provided, no.
Q And did you do any independent verification as to whether the alleged conduct by B&O actually caused M&N damage? 09:57:08
A Can you ask that again? I'm so sorry.
Q Yeah, that's quite all right.
You did not independently verify that the 09:57:31

alleged conduct undertaken by B&O actually caused M&N damage; correct?

A Well, in the report, we correlate the termination to the damages.

Q So if I unpack that -- I want to make sure I understand you clearly, Mr. Grobstein. You make the assumption that Bang & Olufsen undertook particular conduct as conveyed to you by M&N or its counsel? 09:57:50

A I'm saying that there were damages as a result of the termination of the contract and as a result of other actions by B&O. 09:58:07

Q Okay. And I guess my question is whether you independently verified the actual causal connection between that conduct that you just described and the damage to M&N, or did you assume the causation element between that conduct and the damage? 09:58:24

MR. FREEDMAN: Object to form.

THE WITNESS: I was -- the contract -- I'll explain it the best I can. The contract was terminated. There were communications with regard to these custom technology integrators, and using the information related to both of those -- those bits of information that we reviewed, we determined 09:58:39 09:59:01

on our own the damages that we believe were associated with that.

BY MS. BISHOP:

Q Okay. But you did not -- if I understand your prior testimony a couple of minutes ago, you did not verify that that conduct actually occurred; correct? 09:59:16

A I saw the termination. That's all I could say. Other than verifying beyond that, no.

Q Okay. Is it fair to say, Mr. Grobstein, that if the conduct -- the harmful conduct that you referred to in your report undertaken allegedly by Bang & Olufsen did not occur, that that would change your opinion in this matter? 09:59:31

A I'm sorry. Say that one more time. I apologize. 09:59:56

Q If the conduct that you assumed Bang & Olufsen undertook in this action did not actually occur, that would undermine your opinion in this matter; correct? 10:00:10

A If they did not terminate -- are you asking if they did not terminate the contract, the damage would --

Q Let's put it this way. Let's say that Bang & Olufsen -- that the information conveyed to 10:00:27

you by M&N regarding the custom technology integrators into the California territory is not accurate, would that impact the accuracy of your opinion?

A Well, I did some independent research with regard to independent -- I'm sorry -- the custom integrators. 10:00:43

Q What independent research did you do as to the custom integrators?

A Just researching the impact of their activities during the relevant timeframe of '22 to '24 on monobrands and the ultra high-end audio/video space. 10:01:00

Q Which custom technology integrators did you research? 10:01:16

A Well, the only one I distinctly researched was Malibu Wired. However, I looked more broadly at the market shift from monobrands to the integrated custom technology folks and the impact on the high-end audio market. 10:01:40

Q Mr. Grobstein, can you point me to where that research is reflected in your report?

A I don't believe it's in my report.

Q Do you recall what market research you did specifically, what sources you looked at? 10:01:59

A I don't remember the specific sources. I think I have them, but it was just internet research.
Q With respect to -- you said Malibu Wired was the one specific? I'm going to use the term "CTI." If I use "CTI," you understand I'm referring to custom integrates? 10:02:21
A Yeah, it will be easier. Thank you.
Q Yeah. Agree.
A I keep changing the order of those words. So apologies. 10:02:33
Q No problem. You said that the one CTI you specifically researched was Malibu Wired; is that correct?
A That's correct. 10:02:42
Q What research did you do with respect to Malibu Wired?
A I just went on their website and looked at it.
Q What did you learn from Malibu Wired's website? 10:02:56
A That they are a CTI provider, and that their primary relationship in the audio space is with Bang & Olufsen.
Q And that was on Malibu Wired's website? 10:03:13

A Yes.
Q Do you recall when you did that research?
A Within the last week and at some point prior to that.
Q Did you do that research prior to preparing your May 1 expert report? 10:03:31
A I believe the first time I looked was during the time we were preparing the report, but this week was obviously after the report was prepared. 10:03:51
Q So to the extent that you did look at the website or other market materials in preparation of -- in connection with the preparation of your expert report, that information is not disclosed in this report; correct? 10:04:08
A That's correct.
Q And what's been marked as Exhibit 2.
I think a few minutes ago, Mr. Grobstein, you said that you determined that based on the information you were provided by M&N regarding termination and CTIs, you determined that Bang & Olufsen's conduct caused M&N's damage. Am I understanding your testimony; correctly? 10:04:43
A Well, the "but for" analysis in the report, there's an inherent assumption there that had the 10:05:01

contract not been terminated, this is what would have occurred.

Q Okay. And as I think you mentioned a few moments ago, you're not offering an opinion, however, on the propriety of that termination; 10:05:29
correct?

A Correct.

Q Mr. Grobstein, in your report, one of the materials you note that you considered was Bang & Olufsen's answer and amended counterclaims in 10:05:46
this case; is that right?

A That's correct.

Q In your report, you do not account for any of the allegations that Bang & Olufsen has made or the causes of action it has brought against M&N; 10:06:03
correct?

A Correct.

Q You also refer in your report to relying on M&N's second amended complaint in your report, Mr. Grobstein; is that correct? 10:06:22

A That's correct.

Q Your report does not identify, though, claim by claim which cause of action that M&N has brought that correlates to each bucket of damages in your damages opinion; correct? 10:06:38

A Correct.
Q You're being paid on an hourly basis for your work, Mr. Grobstein; is that right?
A That's correct.
Q And is any portion of your fee contingent 10:06:52 on the outcome of this matter?
A No.
Q Have you previously been retained by M&N or its counsel in the past five years?
A I had been retained by DLA in another 10:07:07 matter.
Q Do you recall what that matter -- the title of that matter was, any of the parties involved?
A Yes. I was contacted by general counsel for City National Bank. I think it was a couple of 10:07:26 years ago, and they had already engaged DLA Piper, and City National Bank wanted them to use me for a litigation matter.
Q And you acted on behalf of the international bank in that matter? 10:07:45
A City National Bank, correct.
Q City National Bank. And what was the scope of your engagement in that matter?
A That was forensic accounting, tracing.
Q Mr. Grobstein, if I can point you to 10:08:06

page 12 of the narrative part of your report, please.
A I'm there.
Q And specifically Roman numeral IX in "Data or Information Relied Upon." 10:08:31
A Yes.
Q Does section IX set forth the total universe of data and documents you relied upon in preparing your report?
A I think generally. I believe there were 10:08:47 specific documents within these categories. I don't know that we listed every single document, but we provided every single document that we relied on.
Q But you did not provide the website addresses for the Malibu Wired sites you may have 10:09:07 visited; correct?
A That's correct.
Q Or the market research you did in connection with the CTIs?
A That's correct. 10:09:17
Q And when you say that there may be documents within these listed in section IX of your report, do you mean that there may be exhibits within the information listed in A through M?
A Well, so reporting -- for example, there 10:09:40



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

could be multiple files under "reporting." I'd have to go back and look specifically, but I'm just wanting to say that I don't think we specifically said every single spreadsheet or whatnot. There might be things in there that were reporting, but 10:09:56 "reporting" could be broad.

Q I understand. So for instance, if we looked at G, a document entitled "MNAV 2018 P&L by store for February 2026 reporting," you're saying that there may be underlying spreadsheets that 10:10:14 comprise that document?

A Correct or extracts from QuickBooks from the client, things like that.

Q Okay. But I think you said a minute ago -- please correct me if I'm wrong -- that you did 10:10:32 provide everything in your disclosure?

A Correct, everything.

Q Are there any categories of documents or data that you requested from M&N that M&N did not provide to you in preparing your report? 10:10:49

A I don't believe so.

Q In your Roman numeral section IX in your report, you list in subsection C, D, and E three prior agreements between Bang & Olufsen and M&N Luxury; is that right? 10:11:38

A That's correct.
Q And you note in your report on page 3 that these agreements were superseded by the parties' framework agreement; correct?
A That's correct. 10:11:49
Q And in subsections G through L of Roman numeral section IX, it states that you relied upon M&N's annual profit and loss statements for 2018 through 2023; correct?
A Correct. 10:12:12
Q You considered only the annual reports, not any monthly profit and loss statements; is that right?
A That's correct.
Q Do you know who prepared the profit and 10:12:28 loss statements set forth in sections G through L of section IX of your report?
A I only know that it was somebody at M&N. I don't -- I don't know who.
Q It wasn't, at least as far as you know, 10:12:43 prepared by an outside accountant to M&N?
A Not to my knowledge.
Q In your report, Mr. Grobstein, on page 2, you note that you did not perform an audit or examination of the information you relied upon. 10:13:01

That's fair to say?
A That's correct.
Q Do you know if the profit and loss statements you were provided by M&N were audited by an independent third party? 10:13:10
A I don't recall seeing that they were audited.
Q So you're not sure?
A I don't believe so -- I don't believe they were audited, but I'm not 100 percent certain, no. 10:13:26
Q In connection with preparing your report, did you request any of M&N's federal or state tax returns for the period 2018 through 2024?
A I did not. I don't know if one of my colleagues who was working with me did or didn't, 10:13:49 but I don't believe we received any returns.
Q Who else from Grobstein Teeple was helping you prepare your report?
A Two other people. I have a partner, Dimple Mehra, M-e-h-r-a, and a colleague -- a director 10:14:12 colleague, Will Thomsen, T-h-o-m-s-e-n. There may have been staff under them that did general spreadsheeting, but I don't know specifically who it was.
Q And starting with -- I'm sorry. I missed 10:14:32

the first name, but Ms. or Mr. Mehra, what is his or her background?
A She is -- it's Dimple like what's on your face. She's a Certified Fraud Examiner.
Q Okay. And what about Mr. Thomsen? 10:14:51
A He's a valuation expert.
Q And what did each of those colleagues specifically do in connection with preparing your report?
A So DLA structured their -- I believe they 10:15:07 structure their cases in way that they prefer their to expert to be -- sort of come in towards the end, different than other firms that I've worked with.
And so Ms. Mehra was the primary contact partner dealing with DLA and sort of overseeing the 10:15:26 case, keeping me in the loop about what was going on.
And Mr. Thomsen was the primary person who conducted the valuation and damages -- I should say damages, not valuation. Damages analysis. 10:15:44
Q And so Mr. Thomsen would get the information from M&N, do the underlying analysis, and did he then present his work to you for your review and approval?
A Yes. We would work -- I worked with him 10:16:08

intermittently and made sure that it was, you know, going -- you know, it was happening, getting done, and that, you know, I understood the concepts and agreed or disagreed with what they were doing. I oversaw it. 10:16:21

Q Were there any elements of Mr. Thomsen's work with which you disagreed?

A No.

Q Did Ms. Dimple or Mr. Thomsen draft any portions of your report, including the underlying 10:16:36 exhibits?

A They certainly had a heavy hand in different aspects. For example, Ms. Mehra started the draft of the actual report, the narrative. And Mr. Thomsen was primarily responsible for sort of 10:16:51 starting the preparation of the exhibits -- the primary exhibits.

Q Okay. And after they had prepared those elements, you reviewed all of their underlying work, and ultimately adopted their analyses and 10:17:11 narratives?

A It wasn't after. It was a process. During the process, they would -- we would have regular calls and go over -- go over aspects of the report, aspects of the calculations. So it wasn't like they 10:17:27

finished everything, and then showed it to me. We actually met throughout the course of the preparation of the report.

Q Okay. Understood. And to be clear, you reviewed M&N's profit and loss statements from 2018 to 2023, but did not review any of their statements for 2024; correct? 10:17:45

MR. FREEDMAN: Object to form.

THE WITNESS: I'd have to go back and look and see. I believe we saw something with regard to '24, and I see that it's not on this list here. But I'd have to go back and look. Maybe I can do that on a break. 10:18:03

BY MS. BISHOP:

Q Sure. Okay. Yeah, let's -- maybe on a break, we can clarify the universe of the profit and loss statements that you reviewed in connection with the preparation of your report. 10:18:15

A Yes.

MS. BISHOP: Okay. Mr. Grobstein, I'd like to show you what we'd like to mark as Bang & Olufsen's Exhibit 3, which I'll represent to you is a May 5, 2026, letter from Sam Bodle of DLA to Chris Finnerty and myself, Lindsay Bishop, of K&L Gates. 10:18:39 10:19:28

(Exhibit 3 was marked for identification by the court reporter.)

THE WITNESS: I have that letter and that exhibit.

BY MS. BISHOP: 10:19:48

Q Okay. You've had an opportunity to review it?

A I skimmed it. Do you want me to review it entirely?

Q You're welcome to review it entirely. I 10:19:56 was just wanting to verify whether you are familiar with it. If you haven't seen it before, yes, please take an opportunity to read it.

A Yeah, I have not seen this before.

Q Okay. Do you have any reason to doubt that 10:20:09 DLA sent K&L this letter dated May 5, 2026?

A No. I have no reason to doubt that.

Q And if I could point your attention to page 2, Mr. Grobstein, at the top, please, the paragraph that begins with "First," and I'll read it 10:20:30 into the record. "First, the communications between the parties that Mr. Grobstein considered include the agreements executed between the parties and other documents exchanged between the parties, along with the references to further inter partes 10:20:44

communications described in the pleadings. All of these communications were disclosed with the Grobstein report and supporting documents." Did I read that correctly?

A Yes. 10:20:55

Q And does DLA's letter accurately describe the communications that you relied upon in preparing your report?

A The parties being the Plaintiff and the Defendants or who are the parties? 10:21:20

Q Well, let me ask you, Mr. Grobstein, if you reviewed any communications between parties beyond M&N and Bang & Olufsen in this matter?

A Other than with counsel and my team, no.

Q Okay. So you did not receive or review any 10:21:44 additional contemporaneous communications between M&N and Bang & Olufsen beyond what was incorporated or referenced in the parties' pleadings as described in this May 5 letter?

A That's my recollection. 10:22:06

Q Okay. Other than the documents that you identified in section IX of your report, Mr. Grobstein, you state that you also relied upon, and I quote, "insight from M&N's management," end quote. Is that accurate? 10:22:26

A That's correct.
Q Who specifically from M&N did you speak with in preparing your report?
A I participated on a couple of calls with David Junk and Doug Moore. I believe that Ms. Mehra 10:22:40 and Mr. Thomsen participated in more calls with them than I did.
Q Do you know how many more calls Ms. Mehra and Mr. Thomsen participated in with M&N?
A I don't. 10:23:03
Q And do you know when those calls occurred?
A Leading up to the preparation of the report, but I don't know specifically.
Q Do you know whether Ms. Mehra and Mr. Thomsen conducted those calls together or if 10:23:20 Ms. Mehra had individual calls with M&N?
A I don't know.
Q And same question for Mr. Thomsen, you don't know if he did those on his own or if he did them with Ms. Mehra? 10:23:36
A That's correct. I don't know.
Q Do you know whether Ms. Mehra or Mr. Thomsen took notes during any of those calls?
A We have a policy where we take notes on the live document. That's our standard policy for 10:23:50

litigation matters.

Q Do you have any sense, Mr. Grobstein, of how many additional calls Ms. Mehra or Mr. Thomsen may have had with M&N?

A I would be speculating, but I think around five I would estimate. Could be less. 10:24:12

Q And you personally participated in two calls; is that right?

A Yes, portions.

Q And the attending of the -- oh, sorry. 10:24:31

A Sorry. I just wanted to clarify that. I believe I participated in portions of two calls.

Q When you say portions of a few calls, you joined for just a brief time or a limited time period within a bigger call? 10:24:50

A Yeah. To clarify, portions of the two calls, but that's correct, yes.

Q I see. And the other attendees on the two calls that you attended portions of were Ms. Mehra; correct? 10:25:06

A Correct.

Q Mr. Thomsen?

A Correct.

Q And Mr. Junk and Mr. Moore?

A Yeah. I do believe that in -- at least in 10:25:14

the instances where I was involved, members of DLA were also on the calls. I don't know if the same is appropriate for the calls that I was not on.

Q Okay. You're not sure whether DLA attended the calls that Ms. Mehra or Mr. Thomsen held 10:25:36 independent of your calls with M&N?

A I don't know for sure. Assuming I know Sam Bodle, he was on those calls, but I can't be certain.

Q The two calls that you attended portions 10:25:48 of, about how long were you on those phone calls for, you individually, Mr. Grobstein?

A Yes, one was for about, I believe, less than 15 minutes. It was more of -- I think it was the first call, and it was more of an introductory 10:26:08 call.

And one was extremely brief. It had been put in my calendar. And again, consistent with how DLA structured it, I jumped on the call, and their preference was for me to not be on the call. So I 10:26:23 jumped off the call.

Q Okay. What about the second call that you attended a portion of, how long were you on the second call for?

A That was the one I was referring to. The 10:26:35

first one was about 15 minutes. The second one, I literally jumped on, and Sam says oh, we don't need you. You can -- you can leave. So it was maybe a minute.

Q Understood. Okay. Do you happen to know how long those calls went on for in total? 10:26:46

A I don't.

MS. BISHOP: If we could go off the record for just one second. We're getting some feedback from the speaker in our room. I just want to try to go mute and unmute and see if that might adjust it, if that's okay. We'll just take a two minute break. 10:27:16

THE WITNESS: Sure.

THE VIDEOGRAPHER: Seeing there are no objections, we are going off the record. This marks the end of Media Unit No. 1. The time is 10:28 a.m. 10:27:25

(Recess.)

THE VIDEOGRAPHER: We are back on the record. This marks the beginning of Media Unit No. 2. The time is 10:38 a.m. 10:38:21

BY MS. BISHOP:

Q Thank you very much. Okay. Mr. Grobstein, so between you and Ms. Mehra and Mr. Thomsen, you spoke with David Junk and Doug Moore of M&N on at least two occasions, and it appears several other 10:38:42

phone calls on which you were not an attendee; correct?
A Correct. I don't know the volume of the other calls, but correct.
Q In speaking with Mr. Junk, what specifically did Mr. Junk tell you or your team in connection with these phone calls as you were preparing your report? 10:38:54
A I don't believe that the call I had with Mr. Junk and Mr. Moore was substantive in any way. 10:39:17
Q Do you know what Mr. Junk or Mr. Moore told your team?
A I believe there's references to the conversations or their information in the report. I might have to go back and look and see if there's specifics. 10:39:38
Q What do you understand Mr. Junk's role to be with M&N?
A I believe he was the founder, majority, if not entire, owner. 10:39:54
Q And what about Mr. Moore, what do you understand his role to be with M&N?
A I don't know his exact role. I understood that he worked at B&O for an extended period of time prior to this, but I don't -- I don't know his title 10:40:08

or his specific role.
Q Do you happen to know when Mr. Moore worked at Bang & Olufsen prior to working with M&N?
A I do not.
Q Are you aware that Mr. Moore stopped working for Bang & Olufsen in 2018? 10:40:17
A I'm not aware.
Q Okay. Do you know what Mr. Moore did when he was at Bang & Olufsen, what his job title was?
A I don't. 10:40:36
Q Do you happen to know what his job responsibilities entailed at Bang & Olufsen?
A I do not.
Q Are you able to summarize for us what you or your team did to verify the accuracy of what Mr. Junk or Mr. Moore told you during these phone calls? 10:40:56
MR. FREEDMAN: Object to form.
THE WITNESS: I think in cases like this, you listen to what they say, and you ask some detailed questions to try to get to the bottom of the answers that you need, and so I believe those conversations consisted of that. 10:41:07
BY MS. BISHOP:
Q Do you know for certain whether Mr. Thomsen 10:41:24

or Ms. Mehra did any independent research to test the accuracy of what Mr. Junk or Mr. Moore told them during their phone calls?

A If it related specific to the operations or the financial information from M&N, I don't think 10:41:42
that there's any other source you could go to other than their actual books and records, which we did.

Q What about beyond their operations or their financial information, any other information that was provided by Mr. Junk or Mr. Moore outside of 10:41:58
those two categories you just referenced? Do you know if Mr. Thomsen or Ms. Mehra independently tested that information for accuracy?

A I'm not aware.

Q Turning back to section IX of the documents 10:42:21
relied upon in your report, Mr. Grobstein, one of the other documents you referenced in subsection M is a document with the title "BO SoCal_Marketing History_Web2_LowRes"; correct?

A I see that, yes. 10:42:50

MS. BISHOP: Okay. I'm going to ask that we hand you a copy of what we'd like to mark Bang & Olufsen Exhibit 4, which is copy of the PDF of that document that you supplied in connection with your report. 10:43:30

(Exhibit 4 was marked for
identification by the court reporter.)
BY MS. BISHOP:
Q Have you had an opportunity to review the
document, Mr. Grobstein? 10:44:22
A I've looked at it.
Q Okay. Do you know who prepared this
document?
A I don't.
Q Do you know what the purpose of the 10:44:31
document was?
A I don't.
Q Based on the title of the file that you
identified, section IX, M of your report, is it your
understanding that it was meant to capture M&N's 10:44:48
marketing history?
A It appears -- it appears to look like that
based on the name.
Q If you could turn to page -- there are
Bates labels on the bottom right-hand corner. If 10:45:05
you could turn to the page that ends in MN_00069629,
please.
A I'm there.
Q Do you see there's a disclaimer in the
bottom right-hand corner that I'll read? It says 10:45:35

"Disclaimer: Information based on recollections of veteran staff and may contain some inaccuracies. The intent is to illustrate the general retail instability in the California market." Did I read that correctly? 10:45:49

A Yes, you did.

Q In relying upon this document in your report, did you do anything to verify the contents of this document?

A I don't know to what extent we relied on 10:46:02 it. I think we looked at it, but I don't know that there was much -- looking at what's contained in it, I don't know that we did much reliance on it. It's mostly pictures.

Q Understood. If you flip ahead to the page 10:46:18 that ends in Bates label 69632.

A I'm there.

Q Okay. And on that page, you'll see at the top, it's -- there's a -- it depicts a bar graph that says "Growth is in line with our approved 10:46:56 5-year business plan." Do you see that?

A Yes, I do.

Q Okay. Did you or anyone on your team do anything to verify the growth and revenue data set forth on this document? 10:47:11

A I don't believe so, but we relied on the actual books and records when we did our analysis, not this.
Q Not this. Okay. Got it.
Mr. Grobstein, is there any category of document or data that M&N or its counsel offered you to -- offered to you to review, but you opted not to? 10:47:30
A No, not that I'm aware of at all.
Q Did you review any records regarding M&N's payment history in connection with your report? 10:47:44
A Other than what was contained in the complaint and counterclaims, I don't believe that we specifically looked at payment history.
Q Okay. Did you review any of M&N's underlying sales records -- for example, sales receipts -- in connection with preparing your reports? 10:48:08
A I don't believe so.
Q Did you review any sales records of the CTI integrators you reference in your report? 10:48:27
A I don't believe so.
Q Did you happen to review any of the contracts between Bang & Olufsen and any of the CTIs that you reference in your report? 10:48:46

A I don't believe so.
Q Did you review any of the contracts between Bang & Olufsen and other monobrand dealers beyond M&N in preparing your report?
A Not that I'm aware of. 10:49:00
Q One of the things in your report you note you relied upon M&N's management insight for was the likely sales growth for each of M&N's historic locations. What specifically did M&N tell you about the likely sales growth for its locations? 10:49:20
A They provided the estimated growth rates on a store-by-store basis for us.
Q Do you know what those estimates were based upon?
A Other than their knowledge and experience, 10:49:40 I don't -- I don't know anything other than that.
Q And when you say "their knowledge," are you referring to Mr. Junk and Mr. Moore?
A Correct.
Q Okay. And did you use the exact sales 10:49:51 growth rates that they provided you in your report?
A For the most part, yes. However, there was, I believe, one store where we pushed back on what we thought was an aggressive growth rate. I'd have to go look when we -- if we get there. I can 10:50:11

show you which one it is, but we pushed back on the growth rate and thought it was not reasonable.

Q What made you think that it was aggressive or not reasonable?

A Just our background from what we had learned already and believing that it was just too aggressive. 10:50:24

Q And then did you make a subsequent downward adjustment to that growth rate?

A Yes, we did. 10:50:45

Q Okay. And yes, if we can pinpoint which store and which rate that was for when we get there, that would be helpful.

A Sure.

Q In connection with preparing your report, did you review any forecasts of profits or sales created by M&N in their ordinary course? 10:50:56

A I did not.

Q Did you review any forecasts of profits or sales created by Bang & Olufsen? 10:51:16

A I did not.

Q Did you review any third party forecasts of profits or sales in the premium audio/visual industry?

A I don't know if Ms. Mehra or Mr. Thomsen 10:51:30

did, but I did not.

Q Okay. Is it possible that Ms. Mehra or Mr. Thomsen reviewed third party forecasts of profits or sales in the consumer electronics industry as well? 10:51:46

A It's possible. I don't know.

Q Okay. So as it relates to growth rates, beyond the one store for which you pushed back based on the M&N rate being what you described as too aggressive or not reasonable, you otherwise relied 10:52:15 only on the growth rates that M&N management provided to you?

A Yeah, my understanding is that Mr. Thomsen had conversations with them regarding why they believed these growth rates were appropriate, and 10:52:29 based on that, utilized them.

Q But as far as you know, Mr. Thomsen did not compare those growth rates to third party growth rates in the premium audio/visual industry?

A To the extent it's not in our report or in 10:52:59 our documents, then he didn't -- he didn't do that. I do think there's reference to comparables, but beyond that, I don't think there was any additional or research done.

Q Okay. If we could go to page 3 of your 10:53:21

narrative report, Mr. Grobstein.
A I'm there.
Q Okay. At the top under Roman numeral IV, "Summary of Findings," it states "B&O's actions resulted in M&N incurring economic damage in the amount of $13,167,000"; correct? 10:53:50
A Correct.
Q And there are three categories of damage. You include lost profits, lost business value, and lost store expansion opportunity; correct? 10:54:04
A Correct.
Q For all three of these damages categories, your opinion is that but for Bang & Olufsen's conduct, M&N would not have suffered the losses reflected in your analysis; right? 10:54:18
A That's correct.
Q And at times in your report, you refer to B&O's harmful conduct or B&O's harmful action; is that right?
A Correct. 10:54:29
Q And that conduct or that action is an underlying assumption for your damages analysis?
A That's correct.
Q And for that conduct, you relied upon what M&N management told you about the nature and effect 10:54:44

of Bang & Olufsen's conduct for your opinion; correct?

A I'm sorry. Ask that again.

Q Sure. You relied upon what M&N management told you about the nature and effect of Bang & Olufsen's conduct as a basis for your opinion? 10:54:55

A Yes.

Q When you use the term "harmful," can you elaborate on what you mean by that? 10:55:09

A Sure. I think, again, we're primarily focused on the ITCs and the termination of the contract.

Q And when you use the term "harmful," you're making the assumption as it relates to the termination that the termination was not proper; is that right? 10:55:38

A I'm speaking just about the fact that it was terminated.

Q And that the termination was therefore a harmful action by Bang & Olufsen? Is that what you're getting at in your report? 10:55:57

A That's correct.

Q Okay. And as it relates to the CTIs, it's that they were permitted to sell Bang & Olufsen 10:56:12

products in California is what you deemed was harmful conduct by Bang & Olufsen?

A Correct.

Q If the termination was proper, how would that impact your damages analysis? 10:56:39

A Well, it would largely impact the amount of damages if there was a basis for it to be validly terminated, but that's a legal issue that I can't opine on.

Q And similar question for the custom 10:57:05 technology integrators. If they were -- if their sales of Bang & Olufsen products in California was authorized, would that similarly impact your damages analysis?

A No, because I think in that particular 10:57:20 case, Bang & Olufsen had options and choices, and they made -- they took actions that reduced the amount of business that M&N would have.

Q Can you elaborate on what you mean by options and choices? 10:57:42

A Whether it was authorized or not, they -- I think -- if it's authorized, it's authorized. But by using those outlets as opposed to their monobrands, it impacted the sales of M&N.

Q Do you have an understanding of the 10:58:03

percentage of M&N's sales in 2023 that were attributable to distribution to CTIs?

A I read some percentages, I believe, in Dr. Crockett's report.

Q Do you recall that in 2023 -- I'm sorry. 10:58:22
In 2021 and 2022, sales of custom technology integrators comprised 5 percent of M&N sales?

A Yes.

Q And that it was 4 percent for 2022 and 2023? 10:58:44

A Yes.

Q Beyond Malibu Wired, do you know which custom integrators allegedly sold Bang & Olufsen products in California?

A I don't. 10:59:19

Q What is your understanding of the custom technology integrator business model?

A Generally, they're one-stop shops for everything home related. So smart -- you know, smart homes, alarm systems, security systems, 10:59:38 lighting, pretty much everything electronic.

Q And it's your understanding that custom integrators sell multiple brands, not just Bang & Olufsen products; right?

A I think it depends on the ITC, but some 10:59:59

sell exclusively one brand, and some sell multiple brands.

Q Do you know what Malibu Wired sold in terms of their product makeup?

A Well, when I last looked, they indicate on their website that they sell Bang & Olufsen. They don't reference -- it says "brands." And then when you drop down, as to audio, it only shows Bang & Olufsen. So if they have other partnerships, they don't indicate it on their website. 11:00:15 11:00:30

Q So based on your review of the website, your understanding is that Malibu Wired exclusively sells Bang & Olufsen audio products?

A I'm saying that based on their website, that's all that they list as their audio partner or whatever you want to call it. 11:00:45

Q And M&N did not provide you with any documents or data as to what Malibu Wired might sell beyond the Bang & Olufsen audio products; correct?

A I didn't see anything. That's correct. 11:01:04

Q In your report, you do not analyze how much revenue the custom integrators that sold in California earned from sales of Bang & Olufsen products in 2023 and 2024; correct?

A I'm sorry. Ask that question again. 11:01:27

Q Of course. You did not analyze in your report how much revenue the custom integrators that sold Bang & Olufsen products in California earned from their sales in 2023 and 2024; correct?
A Correct. I don't think we had that information. 11:01:43
Q And you don't trace the sales activity of any custom integrators in California in 2023 and forward to any specific dollar amount of lost profits in your damages model; correct? 11:02:00
A Correct.
Q Your lost profits model period begins as of January 1, 2023; right?
A Correct.
Q Did you conduct any independent analysis that shows that competition from the CTIs occurred specifically as of January 1st, 2023? 11:02:13
A No.
Q Is there any reason you used that precise date as the beginning of your lost profits damages model? 11:02:33
A I believe it was based on discussions with, again, Mr. Junk, Mr. Moore, and counsel regarding the timing of when they believed it started to impact their business. 11:02:46

Q And they did not provide you with any documentary evidence of the impact that they discussed?
A I'm not aware of any.
MS. BISHOP: Okay. I'm going to ask that you be passed what we'll mark as Bang & Olufsen Exhibit 5, which bears the Bates label B&O_014976. 11:03:14
(Exhibit 5 was marked for identification by the court reporter.)
BY MS. BISHOP: 11:03:29
Q Please let me know when you've had a chance to review that, Mr. Grobstein.
A I've read it.
Q Have you seen this document before, Mr. Grobstein? 11:05:17
A I don't recall seeing it.
Q And I'll represent to you that it is a document that Bang & Olufsen produced to M&N in discovery in this litigation, and it is an April 26, 2023, E-mail from Rick Costanzo to Kristian Tear. 11:05:35
Does that appear to be accurate based on the face of the document?
A Yes, it does.
Q Are you familiar with Mr. Costanzo?
A I've seen his name and his position in 11:05:47

various documents.

Q And what about Mr. Tear?

A I don't believe I've seen that name.

Q The E-mail from Mr. Costanzo begins "Hi Kristian, we finished our meeting with David Junk and Doug Moore earlier this afternoon. Key points," and then Mr. Costanzo lists five numbered paragraphs; is that accurate? 11:06:10

A That's correct.

Q And in No. 3 on Mr. Constanzo's list, it states "We let them know we are closing down the CI program so that they focus on selling to consumers. We are giving them six months notice," and then there's a privileged redacted portion. And then it picks up with "and will grandfather any partners they have already signed. They pushed back on this, and we held firm based on the fact that the program has only resulted in 5 percent of monobrand revenue in 2021 to 2022, and 4 percent of revenue in 2022 to 2023." Did I read that correctly? 11:06:23 11:06:47 11:07:01

A Yes, you did.

Q Okay. And does it appear from the face of this document that Mr. Costanzo is providing a recap of a meeting he had with David Junk and Doug Moore? 11:07:17

A Yes.
Q And have you seen any data or documentation that is inconsistent with the custom integrator revenue percentages that Mr. Costanzo set forth in this E-mail? 11:07:29
A No.
Q Prior to preparing your report -- just to verify, M&N did not provide you with this document; correct?
A I had not seen it. I don't know if it was 11:07:37 produced, and Ms. Mehra or Mr. Thomsen saw it, but I did not see it.
Q Okay. And the date of this E-mail is April 26, 2023; correct?
A Correct. 11:07:53
Q Going back to page 4 of your report, you state that "In or about November 2023, M&N raised concerns to B&O related to custom technology integrators being allowed to sell B&O products in M&N's territory"; correct? 11:08:10
A Correct.
Q So as of November 2023, at least according to this E-mail, M&N had been on notice for at least six months that the custom integration program was being shut down; correct? 11:08:24

A Correct.
Q Are you aware, Mr. Grobstein, that there is a term in the framework agreement that provides monobrand dealers with revenue sharing credits attributable to custom integrator sales in their territories? 11:08:41
A I saw that. I don't remember the details of the provision, but I did see that.
Q Okay. To the extent M&N qualified for those credits from 2023 forward, you did not account for those in your lost profits damages model; correct? 11:08:50
A If it was built into their revenues that they reflect in their books, it was accounted for. If it wasn't built into their revenue, then it was not. 11:09:07
Q Okay. Also on page 4 of your report, Mr. Grobstein, you state that "In or about February 2023, B&O asked that M&N purchase over $151,000 of Bang & Olufsen products that were not needed by M&N"; correct? 11:09:27
A Correct.
Q And your statement that M&N did not need those products is based on what M&N told you?
A I believe so. 11:09:38

Q Do you know what types of products comprise that $151,000 purchase?
A I don't.
Q Did M&N provide you with any documentation to verify that that $151,000 purchase was actually made? 11:09:52
A They may have. I don't remember specifically seeing it.
Q Do you know if M&N purchased these products from Bang & Olufsen at Bang & Olufsen's standard list prices or at discounted prices? 11:10:06
A I don't know that.
Q Do you know if M&N ultimately sold the items that were part of this $151,000 purchase in February of 2023? 11:10:22
A I don't know.
Q So you don't know if they were sold, at what prices or at what margins M&N may have realized on them?
A Correct. 11:10:36
Q And it's possible that M&N sold all of those items; correct?
A Yes.
Q And possible that they sold all of those items prior to the August 15, 2024, termination 11:10:48

date?
A It's possible.
Q You don't trace that $151,000 inventory purchase to a specific dollar amount in your lost profits damages model; right? 11:11:02
A Correct.
Q If M&N, in fact, did sell those items at or near their standard margins, would those purchases still constitute a lost profit?
A Well, it's all factored into the numbers and the theories in the report. All sales are factored into -- 11:11:20
Q Can you elaborate --
A I'm sorry. All sales --
Q Sorry. I didn't mean to interrupt you. 11:11:32
A All sales are factored into the report regardless of whether it was related to that 151,000 or not.
Q But you don't know if those products were sold or not? 11:11:42
A Correct.
Q In your report and lost profits damages model, you don't quantify the causal connectin between a specific Bang & Olufsen's alleged harmful action and a specific dollar amount of lost profits; 11:12:13

right?

A That's correct.

Q Is it possible that some or all of M&N's profitability shortfalls in 2023 were caused by factors unrelated to Bang & Olufsen's conduct? 11:12:27

A Ask the question again, please.

Q Sure. Is it possible that some or all of M&N's profitability shortfalls in 2023 were caused by factors unrelated to Bang & Olufsen's conduct?

A I don't believe so. 11:12:45

Q What's the basis for your belief that that's not possible?

A That the market in the areas that -- the geographical areas that they were in were resilient to any kind of economic downturn during that period, 11:13:02 and in fact, in some cases performed better. High net worth people continued to purchase expensive everything during those timeframes.

Q And when you say during these timeframes, what specific timeframes are you referring to? 11:13:22

A To 20- -- predominantly '23 and maybe the tail end of '22.

Q And is that understanding based on market research that you or your team performed?

A That's the research that I expressed to you 11:13:47

earlier today, my research.
Q And I believe you said earlier, Mr. Grobstein, you don't recall what those sources were, but I'd ask that either during a break or after your deposition if you could specify what those sources were. 11:14:08
A Absolutely.
Q Are you aware generally that the premium consumer electronics and home audio/visual market experienced an elevated sales peak during and immediately following the COVID-19 pandemic? 11:14:30
A That's my understanding.
Q Is that consistent with the research that you saw that you just mentioned?
A Yes. 11:14:44
Q And in terms of that elevated sales activity in that market, approximately what time period do you understand that peak to have occurred during?
A I'd have to go back and look. I believe -- I believe it was in early '22, but I'd have to go back and look. 11:15:03
Q Okay. And that's similar to what you were describing about high net worth individuals purchasing high-end audio/visual home products 11:15:22

during COVID?
A During COVID, and then there was a general dip in '23. But my research indicates that the affluent geographies where these stores particularly were were resilient to it, generally, and then had started to accelerate again in '24. 11:15:40
Q Your lost profits analysis begins as of January 1, 2023; correct?
A Yes, for -- yes.
Q But you did not perform an analysis of how much M&N's revenue decline during 2023 and 2024 would be attributable to the general dip you just mentioned; correct? 11:15:58
A That's correct because generally speaking, these brands were resilient to those dips. 11:16:14
Q Did you review the financial performance of any comparable premium audio/visual retailers during the 2022 to 2024 time period to test those market trends?
A No. 11:16:33
Q Did you review Bang & Olufsen's sales data for that time period to determine whether Bang & Olufsen experienced any revenue decline during 2022 to 2024?
A Well, I don't know that I could access 11:16:44

Bang & Olufsen specifically to this particular territory, but no.
Q And you did not review the financial performance of Bang & Olufsen' other monobrand dealers in the 2022 to 2024 period; correct? 11:16:59
A I don't believe I would have access to that, but that's correct.
Q Did you ask for that information from anyone at M&N?
A I don't believe so. 11:17:10
Q Mr. Grobstein, I want to take a minute and look at Exhibit 7 to your report, which as I understand, it has within it Exhibits A through D that sets forth your calculations for your damages model. Is that fair to describe it in that fashion? 11:17:45
A Yes. May I ask a quick question? Are we going to go through the whole thing right now or --
Q No. I wasn't -- I wasn't planning to go page by page. I promise.
A No. I'm just wanting to have a lunch at 11:18:09 some point. If we were going to embark on like a two or three hour thing, I thought it might be better to do it after a lunch break as opposed to breaking it up. That's all I was saying -- offering up. 11:18:21

Q That's totally fine. This is sort of a natural stopping point for us if you want to do lunch now.
John, were you going to say something?
MR. BLESSINGTON: I'm not sure it's here yet. I got to find out. 11:18:34
THE WITNESS: Oh, you're bringing lunch in?
MR. BLESSINGTON: We're bringing lunch in.
THE WITNESS: Oh, okay.
MR. BLESSINGTON: Let me -- let me -- can we go off -- 11:18:39
MR. FREEDMAN: Should we go off the record?
MR. BLESSINGTON: Yeah, go off the record for a minute.
MS. BISHOP: Let's go off the record, yeah. 11:18:41
THE VIDEOGRAPHER: Seeing there are no objections, we're going off the record. This marks the end of Media Unit No. 2. The time is 11:19 a.m.
(Recess.)
THE VIDEOGRAPHER: We are back on the record. This marks the beginning of Media Unit No. 3. The time is 11:29 a.m. 11:28:24
BY MS. BISHOP:
Q Okay. When we left off, Mr. Grobstein, we were just about to look at your Exhibit 7 to your 11:28:43

report, and I want to look at the lost profits model for a few more minutes here.

In generating your "but for" revenue analysis, you applied the management -- M&N management provided growth rate assumptions; 11:29:04 correct?

A Correct.

Q And those growth rates range from 15 percent to 60 percent per store; correct?

A Correct. 11:29:16

Q And earlier you testified that there was a growth rate that you or Mr. Thomsen pushed back on that you described as too aggressive or not reasonable. Do you recall which growth rate that was and for which store? 11:29:33

A I don't. I would need to look at the document.

Q Okay. Do you want to take a minute and go through --

A I don't have a document in front -- I'm so 11:29:43 sorry. I didn't mean to interrupt you. Please go ahead.

Q No. That's okay. I didn't know if you wanted to take a moment to review Exhibit 7 to determine which store that was for. 11:29:53

A It hasn't been handed yet.

MR. BLESSINGTON: Can I ask on the -- no, no. Exhibit 7 is --

MR. FREEDMAN: I'll find it. On the ECF header, if you have it in front of you, what's the page number? 11:30:03

MR. BLESSINGTON: It's not part of that.

MS. BISHOP: It's not -- it's not part of the ECF document, unfortunately. It is --

MR. FREEDMAN: It's not part of the -- 11:30:14

MS. BISHOP: -- at the back of Mr. Grobstein's report.

MR. BLESSINGTON: It's this far back.

MR. FREEDMAN: I'm almost there. I promise. I'm going to find it. 11:30:23

MS. BISHOP: Take your time.

MR. FREEDMAN: Some of the exhibits are ECF documents. That was my confusion. Okay. Here we go. You got it?

THE WITNESS: I see it. 11:30:34

MR. FREEDMAN: You got it?

THE WITNESS: Yeah, I got it.

MR. FREEDMAN: Further back. Oh, no. There you go. Perfect.

THE WITNESS: I believe it was South Coast 11:31:28

Plaza.
BY MS. BISHOP:
Q And can you point me to the exhibit header at the top of the page so I can verify I'm looking at the same document you are, Mr. Grobstein? 11:31:44
A Yes. It's Footnote D on Exhibit B-1, and I believe that M&N wanted to apply a 15 percent growth rate, but we pushed back given the maturity of the store.
Q And what rate did you implement in the alternative? 11:32:15
A 10 percent.
Q Okay. And earlier, Mr. Grobstein, you mentioned that your team, you know, asked questions of M&N's management regarding the growth rates to test their reasonableness. You didn't do any alternative analyses using other growth rates in your report beyond what M&N provided to you; correct? 11:32:39
A That's correct. 11:32:57
Q And if the M&N's provided "but for" growth rates were too aggressive or unreasonable, then your lost profits analysis would also be overstated; correct?
A Yeah. I would imagine if it was determined 11:33:15

that those were too high, then yes.

Q Okay. Did you do any sensitivity analysis on the growth rates that M&N provided?

A I don't believe so.

Q Is it your opinion that a B&O monobrand retailer in Northern California could organically grow revenue 60 percent in a single year in the 2023 to 2024 market environment? 11:33:51

A So that store opened at the very end of 2022 and had only been open a couple of months. And the reason that that had such a high growth rate is because typically when a store would open, it would have -- it would go from zero to something much larger. That's why that one has more of an anomalous growth rate than the other ones do. 11:34:06 11:34:24

It had just started. So it's going from zero up. So we believe that 60 percent was an accurate growth rate for that. And you can see both here where in '24 it goes down -- pares down to 40 percent. And then in our projections later on, it will taper down even further. 11:34:39

Q And what page are you referring to, Mr. Grobstein?

A So that same page that we were looking on in Footnote -- instead of -- it's right below -- 11:34:58

right below the South Coast Plaza one. It's Footnote E and --

Q Okay. Footnote E on Exhibit B-1?

A Correct.

Q Did you review or analyze any comparable companies in this time period to test the accuracy of a 60 percent growth rate? 11:35:23

A It's a very specific thing to look up with a very limited pool of comparables, so no.

Q I have a clarifying question, Mr. Grobstein. In Footnote C of Exhibit B-1, you write that M&N management stated that revenues at M&N's Pasadena store would have increased by 25 percent in 2023 and 2024 if not for Bang & Olufsen's actions, but your calculations use a growth rate of 15 percent. Do you know which growth rate is the correct one? 11:35:50 11:36:09

A 15 percent.

Q So the 25 percent, is that just a typo?

A It could be a typo or it could be another one that we had originally typed something and pushed them down, but it's one of those two. 11:36:28

Q Okay. So either a typo or a spot where you or your teammate pushed back on an aggressive growth rate? 11:36:45

A Correct.
Q Okay. In your lost profits model, you held operating expenses fixed at actual levels; correct?
A Just for that two year portion, yes.
Q And why for that two year portion did you hold those operating expenses at fixed actual levels? 11:36:58
A We just didn't see that there would be much of a shift during that period.
Q If the revenue of a business is growing as much as 60 percent, isn't it fair to assume that the cost of running that business might also increase? 11:37:13
A No. Most of the costs associated with this particular business was in cost of goods sold, but there wasn't -- there wasn't a lot of variable -- variability in the operating costs. Most of the operating costs were fixed. 11:37:28
Q What about commissions, would you agree that if sales increase, commissions generally increase to some degree? 11:37:42
A Yes.
Q But your lost profits model does not increase commissions as the sales increase; correct?
A That may be in -- if it's in operating costs, that's correct. You have to go back and look 11:37:52

and see if it's in cost of goods sold or in
operating.
Q Did you keep operating expenses fixed in
your other damages models -- in your discounted cash
flow models or your store expansion models? 11:38:22
A No, we did not.
Q Why the distinction?
A Again, this was a very short period of
time, and we didn't think there would be much
variability. Whereas now we're projecting over a 11:38:35
five year period. So we address the additional
costs associated with operations going forward.
Q In Exhibit B-1, you reduced the "but for"
operating expenses by removing what you
characterized as litigation related legal costs; 11:38:54
correct?
A Yes.
Q Without disclosing any privileged
communications you may have had with counsel or M&N,
did you review any documents to confirm that those 11:39:04
legal costs were entirely and exclusively related to
this litigation?
A We were advised by Mr. Junk that they were
specifically for this litigation. I understand that
and I read that Dr. Crockett questioned two other 11:39:20

potential pieces of litigation, but those actually happened after this year.

Q Do you know if M&N had any other legal matters in 2024 that might account for some portion of those legal expenses? 11:39:35

A I'm not aware of any.

Q Okay. In your lost profits model, you added simple interest at 10 percent per annum; correct?

A Correct. 11:39:49

Q And I believe it's in Footnote C on Exhibit B, just Exhibit B, not B-1. You write "We express no opinion as to the appropriateness of the interest rate utilized in this calculation"; correct? 11:40:06

A Yes.

Q As far as you know, Mr. Grobstein, is that 10 percent interest rate mandated by statute or required by the contract?

A It's what is commonly used in the state of 11:40:15 California. So I'm not sure why they put that there, to be honest with you. I would have -- I would have taken it out. I just missed it. But I think it's the appropriate interest rate to charge in the state of California. 11:40:31

Q You're not offering a legal opinion that M&N is entitled to prejudgment interest; correct?
A I'm just stating what the interest calculation would be based on.
MS. BISHOP: Okay. I think now is probably as good a time as any to break. And then after lunch, I anticipate I probably have about another hour or so. 11:41:13
THE WITNESS: Okay. Sure.
MR. BLESSINGTON: They're holding you to that. 11:41:28
THE WITNESS: Better than another five hours. I'll tell you that.
MR. FREEDMAN: I'm a big believer in an efficient deposition. 11:41:36
THE VIDEOGRAPHER: Quick read off before we go off.
Seeing there are no objections, we're going off the record. The time is 11:42 a.m.
(Lunch recess.) 11:41:44
THE VIDEOGRAPHER: We are back on the record. The time is 12:38 p.m.
BY MS. BISHOP:
Q Thank you very much.
Okay. Mr. Grobstein, I want to start with 12:38:27

the lost business value portion of your expert report, which you value as $7,972,000; correct?

A Yes. Bear with me for one second.

Q Yeah. Sure.

A Yes, that's correct. 12:38:51

Q And the formula you used for lost business value is lost business value equals "but for" fair market value minus actual fair market value; correct?

A Correct. 12:39:06

Q And on page 10 of your report, right in the middle, on the third bullet point, you say "AV equals actual fair market value (in other words, M&N's value taking into consideration the harmful actions of B&O, in this case, zero.)" 12:39:23

Later on your report on the next page, actually, on page 11, you calculate actual value using the asset approach and reach a figure of $297,776 as of December 31st, 2024. And my question is which figure did you actually use in computing 12:39:46 the lost business value to reach the 7.9 million?

A The 297-.

Q Okay. So is the zero in the parenthetical on page 10, is that a typo or is that just an example? 12:40:04

A It must be a typo.
Q Okay. So for your lost business value model, you utilized a combination of the discounted cash flow -- and I'll use "DCF" going forward -- and the Guideline Transactions Method; right? 12:40:32
A Correct.
Q Okay. And your "but for" DCF analysis produced a value of approximately 8.5 million, and that's on page 10 of your report and Exhibit C as well; correct? 12:40:48
A Correct.
Q And the revenue growth rates that you used in the DCF model, are those the same M&N provided growth rate assumptions that you used for your lost profits analysis? 12:41:04
A We used -- so this relates primarily towards -- relates to the projections that we prepared, which are back on Exhibit B, that we calculated the revenues and the cost of goods sold on, as well as operating expenses going forward. 12:41:23
Q Okay. So let me make sure I understand you. So the discounted cash flow analysis, as I understood it, is set forth in Exhibit C to your report; correct?
A Correct. 12:41:48

Q And what you're saying is that the inputs for Exhibit C were taken from the calculations you did on Exhibit B in some of the projections you prepared?

A Yes. They're also on page 10 of Exhibit C-2, are the projections specifically for the -- for the DCF model. They're in the footnotes. 12:42:06

Q This is on page 10 of Exhibit C-2?

A They start -- they start there, yes.

Q Okay. And in the middle of that same page, there's a Note A. It says "See calculation below. Source for projected growth rates: Discussions with M&N management"; correct? 12:42:29

A Correct. So you see that we started in '24 with the 15 percent that they projected. And then for each of them, they actually go down -- the growth goes down substantially every year. 12:42:44

Q Okay. What terminal growth rate assumption did you use for your DCF model?

A Well, it's built in -- it's built into the growth rates that are listed below. 12:43:10

Q And by "listed below," are you talking about on the left-hand side -- let's use the middle of page 10 as an example. It says "La Jolla." Then the next row down is "Revenue," and then it says 12:43:27

"Percentage change from prior year"?
A Yes. So the terminal value is the final year. So you can see that we used 3 percent for all of the stores. I mean, for all -- yeah, for all of the stores, we used the 3 percent terminal growth rate. 12:43:43
Q And what was the basis for using the 3 percent terminal growth rate?
A I think it was our -- it was our estimate for -- it was just using our view of what we think is appropriate. 12:44:00
Q Was that based on any textbooks or other third party sources as to why 3 percent would be an appropriate terminal growth rate?
A I don't believe so. 12:44:20
Q Sticking with Exhibit C-2 --
A May I just qualify that?
Q -- there's a note --
A I'm sorry. May I just add --
Q Yes, of course. 12:44:46
A If you go to Footnote I, we note long-term growth rate is just a little bit higher than the inflation rate. So that's why we use 3 percent. It was just a tiny bit higher than what current inflation is. 12:44:56

Q You anticipated my next question. I was going to point you exactly to that note, and ask your assumed expected inflation rate was what for Note I?

A I don't remember the exact percentage. It was roughly below 3. I think it was 2.8 or somewhere around there. 12:45:11

Q And what was the basis for assuming that the long-term growth rate would be higher than the inflation rate? 12:45:26

A I think the inflation rate is the lowest basis for growth -- for standard expected growth.

Q Is that based on your professional knowledge or is that based on any independent third party sources? 12:45:47

A My professional knowledge and experience.

Q Is the expected inflation rate a -- is there an industry standard inflation rate that sort of sets a baseline for these sorts of analyses?

A Yes. You can look at the standard inflation rate online. 12:46:23

Q Where online would one go to find that?

A I think you just Google "current inflation rate," and you get different indices from different banks or sources that show you the rate -- the 12:46:36

current inflation rate.
Q And that's for current rates, but what about projected inflation rates like beyond 2030, for instance?
A I'd have to look and see if they're different. They're typically -- I can tell you over the last several years, it's been roughly 3 percent. 12:46:52
Q How much higher than your assumed expected inflation rate do you assume that the growth in sales in retail stores in Southern California would be? 12:47:31
A I'm sorry. I didn't understand the question.
Q Sure. Let me -- let me do a better job of asking it. 12:47:42
You make the assumption in your report that the market for Bang & Olufsen products would continue to grow into the future indefinitely; correct?
A Yes. 12:47:55
Q What is that assumption based on?
A It's based on market conditions and our expectation that these kind of businesses would grow, albeit at a slower rate each year, but they'll continue to grow. 12:48:15

Q Do you know the current growth rate for retail sales of Bang & Olufsen products?
A I don't.
Q Do you know the current profit growth rates for retail sales of Bang & Olufsen products? 12:48:26
A I don't.
Q What discount rates do you use in your DCF model?
A 23 percent.
Q Can you point me to that percentage in your report, please. 12:49:18
A Yes. It's on page 9.
Q That's the second row up from the bottom on page 9, Mr. Grobstein? Am I on the right spot?
A Yes, also in the box above it when we calculate the terminal value. But for both purposes, it was 23 percent. 12:49:49
Q Okay. How did you arrive at 23 percent for the discount rate?
A There's a buildup analysis that we did. It's on C-3, page 13. 12:49:59
Q In the chart at the top of C-3, page 13?
A That's correct.
Q On that same page, page 13 of Exhibit C-3, Footnote C, you state "Size premium was based on 12:50:53

CRSP decile 10, which included 691 firms with an equity market capitalization size ranging from $1,108,000 to $304,479,000 in Q4, 2024." Did I read that correctly?

A Yes. 12:51:12

Q Where would M&N's "but for" business value fall within that distribution that you provided for the CRSP decile 10?

A Well, it doesn't fall within -- I'm sorry. Ask the question again. 12:51:49

Q Where would M&N's "but for" business value fall within that distribution that you provided? In the lower left-hand side of that distribution spectrum?

A Yes, yes. 12:52:10

Q Sticking with this Exhibit C-3, but onto the next page in Footnote E, you state that "A 5 percent company specific risk premium (CSRP) was selected based on professional judgment." Can you elaborate on that and why you went with a 5 percent? 12:52:25

A Yeah. It's spelled out in the footnote. We used our professional judgment and explained there. I can read -- I can read the explanations to you, but that's how we determined that value -- that percentage. 12:52:49

Q And that footnote references the presentation we looked at earlier, the marketing document?
A Right, but we also factor in the fact that it could not -- it may not materialize, correct. 12:53:07
Q Can you explain that to me a little bit? So you're saying that -- in that footnote, it says "Factors considered include the significantly small size of the business relative to public companies, level of compensation in the retail industry, and 12:53:31 the possibility that revenues and profits would not materialize as forecasted. These risk factors are mitigated by such positive factors as a highly recognized brand name (B&O), M&N's management track record of experience in the marketplace, and M&N's 12:53:44 achievement of growing its B&O stores at rates that were in line or in excess of its 5 year business plan during 2018 to 2022 (see presentation titled 'Bang & Olufsen: A California Success Story.'")
So can you just expand on that footnote for 12:53:59 me? You're saying that there are risk factors that you considered in the front end, but you think that those risk factors were mitigated by the things that -- the items that you mentioned in the sentence beginning "These risk factors are mitigated by such 12:54:16

positive factors"?
A To some extent, but we do measure that there's risk.
Q Okay. And I believe when we discussed that presentation earlier, you said you didn't think that 12:54:29
you relied much on that in your report?
A That's correct.
Q Your ECF model builds on the lost profits model in the sense that you start the DCF model with "but for" revenues of about $11 million for 2024 12:54:56
from your Exhibit B-1; right?
A Correct.
Q Okay. And if the lost profits analysis is inaccurate, then would those problems naturally carry over to the DCF model? 12:55:11
A Yeah. If there's inaccuracies with the projection from the other portion of the analysis, then yes.
Q Did you build or analyze any sensitivity scenarios for your DCF model? 12:55:31
A I don't believe so.
Q Okay. Your DCF model includes a terminal value of beyond 2030. What information did you rely upon for the assumption that M&N would have continued generating B&O direct cash flows beyond 12:55:48

February of 2027?

A I didn't see any reason not to. The framework agreement that we had did not have an expiration or a termination date. That's what's in our exhibits is the one that we were given, and we didn't believe going forward that we should assume anything other than that there would continue to be a fruitful relationship between the two entities. 12:56:09

Q Are you aware, Mr. Grobstein, that there is another version of Schedule 24 to the framework agreement that sets forth an initial term expiring in February of 2027? 12:56:27

A I've heard of that. It wouldn't have changed my opinion, though, and my approach.

Q Are you also aware that that same other iteration of Schedule 24 has a second term with an expiration date of 2030 and no term beyond that date? 12:56:44

A I don't recall seeing that one.

Q Okay. If under that version of Schedule 24, which was set to -- the second term, which was set to expire as of February 2030, would that impact your analysis? 12:57:05

A I don't believe so.

Q Can you elaborate on that for me? 12:58:01

A I don't think we would have changed the growth rate, and I don't think that it would have changed our terminal analysis.
Q In your report, you note -- sorry. Were you finished? 12:58:18
A I was going to say that we reduced -- in the terminal value, we reduce it by the growth rate, and so I don't think that that would have affected it one way or another.
Q Even if the agreement terminated as of 12:58:30 February 2030, that would not have changed the rates that you used?
A Again, if there was a -- I don't know if there was a renewal or not based on what you saw. But if there was a potential for renewal similar to 12:58:44 the prior one, then I would say it doesn't affect our analysis.
Q Okay. I guess either way, because you were not provided with that iteration of Schedule 24 to the framework agreement, you didn't model any other 12:59:01 scenario where the framework agreement would not have been renewed post February 2027?
A Correct.
Q I believe it's mentioned in the narrative portion of your report, Mr. Grobstein, that in 12:59:18

November of 2023, M&N requested that Bang & Olufsen
buy its stores out?
A That's my understanding, yes.
Q Did you factor that into your DCF model?
A No. 12:59:36
Q Okay. You also used as part of your lost
business valuation model a Guideline Transactions
Method; correct?
A Correct. Correct.
Q And I believe that that is set forth, your 12:59:53
analysis, in Exhibit C-5. Do I have that right?
A Yes.
Q Okay. And on Exhibit C-5, you set forth
seven transactions from the DealStats.com database?
A Yes. 01:00:33
Q Okay. And you didn't disclose the details
of those individual transactions in your report;
correct?
A When you say the details, what are you
referring to? 01:00:48
Q Sure. By details, I mean the name of the
entity, where the businesses were located.
A Well, no. It shows where they're located
by state. It shows the transaction type.
Q I see that there. 01:01:03

A It shows the sale, see EBITDA. It shows the sale price.
Q Do you know what -- sorry. Continue.
Do you know if any of those transactions for those businesses were -- sorry. Let me start that over. 01:01:19
Do you know if any of the businesses included in this list of seven transactions were monobrand type retailers like M&N?
A There was very limited private company information available. 01:01:36
Q Do you know how many years each of the seven companies were in business for as of the time of these transactions?
A No. 01:01:52
Q Do you know how many locations each of these companies operated at the time of these transactions?
A No.
Q And none of these companies were actually Bang & Olufsen resellers or retailers; correct? 01:02:02
A I actually don't know based on their names.
Q Okay. And you don't know the profitability for any of these individual companies as of the time of the transaction, do you? 01:02:37

A Well, it's listed there on that chart.
Earnings before --
Q In which columns?
A EBITDA. It shows you their -- that's
essentially their net income. It shows you their 01:02:50
sales, and it shows you their net income.
Q Your median multiple from the seven
transactions is 3.93. Do I have that right?
A Yes.
Q Okay. And the mean is 4.87; correct? 01:03:20
A Well, that's for that particular
calculation in that last column. That's a
calculation. That's one -- the last three columns
are calculations.
Q Okay. And those are calculations from 01:03:42
reading left to right or top to bottom?
A Well, it's going to be -- it's going to be
the Pure Play capital, which is actually the
purchase price over EBITDA. That's how that number
is determined. It's the purchase price divided by 01:04:02
EBITDA for that column. The one prior is the
purchase price divided by sales.
Q Okay. And you use a multiple of 5 for
M&N Luxury in the "but for" row at the bottom of
that chart? 01:04:27

A Correct.
Q Okay. What was the basis for using the 5.0 multiplier?
A I mean, it was close to the mean. And as you can see, we threw out the last transaction. It was so out of whack, it didn't make sense to be in there. And so if you look at those amounts ranging -- if you look at the mean, it made sense to use roughly 5, from our perspective. 01:04:42
Q What is the basis for using a multiple above the mean? 01:05:03
A Well, if you throw out -- so our company is larger than all of those, the one that we're -- M&N, and so we increased it by a small fraction.
Q And in your analysis, can you explain why you would use the mean as opposed to the median as the multiple? Why the 4.7 -- why use a multiple of 5, closer to 4.87, as opposed to a multiple closer to the 3.93 median number? 01:05:23
A I've always used the mean. 01:05:45
Q In all of your analyses?
A In my analyses, yes.
Q Would you agree that a median can sometimes be a helpful measure because it's less sensitive to outliers than the mean is? 01:06:06

A Well, we got rid of the main outlier. I suppose there's an argument both ways, the average versus the median. I think that average is acceptable.
Q Okay. In using a combined approach between the DCF and your guideline transaction approach, you use a 60/40 split; right? 01:06:23
A Yes.
Q Okay. What factors led you to that 60/40 split? 01:06:45
A Well, we think that given the small amount of comps that are available for private companies as exhibited on that page 17, it should have been more heavily weighted to a DCF component rather than the guidelines component. 01:07:00
Q And is that based on just the limited number of comparable companies? Am I understanding you correctly?
A Well, and DCF. We believe that DCF is a more accurate measure. We were conservative in this because if we had attributed any more value to the DCF, obviously, it would have been a higher valuation. 01:07:13
Q You use a figure of 1.4 -- $1,405,000 for your lost store expansion opportunity category of 01:07:40

damages; correct?
A What page are you looking at just so I can --
Q This is in your main report and on the front page of Exhibit A for your economic damages 01:07:55 calculation.
A For the lost store opportunity, you're going to now?
Q Yes.
A Yes, that's correct. 01:08:03
Q Okay. And that analysis assumes that M&N would have opened a San Jose store on January 1, 2024, and a Palo Alto store on January 1, 2025?
A I believe those -- I believe those dates are right. If you can refer me to where you're 01:08:37 seeing those dates, but I believe those dates are correct.
Q I believe that you cite to Exhibit 4 to your report. There's an excerpt of Schedule 27 to the framework agreement. 01:08:53
A Okay. That's correct.
Q And Exhibit 4 to your report, which sets forth this version of Schedule 27, that's the agreement that you are basing your assumption for those two additional stores being open; right? 01:09:10

A Correct.
Q Okay. I want to -- I'm going to ask you to look back to what we previously marked as Bang & Olufsen Exhibit 5, please.
A I have that. 01:09:28
Q Okay. Great. And we previously covered this. This is an April 26, 2023, E-mail from Rick Costanzo to Kristian Tear with the subject line "Recap on meeting with David Junk and Doug Moore."
A Yes. 01:09:45
Q And in point 1 in the E-mail and just above that, Rick writes "We finished our meeting with David Junk and Doug Moore earlier this afternoon. Key points: No. 1, We let them know that we would be pausing opening any new locations with them until 01:09:59 we addressed the gaps we are seeing on service and installation quality. We have a training plan that has been developed for them, which was shared today, and they were positive about this. Similarly, Todd and Bernie from Thomas Folkman's organization will 01:10:11 arrange a workshop with Dave and Doug's team to develop a plan to close the service gap. A key issue that needs to be addressed is that California only has one internal staff member focusing on service and three on installation (1 of the 3 is the 01:10:25

service fellow) across five locations. It's too few, and the quality of service being delivered is compromised."

Did I read that correctly?

A Yes, you did. 01:10:41

Q All right. When you were preparing your report, were you aware of this document?

A I believed I mentioned earlier that I hadn't seen this.

Q In preparing your report, did M&N convey to 01:10:58 you that as of April 26, 2023, that Bang & Olufsen had paused the plan for M&N to open more stores in Northern California?

A They may have -- they may have mentioned it to Mr. Thomsen or Ms. Mehra. I wasn't involved in 01:11:16 conversations where that came up.

Q Okay. And to the extent that that was mentioned to Mr. Thomsen or Ms. Mehra, was that considered in your lost or expansion analysis?

A Well, I can't answer that because I don't 01:11:31 know if it was mentioned to them or not.

Q Okay. If hypothetically the store expansion was, in fact, put on hold due to installation and service issues, as mentioned in this E-mail, how would that affect your store 01:11:53

expansion opportunity analysis?
A Well, it says -- it says it was -- they were putting a pause on it, and they gave them things that they needed to fix. So as I sit here right now, if they had fixed those -- the 01:12:10 termination didn't come until later that year. So it could have been brought back on.
Q And as far as you know, you don't know if that pause was ever lifted; correct?
A Correct. 01:12:26
Q Did you do any analysis to perform -- I'm sorry.
Did you do any analysis to verify whether M&N had the capital, credit, and operational capacity to open the two new stores? 01:12:40
A At that moment in time, no, I did not.
Q Did M&N provide you with any information regarding their credit history or their banking relationships in the 2022 to 2024 time period?
A No. 01:13:06
Q Okay. So one more question on this. Do you know if M&N had begun exploring signing leases or finding locations for those two new retail locations?
A I don't know. 01:13:24

Q But none of those factors were considered in your lost store expansion analysis; correct?
A Correct. I do understand that they paid off all their outstanding invoices in January of '24. So they had resources in some way. 01:13:42
Q And M&N didn't provide you with any copies of those underlying invoices or their payments to Bang & Olufsen?
A Correct.
Q Your revenue projections for the new stores 01:14:16 are based on the San Francisco location store trends, plus management provided growth rates; correct?
A What page are you looking at so I have it in front of me? 01:14:47
Q We are in Exhibit D-1, page 21.
A So I'm sorry. Ask me your question again. I apologize.
Q Sure. The revenue projections that you set forth in Exhibit D-1 to your report, those are based 01:15:43 on San Francisco's store trends, plus growth rates provided by management; correct?
A So the 60 percent in '23 and the 40 percent in '24, yes. I believe that we had discussions with them and provided input with regard to the growth 01:16:07

rates subsequent to that year.
Q Okay. And when you say discussions with them, you're talking about discussions with folks from M&N?
A Correct. I'm sorry. Yes. 01:16:17
Q That's okay. Did you account for the possibility that there might be cannibalization among those three Bay area stores if they were to open within that timeframe?
A Well, those areas are not really close to each other. That would be -- that would be a stretch for cannibalization. I mean, the Bay -- San Francisco -- 01:16:38
Q Is it possible?
A San Francisco and Palo Alto and San Jose are very distinct locations. 01:16:49
Q Would it have been possible that the growth rates for the second and third stores would have been slower than for the first store in the Bay area given that there was a higher concentration of stores in that geographic area? 01:17:08
A I don't think the concentration in that geographic area would impact that in any way. Having spent a lot of time up in that area, nobody wants to leave San Francisco. Nobody wants to go 01:17:22

into San Francisco. Palo Alto has its own personality, and San Jose has its own personality, and they're all very wealthy areas.

Q Did you analyze the revenue run rates that new Bang & Olufsen monobrand stores in comparable markets achieved in their first years of operation in connection with the lost store expansion analysis? 01:17:40

A Other Bang & Olufsen monobrand stores?

Q Yes. 01:17:53

A I don't think we could have access to that information.

Q Did you ask for it?

A No, but I just don't see a scenario where some other independent private company is going to share their financial data with another private company in litigation. So I just don't see that happening. 01:18:00

Q You understand that Bang & Olufsen is a public company; correct? 01:18:12

A Yeah, but you said other monobrands. So I'm assuming you're talking at the store level.

Q My question is whether you asked from M&N whether it had information from Bang & Olufsen in this litigation regarding the revenue run rates of 01:18:24

other Bang & Olufsen monobrand stores?
A I don't believe so.
Q Back to your narrative report, Mr. Grobstein. You repeat the M&N allegation that the framework agreement was presented to M&N on a 01:18:54 "take it or leave it" basis and drafted entirely by Bang & Olufsen; correct?
A What page are you looking at? I'm sorry. I'm still over here.
Q Oh, sure. I am on page 4 in the top 01:19:06 paragraph of your narrative report.
A So I'm sorry. What was your question again? I apologize.
Q That's okay. It reads, the last -- second to last three sentences up from the first paragraph, 01:19:35 you state "M&N alleges the agreements were presented on a 'take it or leave it' basis. All agreements presented by Bang & Olufsen to M&N were drafted by Bang & Olufsen. M&N was not allowed to provide input or negotiate terms." Did I read that 01:19:51 correctly?
A Yes, you did.
Q And is that based on the allegations set forth in M&N's second amended complaint?
A Yes. We make it clear that -- on page 3 01:20:01

that the information contained thereafter is based on -- in that Background section is based on the second amended complaint.

MS. BISHOP: Okay. I'm going to ask to pass to you -- I apologize. I don't know what number we're up to. 6 -- what I'd like to premark as Bang & Olufsen Exhibit 6. It is a document bearing the Bates label MN_00029777. 01:20:19

(Exhibit 6 was marked for identification by the court reporter.) 01:20:27

THE WITNESS: Okay.

BY MS. BISHOP:

Q Okay. This document, I'll represent to you, was produced by M&N in connection with the underlying discovery phase of this litigation. 01:22:22

I want to point you to the October 4th, 2019, E-mail that is on page 2 of this stapled exhibit, which ends in the Bates label 29778.

A Yes.

Q And had you seen this document prior to me showing it to you, Mr. Grobstein? 01:22:42

A No, I have not.

Q Okay. And do you have any reason to doubt that this was a document that M&N produced in this litigation? 01:22:53

A No.

Q Okay. In the -- towards the bottom of that page, there's an October 4th, 2019, E-mail at 9:03 a.m. from Ulrich Wohn with the E-mail address ulr@bang-olufsen.dk. And he writes "Hi David, as discussed when together in L.A., please find the details and particulars of the contract. As requested, we made the necessary changes you had wanted. In particular, we have decoupled the results of the Mystery Shoppers from a collective score to an individual store performance. But also, as agreed, this means that each store would need to separate their orders. If combined on any level, it would negate the separation you had requested. Also, included is the final version of the 'start-up' money we also discussed. It is included in Schedule 27. This needs to be formalized and included so there is a record on all sides. Let me know if you have any questions." 01:23:09 01:23:21 01:23:33

Did I read that correctly? 01:23:45

A Yes, you did.

Q Okay. And directly above that, there is a response from David Junk with the E-mail address Daj@Bang-OlufsenSoCal.com, and Mr. Junk writes "Thank you, Ulrich. I'll look it over with our 01:23:59

attorney and get back to you with any questions. Have a nice weekend. Regards, David."

Did I read that correctly?

A Yes, you did.

Q And fair to say you didn't consider this document when preparing your report as it relates to the negotiation of the framework agreement; correct? 01:24:09

A That's correct. And again, it was just -- it was referenced that it just came directly from the second amended complaint. 01:24:21

Q Understood. Understood.

A And for the record, we would have had to go back to 1940. I don't know what's wrong with his computer, but we would have had to go back to 1940.

Q Yeah. I also wondered what time machine situation was happening with that E-mail. I'm not sure why it's printed like that, but we'll have to ask M&N. 01:24:35

Okay. I'm going to now show you one more exhibit. We'll mark that as Bang & Olufsen 7. It bears the Bang & Olufsen Bates range B&O_008030. 01:24:49

(Exhibit 7 was marked for identification by the court reporter.)

BY MS. BISHOP:

Q And let me know when you've had an 01:25:01



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

opportunity to review that, please.

A Okay.

Q Okay. Mr. Grobstein, I'll submit to you that this a document that Bang & Olufsen produced to M&N in the discovery phase of the underlying 01:26:27 litigation, and it is a December 19th, 2019, E-mail chain, which at the top starts with an E-mail from David Junk with the E-mail address Daj@Bang-OlufsenSoCal.com to -- in the "To" line Ulrich Wohn, ULR@Bang-Olufsen.dk with a subject line 01:26:46 "Re: Schedule 27 goodwill fee." Does that look right to you?

A Yes.

Q Okay. And in the cc line, do you see the name Matt Janda? 01:26:58

A Yes.

Q Are you aware that is M&N's lawyer in connection with the negotiation of the framework agreement?

A No. 01:27:11

Q And I'm just going to start with the top E-mail here, and I might bounce around a little bit. It's numbered. So I'll orient you to where I'm going.

The E-mail from David Junk starts "Hi 01:27:24

Ulrich, we finished reviewing the latest version of the LDA. Here's the items we need to clarify. Matt, our attorney, is on copy.

"No. 1, Schedule 24. We need the initial 5 year term start January 1, 2022. 01:27:35

"No. 2, Schedule 27, need to remove Section 3 (see my E-mail below per our earlier phone call.)

"No. 5, Store Opening Bonus. Need to clarify that Chicago would be store No. 5, not No. 1 01:27:49 in a new cluster. Our attorney is working on language we would like to propose that would have B&O give us six month option to sign a lease in Chicago, three months afterwards to open the store.

"No. 6, Territory Restrictions. Our 01:28:00 attorney would like to see language from your E-mail incorporated into section 13.4.ii or Schedule 24. Here's the language from your E-mail."

Did I read that correctly?

A Yes. 01:28:14

Q Okay. And so like the prior exhibit we just went over, fair to say that you didn't have this agreement or considered that M&N was represented by counsel during its negotiation of the framework agreement and was providing language it 01:28:27

wanted in that agreement to Bang & Olufsen?
A That's correct.
Q Okay. Throughout your report, Mr. Grobstein, you use December 31, 2024, as the date for valuation. What was the basis for using that as a valuation date? 01:28:45
A Well, that was sort of the end of -- the end of the wind-down of their operation throughout '24.
Q You're aware that M&N continued to operate under a "doing business as" entity named Sound & Shades? 01:29:07
A Yes, I am.
Q And Sound & Shades is operational today; correct? 01:29:21
A That's my understanding.
Q And are you aware, Mr. Grobstein, that Sound & Shades continued to sell Bang & Olufsen products past December 31, 2024?
A That's my understanding. 01:29:56
Q Okay. Did you account for the revenues that Sound & Shades earned from the sale of Bang & Olufsen products past December 31, 2024, in your valuation?
A I'm sorry. Ask the question again, 01:30:10

please.

Q Did you account for revenues that Sound & Shades earned from its sale of Bang & Olufsen products past December 31st, 2024?

A In our valuation? 01:30:25

Q Yes.

A No.

MS. BISHOP: I think I might only have 10 or 15 minutes left. Would you be okay if we took a quick 5 minute break to organize myself? 01:31:12

THE WITNESS: Of course. Of course.

THE VIDEOGRAPHER: Seeing there are no objections, we are going off the record. The time is 1:31 p.m.

(Recess.) 01:31:20

THE VIDEOGRAPHER: We are back on the record. The time is 1:46 p.m.

BY MS. BISHOP:

Q Okay. Mr. Grobstein, I know we've covered this, but I just want to verify two quick things 01:46:18 with respect to your total economic damages opinion.

You say that M&N was damaged as a result of B&O's harmful actions in the total amount of $13,167,000; correct?

A Correct. 01:46:34

Q And that 13.1 million comprises three components. The first is lost profits, plus prejudgment interest of approximately $3.79 million?
A Correct.
Q Lost business value of approximately $7.972 million? 01:46:49
A Correct.
Q And the last component is a lost store expansion opportunity of approximately $1.405 million; correct? 01:47:13
A Correct.
Q And your opinion is that all three of those components are simultaneously recoverable without any double counting; correct?
A That's correct. 01:47:23
Q You don't analyze in your report any potential overlap between lost profits, lost business value, and the store expansion opportunity; right?
A Correct. I can tell you that Mr. Thomsen and I had extensive conversations about this, and I'm confident there's no overlap. 01:47:33
Q When did you have those conversations?
A Throughout the course because I wanted to ensure that there was no overlap. It was a concern 01:47:44

of mine, too, to make sure that we did not do.
Q And what made you feel comfortable reaching that conclusion, that there was no overlap?
A They're distinct buckets that address very specific issues and are not -- they're not -- 01:47:58 they're not related. There's no way they can be overlapping.
Q Did Mr. Thomsen have a different point of view on that piece?
A No. We had the same. I just wanted to 01:48:12 make sure that we were certain that there was no overlap.
MS. BISHOP: Okay. Mr. Grobstein, I'm going to pass to you what is Exhibit -- what will be Bang & Olufsen Exhibit 8, which is a copy of your 01:48:32 expert rebuttal report dated June 1, 2026.
MR. BLESSINGTON: Can we go off the record for a second? I apologize.
MS. BISHOP: Yes, of course.
THE VIDEOGRAPHER: Seeing there are no 01:48:44 objections, we are going off the record. The time is 1:49 p.m.
(Recess.)
THE VIDEOGRAPHER: We are back on the record. The time is 1:51 p.m. 01:51:18

(Exhibit 8 was marked for
identification by the court reporter.)

BY MS. BISHOP:

Q Okay. Mr. Grobstein, do you now have in front of you a copy of what we're marking as Bang & Olufsen Exhibit 8, which is your expert rebuttal report dated June 1, 2026? 01:51:25

A Yes.

Q Okay. And we provided you with a copy of the narrative section of your report, but I just want to acknowledge that you also submitted 13 exhibits to that report that are set forth on page 1; correct? 01:51:38

A Correct.

Q Okay. And I have not printed those out, but those capture all of the exhibits to your rebuttal report; correct? 01:51:48

A Correct.

Q You were engaged by DLA to prepare this rebuttal report in response to the expert opinion of Bang & Olufsen's expert, Dr. Crockett; correct? 01:52:05

A Correct.

Q And you set forth the sum total of your findings in Roman numeral section III entitled "Summary of Findings"? 01:52:19

A Correct.
Q And in Roman numeral Section V on page 3, you list out in bullet the information you reviewed and analyzed in connection with your rebuttal; correct? 01:52:37
A Correct.
Q Is that the entire universe of the information you reviewed and analyzed in preparing your rebuttal report?
A I believe so, yes. 01:52:47
Q In the last bullet point, it references communications with and information received from M&N management via telephone on March 5, 2026, March 12, 2026, and May 28, 2026; correct?
A Correct. 01:53:03
Q And is it the May 28, 2026, phone call that was conducted while preparing your June 1, 2026, rebuttal report?
A I was not on a call with M&N management regarding the rebuttal report. 01:53:30
Q Okay. Who from your team communicated with M&N management with respect to the rebuttal report?
A I would imagine certainly Mr. Thomsen and maybe Ms. Mehra.
Q Okay. You don't know for sure? 01:53:53

A I don't know for sure.
Q Okay. And is it your understanding that the May 28th phone call was the only phone call specific to preparing the rebuttal report or is it possible that other phone calls occurred as well? 01:54:05
A Well, this -- I guess, I'm not certain because this says M&N management. I know I was on a call with DLA with Mr. Thomsen.
Q Okay. What was the date of your phone call with you, Mr. Thomsen, and DLA -- 01:54:28
A I don't know.
Q -- if you recall?
A I don't know.
Q But it is not this May 28, 2026, phone call referenced in the last bullet point? 01:54:38
A Sorry about that. If M&N management was on it, I was not because I haven't had a call recently with them.
Q Okay. And so sitting here, you don't know who from M&N management would have participated in 01:54:51 that May 28, 2026, phone call?
A I don't know. I don't know.
Q Okay. Who from your firm helped to prepare the rebuttal report?
A The same people, Ms. Mehra and Mr. Thomsen. 01:55:10

Q Okay. And was your process the same between the three of you as it was for your opening report, that they would prepare the initial analyses under your supervision?

A Yes. I had -- I had calls internally with Mr. Thomsen regarding this report upfront and during the process probably a little more intensely given the short timeframe than I did in the initial report. 01:55:28

Q Okay. On page 4 of the rebuttal, Mr. Grobstein, one of the criticisms of Dr. Crockett's report is that she relies on legal conclusions provided Bang & Olufsen's counsel; correct? 01:56:04

A Where are you looking on that page? 01:56:25

Q I am looking at the -- it's the middle paragraph that begins "Crockett's conclusion."

A Okay. I see that.

Q Okay. And you also make mention that she failed to provide any evidence to rebut the argument that the liquidated damages provision and the application of liquidated damages in this case are unconscionable in that same paragraph. Do you see that? 01:57:03

A Yes. 01:57:19

Q Okay. As to unconscionability of a contract term, you would agree that's a legal determination; correct?

A Yes.

Q And you are not opining on whether any -- whether section 16 of the framework agreement or any other terms in the framework agreement is unconscionable; correct? 01:57:31

A Correct.

Q Beyond the information and documents and data you set forth in section 5 that you considered in preparing the rebuttal report, are you aware of any evidence in the record to support a finding that section 16 of the framework agreement would be unconscionable? 01:57:45 01:58:00

A No.

Q On page 10 of your report, under subsection 5, the sentence begins "Crockett's liquidated damages calculation is based on the false assumption that M&N's sales fall within the scope of FA 16.2. This is incorrect. First, according to counsel, due to B&O's improper termination of the framework agreement, it follows that M&N's post-termination sales were not unauthorized." 01:58:40

Did I read that correctly? 01:58:57

A Yes.
Q Okay. So in this rebuttal report, you're also relying on information provided by counsel; correct?
A Yes. 01:59:06
Q And you're assuming that Bang & Olufsen's termination was improper for purposes of your rebuttal; correct?
A Correct.
Q And you're also assuming that if 01:59:16 Bang & Olufsen's termination was improper, that M&N's sales were, in fact, authorized; correct?
A Correct.
Q If B&O's termination was proper, however, it would be your opinion then that M&N's sales were 01:59:32 not authorized?
A If the termination was correct and the contract was terminated, then I would imagine they would be unauthorized.
Q On page 10 in that same paragraph, about 01:59:53 six lines down, there's a sentence that begins "However, almost all of the sales contained in Exhibit 3 were made within M&N's territory. Attached as Exhibit 5 (MN_00070387) is an updated version of the same spreadsheet confirming the 02:00:20

location of each sale."
Did I read that correctly?
A Yes.
Q Okay. Did M&N provide you with the underlying sales receipts and invoices for you to independently verify the items sold, the dates the items were sold, and the prices at which those items were sold? 02:00:29
A I don't believe so.
Q Okay. And they didn't provide you with information beyond that spreadsheet, for instance, underlying sales receipts and invoices to verify -- for you to be able to verify the locations of where those items were sold to; correct? 02:00:42
A I'm not certain. 02:01:02
Q Okay. Are you aware that in the framework agreement there is a term that prohibits online sales?
A I believe I saw that, yes.
Q Okay. Is it your understanding that that would prohibit sales made via eBay? 02:01:12
A Yes.
Q In Dr. Crockett's report, she identified several eBay invoices that were not captured on Exhibit 5 to your rebuttal report, which is the M&N 02:01:36

sales spreadsheet with the Bates label MN_0069607. Have you had an opportunity to review the additional eBay sales receipts that Dr. Crockett identified in her report?

A I don't believe so, but I don't remember that she gave an amount. 02:01:54

Q I'm not asking if there was an amount. I was just curious if you had, in fact, looked at the additional eBay sales that she had provided in connection with her report? 02:02:09

A I don't believe so.

Q Also on page 10, a little bit above subsection 5, there's a paragraph that begins with the word "Generally." A few sentences down from there, you say "Crockett offers no support for the contention that M&N's sales of B&O product at a discounted rate for a brief period." 02:02:29

Did I read that correctly?

A Yes.

Q You're aware that M&N admits it sold sales and products past August 15, 2024, until January 6, 2026; correct? 02:02:41

A Well, the last collection was on January of -- that date that you just said. I'm sorry. January 6 -- 02:03:06

Q January 6, 2026.
A Right. That was the last collection, yes.
Q Okay. In the rebuttal, there's a statement -- I don't have the pin cite at the moment. I will look for it. But there is a 02:03:30 statement that it was not possible to replicate Dr. Crockett's analyses. Did you or someone on your team attempt to replicate her damages calculations?
A Yeah. To be clear, it was not possible to test her calculations. No, we did not. 02:03:52
Q Okay. And what is the -- when you say it wasn't possible, why is that?
A It wasn't possible to see her calculations because she didn't provide them.
Q Are you aware that in response to the 02:04:09 subpoena that M&N served on Dr. Crockett, that she provided scripts for her R-analysis?
A I don't believe so.
Q Okay. M&N didn't provide those to you?
A I don't believe so. 02:04:28
Q Okay. All right. Mr. Grobstein, I think that's all that I have at this time.
A Thank you very much.
Q Thank you very much for your time.
Thank you to everyone in California for 02:04:52

your time today.

A Okay. I appreciate it.

MR. FREEDMAN: Thank you. I don't have any questions.

THE REPORTER: And do you need to order a copy of the transcript? 02:04:57

MR. FREEDMAN: Yes, please.

THE VIDEOGRAPHER: Would you like a copy of the video as well?

MR. FREEDMAN: Not at this time. 02:05:03

THE VIDEOGRAPHER: We are off the record at 2:05 p.m., and this concludes today's testimony given by Expert Howard B. Grobstein. The total number of media units used was three and will be retained by Veritext Legal Solutions. 02:05:18

(TIME NOTED: 2:05 p.m.)

I, HOWARD B. GROBSTEIN, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of _______________, 2026, at ______________________, ________________.
(City) (State)

____________________________________
HOWARD B. GROBSTEIN

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were placed under oath; that a verbatim record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; further, that the foregoing is an accurate transcription thereof.

I further certify that I am neither financially interested in the action nor a relative or employee of any attorney of any of the parties.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: June 21, 2026

Maria Ellersick

MARIA ELLERSICK
CSR No. 10531

LINDSAY S. BISHOP, ESQ.
lindsay.bishop@klgates.com

June 21, 2026

RE: M&N Luxury v. Bang & Olufsen American Inc.
6/17/2026, Howard B. Grobstein, (#8275584).

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure. Contact Veritext when the sealed original is required.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_x_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

DLA PIPER

**DLA Piper LLP (US)**
555 Mission Street
Suite 2400
San Francisco, California 94105-2933
www.dlapiper.com

Sam Bodle
sam.bodle@us.dlapiper.com
T 415.836.2588

May 5, 2026

*Via Email Only*
Christopher Finnerty
Lindsay S. Bishop
K&L Gates LLP
One Congress Street, Suite 2900
Boston, MA 02114

**RE: M&N Luxury AV, LLC v. Bang & Olufsen Am. Inc. et al. – *Response to May 4 Letter***

Dear Mr. Finnerty and Ms. Bishop:

We write in response to your letter of May 4, 2026, concerning the Expert Report of Howard B. Grobstein (the "Grobstein Report"). As detailed below, B&O's assertion that the Grobstein Report is incomplete or deficient is both meritless and provides no basis for B&O to move to strike. M&N has already made all disclosures required under Federal Rule of Civil Procedure 26(a)(2)(B). Any alleged omission (which is denied) is readily curable and will cause no prejudice to B&O.

Conversely, M&N has identified deficiencies with B&O's disclosure of the Opening Expert Report Regarding Damages of B. Erin Crockett, PhD. (the "Crockett Report"), along with the basis for Dr. Crockett's testimony.

**B&O Has No Basis for Moving to Strike the Grobstein Report**

1. **M&N has disclosed all materials considered in preparing the Grobstein Report.**

B&O cites three categories of alleged missing material from the Grobstein Report: (1) communications between the parties; (2) industry materials; and (3) insight from M&N's management. M&N has already produced this information. While it is under no obligation to do so, and as a professional courtesy, M&N is willing to disclose additional information beyond the requirements of the Federal Rules.

EXHIBIT
3

DLA PIPER



*First*, the communications between the parties that Mr. Grobstein considered include the agreements executed between the parties and other documents exchanged between the parties, along with the references to further inter partes communications described in the pleadings. All of these communications were disclosed with the Grobstein Report and supporting documents.

*Second*, the industry materials Mr. Grobstein considered are expressly cited in the Grobstein Report and publicly available. He considered the following industry sources in preparing the report:

- Audio & Video Equipment Manufacturing, Dun & Bradsheet, First Research (December 23, 2024). Mr. Grobstein considered this report, but deemed it irrelevant and therefore did not factor it into his report.
- Industry Betas, Levered and Unlevered, Salvidio & Partners (IV Quarter, 2024). See Grobstein Report, Exhibit 7 Calculation of Damages, Exhibit C-3[c].
- DealStats.com Spreadsheet, showing transaction data for the sale of companies used as comparables. See Grobstein Report, Exhibit 7 Calculation of Damages, C-5.
- The M&N marketing document disclosed with the report, which contains industry data. See M&N Expert Disclosure - Supporting Materials.zip, BOSoCal_MarketingHistory_WEB2_LowRes.pdf.

While these materials not previously produced are publicly available, as a professional courtesy, M&N is producing copies of each at the same time as this letter.

*Third*, the insight from management considered in the Grobstein Report consists of information communicated during two telephone calls on March 5 and 12, 2026. The M&N participants were David Junk, Douglas Moore, Christine Chang, and counsel. During these conversations, Mr. Moore explained how, based on his time and experience as a B&O employee, B&O expects an approximately 5-year ramp-up period during which sales growth rate rapidly increases for new stores at different levels depending on location, after which the long-term growth rate normalizes to a sustainable level. There is no written record of these conversations.

M&N has therefore disclosed the requisite information pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) considered by Mr. Grobstein in drafting the Grobstein Report.

**2. The Federal Rules do not permit a motion to strike when an omission of materials from expert disclosures is harmless.**

B&O has no basis for moving to strike the Grobstein Report because any alleged omission of materials considered in the report (which is denied) was harmless. Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless" (emphasis added). Whether or not a failure to disclose is harmless "requires inquiry into resulting prejudice." St. John v. Toyota Motor Sales, U.S.A., Inc., 2013 WL 12182029, at *2 (C.D. Cal. Aug. 20, 2013) (citing Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir. 2001)).

Courts thus deny motions to exclude expert testimony when a failure to disclose reliance materials is cured, and especially prior to deposition of the relevant expert. See Lewert v. Boiron, Inc., 212 F. Supp. 3d 917 (C.D. Cal. 2016) (denying motion to strike to exclude testimony and finding expert's failure to disclose harmless if expert supplements his report to disclose all materials he reviewed and is subject to deposition on those materials); see also Silverlake Park LLC v. Stewart Title Guar. Co., 2025 WL 241118 (C.D. Cal. Jan. 10, 2025) (exclusion of expert testimony not warranted because the missing materials were provided before deposition).

Here, any alleged omission may be readily cured without prejudice to B&O. As detailed above, M&N timely disclosed additional materials from all categories of information B&O identified in its letter, to the extent such materials exist. Four days have passed since the parties made their expert disclosures, B&O has not even noticed let alone taken Mr. Grobstein's deposition, and the expert discovery cut-off is over five weeks away, B&O has not faced any prejudice that could warrant a motion to strike. Bringing such a motion in this context is both discovery misconduct, and further meritless motion practice by B&O which this Court has warned against and rejected time and again.

DLA PIPER



**<u>B&O's Expert Disclosure is Deficient and Dr. Crockett's Testimony Should Be Excluded</u>**

First, B&O has failed to disclose any documents, including interview notes, from the April 27, 2026, interview of Claus Højmark Jensen, which is cited as material considered in support of Dr. Crockett's report. B&O has an obligation to produce these documents pursuant to Federal Rule of Civil Procedure 26(a)(2)(B). Please confirm that, to the extent these documents exist, they will be promptly produced.

Second, Dr. Crockett's report fails to qualify as an expert opinion. It does not rely on any specialized knowledge that would assist the trier of fact. Under Federal Rule of Evidence 702, expert testimony is admissible only when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Conversely, "[e]xpert testimony is not helpful to the trier of fact and is thus inadmissible when it does not rely on scientific, technical, or other specialized knowledge." <u>Barillas v. City of Los Angeles</u>, No. CV 18-08740-CJC (ASX), 2021 WL 4434977, at *9 (C.D. Cal. Apr. 12, 2021). Here, the entirety of Dr. Crockett's purported "expert opinion" consists of nothing more than matching M&N's produced sales data with corresponding B&O product prices, multiplying the MSRP figure by five, and then adding up the total of all entries. This rudimentary arithmetic exercise does not constitute the type of specialized knowledge contemplated by Rule 702, nor does it offer the factfinder any insight beyond what a layperson could readily calculate without expert assistance. <u>See</u> Fed. R. Evid. 702. Please confirm the basis on which you contend Dr. Crockett's report qualifies as expert opinion. All M&N's rights are reserved.

* * *

B&O has no grounds for pursuing a motion to strike the Grobstein Report. However, M&N remains willing to meet and confer on these issues. Our earliest availability is Friday, May 8, 2026, at 10:30 a.m. PST.

Also included with this letter is a Subpoena to Testify at a Deposition in a Civil Action to Dr. B. Erin Crockett. Please confirm by no later than Thursday, May 7, 2026, whether you will accept service of this Subpoena on Dr. Crockett's behalf.

Respectfully yours,

FOR M&N LUXURY AV, LLC

*/s/* Sam Bodle

Sam Bodle